**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

ERNEST KEVIN TRIVETTE, and

DISABILITY RIGHTS TENNESSEE
in its organizational and representative capacity,
and in conjunction with Plaintiff Trivette,

Plaintiffs,

v.

TENNESSEE DEPARTMENT OF CORRECTION,

Defendant.

---

## COMPLAINT

---

Plaintiffs Ernest Kevin Trivette and Disability Rights Tennessee ("DRT"), by and

through counsel, hereby file this Complaint against the Tennessee Department of Correction

("TDOC").

## **INTRODUCTION**

1.      Plaintiff Ernest Kevin Trivette was in the custody of TDOC from approximately

June 2015 to April 2, 2019.[1]  During that period, he was in multiple TDOC facilities.  He is

currently on parole.

---

[1] Plaintiff Trivette was previously in TDOC custody from approximately 1979 to 2002.  While
he experienced similar issues during this prior incarceration, this Complaint is limited to Mr.
Trivette's claims against TDOC for discrimination against him while he was in TDOC custody
from approximately 2015 to 2019.

2.      Mr. Trivette is Deaf.[2]  His primary language is American Sign Language ("ASL") not spoken or written English.

3.      Throughout Mr. Trivette's time in TDOC custody, TDOC consistently failed to provide effective communication to him.

4.      Mr. Trivette regularly requested that TDOC provide qualified sign language interpreters to him when necessary to ensure effective communication.  TDOC did so on only a handful of occasions.  Instead of providing Mr. Trivette with qualified sign language interpreters, TDOC largely attempted to communicate with Mr. Trivette verbally, by written notes, and/or by relying on a hearing inmate who has only a rudimentary knowledge of sign language and no formal training as an interpreter to "interpret" for him, including for multiple medical and psychiatric appointments.  None of these methods resulted in effective communication for Mr. Trivette; they also compromised his privacy and safety.

5.      Mr. Trivette also regularly requested access to appropriate telecommunication equipment necessary for him to communicate with his mother and friends.  TDOC failed to provide such equipment until approximately the fall of 2018, a few months prior to Plaintiff Trivette's parole.  Even after providing such equipment, TDOC failed to ensure that the equipment was in good working order.  In addition, throughout Mr. Trivette's time in custody, TDOC placed more stringent rules on his use of telecommunication equipment than the rules for

---

[2] Uppercase Deaf typically refers to people like Mr. Trivette who share a language—American Sign Language (ASL)—and culture with other Deaf people.  In contrast, lowercase deaf typically refers to people who do not hear but are not participants in Deaf culture.  For additional information, see Community and Culture—Frequently Asked Questions, The National Association of the Deaf at  https://www.nad.org/resources/american-sign-language/community-and-culture-frequently-asked-questions/ (last visited on March 30, 2020).

2

hearing inmates to use phones. Thus, TDOC deprived Mr. Trivette of equal access to its phone program throughout his time in TDOC custody.

6. TDOC's failure to provide Mr. Trivette with effective communication and equal access to TDOC's programs and services is part of a longstanding and ongoing pattern and practice of discrimination against deaf and hard of hearing inmates.

7. In addition, for the past several years, DRT has repeatedly advocated for TDOC to provide effective communication to deaf and hard of hearing inmates, and, in the process has expended agency resources, money, and time. DRT has engaged in this advocacy on behalf of both DRT's individual clients and systemically on behalf of all deaf and hard of hearing inmates in TDOC custody.

8. Prior to and separate from this litigation, DRT has invested and spent significant time, manpower, and related financial resources into its advocacy for TDOC to provide effective communication to deaf and hard of hearing inmates.

9. Despite DRT repeatedly informing TDOC about barriers to effective communication and the federal rights infringed upon thereby and advocating for TDOC to make changes to its actions, policies, and procedures, and to provide appropriate training to its personnel, TDOC continues to fail to provide effective communication to deaf and hard of hearing inmates and continues to be in violation of federal laws.

10. Plaintiffs bring these claims under title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.* ("ADA" or "Title II"), and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504"), to challenge TDOC's discrimination against and resulting injury to Mr. Trivette and deaf and hard of hearing inmates currently in TDOC custody.

3

11.     TDOC discriminated against Mr. Trivette in violation of the ADA on the basis of his disability and in violation of Section 504 solely by reason of his disability.

12.     TDOC is discriminating against deaf and hard of hearing inmates in TDOC custody in violation of the ADA on the basis of their disabilities and in violation of Section 504 solely by reason of their disabilities.

## JURISDICTION AND VENUE

13.     This action arises under the laws of the United States. Jurisdiction is conferred upon this court pursuant to 28 U.S.C. §§ 1331 and 1343.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because TDOC's central office is in the Middle District of Tennessee.

## PARTIES

15.     Plaintiff Trivette is on parole from TDOC custody.  He resides in Jackson, Tennessee.

16.     Mr. Trivette is Deaf.

17.     Mr. Trivette has an impairment that substantially limits major life activities that include but are not limited to hearing.

18.     As such, he is a qualified individual with a disability as that term is used in the ADA and Section 504.

19.     Mr. Trivette has been Deaf since early childhood, and ASL is his primary language.

4

20.     Plaintiff DRT is a Tennessee nonprofit corporation with its principal place of business in Nashville, Tennessee.  DRT maintains regional offices in Nashville, Memphis, and Knoxville, Tennessee.  It serves individuals with disabilities in all 95 counties in Tennessee.

21.     DRT is the federally mandated protection and advocacy system for the State of Tennessee.  As such, DRT is authorized by multiple federal statutes to, among other things, pursue administrative, legal, and other remedies on behalf of people with disabilities, including but not limited to, people who are deaf and hard of hearing and are in the custody of TDOC, whose federally-protected rights are being violated.

22.     DRT joins this suit on its own behalf as an organization that has suffered specific economic injury separate and apart from this litigation as a result of TDOC's longstanding and ongoing pattern and practice of discrimination against deaf and hard of hearing inmates.

23.     DRT also joins this lawsuit separately in its representative capacity in conjunction with Plaintiff Trivette, and on behalf of and to vindicate the rights of deaf and hard of hearing inmates in TDOC custody who are being denied equal access to programs and services and effective communication in violation of the ADA and Section 504.

24.     Defendant TDOC is a department of the State of Tennessee.

25.     TDOC receives federal financial assistance as that term is used in 29 U.S.C. § 794.

26.     TDOC's central office is in Nashville, Tennessee.

**FACTS**

**American Sign Language (ASL)**

27.      ASL is a visual language. It is a complete, complex language that employs signs made by moving the hands combined with facial expressions and postures of the body.  For example, "English speakers ask a question by raising the pitch of their voice; ASL users ask a question by raising their eyebrows, widening their eyes, and tilting their bodies forward." *American Sign Language,* National Institute on Deafness and Other Communication Disorders (NIDCD) (May 8, 2019), https://www.nidcd.nih.gov/health/american-sign-language.

28.      ASL is not English in gestures. It has grammar and syntax that are completely different from English. When deaf people are raised using ASL as their first or primary language, written English is a foreign language, which is often acquired incompletely and imperfectly.

29.      Deaf people for whom ASL is their primary language almost always require the services of a qualified sign language interpreter for effective communication with people who speak English, especially when exchanging lengthy and complex information.

30.      Deaf people for whom ASL is their primary language almost always require the services of a qualified sign language interpreter for effective communication with people who write notes to them in English and for effective communication about the content of English documents, especially when the note or document involves the exchange of lengthy and complex information.

31.      Becoming a qualified sign language interpreter takes many years of training and experience.  Knowing some sign language is not sufficient to be a qualified sign language interpreter. Even being fluent in sign language is not sufficient to be a qualified sign language

6

interpreter. Extensive formal training as an interpreter is needed to be a qualified sign language interpreter.

32. According to the Registry of Interpreters for the Deaf ("RID"), "Interpreting is a complex process that requires a high degree of linguistic, cognitive and technical skills in both English and American Sign Language (ASL)….Interpreters must thoroughly understand the subject matter in which they work so that they are able to convert information from one language, known as the source language, into another, known as the target language." *Professional Sign Language Interpreting Standard Practice Paper,* Registry of Interpreters for the Deaf, Inc. (Updated 2007), https://rid.org/about-rid/about-interpreting/standard-practice-papers/.

33. ADA regulations make clear a "[q]ualified interpreter means an interpreter who… is able to interpret effectively, accurately, and impartially, both receptively and expressively, using any necessary specialized vocabulary. Qualified interpreters include, for example, sign language interpreters…." 28 C.F.R. § 36.104.

**TDOC's Failure to Provide Qualified Sign Language Interpreters**

34. ASL is Mr. Trivette's primary language.

35. Mr. Trivette asked TDOC many times to provide a qualified sign language interpreter.

36. TDOC did so on only a handful of occasions.

37. The Parole Board required Mr. Trivette to complete a cognitive behavioral intervention program ("CBIP") prior to being released on parole.

38. TDOC did not provide qualified interpreters for the CBIP program.

7

39.     No captioning was displayed for the videos shown during the CBIP program.

40.     As a result, Mr. Trivette sat through the CBIP program, which lasted approximately two months, without effective access to the information provided.

41.     During the CBIP program, TDOC staff regularly gave Mr. Trivette written tests.

42.     Mr. Trivette did not understand these tests. He was generally unable to even guess at the answers and often left the answers to many of the questions blank.

43.     TDOC offers Graduate Equivalency Degree (GED) classes and other classes to inmates.

44.     Mr. Trivette requested that TDOC provide an interpreter for GED classes.

45.     TDOC refused to provide an interpreter for Mr. Trivette for GED classes.

46.     As a result, Mr. Trivette was not able to participate in TDOC's GED program or was not able to participate on an equal basis.

47.     As a result, Mr. Trivette was not able to obtain his GED.

48.     The lack of a GED left Mr. Trivette with fewer employment opportunities and lower anticipated future earnings when compared with those who have GEDs.

49.     TDOC provided certain information to Mr. Trivette only in written English.

50.     The information TDOC provided to Mr. Trivette only in written English included information relating to prison rules, the grievance process, and the Prison Rape Elimination Act (PREA).

51.     Mr. Trivette's understanding of this information was crucial to his health and safety while in TDOC custody.

8

52.     Mr. Trivette was unable to fully understand that information and thus was at risk for unwarranted discipline, inability to report infractions, and other violations of his rights.

53.     TDOC provided certain forms to Mr. Trivette only in written English.

54.     The forms TDOC provided to Mr. Trivette only in written English included forms regarding consent for medical treatment.

55.     Mr. Trivette was unable to fully understand any of those forms provided to him only in written English.

56.     Because he felt pressured by TDOC staff, Mr. Trivette often signed forms without understanding them.

57.     On multiple occasions, TDOC used one or more inmates who allegedly knew some sign language ("inmate signers") to "interpret" for Mr. Trivette instead of providing a qualified sign language interpreter.

58.     TDOC used inmate signers for some of Mr. Trivette's medical appointments.

59.     TDOC's own records document the use of an inmate signer for multiple communications with Mr. Trivette instead of a qualified sign language interpreter.

60.     The following paragraphs provide a handful of examples of the many instances on which TDOC denied Mr. Trivette required effective communication.

   a.   A March 16, 2016 entry in Mr. Trivette's medical records from TDOC states as
        follows: "Advised c/o u-11 of need for IM to accompany PT for purpose of sign
        language/communication officer states understanding and will send both for 1145
        Appt today."

9

b.  A note from that March 16, 2016 visit with the Chronic Disease Clinic indicates, "Sign language utilized by cellmate for communication."

c.  A July 19, 2016 note from Rachael Whegber, PNPC it appears to read, in part, as follows: "Pt seen today, states he has not been seen by PT.  The inmate is 'dumb' but with the help of his [illegible] cellmate he acknowledge [sic] that he did not know why he is here."

d.  A November 29, 2017 note regarding dental treatment for Mr. Trivette states, in part, "Do you have someone that signs for you?"  In response, Mr. Trivette identified the inmate most frequently used by TDOC as an inmate signer for Mr. Trivette.

e.  A December 11, 2017 note regarding dental treatment states, "I will schedule you in approximately 1 ~~molt~~ month.  It will be for wax bite.  I will send [inmate signer] a slip again – we will need him for sure at next appt."

f.  On April 25, 2018, Mr. Trivette requested that TDOC provide a qualified sign language interpreter for religious services.  The chaplain responded: "Asking some of our volunteers if they can help on this issue!"  TDOC did not provide an interpreter to Mr. Trivette so he stopped attending religious services.

g.  Between February 12, 2019 and April 2, 2019, Northeast Correctional Complex ("NECX") Clinical Case Manager Kellie Shoun met with Mr. Trivette on approximately eleven occasions.  These meetings were regarding case management services related to his upcoming parole.  On February 12, 2019, Ms. Shoun noted, "Inmate is deaf and his interpreter was not available.  CCM

communicated with inmate via written communication. CCM will ensure

inmate's interpreter is available for next appointment."

h. Other than a few notes that make no reference at all to an interpreter, Ms. Shoun's notes for the remainder of the appointments repeatedly indicate that "inmate's interpreter" was present.

i. All of Ms. Shoun's references to "inmate's interpreter" and "his interpreter" are references to an inmate signer who is not a qualified sign language interpreter.

j. In a February 5, 2020 Memo addressed To Whom It May Concern, NECX's Clinical Case Manager Kellie Shoun documents that TDOC has used the same inmate signer as a "sign language interpreter" for many years. She notes that this specific inmate signer has assisted her and many other staff members "in working with clients in need of an interpreter." While Ms. Shoun inaccurately states that the inmate signer is fluent in ASL, this memo documents that TDOC's reliance on unqualified inmate signers has occurred repeatedly and remains ongoing.

61. TDOC has no policy regarding provision of qualified sign language interpreters.

62. TDOC has no procedure regarding provision of qualified sign language interpreters.

63. TDOC has no policy regarding ensuring effective communication with people who are deaf and hard of hearing.

64. TDOC has no procedure regarding ensuring effective communication with people who are deaf and hard of hearing.

11

65. In contrast, TDOC has a detailed Limited English Proficiency (LEP) policy for providing communication to hearing individuals who use spoken languages other than English. *See* TDOC Policy 103.10.1. Although the LEP policy contains one reference to interpreters for the "hearing impaired," it does not otherwise provide guidance about how or when to obtain or utilize the interpreters.

66. Upon information and belief, TDOC does not have a contract with any agencies which provide sign language interpreters.

67. Throughout his time in TDOC custody from approximately June 2015 - April 2, 2019, with the exception of a handful of occasions when it provided qualified sign language interpreters to him, TDOC failed to provide effective communication to Mr. Trivette for all complex and/or lengthy written and spoken English information, including that provided about grievance and PREA procedures and during orientation, medical appointments, dental appointments, case management, church services, the CBIP program, and the GED program.

68. TDOC continues to refuse to provide qualified sign language interpreters to deaf and hard of inmates currently in custody.

**Technology for Phone Access by Deaf and Hard of Hearing Inmates**

69. Because deaf people cannot use a conventional telephone, technology has developed to permit them to communicate at a distance.

70. The earliest such technology, the teletypewriter or TTY, was invented in approximately 1964. It involved placing a standard telephone handset into an "acoustic coupler" connected to a teleprinter machine. Over time, the device evolved into a single piece of equipment that included a QWERTY keyboard and was connected to a phone jack.

12

71.     A TTY requires that individuals at both ends of the communication have specific TTY equipment.

72.     In a TTY communication, each participant types out in written English his or her side of the conversation, then waits while the other person types back.

73.     As such, TTY communication is a more cumbersome form of communication than a telephone conversation between hearing people.

74.     In addition, deaf people who do not communicate via written English, but primarily communicate via ASL, cannot communicate effectively using a TTY.

75.     For the same reason, TTY communication is a more cumbersome form of communication than a videophone conversation between deaf people or a deaf person and a hearing person who knows ASL.

76.     As technology has evolved, fewer and fewer deaf people own or use TTYs.

77.     It is more and more common for deaf people to use videophones rather than TTYs.

78.     As the name suggests, a videophone has a camera and a screen and transmits a video signal, permitting deaf people -- or a deaf person and a hearing person who signs -- to see each other and communicate directly with one another in ASL.

79.     A videophone also enables a deaf person to communicate with a hearing person who does not sign through a video relay service ("VRS"). A deaf person can use their videophone to connect with a VRS interpreter who then connects by phone to a hearing person. When the deaf person signs, the interpreter voices to the hearing person. When the hearing person speaks, the interpreter signs to the deaf person.

**TDOC's Failure to Provide Equal Access to its Phone Program**

80.     TDOC permits inmates to make phone calls to individuals who are on their allowed telephone number list ("ATN list"). TDOC Administrative Policies and Procedures ("Policy") 503.08 ¶ VI(B)(2).

81.     Telephones are readily accessible to hearing inmates and may be used during days and times of day specified by the Warden of each facility.  Policy 503.08 ¶¶ VI(A)(3), (D)(1)-(2).

82.     Telephones are generally available at TDOC facilities from 6 a.m. to 10 p.m. local time. Policy 503.08 ¶ VI(A)(3).

83.     Each telephone call is limited to no more than thirty minutes.  Policy 503.08 ¶ VI(B)(6)

84.     Hearing inmates who wish to contact hearing family members or friends are permitted to walk up to the phones at any time they are available and place a call, provided they have paid for the time (or are calling collect) and are calling someone on their ATN list.

85.     Policy 503.08 generally states, "Adaptations for the hearing impaired shall be provided." ¶V.  This policy goes on to state, "A TTY system shall be made available at all TDOC and privately managed institutions as needed."  ¶VI(D)(3).

86.     TDOC does not make TTYs available to deaf and hard of hearing inmates on the same basis that telephones are available to hearing inmates.

87.     Some TDOC prisons do not have a TTY on their premises.

88.     Some TDOC prisons do not have a functioning TTY on their premises.

14

89. Instead, deaf and hard of hearing inmates must submit a written request to their counselor or designated unit management team member to use the TTY.

90. The counselor/unit management team member then makes arrangements to "allow the inmate to place the TTY call using a staff telephone…." Policy 503.08 ¶VI(D)(3)(b).

91. This policy is unequal on its face to the policy governing use of the telephone.

92. In addition, TDOC's policy for TTY usage often results in deaf and hard of hearing inmates experiencing delays between submission of their call request and being allowed to make the call.

93. Because his primary language is ASL, Mr. Trivette has difficulty communicating through a TTY. He requires access to a videophone for effective communication.

94. Mr. Trivette's hearing mother and deaf friends do not have access to TTYs.

95. Until TDOC installed a videophone in fall 2018 at North East Correctional Complex (NECX), only one of the many TDOC facilities, Mr. Trivette had no choice but to use a TTY to attempt to communicate with his mother and friends through a telecommunications relay service ("TTY Relay" or "TRS"). This did not result in effective communication.

96. TRS permits a deaf person and a hearing person who does not sign to communicate. Using TRS, a deaf caller uses a TTY to call the hearing person's telephone number. The call is answered by a hearing communications assistant who then connects to the hearing person's phone. As the deaf person types in written English, the call assistant receives the text and then conveys that text verbally to the hearing recipient. As the hearing caller speaks, the call assistant uses a TTY to type the information in written English to the deaf recipient. TRS does not permit the caller or the recipient to communicate in ASL, only in written English.

15

TRS does not permit the caller and recipient to communicate directly with each other, only through an intermediary call assistant. This is the method Mr. Trivette used to attempt to communicate with his mother by TTY.

97. When Mr. Trivette communicated with deaf friends by TTY, the TRS relay involved an additional step. After a deaf caller types into the TTY, the communications assistant reads the text to a hearing Video Relay Service ("VRS") interpreter who signs to the deaf individual receiving the call on their videophone. When the deaf called-party responds, they sign back to the VRS interpreter who speaks to the TTY operator who types the response back to the deaf caller. This process thus adds two intermediaries to a conversation between two people and can cause extreme delays, miscommunication, and confusion in their communication.

98. Even when they work properly, these double-relay processes initiated by TTY are far more cumbersome and time consuming than a phone call, a videophone ("VP") call, or even a VRS call.

99. On many occasions when Mr. Trivette attempted to use the TTY for communication, it did not work properly.

100. The TTY often skipped words or jumbled them, or sometimes both.

101. Mr. Trivette had no way to communicate with his mother in his primary language of ASL or to directly communicate with his deaf friends by phone until one TDOC facility installed a videophone in fall 2018.

102. Limiting Mr. Trivette to communicating through a TTY until fall 2018 essentially limited him to writing letters in rudimentary English -- some on paper, some on the TTY -- while hearing inmates with hearing family and friends are permitted two different modes of

16

communication: letters; and the more direct and intimate communication of a phone call.  In addition, unlike for hearing inmates, communicating in written English is extremely difficult for Mr. Trivette since ASL, not English, is his primary language.  So, limiting Mr. Trivette to written communication is in some ways analogous to limiting a hearing inmate whose primary language is English to only writing letters in Spanish despite having only taken some Spanish during grade school.

103.    Even after TDOC's installation of a VP at Northeast Correctional Complex ("NECX") in fall 2018, Mr. Trivette by and large still lacked equal access to TDOC's phone program due to problems with its specific VP equipment and/or VP connectivity.

104.    The VP at NECX often freezes, pixelates, or moves in slow motion, interfering with Mr. Trivette's ability to understand the signing of the individual on the end of the call and vice versa.

105.    Sometimes the screen goes black on one end, effectively preventing any communication attempts.

106.    Mr. Trivette reported these VP problems to TDOC personnel.

107.    However, TDOC failed to address them and again left him with no access to effective communication or with only an unequal lesser access to effective communication than was provided to other hearing inmates

108.    In addition, TDOC continued its failure to provide equal phone access to Mr. Trivette by placing more restrictions on Mr. Trivette's use of the VP than on use of telephones by hearing inmates.

109.    TDOC allowed Mr. Trivette to make only three (3) VP calls per week.

17

110.    TDOC restricted Mr. Trivette's VP calls to Monday, Wednesday, and Friday.

111.    TDOC restricted Mr. Trivette to making one VP call on each of those days and required the calls to be made between 8:30 a.m. and 10:00 a.m. or between 1:30 p.m. and 2:30 p.m.

112.    In addition, each call was limited to 30 minutes in length.

113.    When Mr. Trivette asked why TDOC was placing these restrictions on his VP calls, TDOC staff indicated in writing on a post-it note, "the state is paying for the system to be here, so it can be limited."

114.    TDOC does not have a policy regarding videophones.

115.    TDOC does not have a procedure regarding videophones.

116.    TDOC also refused to make reasonable accommodations and/or modifications to policies and procedures as requested by Mr. Trivette, for example, by alerting him to fire alarms when they sounded.

**Impact of TDOC's Intentional Conduct**

117.    Throughout his time in TDOC custody, TDOC failed to provide Mr. Trivette with effective communication he needed in order to access and equally participate in its programs and services.  In addition, Mr. Trivette was unable to communicate effectively telephonically with friends and family. This discriminatory treatment and resulting isolation and other harms caused him emotional and psychological distress, inconvenience, frustration, depression, and heartache.

118.    TDOC's actions in refusing to provide effective communication, including qualified sign language interpreters, to Mr. Trivette from 2015 through 2019 was intentional and/or constituted deliberate indifference to the strong likelihood that these policies and practices

18

would likely result in a violation of Plaintiff Trivette's federally protected rights. Plaintiff and DRT repeatedly alerted TDOC to his need for qualified sign language interpreters, and other required aids, services, and accommodations, and that need is obvious. TDOC knowingly and intentionally refused to provide qualified sign language interpreters, and other required aids, services, and accommodations to Mr. Trivette.

119. Despite requests from current deaf inmates and DRT and the obvious need, TDOC continues to routinely refuse to provide qualified sign language interpreters to deaf and hard of hearing inmates for communications including orientation, classification, the STRONG-R, medical appointments, classes, and other programming and services. TDOC's refusal to provide qualified sign language interpreters to deaf and hard of hearing inmates when needed for effective communication is intentional and/or constitutes deliberate indifference to the strong likelihood that these policies and practices will likely result in a violation of these inmates' federally protected rights. TDOC is knowingly and intentionally refusing to provide qualified sign language interpreters when needed for effective communication.

120. TDOC's actions in refusing to provide a videophone at all to Mr. Trivette until fall 2018 and then failing both to ensure that it was in good working order and to provide Mr. Trivette with access to the videophone on the same basis that hearing inmates have access to telephones was intentional and/or constituted deliberate indifference to the strong likelihood that these policies and practices would likely result in a violation of Plaintiff Trivette's federally protected rights.

121. Plaintiff Trivette and Plaintiff DRT repeatedly alerted Defendant to the need for a videophone in good working order and on the same terms and conditions as a telephone and that

19

need is obvious. Defendant knowingly and intentionally initially refused to provide the requested videophone at all.  Once TDOC did provide a videophone, TDOC knowingly and intentionally failed to provide the videophone in good working order and on the same terms and conditions as a telephone.

122.     Despite requests from current deaf inmates and DRT, TDOC continues to refuse to provide a videophone to deaf and hard of hearing inmates housed at any of the TDOC facilities besides NECX.  In addition, TDOC has not taken actions to ensure the videophone at NECX is in good working condition.  TDOC's refusal to provide a videophone at facilities besides NECX and to correct the problems with the videophone at NECX is intentional and/or constitutes deliberate indifference to the strongly likelihood that this policy and practice will likely result in a violation of the federally protected rights of deaf and hard of hearing inmates.

**Disability Rights Tennessee's Advocacy for Deaf and Hard of Hearing Inmates**

123.     DRT is part of the nationwide Protection and Advocacy ("P&A") system which is mandated by Congress to protect and advocate for the rights of people with disabilities in the United States. There is a P&A in all fifty states and in United States territories.

124.     Disability Rights Tennessee is the P&A organization designated for the State of Tennessee.

125.     Disability Rights Tennessee has a physical presence in each of Tennessee's three Grand Divisions, East, Middle, and West.  DRT is headquartered in Nashville with regional offices in Memphis and Knoxville.

126. Congress has charged DRT with the statutory responsibility to represent and advocate for the rights of persons with disabilities, including deaf and hard of hearing individuals in state institutions, including state prisons, who have standing to sue on their own right.

127. DRT has statutory authority to pursue legal remedies on behalf of individuals with disabilities whose federal rights are being violated pursuant to 42 U.S.C.A. § 15043, 42 U.S.C. § 300d-53(k), 42 U.S.C. § 10805, and 29 U.S.C. § 794e(f).

128. DRT's mission is to ensure individuals with disabilities in Tennessee have freedom from harm, freedom to participate in the community, and freedom from discrimination.

129. DRT has a multiple member board of directors which includes people with disabilities.

130. DRT represents people with sensory disabilities, including those who are deaf and hard of hearing, and provides means by which they express their collective views and protect their collective interests.

131. People with disabilities who are served individually or whose communities are served provide input to DRT through DRT's PAIMI Advisory Council, stakeholder and constituent surveys, and grievance process.

132. DRT does multiple types of surveys of DRT's constituents and advisory council members. These surveys include a stakeholder and constituent survey sent out every three years, and a satisfaction survey at the conclusion of each service request. This feedback from constituents and their families informs the financial and programmatic decisions regarding the delivery of services and the allocation of resources for future advocacy.

21

133. In addition, DRT collaborates regularly with local and state disability organizations and taskforces that consist, in part, of people with disabilities.

134. DRT also has a grievance procedure so that individuals with disabilities have full access to and input into DRT's services and areas of work.

135. As a result of DRT's organizational structure, its leadership, allocation of resources for future advocacy and outreach, its connections with constituents in the disability community, and its involvement in disability-rights advocacy, people with disabilities have a strong voice in and a direct influence on the work of DRT.

136. Inmates who are deaf and hard of hearing and are in TDOC custody are among the constituents who are served by, and who inform the work of, DRT. The interest of these constituents goes to the heart of DRT's mission to ensure that people with disabilities, including deaf and hard of hearing individuals, are free from harm and discrimination and have equal access to services and supports that they are entitled to under the ADA and Section 504.

137. DRT has standing on behalf of its constituents and clients who are substantially affected by Defendant's noncompliance with constitutional and statutory protections because such noncompliance falls within DRT's general scope of interest and activity; the relief requested is appropriate for DRT to receive on behalf of its individual constituents; and though neither the claims asserted nor the relief requested require the participation of individual members or constituents in the lawsuit, DRT is joining in this lawsuit in conjunction with Plaintiff Trivette.

138. DRT's constituents have suffered injury—and continue to suffer injury—that would allow them to have standing to sue in their own right. The interests that DRT seeks to protect are germane to DRT's purpose.

139. DRT brings this suit on behalf of individual inmates in TDOC custody who are deaf and hard of hearing and who are being denied effective communication and equal access to TDOC's programs and services in violation of the ADA and Section 504, and in conjunction with Plaintiff Trivette.

140. TDOC's longstanding and ongoing pattern and practice of discrimination against deaf and hard of hearing inmates has impeded DRT's mission of ensuring individuals with disabilities have freedom from harm and discrimination.

141. The availability of financial resources and DRT staff, including but not limited to, advocates and attorneys, directly impacts DRT's ability to open cases and advocate for its constituents.

142. DRT has attempted to resolve the issue of TDOC denying deaf and hard of hearing inmates in TDOC custody effective communication and equal access to goods and services for years prior to this lawsuit. Despite these efforts, DRT has been unable to achieve the reforms necessary to redress the ongoing lack of effective communication and unequal access to programs and services experienced by inmates who are deaf and hard of hearing in TDOC custody.

143. As a result, DRT has invested significant time and related financial resources—prior to and separate from this litigation--- into its advocacy efforts for TDOC to provide effective communication to deaf and hard of hearing inmates.

23

144.    If TDOC had complied with federal law and provided inmates in its custody who are deaf and hard of hearing with effective communication and equal access to programs and services, then DRT could and would have devoted these considerable resources to advocating for and protecting the rights of other vulnerable individuals with disabilities in Tennessee.

<u>**FIRST CLAIM FOR RELIEF:**</u>
<u>**VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT**</u>
<u>**42 U.S.C. § 12131 et seq.**</u>

145.    Plaintiffs incorporate the allegations set forth in the remainder of Complaint as if fully set forth herein.

146.    Title II prohibits public entities such as Defendant TDOC from excluding individuals with disabilities from participation in or denying them the benefits of their services, programs or activities, or otherwise subjecting such individuals to discrimination. 42 U.S.C. § 12132.

147.    Because Plaintiff Trivette is Deaf and was an inmate in the custody of the TDOC during all occurrences alleged herein, he is a qualified individual with a disability within the meaning of the Americans with Disabilities Act. 42 U.S.C. § 12102.

148.    Defendant TDOC excluded Plaintiff Trivette from participation in and/or denied him the benefits of it services, programs, and/or activities and/or subjected him to discrimination on the basis of disability in violation of Title II and its implementing regulations as more fully described in this Complaint.

149.    Such discrimination includes but is not limited to:

a.    denying Plaintiff Trivette the opportunity to participate in or benefit from an aid, benefit, or service, 28 C.F.R. § 35.130(b)(1)(i);

24

b. affording Plaintiff Trivette the opportunity to participate in or benefit from an aid, benefit, or service that is not equal to that afforded others, *see id.* § 35.130(b)(1)(ii);

c. providing Plaintiff Trivette with aids, benefits, and services that are not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others, *see id.* § 35.130(b)(1)(iii);

d. using criteria and methods of administration that have the effect of subjecting Plaintiff Trivette to discrimination on the basis of disability, *see id.* § 35.130(b)(3)(i);

e. using criteria and methods of administration that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of TDOC's program with respect to Plaintiff Trivette, *see id.* § 35.130(b)(3)(ii);

f. failing to make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination against Plaintiff Trivette on the basis of disability, *see id.* § 35.130(b)(7);

g. failing to ensure that communications with Plaintiff Trivette were as effective as communications with others, *see id.* § 35.160(a)(1);

h. failing to furnish appropriate auxiliary aids and services where necessary to afford Plaintiff Trivette an equal opportunity to participate in, and enjoy the benefits of, TDOC's services, programs, or activities, *see id.* § 35.160(b)(1); and/or

25

      i.    failing to give primary consideration to the requests of Plaintiff Trivette

           concerning the types of auxiliary aids and services necessary, *see id.*

           § 35.160(b)(2).

150.    During the occurrences referenced herein, Plaintiff Trivette was qualified to participate in TDOC services, programs, and activities within the meaning of Title II.

151.    Defendant TDOC's actions described in this Complaint were intentional and/or were taken with deliberate indifference to the strong likelihood that pursuit of its questioned policies would likely result in a violation of the Title II rights of Plaintiff Trivette and the rights of current inmates who are deaf and hard of hearing and in TDOC custody.

152.    As a direct and proximate result of Defendant TDOC's acts, omissions, and violations alleged above, Plaintiff Trivette has suffered damages as more fully described above.

153.    Plaintiff Trivette has been injured and aggrieved by and will continue to be injured and aggrieved by Defendant TDOC's discrimination against him.

154.    Inmates who are deaf and hard of hearing and presently in TDOC custody are being denied their federal rights to equal access to TDOC programs and services and effective communication and are being injured and aggrieved by Defendant TDOC's ongoing discrimination against them.

155.    Plaintiff DRT has been injured and aggrieved by Defendant TDOC's discrimination against Plaintiff Trivette and other deaf and hard of hearing inmates. Plaintiff DRT continues to be injured and aggrieved by TDOC's ongoing discrimination against deaf and hard of hearing inmates.

26

## SECOND CLAIM FOR RELIEF:
## VIOLATION OF SECTION 504 OF THE REHABILITATION ACT
## 29 U.S.C. § 794

156.     Plaintiffs incorporate the allegations set forth in all of the other paragraphs of this Complaint as if fully set forth herein.

157.     Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, prohibits discrimination on the basis of disability by recipients of federal financial assistance.

158.     Defendant TDOC receives federal financial assistance as that term is used in Section 504. 29 U.S.C. § 794.

159.     Because he is Deaf and was an inmate in the custody of TDOC at all times relevant to his allegations in this Complaint, Plaintiff Trivette is a qualified individual with a disability within the meaning of Section 504. 29 U.S.C. § 705(9) (incorporating by reference 42 U.S.C. § 12102).

160.     Defendant TDOC excluded Plaintiff Trivette from participation in and/or denied him the benefits of it programs and/or activities and/or subjected him to discrimination solely by reason of his disability and in violation of Section 504 and its implementing regulations as more fully described in this Complaint.

161.     Such discrimination includes but is not limited to:

   a.   denying Plaintiff Trivette the opportunity to participate in TDOC's programs and activities, *see* 28 C.F.R. § 42.503(b)(1)(i);

   b.   denying Plaintiff Trivette an equal opportunity to achieve the same benefits that others achieve in TDOC's programs and activities, s*ee id.* § 42.503(b)(1)(ii);

27

c.  denying Plaintiff Trivette an equal opportunity to achieve the same benefit that others achieve in TDOC's programs and activities by providing him no effective communication in those programs, *see id.* § 42.503(b)(1)(vi);

d.  using criteria or methods of administration that either purposely or in effect discriminate on the basis of disability or defeat or substantially impair accomplishment of the objectives of TDOC's programs or activities with respect to Plaintiff Trivette; *see id.* § 42.503(b)(3);

e.  failing to provide appropriate auxiliary aids to Plaintiff Trivette, thereby discriminatorily impairing or excluding him from participation in TDOC's programs and activities, *see id.* § 42.503(f); and/or

f.  failing to provide reasonable accommodations to Plaintiff Trivette as necessary to ensure that he has meaningful access to TDOC's programs, activities, or benefits, *see Alexander v. Choate*, 469 U.S. 287, 301 (1985).

162.    At all times relevant to his allegations in this Complaint, Plaintiff Trivette was qualified to participate in TDOC services, programs, and activities within the meaning of Section 504.

163.    Defendant TDOC's actions described in this Complaint were intentional and/or were taken with deliberate indifference to the strong likelihood that pursuit of its questioned policies and practices would likely result in a violation of the Section 504 rights of Plaintiff Trivette and the rights of current inmates who are deaf and hard of hearing and in TDOC custody.

28

164.    As a direct and proximate result of Defendant TDOC's acts, omissions, and violations alleged above, Plaintiff Trivette has suffered damages, as more fully described above.

165.    Plaintiff Trivette has been injured and aggrieved by Defendant TDOC's discrimination against him.

166.    Inmates who are deaf and hard of hearing and presently in TDOC custody are being denied their federal rights to equal access to TDOC programs and services and effective communication and are being injured and aggrieved by Defendant TDOC's discrimination against them.

167.    Plaintiff DRT has been injured and aggrieved by Defendant TDOC's discrimination against Plaintiff Trivette and other deaf and hard of hearing inmates. Plaintiff DRT continues to be injured and aggrieved by TDOC's ongoing discrimination against deaf and hard of hearing inmates.

**WHEREFORE, Plaintiff respectfully requests:**

1.    That this Court assume jurisdiction;

2.    That this Court declare the actions of Defendant TDOC described in this Complaint to be in violation of Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act;

3.    That this Court enter an injunction ordering Defendant TDOC to cease violating the rights of deaf and hard of hearing inmates under Title II and Section 504, and to cease discriminating against these inmates on the basis of disability, and requiring Defendant TDOC to begin providing auxiliary aids and services and reasonable modifications, including but not limited to qualified sign language interpreters and videophones, to deaf and hard of hearing

inmates and to develop policies, procedures, and training to ensure non-discrimination against and equal access for these inmates;

4. That this Court award Plaintiffs compensatory damages pursuant to Title II and Section 504;

5. That this Court award Plaintiffs and/or their attorneys their reasonable attorneys' fees and costs; and

6. That this Court award such additional or alternative relief as may be just, proper, and equitable.

Respectfully submitted,


DISABILITY RIGHTS TENNESSEE

/s/  Stacie L. Price
Stacie L. Price (TN Bar# 030625)
Disability Rights Tennessee
2 International Plaza, Suite 825
Nashville, TN 37217
(615) 298-1080
staciep@disabilityrightstn.org

Daniel L. Ellis (TN Bar# 028130)
Disability Rights Tennessee
9050 Executive Park Drive, Suite B-101
Knoxville, TN 37923
(865) 670-2944
daniele@disabilityrightstn.org


CIVIL RIGHTS EDUCATION AND ENFORCEMENT CENTER

/s/ Martha M. Lafferty
Martha M. Lafferty (TN Bar# 019817)
Civil Rights Education and Enforcement Center
525 Royal Parkway, #293063
Nashville, TN 37229
(615) 913-5099
mlafferty@creeclaw.org

Amy F. Robertson* (CO Bar# 25890)
Civil Rights Education and Enforcement Center
1245 E. Colfax Ave., Suite 400
Denver, CO 80218
(303) 757-7901
arobertson@creeclaw.org

*Pro Hac Vice Application Forthcoming

Attorneys for Plaintiffs.

Dated: March 31, 2020

31