**IN THE UNITED STATES DISTRICT COURT FOR THE**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| ERNEST KEVIN TRIVETTE, ET AL., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) Civil No. 3:20-cv-00276 | |
| | ) Judge Trauger | |
| | ) | |
| TENNESSEE DEPARTMENT OF CORRECTION, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

---

### PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

---

Plaintiffs Ernest Kevin Trivette ("Mr. Trivette") and Disability Rights Tennessee ("DRT") (collectively, "Plaintiffs"), by and through counsel, file this brief in opposition to Defendant Tennessee Department of Correction's Motion to Dismiss, ECF 10 ("Motion").

In a detailed, 30-page Complaint, Mr. Trivette – a Deaf man -- has alleged that Defendant Tennessee Department of Corrections ("TDOC") discriminated against him due to his disability by failing to provide effective communication to him and denying him equal access to its programs and services throughout his incarceration from June 2015 through April 2, 2019. Because he has alleged that this discrimination was continuous and ongoing through his release on parole on April 2, 2019, he timely filed this lawsuit on March 31, 2020 within the one-year statute of limitations. Contrary to Defendant's contention, Mr. Trivette's claims are timely for all dates of his incarceration, not just the final three days. Since Mr. Trivette did timely file his claims, he has standing to seek declaratory relief and compensatory damages. Because Mr.

Trivette is on parole and intends to avoid taking any action that would violate his parole and require his return to the custody of TDOC, he concedes that he does not have standing to pursue injunctive relief.

DRT is a private, nonprofit agency and is the protection and advocacy agency for the State of Tennessee. DRT has alleged claims against TDOC in both its organizational and associational capacities. While TDOC asserts DRT lacks representational standing to pursue this Complaint, TDOC does not directly address DRT's statutory authority to bring claims in either DRT's organizational or associational capacity. Plaintiffs discuss that authority in detail below. Because DRT has standing to bring claims in both of its capacities, DRT is entitled to seek all available relief.

For the reasons set out above and discussed in detail below, Defendant's Motion has no merit in regards to Mr. Trivette's claims for declaratory relief and compensatory damages; and in regards to all of DRT's claims. Accordingly, Plaintiffs ask this Court to deny Defendant's Motion with respect to all claims except Mr. Trivette's claim for injunctive relief.

## FACTS

Mr. Trivette is Deaf. His primary language is American Sign Language ("ASL"), not spoken or written English. Throughout Mr. Trivette's time in TDOC custody from June 2015 to April 2, 2019, TDOC consistently failed to provide effective communication to him. This includes failure to provide qualified sign language interpreters, failure to provide access to appropriate telecommunication equipment in good working order, enforcement of discriminatory policies for phone access, lack of policies to ensure effective communication, and failure to grant reasonable modifications and accommodations. TDOC's failure to provide Mr. Trivette with

2

effective communication and equal access to TDOC's programs and services is part of a longstanding and ongoing pattern and practice of discrimination against deaf and hard of hearing inmates. TDOC's discriminatory conduct violates the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("Section 504" or "RA"). Complaint ECF 1, ¶¶ 1-6 *inter alia*, 67.

Throughout his time in TDOC custody, TDOC failed to provide Mr. Trivette with effective communication he needed in order to access and equally participate in its programs and services. In addition, Mr. Trivette was unable to communicate effectively telephonically with friends and family. This discriminatory treatment and resulting isolation and other harms caused him emotional and psychological distress, inconvenience, frustration, depression, and heartache. TDOC's actions in refusing to provide effective communication, including qualified sign language interpreters, to Mr. Trivette from 2015 through 2019 was intentional and/or constituted deliberate indifference to the strong likelihood that these policies and practices would likely result in a violation of Plaintiff Trivette's federally protected rights. Mr. Trivette and DRT repeatedly alerted TDOC to his need for qualified sign language interpreters and other required aids, services, and accommodations, and that need is obvious. TDOC knowingly and intentionally refused to provide qualified sign language interpreters, and other required aids, services, and accommodations to Mr. Trivette. *Id.* ¶¶ 117-118.

DRT is the federally mandated protection and advocacy system for the State of Tennessee. As such, DRT is authorized by multiple federal statutes to, among other things, pursue administrative, legal, and other remedies on behalf of people with disabilities, including but not limited to, people who are deaf or hard of hearing and are in the custody of TDOC,

whose federally protected rights are being violated. *Id.* ¶ 21. DRT filed this Complaint on its own behalf as an organization that has suffered specific economic injury separate and apart from this litigation as a result of TDOC's longstanding and ongoing pattern and practice of discrimination against deaf and hard of hearing inmates. DRT also filed this Complaint in its associational capacity in conjunction with Plaintiff Trivette, and on behalf of -- and to vindicate the rights of -- deaf and hard of hearing inmates in TDOC custody who are being denied equal access to programs and services and effective communication in violation of the ADA and Section 504. *Id.* ¶¶ 21-23.

Congress has charged DRT with the statutory responsibility to represent and advocate for the rights of persons with disabilities, including deaf and hard of hearing individuals in state institutions, including state prisons. These individuals would all have standing to sue in their own right. DRT has statutory authority to pursue legal remedies on behalf of individuals with disabilities whose federal rights are being violated pursuant to 42 U.S.C.A. § 15043, 42 U.S.C. § 300d-53(k), 42 U.S.C. § 10805, and 29 U.S.C. § 794e(f). DRT's mission is to ensure individuals with disabilities in Tennessee have freedom from harm, freedom to participate in the community, and freedom from discrimination. DRT's board of directors includes people with disabilities. DRT represents people with sensory disabilities, including those who are deaf or hard of hearing, and provides means by which they express their collective views and protect their collective interests. People with disabilities who are served individually or whose communities are served provide input to DRT through DRT's PAIMI Advisory Council, stakeholder and constituent surveys, and grievance process. DRT conducts multiple types of surveys of its constituents and advisory council members. These surveys include a stakeholder

and constituent survey sent out every three years, a satisfaction survey at the conclusion of each service request, and a grievance form at the conclusion of every service request. This feedback from constituents and their families informs the financial and programmatic decisions regarding the delivery of services and the allocation of resources for future advocacy. *Id.* ¶¶ 126-132.

Inmates who are deaf or hard of hearing and are in TDOC custody are among the constituents who are served by, and who inform the work of, DRT. DRT has standing on behalf of its constituents and clients who are substantially affected by Defendant's noncompliance with constitutional and statutory protections because such noncompliance falls within DRT's general scope of interest and activity; it is appropriate for DRT to pursue and secure injunctive relief on behalf of its individual constituents; and neither the claims asserted nor the relief requested require the participation of individual members or constituents in the lawsuit. *Id.* ¶¶ 136-137.

In addition to Plaintiff Trivette, other deaf and hard of hearing individuals in TDOC custody – who are, by statute, DRT's constituents – have suffered and continue to suffer injury that would allow them to have standing to sue in their own right. DRT brings this suit on behalf of such constituents who are being denied effective communication and equal access to TDOC's programs and services in violation of the ADA and RA. *Id.* ¶¶ 138-139.

DRT itself has also been injured and continues to be injured by TDOC's discriminatory conduct against deaf and hard of hearing inmates. This has impeded DRT's mission and diverted its staff and financial resources from other matters. DRT has unsuccessfully attempted to resolve the issue of TDOC's discrimination against deaf and hard of hearing inmates in its custody for years prior to this lawsuit. As a result, DRT has invested significant time and related financial

resources— prior to and separate from this litigation--- into its advocacy efforts for TDOC to provide effective communication to deaf and hard of hearing inmates. *Id.* ¶¶ 142-143.

## ARGUMENT

### I.      Standard of Review

Defendant brings this Motion pursuant to Federal Rule of Civil Procedure 12(b)(1), asserting that this Court lacks subject matter jurisdiction because Plaintiffs lack standing for their claims. There are two types of challenges to subject matter jurisdiction pursuant to Rule 12(b)(1), facial and factual. *Wayside Church v. Van Buren County*, 847 F.3d 812, 816 (6th Cir. 2017) (internal citations omitted). Here Defendant is not disputing Plaintiffs' facts but instead bring a facial challenge to Plaintiffs' standing as a matter of law. Accordingly, this Court is required to accept the factual allegations in the Complaint as true and determine whether they are sufficient to establish jurisdiction. *Id.*

### II.     Plaintiff Trivette has standing to bring claims under the ADA and RA.

Plaintiffs agree that there is a one-year statute of limitations for ADA and RA claims in Tennessee. Because Mr. Trivette alleges that TDOC discriminated against him in violation of the ADA and RA throughout his entire period of incarceration and filed this lawsuit within one year of his date of parole, the statute of limitations is not a bar to his claims. Taken alone this allegation demonstrates a continuing violation and bring his claims within the one-year statute of limitations. In addition, Mr. Trivette has pled concrete and particularized injuries in fact that resulted from Defendant's continuous and ongoing discrimination. Instead of addressing Mr. Trivette's allegation of TDOC's continuous and ongoing failure to provide effective

6

communication, Defendant attempts to inaccurately characterize the examples of such failure as discrete acts.

The Complaint makes clear that from the date of his incarceration to the date of his release, TDOC failed to provide Mr. Trivette with an appropriate and functional telecommunication device. Initially, TDOC provided him with no telecommunication device at all; later, only a TTY. Finally, after multiple requests by Mr. Trivette and DRT, TDOC provided him with a videophone. However, that videophone was not in good working order from the time of its installation through Mr. Trivette's parole. Complaint ¶¶ 5, 95-107.

Defendant argues that Mr. Trivette's claims related to TDOC's provision of a TTY ended on the date that TDOC substituted a videophone for the TTY. While that may have been accurate if Mr. Trivette were only complaining about the TTY, it is not accurate here where Mr. Trivette's claims that TDOC failed to provide effective communication and equal treatment include failure to provide access to TDOC's phone program, failure to initially provide any accessible telecommunication device, provision of only a TTY, provision of a videophone not in full working order, and discriminatory policies regarding the use of the TTY and videophone. Complaint ¶¶ 5, 86, 89-92, 95-115. These are not discrete events but instead facts demonstrating TDOC's continuous and ongoing failure to provide effective communication and equal access to Mr. Trivette throughout his incarceration.

Throughout his incarceration from his date of entry to his date of parole, with the exception of a handful of occasions, TDOC also failed to provide Mr. Trivette with qualified sign language interpreters; multiple examples of this failure are documented in the Complaint. *Id.* ¶¶ 4, 34-60, 67. These examples include 11 occasions between February 12, 2019 and April

7

2, 2019 (including on April 2, 2019) when Mr. Trivette's case manager met with him about case management services but TDOC did not provide a qualified sign language interpreter. *Id.* ¶ 60 (g)-(j). Indeed, the Complaint makes clear TDOC failed to provide Mr. Trivette with a qualified sign language interpreter up through the day of his parole including on that day. *Id.* ¶¶ 4, 34-60, 67. In addition to TDOC's ongoing and continuous failure to provide qualified sign language interpreters to Mr. Trivette throughout his incarceration, TDOC failed and continues to fail to have in place policies to ensure the provision of effective communication including in regard to the provision of sign language interpreters. *Id.* ¶¶ 61-66, 68.

It is well settled that "where there is an ongoing, continuous series of discriminatory acts, they may be challenged in their entirety as long as one of those discriminatory acts falls within the limitations period." *Hull v. Cuyahoga Valley Joint Vocational School Dist. Bd. of Educ.*, 926 F.2d 505, 510–11 (6th Cir.). In the Sixth Circuit, the determination of whether a continuing violation has occurred requires a three-part inquiry: 1. Whether defendant's wrongful conduct continued, 2. Whether plaintiff's injury continued, and 3. Whether further injury to the plaintiff was avoidable if defendant had at any time stopped its wrongful conduct. *Tolbert v. State of Ohio Dept. of Transp.*, 1999 Fed.App. 0141P, 940 (6th Cir. 1999) (citing *Kuhnle Brothers, Inc. v. County of Geauga*, 103 F.3d 516, 522 (6th Cir. 1997)). In addition, there are two types of continuing violations, serial actions as discussed in *Hull* and an ongoing policy of discrimination. The second type of continuing violation "arises where there has occurred 'a longstanding and demonstrable policy of discrimination.'" *Deck v. City of Toledo*, 56 F.Supp.2d. 886, 893 (N.D. Ohio 1999), *quoting E.E.O.C. v. Penton Ind. Publishing Co., Inc.*, 851 F.2d 835, 838 (6th Cir. 1988).

In *Deck* several plaintiffs with mobility disabilities sued the City of Toledo in 1998, alleging that the City had been discriminating against them on an ongoing basis since 1992 by failing to comply with the ADA's curb requirements when altering streets and sidewalks. The court held Ohio's two-year statute of limitation inapplicable because the City had committed continuing violations of the plaintiffs' rights since 1992. In reaching this conclusion, the court applied the three-pronged analysis set out in *Tolbert*. Specifically, the *Deck* court held that prong one was met because the City began constructing noncompliant ramps in 1992 and continued doing so through the date of the plaintiffs' lawsuit. Because the City continued to fail to comply with the ADA by building noncompliant ramps, the plaintiffs' injuries continued to accrue. This satisfied prong two. Finally, prong three was satisfied because the City could have avoided further injury to the plaintiffs by beginning to build compliant ramps at any time during the period at issue. Like the plaintiffs in *Deck*, Mr. Trivette has demonstrated that TDOC discriminated against him on an ongoing basis from the date of his incarceration through the date of his parole.

Mr. Trivette has pled facts sufficient to meet all three prongs of the *Tolbert* inquiry for both types of continuing violations: serial wrongful actions; and ongoing discriminatory policies. He alleges that Defendant failed to provide him with effective communication in violation of the ADA and RA from his entry into Defendant's custody in June 2015 through the date of his parole on April 2, 2019. Complaint ¶¶ 3-5, 10. He also alleges Defendant subjected him to unequal treatment and refused to provide him with reasonable accommodations or modifications throughout this same period. *Id.* ¶ 116. In addition, he alleges that throughout his incarceration Defendant failed to have policies in place to ensure effective communication and had

discriminatory policies in place regarding access to its telephone program. Id. ¶¶ 61-66, 68. Thus, Defendant's wrongful conduct continued throughout Mr. Trivette's incarceration.

Mr. Trivette has provided details supporting each allegation including but not limited to specific examples of Defendant's repeated and ongoing failure to provide qualified sign language interpreters, appropriate working telecommunications equipment, and other required effective communication from his date of incarceration through his parole on April 2, 2019. For example, through April 2, 2019, Defendant failed to provide Mr. Trivette with equal access to its phone program due to discriminatory policies for his use of the videophone and because the videophone was not in good working order. Complaint ¶¶ 5, 86, 89-92, 95-115. Similarly, through April 2, 2019 including on that date, Defendant failed to provide Mr. Trivette with qualified sign language interpreters for communications. Id. ¶¶ 4, 34-60, 67. In addition, Plaintiff Trivette has alleged that, throughout the time he was in Defendant's custody, Defendant lacked policies necessary to ensure effective communication and equal treatment and, in fact, specifically enforced unequal policies for phone access. Id. ¶¶ 61-66, 68.

Mr. Trivette has pled that as a result of Defendant's ongoing and continuous discrimination, he experienced injuries including isolation, emotional and psychological distress, inconvenience, frustration, depression, and heartache. Id. ¶ 117. These injuries continued throughout his incarceration. Mr. Trivette and DRT repeatedly requested that Defendant cease its discriminatory actions and policies and provide effective communication and equal treatment. Clearly, if Defendant had done so, that would have cut off any continuing injury to Mr. Trivette.

As discussed above, Mr. Trivette has pled facts sufficient to demonstrate both a continuing violation and a concrete and particularized injury. Throughout his time in TDOC

custody, Mr. Trivette experienced continued injury due to TDOC's consistent and ongoing failure to provide effective communication to him. Such injury was ongoing and exacerbated each time a specific violation occurred—such as failure to provide a qualified sign language interpreter for a specific communication—on top of TDOC's ongoing failure to provide him with effective communication and equal access.

III.    **Plaintiff DRT has standing to bring claims under the ADA and RA.**

As discussed in detail below, Plaintiff DRT has both associational and organizational standing to bring ADA and RA claims against Defendant TDOC.

A.    **The Protection and Advocacy (P&A) system is a unique organization with powers granted by Congress to protect, advocate for, and bring claims on behalf of individuals with disabilities and in its own right.**

In 1975, Congress enacted the legislation that created the Protection and Advocacy System: an agency in each state dedicated to protecting individuals with disabilities from abuse and neglect. Developmental Disabilities Assistance and Bill of Rights Act, Pub. L. No. 94-103, § 203, 89 Stat. 486, 504 (1975) (codified as amended at 42 U.S.C. § 15001 et seq.); S. Rep. No. 93-1297 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6373, 6408-6409. Complaint ¶¶ 126-127.

The role that P&As play in our state and nation is intentionally unique. It is necessary to understand this role in relation to DRT's *de facto* constituents -- all Tennesseans with disabilities -- because the needs of these constituents and communities involve issues that DRT is uniquely able to and empowered to address. For instance, it is important that P&A Systems such as DRT be able to rely on their own standing to bring litigation because some of the individuals who DRT serves may be concerned about participating in litigation because of the need to disclose stigmatizing confidential information or may fear retaliation by facility staff on whom they

depend for care. It is also important that P&As have standing to challenge general policies or practices that may not directly impact particular identifiable persons with disabilities, or where such persons cannot be readily identified. Another illustration of why P&A standing is crucial is that an inmate with a disability (including but not limited to mental illness or deafness) might not file a grievance or appeal it **because of lack of access to effective communication** which is a foundational requirement to reading and writing a grievance. P&A standing protects individuals without a voice.

Three statutes grant authority to protection and advocacy organizations such as DRT to bring actions on their own in order to pursue remedies for injuries to the organization and/or on behalf of the organization's constituents. Specifically, these statutes give P&As "the authority to pursue legal, administrative, and other appropriate remedies to ensure the protection of, and advocacy for the rights of such individuals within the State…." 42 U.S.C. § 300d-53(k); 42 U.S.C § 10805(a)(1)(B); 29 U.S.C.A. § 794e(f)(2) and (3); *see also* 45 C.F.R. § 1326.21(c). Complaint ¶¶ 126-127. These statutes are the Developmental Disabilities Assistance and Bill of Rights Act ("DD Act"), the Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI Act"), and the Protection and Advocacy for Individual Rights Act ("PAIR Act"), respectively. The DD Act provides funding and authority for P&A organizations to provide services to and pursue actions to ensure the rights of people with developmental disabilities. The PAIMI Act does the same in regard to services to and pursuit of actions on behalf of persons with mental illness. The PAIR Act is the broadest of these three statutes and allows P&As to serve individuals with disabilities who are not eligible for services under the other two Acts. Taken together, these three Acts give DRT the funding and authority to provide services to and

12

take actions, including filing lawsuits, to protect the rights of persons with all types of disabilities including those who are deaf or hard of hearing.  Complaint ¶¶ 21, 126-127.

Interpreting the plain language of these three Acts, which create and give authority to P&As, courts have consistently held that P&As are able to bring legal actions in their own right as well as on behalf of the constituents they represent.  For example, after discussing the opportunity for people with mental illness to comment on priorities and activities of the P&A and the ability to file a grievance the Eleventh Circuit held that:

> Much like members of a traditional association, the constituents of the Advocacy Center possess the means to influence the priorities and activities the Advocacy Center undertakes. In a very real sense, therefore, as in *Hunt*, 'the [Advocacy Center] represents the State's [individuals with mental illness] and provides the means by which they express their collective views and protect their collective interests.' *Hunt*, 432 U.S. at 345, 97 S.Ct. 2434. Accordingly, we conclude that the Advocacy Center may sue on behalf of its constituents like a more traditional association may sue on behalf of its members.

*Doe v. Stincer*, 175 F.3d 879, 886 (11th Cir. 1999) (*quoting Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 345 (1977)).

Similarly, the Seventh Circuit, discussing the Indiana P&A system's right to bring an action under PAIMI for access to records has held that under PAIMI a designated protection and advocacy agency "shall ... have access to all records," 42 U.S.C. § 10805(a)(4), and "shall have the authority to pursue administrative, legal, and other appropriate remedies." 42 U.S.C. § 10805(a)(1)(B). These rights are not one or two steps removed from [the protection and advocacy agency]—*they are granted directly to [the P&A] itself."  See Indiana Protection and Advocacy Servs. v. Indiana Family and Soc. Servs. Admin.*, 603 F.3d 365, 378 (7th Cir. 2010) (emphasis added).  In addition, in *Trueblood v. Washington State Dep't of Soc. & Health Servs.*, 101 F. Supp. 3d 1010, 1020 (W.D. Wash. 2015), Disability Rights Washington, the P&A system

13

for Washington State, was held to have standing to represent inmates and persons who require competency services and "to seek a permanent injunction and declaratory judgment establishing the time frames within which due process requires that services be provided."[1]

**B. DRT has organizational and associational standing to bring this suit.**

Entities, such as DRT, may assert standing under two distinct theories: Organizational standing and associational standing. An entity asserting organizational standing sues on its own behalf, alleging injuries to the entity itself. *See, e.g., Havens Reality Corp. v. Coleman*, 455 U.S. 363, 372-79 (1982). An entity asserting associational standing sues on behalf of its members or constituents. *See, e.g. Hunt,* 432 U.S. at 343. Here, DRT has both organizational and associational standing.

**1. DRT has organizational standing.**

The Supreme Court has held that an advocacy organization has organizational standing when its interests are impaired through a concrete and demonstrable injury, such as diversion or draining of the organization's resources or frustration if its mission. *Havens Reality Corp.,* 455 U.S. at 379 (1982). Other federal courts have held that when a P&A diverts staff and resources away from services to other constituents because it must investigate the discriminatory conduct of a defendant, then the P&A has organizational standing. *See Disability Rights Pennsylvania. v.*

---

[1] *Trueblood v. Washington State Dep't of Soc. & Health Servs*., 101 F. Supp. 3d 1010, 1020 (W.D. Wash. 2015), *modified*, No. C14-1178 MJP, 2015 WL 13664033 (W.D. Wash. May 6, 2015), and *modified*, No. C14-1178 MJP, 2016 WL 4533611 (W.D. Wash. Feb. 8, 2016), and *vacated and remanded on other grounds*, 822 F.3d 1037 (9th Cir. 2016). *See also Oregon Advocacy Ctr. v. Mink,* 322 F.3d 1101, 1112 (9th Cir.2003); *In re Lamb,* 173 Wash.2d 173, 196–197, 265 P.3d 876 (2011) (citing to federal law providing DRW with the authority to "pursue legal, administrative, and other appropriate remedies ... to ensure the protection of, and advocacy for, the rights of persons with ... disabilities.").

*Pennsylvania Dept. of Human Servs.*, 2020 WL 1491186,at *5-*6 (M.D. Penn. Mar. 27, 2020) (holding that Pennsylvania's P&A (DRP) had organizational standing against the Department of Human Services, which operated the state's youth detention centers, because it devoted substantial resources to investigating potential discrimination, including abuse and neglect, against its constituents at the detention centers, and, by doing so, diverted funds directly away from other programs and services DRP ordinarily provides); *see also Advocacy Center v. Stadler,* 128 F.Supp.2d 358, 364 (M.D. La. 1999) (holding that the Louisiana P&A had organizational standing because it was statutorily authorized to investigate abuse allegations, and when a state agency denies access to records it needs for its investigation, the P&A suffers a direct injury-in-fact).

The Middle District of Tennessee addressed the issue of the Tennessee P&A's organizational standing twenty-two years ago in *Tennessee Protection and Advocacy v. Board of Educ. of Putnam Cty., Tennessee,* 24 F. Supp.2d 808 (M.D. Tenn. 1998) (*TP&A*).[2]  While the court in *TP&A* held that Tennessee's protection and advocacy agency did not have organizational standing in that situation, the court made clear that facts like those in the instant case do demonstrate organizational standing. Tennessee Protection & Advocacy ("TP&A") filed suit in its own name and as the sole plaintiff against the Putnam County Board of Education ("PCBE") under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et seq. ("IDEA") for failure to provide physical and occupational therapy to children with disabilities.

The court held that a P&A could claim organizational standing, that is, injury to the

---

[2] At the time of the decision, what is now Disability Rights Tennessee was known as Tennessee Protection and Advocacy, Inc.

organization itself, which would satisfy the Article III case and controversy requirements. *TP&A,* 24 F. Supp. 2d. at 816. However, in its original complaint, TP&A did not allege injury to itself. In its amended complaint, TP&A alleged injury to itself *only* because it spent time and resources in pursuing the that very litigation. The court held that "litigation expenses alone do not constitute injury sufficient to support standing." *Id.* at 818. Instead, to have organizational standing, a P&A must allege that it has "devoted additional resources it otherwise would not have in an effort to counteract discrimination." *Id.* at 817. The court concluded that because TP&A failed to "allege injury to itself other than litigation expenditures," it did not have organizational standing. *Id.* at 818. Thus, had TP&A alleged injury to itself apart from litigation expenses, then TP&A would have had organizational standing. Here, Disability Rights Tennessee has alleged injury to itself separate and apart from this litigation as a result of TDOC's longstanding and ongoing pattern and practice of discrimination against deaf and hard of hearing inmates. Complaint ¶¶ 22, 141-143. Accordingly, this case is distinguishable from *TP&A* and DRT has organizational standing.

Similarly, in *Disability Rights Pennsylvania* (DRP), Pennsylvania's P&A sued the state's Department of Human Services (DHS) pleading organizational standing after its investigation discovered various discriminatory and abusive practices at DHS-run Youth Development Centers. *Disability Rights Pennsylvania,* 2020 WL 1491186 at *1-*2. DRP argued that its reallocation of time, money, and resources in order to investigate the defendants' alleged discriminatory conduct was a cognizable injury-in-fact. *Id.* at *5. In agreeing with DRP and holding it had organizational standing to sue, the court recognized that DRP provided a variety of different services and programs for its constituents but that DRP had only "finite resources" to

provide those services and programs. DRP's investigation of abuse at the youth centers diverted staff and resources from providing services and programs to DRP's other constituents, and "plausibly alleged that its diversion of resources 'perceptibly impaired' its ability to provide its services and carry out its mission." *Id*. at *5 (*quoting Havens* 455 U.S. at 379).

In contrast to the allegations in *TP&A* and similar to those in *DRP*, DRT has alleged that that it has spent significant time and resources prior to and separate from this litigation directly in response to Defendant's alleged discrimination. DRT has spent years trying to resolve the issue of effective communication for deaf inmates in TDOC custody, including spending its finite staff and financial resources on investigating and advocating for changes in the system prior to filing this lawsuit. Complaint ¶¶ 22, 141-43. Thus, under the reasoning of the *TP&A* and *DRP* cases, DRT has organizational standing.

### 2. DRT has associational standing.

DRT also has associational standing to bring this suit. The Supreme Court articulated a three-pronged test for associational standing in *Hunt*, 432 U.S. at 343. An entity has associational standing if: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of the individual members of the lawsuit." *Id*. at 343. The first two requirements of the *Hunt* test are constitutional, while the third is prudential and can be abrogated by Congress. *Oregon Advocacy Center v. Mink*, 322 F.3d 1101, 1109-10 (9th Cir. 2003) (*citing United Food and Commercial Workers Union Local 751*, 517 U.S. 544, 555-57 (1996)). Of note, Defendant, in its Motion to Dismiss, fails to analyze the *Hunt* factors – the governing Supreme Court standard – in relation to DRT's standing.

### a. DRT's constituents would have standing in their own right.

An organization satisfies the first prong of the *Hunt* test if at least one member has standing in their own right. *Hunt*, 432 U.S. at 343. DRT, as Tennessee's P&A, is a membership organization by statute, that is, Congress designated by statute individuals with disabilities in American society as P&A members. Complaint ¶¶ 21, 126-127. Given DRT's statutory mandate to represent the interests of Tennesseans with disabilities – including deaf Tennesseans incarcerated in Defendant's custody – the first prong of *Hunt* is satisfied.

In addition, to satisfy the first prong of the *Hunt* standard, an association is not required to "name the members on whose behalf suit is brought." *Stincer,* 175 F.3d at 882; *see also Nat'l Council of La Raza v. Cegavske,* 800 F.3d 1032, 1041 (9th Cir. 2015) (stating "we see no purpose to be served by requiring an organization to identify by name the member or members injured"); *Dunn v. Dunn*, 219 F.Supp.3d 1163, 1169 (M.D. Ala. 2016) (holding that one P&A constituent is enough to establish standing, "and he or she (and any additional constituents) need not be named"). As the District of Columbia Circuit explained, the purpose of requiring that at least one member have standing is to ensure that the "requisite injury really has occurred or will occur in the future to members of the organizations, thereby endowing the organizations with standing to sue as representatives, not simply as groups with a longstanding 'interest in a problem.'" *Pub. Citizen v. F.T.C.*, 869 F.2d 1541, 1552 (D.C. Cir. 1989).

Here, again, given that any deaf person incarcerated in Defendant's custody is DRT's constituent, "it is not necessary for [the court] to know the names of injured persons" to establish associational standing. *See id.* This is consistent with the purpose of the statutes creating protection and advocacy systems such as DRT to confer standing to represent the rights of

18

individuals with disabilities throughout each state. *See, e.g.*, *Stincer*, 175 F.3d at 884 ("[T]he current statute is clear that [protection and advocacy] systems have standing to pursue legal remedies to ensure the protection of and advocacy for individuals with [mental illnesses] within the State," *citing* S.Rep. No. 103–120, at 39 (1994), *reprinted in* 1994 U.S.C.C.A.N. 164, 202)). In this instance DRT has authority to pursue legal remedies under the Protection and Advocacy for Individual Rights ("PAIR") Act at 29 U.S.C.A. § 794e(f)(3) which states that an eligible Protection and Advocacy System will "have the authority to pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of such individuals with in the state" who are described in the PAIR Act.

The first prong of the *Hunt* test extends to organizations whose constituents possess an "indicia of membership" in the organization. *Hunt*, 432 U.S. at 344. Indeed, this was the case in *Hunt* itself: the Court explained that "while the apple growers and dealers [were] not 'members' of the Commission in the traditional trade association sense, they possess[ed] all of the indicia of membership in an organization." *Hunt*, 432 U.S. at 334. Courts across the country have held that P&As, by their very nature, have such an "indicia of membership" sufficient to satisfy the first prong of the *Hunt* test. *Stincer,* 175 F.3d at 886 (holding that Congress designated P&As to "serve a specialized segment of the … community, which is the primary beneficiary of its activities … .");  *Oregon Advocacy Center,* 322 F.3d  at 1111 (holding that P&A constituents have an indicia of membership to satisfy associational standing  because "the organization is sufficiently identified with and subject to influence of those it seeks to represent to have a personal stake in the outcome of the controversy") (*quoting Village of Arlington Heights v. Metropolitan Housing and Developmental Corp.,* 429 U.S. 252, 261 (1977))*; Dunn, 219*

19

*F.Supp.3d* at 1169-70 (holding that a P&A "***need only show the high likelihood of the existence of a member who will be harmed by the challenged policy or practice, but need not identify any particular member with standing.***" (*citing Stincer, 175 F.3d* at 884 (emphasis added)); *Wilson v. Thomas,* 43 F.Supp.3d 628 (E.D. N.C. 2014) (holding that Disability Rights North Carolina satisfied the first prong of the *Hunt* test); *Disability Rights Pennsylvania,* 2020 WL 1491186 at *7 (holding that the *Hunt* indicia-of-membership inquiry is merely a means to determine whether an organization offers its constituents a means to express their collective views and protect their collective interests) (*citing Stincer, 175 F.3d* at 886).

In the *TP&A* case, the court held that the P&A did not have associational standing. That case is distinguishable, however, because the P&A only filed suit on its own behalf. In contrast, DRT has filed this suit on behalf of deaf individuals in state prison in order to remedy the ongoing violations to the rights of deaf inmates in TDOC custody. Complaint ¶¶ 9-10, 12. The court in *TP&A* made clear this is the correct pathway to associational standing. *TP&A,* 24 F.Supp.2d at 815-16. Thus, DRT's constituents have an indicia of membership in the organization, and DRT satisfies the first prong of the *Hunt* Test.

> **b.** **DRT satisfies the second prong of the *Hunt* Test because the interests DRT seeks to protect in this lawsuit are germane to DRT's purpose.**

Although Defendant does not appear to challenge this, DRT satisfies the second prong of the *Hunt* test. P&A's, including DRT, are mandated by Congress to protect, advocate for, and litigate for the rights of individuals with disabilities, particularly vulnerable and isolated populations, like state inmates with disabilities. DRT's mission is to ensure individuals with disabilities across the state have freedom from harm and discrimination. Ensuring that deaf

20

inmates in state prisons are free from the harm and discrimination caused by lack of effective communication and unequal access to programs and services goes to the very core of DRT's purpose and mission. Complaint ¶¶ 139-140.

### 3. DRT meets the third prong of the *Hunt* Test because neither the claim asserted nor the relief requested requires the participation of the individual members of the lawsuit.

Again, Defendant does not appear to challenge the third prong of the *Hunt* test. It is clear, however, that DRT meets that prong as well. In analyzing the third prong of the *Hunt* test, the Court in *TP&A* explicitly held that the P&A "'need not run the gauntlet of prudential standing tests;'" because "Congress implicitly granted standing to [P & A] advocacy groups to advocate for disabled individuals to the full extent permitted by Article III." *TP&A.,* 24 F.Supp.2d at 814 (quoting *Family & Children's Center v. School City of Mishawaka,* 13 F.3d 1052, 1061 (7th Cir. 1994); *see also* 42 U.S.C.A. § 15043, 42 U.S.C. § 300d-53(k), 42 U.S.C. § 10805, and 29 U.S.C. § 794e(f). Thus, in *TP&A,* the court recognized that by its very nature Tennessee's protection and advocacy agency satisfies the third prong of the *Hunt* test. *See also Dunn,* 219 F.Supp.3d at 1171*, (*quoting *Oregon Advocacy Center,* 322 F.3d at 113 (recognizing that the Eleventh Circuit in *Doe v. Stincer* and numerous other courts had concluded that Congress had, by passing the P&A statutes, "'explicitly authorized [P & As] to bring suit on behalf of their constituents,'" and that this action abrogated the third prong of the *Hunt* test); *see also Ball by Burba v. Kasich*, 244 F. Supp. 3d 662, 683 (S.D. Ohio 2017) (quoting *Sandusky Cty. Democratic Party v. Blackwell,* 387 F.3d 565, 574 (6th Cir. 2004)) (finding that as to the third prong of the *Hunt* test, the Sixth Circuit has held that "[t]he individual participation of an organization's members is not normally necessary when an association seeks prospective or injunctive relief for its members"). Thus,

21

Disability Rights Tennessee has standing to pursue its claims for relief without the participation of individual members or constituents.

Although Defendant argues that DRT has not made a factual allegation that deaf inmates in TDOC custody cannot protect their own interests, neither of the cases on which it relies were applying the well-established *Hunt* test permitting associational standing. ECF 11 at 10 (citing *Michigan State A. Philip Randolph Institute v. Johnson*, 209 F. Supp. 3d 935, 945 (E.D. Mich. 2016) and *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004)). The inability of members or constituents to protect their own interests is not a prerequisite for associational standing under *Hunt.*

## IV.     DRT is entitled to the full array of relief under the ADA and RA.

The remedies available to an aggrieved party under Title II of the ADA and the RA include declaratory relief, injunctive relief, and monetary damages. *See* 29 U.S.C. § 794a; 42 U.S.C. § 12133. The ADA provides relief to "any person alleging discrimination on the basis of disability," while the RA provides relief to "any person aggrieved" by unlawful discrimination. 42 U.S.C. § 12133; 29 U.S.C. § 794a(a)(2).[3] The Sixth Circuit has held that standing under these statutes is defined "'as broadly as is permitted by Article III of the Constitution.'" *MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 334 (6th Cir. 2002) (*quoting Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, *47 (2d Cir. 1997)); *see also Disability Rights Pennsylvania,* 2020 WL 13191186 at *9 (citing *Addiction Specialists,* 411 F.3d at 405). Generally, an associational plaintiff is entitled to injunctive relief, while an organizational plaintiff, who has

---

[3] An entity, such as DRT, is the same thing as a "person" under the ADA and Section 504. *Addiction Specialists, Inc. v. The Township of Hampton, et al.,* 411 F.3d 399, 405 (3rd Cir. 2005).

suffered an injury-in-fact, is entitled to the full gamut of relief, including injunctive, declaratory, and monetary relief. *See Stalder,* 128 F.Supp.2d at 367 (holding that injunctive relief was available to the P&A and future violation was cognizable); *Oregon Advocacy Center,* 322 F.3d at 1121 (upholding an injunction granted to Oregon's P&A). Accordingly, DRT is entitled to all available remedies including declaratory relief, compensatory damages, and injunctive relief. [4]

## V.      Conclusion

As discussed above, Plaintiff Trivette has filed timely claims and has standing to pursue declaratory relief and compensatory damages. In addition, Plaintiff DRT has standing to pursue all available remedies including declaratory relief, compensatory damages, and injunctive relief. Accordingly, Plaintiffs ask this Court to deny Defendant's Motion in all respects other than regarding Plaintiff Trivette's standing to pursue injunctive relief.

---

[4] Contrary to Defendant's assertion based on the cases of *Advocates for Individuals with Disabilities LLC v. WSA Properties LLC,* 210 F.Supp.3d 1213 (D. Ariz. 2016) *and MX Group, Inc. v. City of Covington,* 293 F.3d 326 (6th Cir. 2002), which are not a P&A cases, DRT does not have to allege that TDOC discriminated against it on the basis of an association with a person with a disability, it has been discriminated against by TDOC, or it has been denied the benefits of the ADA or Section 504 by TDOC. *See, e.g., Mote v. City of Chelsea*, 284 F. Supp. 3d 863, 888 (E.D. Mich. 2018) (holding that advocacy organization had standing under Title II under *Havens* without requiring "association" with disabled persons); *Ability Ctr. of Greater Toledo v. Lumpkin*, 808 F. Supp. 2d 1003, 1018 (N.D. Ohio 2011) (same). P&As are statutorily authorized to bring suits on behalf of individuals with disabilities. A P&A has an injury-in-fact if it alleges injuries incurred separate and apart from litigation expenses. Nonetheless, DRT has been discriminated against by TDOC's refusal to provide videophones to inmates. By denying this equal access, DRT has been unable to effectively communicate with deaf inmates through TDOC's phone program.

23

Respectfully submitted,

DISABILITY RIGHTS TENNESSEE

/s/  Stacie L. Price

Stacie L. Price (TN Bar# 030625)
Disability Rights Tennessee
2 International Plaza, Suite 825
Nashville, TN 37217
(615) 298-1080
staciep@disabilityrightstn.org

Daniel L. Ellis (TN Bar# 028130)
Disability Rights Tennessee
9050 Executive Park Drive, Suite B-101
Knoxville, TN 37923
(865) 670-2944
daniele@disabilityrightstn.org


CIVIL RIGHTS EDUCATION AND ENFORCEMENT CENTER

/s/ Martha M. Lafferty

Martha M. Lafferty (TN Bar# 019817)
Civil Rights Education and Enforcement Center
525 Royal Parkway, #293063
Nashville, TN 37229
(615) 913-5099
mlafferty@creeclaw.org

Amy F. Robertson* (CO Bar# 25890)
Civil Rights Education and Enforcement Center
1245 E. Colfax Ave., Suite 400
Denver, CO 80218
(303) 757-7901
arobertson@creeclaw.org
*Pro Hac Vice

Attorneys for Plaintiffs.

Dated: May 21, 2020

## <u>CERTIFICATE OF SERVICE</u>

I certify that, on May 21, 2020, I served the foregoing document upon all parties herein by e-filing with the CM/ECF system maintained by the court which will provide notice to the following:

Pamela S. Lorch
Tennessee Attorney General's Office
P O Box 20207
Nashville, TN 37202-0207
(615) 741-3491
pam.lorch@ag.tn.gov

_s/ Yashna Eswaran_
Paralegal
Civil Rights Education and Enforcement Center