# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **ERNEST KEVIN TRIVETTE et al.** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:20-cv-00276** |
| | ) | **Judge Aleta A. Trauger** |
| **TENNESSEE DEPARTMENT OF** | ) | |
| **CORRECTION,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM

Disability Rights Tennessee ("DRT"), Alex Gordon Stinnett, and Jason Andrew Collins have filed a Motion for Preliminary Injunction (Doc. No. 22), to which the Tennessee Department of Correction ("TDOC") has filed a Response (Doc. No. 32), the movants have filed a reply (Doc. No. 35), and TDOC has filed a Sur-Reply (Doc. No. 40.). For the reasons set out herein, the motion will be granted, as modified by the court.

## I. BACKGROUND

### A. Parties

DRT is a nonprofit corporation that advocates on behalf of Tennesseans with disabilities as part of the federal government's Protection and Advocacy ("P&A") system. The P&A system is a constellation of state-level organizations intended to help ensure that disabled individuals "participate in the design of and have access to needed community services, individualized supports, and other forms of assistance that promote self-determination, independence, productivity, and integration and inclusion in all facets of community life, through culturally competent programs." 42 U.S.C. § 15001(b). In order for a state's P&A organization to qualify for

federal funds, it must have certain powers, including the power to "pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of such individuals within the State who are or who may be eligible for treatment, services, or habilitation, or who are being considered for a change in living arrangements." 42 U.S.C. § 15043(a)(2)(A)(i); *see also* 29 U.S.C. § 794e(f)(3) (extending power-to-sue requirement to additional P&A duties); 42 U.S.C. § 300d-53(k) (same); 42 U.S.C. § 10805(a)(1)(B) (same). TDOC is the agency of the State of Tennessee that operates prisons, *see* Tenn. Code Ann. §§ 4-3-601 to -612, and is one of the entities whose actions are monitored by DRT.

Stinnett is a TDOC prisoner who is Deaf[1] and whose primary language is American Sign Language ("ASL"). ASL is a language with a structure and vocabulary distinct from American English, through which individuals are able to convey information, feelings, and ideas through hand gestures and facial expressions without the need of sound. (Doc. No. 28 ¶¶ 2–4.) According to Stinnett, the only way he can converse remotely in ASL is with a videophone ("VP"). In the past, TDOC has used teletypewriter ("TTY") technology to allow Deaf inmates to converse with individuals on the outside, but TTY devices only permit communication via written, alphanumeric language—for example, written English. ASL does not have a typewritten variant and therefore cannot be conveyed via TTY. (*Id.* ¶¶ 4–8.) Stinnett maintains that he needs access to the VP in order to sufficiently communicate with family and friends and that he is entitled to that access on terms equal to those afforded to hearing prisoners who communicate with voice telephones. (Doc. No. 42 ¶ 4.)

---

[1] The court will use the plaintiffs' preferred capitalized "Deaf" to reflect the fact that each plaintiff identifies not merely as having a hearing-related disability but also as being a member of a community of individuals with similar conditions who share a distinct culture and sense of identity. When quoting other documents or sources, however, the court will retain the quoted language's original capitalization.

Collins is also a TDOC prisoner who is Deaf. Like Stinnett, Collins' primary language is ASL and he states that he cannot effectively communicate with outside individuals without VP technology. (Docket No. 23-1 ¶¶ 4–8.) Collins' requested accommodations are essentially the same as Stinnett's. He seeks access to a sufficiently functional VP on terms at least equivalent to those offered to hearing prisoners using voice phones, in order to communicate with individuals outside the facility. In Collins' case, this includes his Deaf children. (Doc. No. 43 ¶ 7.)

**B. Procedural History**

1. The Plaintiffs' Grievances

On March 5, 2020, while Stinnett was at Bledsoe County Correctional Complex ("BCCX"), he filed a grievance with prison officials citing his lack of VP access. (Doc. No. 57-3 ¶ 2.) TDOC denied his request and returned the paper grievance to him. According to Stinnett, when he received the grievance, the section of the paperwork asking him if he would like to appeal TDOC's determination had been struck through. (*Id.*) He has provided a copy of the grievance that does, in fact, show the following text struck through in what appears to be black pen: "Do you wish to appeal this response? _____ YES _____ NO." (*Id.* at 4.) Stinnett provided the denial paperwork to his attorney and did not pursue the request further through formal administrative processes. (*Id.* ¶ 3.)

Collins also filed a grievance requesting VP access while at BCCX, on March 8, 2020. (Doc. No. 57-4 ¶ 2.) Collins' request, like Stinnett's, was denied, and, as was the case for Stinnett, the text asking him if he wished to appeal has been struck through in ink. On Collins' form, however, both the written denial of his request and the strike-through are in red ink, while Collins filled out his portion of the form in black. (Doc. No. 57-4 at 4.) Collins states that he had no access

to a red pen at the time. (*Id.* ¶ 4.) Collins, like Stinnett, mailed the form to his attorney and did not pursue further administrative review. (*Id.* ¶ 3.)

TDOC has filed a Declaration by BCCX Grievance Chairperson Sergeant Johnathan Coty Holland, stating that he was the TDOC official who signed the grievance forms. He claims not to have struck through the text offering the opportunity for an appeal and claims that, "[i]f Mr. Collins or Mr. Stinnett wished to appeal, they could have signed, dated and returned the grievance to me, as indicated at the bottom of page 1 of the grievances and I would have assisted them appropriately to the next respective levels of the procedures," but that Collins and Stinnett failed to do so. (Doc. No. 51-1 ¶ 6.)

### 2. This Case

On March 31, 2020, DRT and Ernest Kevin Trivette[2] filed a Complaint pleading claims under Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act related to several aspects of TDOC's treatment of deaf and hearing-impaired prisoners within TDOC facilities, including the lack of access to VPs. (Doc. No. 1 ¶¶ 145–67.) On July 13, 2020, the plaintiffs filed a Motion for Leave to File First Amended Complaint that would add Stinnett and Collins as plaintiffs. (Doc. No. 18.) On November 12, 2020, the court granted that motion.[3] (Doc. No. 29.) The First Amended Complaint ("FAC") asserts that, "[d]espite repeated requests, TDOC did not provide a videophone to . . . Stinnett while he was housed at BCCX." (Doc. No. 30 ¶ 188.) Stinnett was then transferred to Northeast Correctional Complex ("NECX"), but, according to the First Amended Complaint, there was "not a properly working videophone at NECX" either. (*Id.* ¶ 191.)

---

[2] Trivette is not seeking a preliminary injunction, because he is no longer in TDOC custody.

[3] The court also granted in part and denied in part a Motion to Dismiss directed at Trivette's claims.

4

With regard to Collins, who was, at the time the FAC was drafted, still at BCCX, the FAC alleges that, "[d]espite repeated requests, TDOC has not provided a videophone to . . . Collins since he entered custody." (*Id.* ¶ 202.) The FAC identifies various reasons—some general and some situation-specific—why Stinnett and Collins consider TTY to be an inadequate option. For example, "Collins is unable to communicate with his three Deaf children, ranging in age from five to eleven years old, at all through TTY Relay." (*Id.* ¶ 200.) Stinnett claims to be unable to communicate with his grandparents, including, in particular, his grandfather who suffers from progressive dementia. (*Id.* ¶ 187.)

On October 14, 2010, DRT, Collins, and Stinnett filed a Motion for Preliminary Injunction. (Doc. No. 22.) They ask the court to order that TDOC "shall provide videophone service to Gordon Stinnett and Jason Andrew Collins and shall ensure that Mr. Stinnett and Mr. Collins have access to the videophone on an equal basis with hearing inmates' access to telephones." (Doc. No. 22-1 at 3.) In light of pandemic-related concerns, the parties agreed to present evidence in support of or in opposition to the motion in the form of declarations and exhibits and to present oral argument by videoconference, rather than having a full evidentiary hearing. The parties filed a number of declarations and, on January 12, 2021, the court held the planned videoconference. Since then, the parties have filed a number of additional documents updating and/or clarifying matters at issue.

One of the challenges of this case and the current motion has been that, throughout the proceedings, neither the prisoners' situations nor TDOC's capabilities have been static. As a result, significant aspects of the briefing have been rendered obsolete by later developments, and many pieces of evidence presented have been effectively superseded by newer accounts of the developing status quo. In an attempt to piece the facts together and provide a timeline of how this

situation has developed, the court will review the most salient evidence presented both before and after the preliminary injunction hearing.[4]

## C. Pre-Hearing Evidence Related to Current Conditions in TDOC Prisons

### 1. Pre-Hearing Declarations of Stinnett and Collins

#### a. Stinnett

Stinnett filed an initial Declaration and a Supplemental Declaration on, respectively, October 23 and December 21, 2020, explaining his conditions at NECX as of those dates. (Doc. Nos. 28, 42.) NECX has both a Main Compound and an Annex, and Stinnett was housed in the Annex, which had no VP technology. He stated that he was given the opportunity to transfer to the Main Compound, which did have a VP, but chose not to do so, because he "d[id] not know whether the VP [in the Main Compound] works and ha[d] reason to believe it does not." (Doc. No. 42 ¶ 6.) Stinnett had been in the Main Compound for a two-week period before, while he was in quarantine, and had not been given access to a VP at the time. (*Id.* ¶ 8.)

Stinnett filed a Second Supplemental Declaration on December 30, 2020. (Doc. No. 46-1 at 3–4.) In the Second Supplemental Declaration, he stated that he was still housed in the NECX Annex and had not received access to a VP. (*Id.* ¶¶ 1–3.)

On January 7, 2021, Stinnett filed a Third Supplemental Declaration. (Doc. No. 49-1 at 4–5.) He stated that he was still in NECX and claimed that he, at that time, still had not had access to a VP. He stated, however, that a TDOC employee told his hearing cellmate, on January 5, 2020, that a VP was to be installed at the Annex that night. (*Id.* ¶¶ 2–6.)

---

[4] The hearing itself consisted only of argument and did not involve the presentation of additional evidence.

6

<u>b. Collins</u>

Collins filed his first Declaration on October 14, 2020, at which time he was imprisoned at BCCX in Pikeville, Tennessee, and had been given no access to a VP, despite his requests. (Doc. No. 23-1 ¶¶ 2, 6.) Collins filed a Supplemental Declaration on December 21, 2020 stating that, on November 16, 2020, he was transferred to NECX. (Doc. No. 43 ¶ 2.) At the time that the Supplemental Declaration was filed, he was still in post-transfer quarantine in the NECX Main Compound. He stated that, while in quarantine, he was not given VP access but that he had been told that, once the quarantine had been lifted, he would have access to the VP installed in the Main Compound. He stated that he did not know whether that VP was "in working order." (*Id.* ¶ 3.) According to Collins, hearing inmates were permitted use of phones while in quarantine, while he was denied VP access. (*Id.* ¶ 4.)

Collins filed a Second Supplemental Declaration on December 30, 2020 (Doc. No. 46-1 at 5–7), in which he stated that he was housed in the NECX Main Compound and was first given access to the VP on December 7, 2020. However, he complained that the VP "does not work like a fully functional VP should." Specifically, he stated that "[t]here are problems with the VP's video quality" and that "[s]ometimes, the video moves slowly and may freeze." (*Id.* ¶¶ 5–6.) He also claimed that the NECX Main Compound VP allowed only "relay" calls—meaning calls routed through an intervening interpreter—and not "point-to-point" calls directly between VP users. (*Id.* ¶ 7.)

On January 7, 2021, Collins filed a Third Supplemental Declaration. (Doc. No. 49-1 at 7–8.) He stated:

> On December 26, 2020, I was able to use the videophone (VP) at NECX to make a point-to-point call to my hearing mother and Deaf children who are fluent in ASL. I called them on their VP. However, the video for that call was not clear on my end. It was much worse than the video on my end during relay calls. I was not able to

7

follow the signing of my mother and children due to the video quality. I kept asking them to repeat signs but could not understand them because the video kept freezing. It was frustrating and made me sad to see my children but not be able to talk with them.

(*Id.* ¶ 2.) He stated, "I still have unequal access to the VP compared to the access hearing prisoners have to conventional telephones. After using the VP on December 26, 2020, I was not allowed to use it again until January 4, 2021." (*Id.* ¶ 4 .)

## 2. TDOC's Pre-Hearing Declarations

### a. Todd Stutts

TDOC provided two pre-hearing Declarations by Global Tel*Link Corporation ("GTLC") Senior Vice President of Business Development Todd Stutts. (Doc. Nos. 45-4 & 48-1.) Stutts explained that GTLC has a contract with TDOC for installation and maintenance of VP systems at NECX. He stated that GTLC had reviewed the system and found that it is working as intended, without connection problems. (Doc. No. 45-4 ¶¶ 1–3.) In his second Declaration, he addressed Collins' claims about the NECX VP system. Stutts stated that the system was working as intended and that, if Collins has experienced connectivity problems, it has not been due to GTLC's equipment. (Doc. No. 48-1 ¶¶ 2–3.)

### b. Jerry Gentry

TDOC provided three pre-hearing Declarations by NECX Compliance Manager Jerry Gentry. (Doc Nos. 32-1, 45-1, 48-2.) In his first Declaration, Gentry described the VP system in the NECX Main Compound as follows:

At NECX, the videophone is hooked up 24/7 in the unit team office in the core area between Units 13 and 14 on the main compound. For security reasons, the office is locked and when a Deaf inmate wishes to use the videophone, officers must escort him to the unit team office where the inmate can then make a private videophone call. The videophone system employs a relay service and the reception is very good and clear and the system works well. If an inmate wishes to connect directly to someone without the relay service, the recipient needs to have 1 to 2 gigs of

8

bandwidth for the connection. If the recipient has insufficient bandwidth to do so, the parties can employ the relay service.

(*Id.* ¶ 4.)

Gentry conceded that "[h]earing inmates have greater access to telephones than Deaf" inmates, which he attributed to the fact that there are non-VP telephones in NECX's housing units. (*Id.* ¶ 6.) He explained that a VP system could not currently be placed in the housing units, because the system would require fiber cable, which the housing units do not have. Gentry stated that having fiber installed for that portion of NECX would cost approximately $1.2 million. Because of these physical and financial limitations, Gentry stated, the VP is located in the unit office. (*Id.* ¶ 5.)

Gentry stated that the formal policy of NECX is to allow an inmate to access the VP only three times a week for 30 minutes, but he claimed that, "[i]f . . . Stinnett and Collins wish to use the videophones more often than three times a week, we will do our best to accommodate them." (*Id.* ¶ 6.) In contrast, hearing prisoners are generally allowed access to the voice telephones from 6:00 a.m. to 10:00 p.m. daily, unless the facility warden imposes some additional restriction. (Doc. No. 23-3 at 36 (TDOC Policy #503.8 § VI(A)(3)).)

In his Second Declaration, Gentry stated that the Annex still lacked a VP for Stinnett but that, in the Main Compound, Collins had successfully contacted his mother three times per week through the VP relay service, although he had been unable, so far, to connect point-to-point. An Annex VP, he claimed, was being installed. (Doc. No. 45-1 ¶¶ 3, 5.)

In his third Declaration, Gentry stated that GTLC had successfully installed a VP in the Annex that was available to Stinnett. (Doc. No. 48-2 ¶¶ 1–3.) With regard to Collins, Gentry stated that he had seen him use the VP to speak with his mother and that, during the call, the connection

9

was good and the direct point-to-point technology functioned properly. Gentry also stated that Collins had been allowed to use the VP more often than three times per week. (*Id.* ¶¶ 4–6.)

### 3. Report and Declarations of the Plaintiffs' Expert

The plaintiffs retained as an expert Richard Lorenzo Ray, who was the ADA Technology Access Coordinator for the City of Los Angeles until his recent retirement. Ray has extensive experience with adapting government services, including those involving telecommunications systems, to meet the needs of disabled individuals. (Doc. No. 23-3 at 2–3.)

In his Expert Report, Ray explained that recent decades have seen a society-wide transformation in telecommunications technology and practices, often accompanied by changes in the basic infrastructure through which telecommunications are transmitted. (*Id.* at 9–11.) Central to these changes, for Deaf individuals, has been the transition from TTY technology—which permits only communication in written language through comparatively slow conventional telecommunication connections—to video-based technologies that permit conversation in ASL but which require faster, more modern connections. While TTY was a dominant technology in the context of several decades ago, it presents a number of limitations. First and perhaps most prominently, neither English nor any other written alphanumeric language is the primary conversational language of most Deaf Americans. Even individuals proficient in written English, moreover, lose many expressive options when forced to speak through written text, which has significantly more limited options for expressing tone, emphasis, or affect. Moreover, not all Deaf individuals (or the people with whom they wish to converse) are proficient enough in written language to communicate effectively in writing. TTY machines, moreover, are very slow— according to Ray, "most TTYs use a communication code that is limited to transmitting text over telephone lines between the rate 30 to 60 words per minute." (*Id.* at 11.)

10

Ray also discussed the role played by telecommunications relay services ("TRS")—that is, "services that provide the ability for an individual who is deaf, hard of hearing, deaf-blind, or who has a speech disability to engage in communication by wire or radio with one or more individuals, in a manner that is functionally equivalent to the ability of a hearing individual who does not have a speech disability to communicate using voice communication services by wire or radio." 47 C.F.R. § 64.601(42). As relevant to this case, the need for a relay service is most prominent when a Deaf prisoner wishes to communicate with a hearing person who is not proficient in ASL. Relay services are available for use with TTY machines, but recent years have seen a migration to the use of video relay services ("VRSs") that "allow[] people with hearing or speech disabilities who use sign language to communicate with voice telephone users through video equipment." 47 C.F.R. § 64.601(50). The way that VRS works is straightforward:

> The deaf individual signs to an intermediary sign language interpreter via video monitor. The interpreter, in turn, relays the deaf person's message to the hearing individual in spoken English and vice versa. In a VRS conversation, the hearing party speaks into a standard telephone as he or she normally would.

(Doc. No. 23-3 at 15.) That seemingly simple process, of course, has both equipment and personnel costs. As Ray explained, however, "TRS providers—generally telephone companies—are compensated for the costs of providing TRS from either a state or a federal fund," and "[t]here is no cost to the TRS user"—at least no cost directly associated with the use of TRS in and of itself, although the user might still bear some other telecommunications-related costs. (*Id.* at 13.).

Ray's Report also addressed the logistical details of adopting and implementing video-based communication services, concluding that "there is no significant technological barrier preventing or that would have prevented TDOC's implementation of . . . video based accommodations. Moreover, any security concerns with these services are easily addressed." (*Id.* at 16–17.) Ray's analysis in his initial Report, however, did not go into detail regarding the specific

physical steps or expenditures necessary to implement those accommodations at NECX, in particular, but rather drew on his experience with prison accommodations generally. (*See id.* at 18–19.)

In light of the superior communication facilitated by videophones and VRS, Ray concluded:

> The Tennessee Department of Correction failed and continues to fail to provide Plaintiffs, other inmates who are deaf and hard of hearing, and other inmates with friends or family who are deaf or hard of hearing, with the means to communicate effectively and access TDOC's programs, services, and facilities. . . .
>
> Due to technological changes in the industry and expansion of videophone systems, implementation of technology, programs, and services to meet their communication needs, TDOC should keep abreast to ensure communication accessibility. By utilizing current device interfaces with network connections, an individual is able to experience video communication that is more functionally equivalent to that enjoyed by people who can hear and speak. . . .
>
> The expressed choice of the individual with the disability, who is in the best position to know his or her needs, should be given primary consideration in determining which communication aid to provide to ensure equal access to TDOC and its facilities, programs, activities, and services for all deaf and hard of hearing prisoners as well as inmates who can hear whose families are deaf or hard of hearing.

(*Id.* at 19.)

The plaintiffs also filed a pre-hearing Declaration by Ray directly responding to issues raised by TDOC in relation to the pending motion. (Doc. No. 35-2.) According to Ray, TDOC, in providing its estimate of the costs associated with providing VPs in the housing units, overstated the speed of the connection required for videophone services to function properly. (*Id.* ¶¶ 13–15.) Specifically, Gentry had claimed that 1 to two "gigs"—meaning gigabits—of bandwidth were required, which, according to Ray, "overstates the requirement by several orders of magnitude. One gigabit is equal to 1,000,000 kilobits; the 512 [kilobits per second] required for videophone communication is equal to 0.000512 gigs." (*Id.* ¶ 16.) Ray concluded that TDOC's $1.2 million

estimated cost of supplying videophone access to the housing units of NECX was significantly overstated, because it should not be necessary to install a new fiber connection, but rather merely to extend the current connection or use a non-fiber alternative. (*Id.* ¶¶ 23–26.)

**E. Post-Hearing Information Regarding VP Access**

1. TDOC's Update

On January 27, 2021, TDOC filed a Fourth Declaration of Jerry Gentry, providing an update on the availability of VP technology at NECX. Gentry conceded that there had been some unexpected delays related to the installation of the Annex VP but that the device was now installed and working. (Doc. No. 54-2 ¶¶ 2–5.) When the Annex videophone was installed, however, it temporarily caused the preexisting videophone in the Main Compound, which was an older model, to stop working. That issue, according to Gentry, was resolved by January 25, 2021. (*Id.* ¶¶ 8–9.)

2. Prisoners' Update

On February 16, 2021, the plaintiffs filed Third and Fourth Supplemental Declarations by Stinnett and Collins. (Doc. Nos. 57-1 to -4.) Stinnett described the continued difficulties in his attempts to use NECX's supposed VP capabilities:

> 4. On approximately January 8, 2021, TDOC began installing a VP in the Annex at Northeast Correctional Complex (NECX). It was not ready to use until January 11, 2021. I tried to use the VP on January 11, 2021, to call my mother, who is Deaf, point-to-point (VP to VP), and my boss, who is hearing, over video relay, but neither worked. Compliance Manager Jerry Gentry was there and saw that the VP was not working. I tried to use the VP two additional times the week of January 11th, but it did not work. I tried to use the VP again on January 19, 2021, and it still did not work.
>
> 5. Jerry Gentry indicated to me that the problem connecting with my Deaf mother over VP was on her end because she does not have Purple VP service. My mother does have Purple VP service.
>
> 6. The VP in the Annex at NECX does not work at all. A message keeps popping up that states "audio only."

13

7. As of January 19, 2021, I have not had access to a working videophone (VP) since entering TDOC custody. There is only a TTY which does not result in effective communication for me.

(Doc. No. 57-3 ¶¶ 4–7.)

Collins described the situation in the Main Compound as follows:

5. On or about January 6th, 2021, the VP in the Main Compound at NECX completely stopped working.

6. Since that time, the VP has not worked at all, either for relay calls or VP to VP (point to point).

7. TDOC has not indicated when the VP will be repaired.

8. Since approximately January 6, 2021, I have again only had access to TTY which is not effective for me.

9. I have been able to see into the room where the videophone was located and it is not there. I first noticed this on approximately January 15, 2021.

10. As of January 19, 2021, I have not been able to effectively communicate with my Deaf children since entering TDOC custody. I also have not had effective communication with my hearing adult family members who are fluent in ASL or been able to connect with my Deaf friends.

(Doc. No. 57-4 ¶¶ 5–10.) There is, in other words, still a considerable lack of clarity with regard to what is actually reliably available to either prisoner, although it does appear that TDOC has been making efforts to provide some VP access in both the Annex and the Main Compound, with some limited success.

**F. TDOC RFP for Update of Prison Telecommunication Systems**

The plaintiffs' claims involve the limited access to VP technology under current and past TDOC conditions. As this matter was briefed and argued, however, an additional complication became clear: TDOC appears to be in the early stages of a process that, if it continues to its expected completion, will upend the way that the agency handles telecommunications in its facilities, such that many of the practical and logistical assumptions underlying both the plaintiffs'

14

and TDOC's arguments may change dramatically. On July 31, 2020, TDOC issued Request for Proposals ("RFP") #32901-31247, seeking bids for a "Contractor to provide, install and maintain an Inmate Telephone System ('ITS'), standard visitation telephones, Video Visitation System ('VVS'), Inmate and general public kiosks ('Kiosk Services'), Electronic Trust Account Deposits and Correctional Grade Tablet Services ('Tablet Services') at its Institutions." TDOC, Request for Proposals for Inmate Communications and Related Services (July 31, 2020) ("Comms RFP").[5] According to TDOC Director of Contract Administration Priscilla Wainwright, the contemplated project would include installation of equipment to provide "video visitation services (VVS) at every such prison via multiple 'kiosks,' and via available-for-purchase inmate tablet services. Inmates will be able to use the tablets in their cells." (Doc. No. 51-2 ¶ 3.)

After the court's preliminary injunction hearing, the plaintiffs provided a Supplemental Declaration by Ray, analyzing the Comms RFP. Ray stated, "In my experience, the types of tablets sought by this RFP *could* have the capacity to provide point-to-point videophone service as well as video relay service . However, the RFP as drafted does not require or ensure the provision of either of these services." (Doc. No. 52-2 ¶ 7.) The Comms RFP, according to Ray, is chiefly focused on a broad overhaul of electronic communication services available to the general inmate population, and "[t]here is nothing in the RFP . . . regarding the availability of or procedures for video communications from deaf inmates to hearing individuals outside the prison through relay service or from deaf inmates to deaf individuals outside the prison through a point-to-point videophone connection." (*Id.* ¶ 11.) As a result, "while it is possible that the equipment and services called for by this RFP could be used [to] provide equivalent telecommunications services for deaf

---

5  Available at https://www.tn.gov/content/dam/tn/generalservices/documents/cpo/rfp-updates/32901-31247/TDOC%20RFP%2032901-31247%20Inmate%20Communication%20and%20Related%20Services.pdf.

15

inmates that are currently provided to hearing inmates, there is nothing in this RFP that requires or ensures that. (*Id.* ¶ 14.)

When the Comms RFP was originally issued, it had a Response Deadline of November 9, 2020 and a Contractor Signature Deadline of February 15, 2021. Comms RFP at 7. Since then, however, the RFP's Schedule of Events has been amended several times. In its most recent form, the Comms RFP has a Response Deadline of September 27, 2021 and a Contractor Signature Deadline of December 16, 2021.[6] (Doc. No. 58 at 4–5.) TDOC Inspector General Kelly Young has stated that the delays have been necessary because the RFP is "comprehensive and intricate" and has therefore required substantial back-and-forth with vendors. (Doc. No. 54-1 ¶ 9.) It therefore remains to be seen when TDOC will begin the installation of new systems that might resolve the specific problems at issue here.

## II. LEGAL STANDARD

"Four factors determine when a court should grant a preliminary injunction: (1) whether the party moving for the injunction is facing immediate, irreparable harm, (2) the likelihood that the movant will succeed on the merits, (3) the balance of the equities, and (4) the public interest." *D.T. v. Sumner Cty. Sch.*, 942 F.3d 324 (6th Cir. 2019) (citing *Benisek v. Lamone*, 138 S. Ct. 1942, 1943–44 (2018); Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2948 (3d ed. & Supp. 2019)). The district court must "weigh the strength of the four factors against one another," with the qualification that irreparable harm is an "indispensable" requirement, without which there is "no need to grant relief *now* as opposed to at the end of the lawsuit." *Id.* (citing *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982)). "Although no one factor is [otherwise]

---

[6] At the hearing, counsel for TDOC represented that the agency is hopeful that, once the contract is signed, the underlying telecommunications systems can be installed within about a month. Because there is no official transcript of the hearing in the record, the court's references to the hearing are based on notes and recollection.

controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000) (citing *Mich. State AFL–CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997)).

## III. ANALYSIS

### A. Likelihood of Success on the Merits

#### 1. Exhaustion

TDOC argues that the plaintiffs cannot establish a likelihood of success on the merits because their claims are subject to dismissal under the Prison Litigation Reform Act ("PLRA") for failure to exhaust. "The PLRA provides that '[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner . . . until such administrative remedies as are available are exhausted.'" *Lee v. Willey*, 789 F.3d 673, 677 (6th Cir. 2015) (quoting 42 U.S.C. § 1997e(a)). "The PLRA has been interpreted to require 'proper exhaustion,' meaning that a prisoner must 'complete the administrative review process in accordance with the applicable procedural rules,' as defined not by the PLRA, but by the prison grievance process itself." *Id.* (quoting *Jones v. Bock*, 549 U.S. 199, 218 (2007) (alterations omitted)). "[T]he PLRA's exhaustion requirement is designed to give prison officials a fair opportunity to address a prisoner's claims on the merits before federal litigation is commenced." *Mattox v. Edelman*, 851 F.3d 583, 592 (6th Cir. 2017) (citing *Reed-Bey v. Pramstaller*, 603 F.3d 322, 324 (6th Cir. 2010)). The Sixth Circuit has held, however, that "[a] prisoner's lack of compliance may be excused if the administrative remedies are not available," despite the prisoner's "'affirmative efforts to comply.'" *Lee*, 789 F.3c at 677 (quoting *Napier v. Laurel Cnty.*, 636 F.3d 218, 223 (6th Cir.2011) (citation omitted); citing *Brock v. Kenton Cty.*, 93 F. App'x 793, 798 (6th Cir. 2004)).

Stinnett and Collins each filed a grievance while in TDOC custody regarding the lack of VP technology, each of which was denied. The only legitimate issues that TDOC has identified with regard to their exhaustion, therefore, are that (1) the grievances were filed while each man was at a facility other than NECX, and (2) neither man pursued an administrative appeal. With regard to the first of these issues, TDOC has failed to identify any caselaw requiring that a prisoner must file a fresh grievance when he is transferred to a new facility, despite the fact that he is serving the same period of confinement in the custody of the same agency and complaining of the same deficiency. With regard to the second issue, TDOC is likely correct that a failure to pursue an administrative appeal typically would be fatal to a prisoner's claim under the PLRA. In this case, however, the plaintiffs have provided compelling evidence suggesting that TDOC personnel led them to believe that no appeal was available. Admittedly, the evidence does not indisputably establish why or how the prisoners' grievance forms were altered to strike through the language offering the opportunity for the appeal. The fact that the strike-throughs happened twice, however, combined with the red ink used on Collins' form, favors a conclusion that it was TDOC, not the plaintiffs, their attorneys, or any other party who made the alteration.

The court concludes that the most reasonable interpretation of receiving such a form, with the appeal language marked out, would be to read it as indicating that, in the prisoner's specific situation, no appeal was permitted. Indeed, it is difficult to imagine what else such an alteration could possibly mean. Accordingly, the current evidence does not support a conclusion that a failure to exhaust renders Stinnett and Collins unlikely to prevail. The court, accordingly, will consider the merits of their claims.

18

### 2. Substance of Claims

To state a claim under Title II of the ADA, the plaintiff must allege that (1) he has a disability; (2) he is otherwise qualified; and (3) he was excluded from participation in, denied the benefits of, or was subjected to discrimination under the program because of his disability. *Anderson v. City of Blue Ash*, 798 F.3d 338, 357 (6th Cir. 2015). The Rehabilitation Act's protections are the same. *S.S. v. E. Ky. Univ.* 532 F.3d 445, 452-53 (6th Cir. 2008). Under either statute, "prison officials have a general duty to provide reasonable accommodations to their disabled inmates." *Cox v. Corr. Med. Servs., Inc.*, No. 06-10350, 2006 WL 3147733, at *3 (E.D. Mich. Oct. 25, 2006).

Title II, like other antidiscrimination laws, provides a general mandate and framework, without expressly resolving how the law will apply in the full range of situations in which its requirements could arguably arise. The Sixth Circuit has recognized that, to that end, the federal government may issue regulations that "effectuate[] a mandate of Title II and [are] therefore enforceable through the private cause of action available under the statute." *Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 907 (6th Cir. 2004). As relevant to this case, the Department of Justice ("DOJ") has promulgated regulations setting forth the duties of government agencies subject to Title II with regard to individuals with communication-related disabilities. *See* 28 C.F.R. §§ 35.101, -.160–64. Pursuant to those regulations, the agency must "furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities, including applicants, participants, companions, and members of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." 28 C.F.R. § 35.160(b)(1).

The regulations recognize that, in many situations, the agency may face a choice between various alternative auxiliary aids and services with different capabilities, and the DOJ prescribes the following principles for selecting among those alternatives:

> The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place. In determining what types of auxiliary aids and services are necessary, a public entity *shall give primary consideration to the requests of individuals with disabilities*. In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability.

28 C.F.R. § 35.160(b)(2) (emphasis added).

A disabled participant in a government program, however, does not have an unqualified right to dictate how the agency will accommodate his needs. There are two overarching limitations to an individual's rights under Title II that safeguard a government's resources and objectives from accommodation requests that would be too expensive or disruptive to grant: first, "[t]he requirements of Title II are 'subject to the bounds of reasonableness,'" meaning that, among other things, there is no duty to provide an accommodation that would result in "undue financial and administrative burdens"; and, second, "the ADA 'does not require a public entity to take any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity . . . .'" *Tucker v. Tennessee*, 539 F.3d 526, 532 (6th Cir. 2008) (quoting *Johnson v. City of Saline*, 151 F.3d 564, 571 (6th Cir. 1998) (emphasis omitted); *see also* 28 C.F.R. § 35.164 (codifying limitations in context of communications-related accommodations).

With those principles in mind, the court has relatively little difficulty concluding that the plaintiffs are likely to succeed with regard to their claims, based on at least portions of the past

periods of time in which they had no access whatsoever to VP technology,[7] just as some other prisoners have succeeded on similar claims in recent years. *See Rogers v. Colo. Dep't of Corr.*, No. 16-CV-02733-STV, 2019 WL 4464036, at \*16 (D. Colo. Sept. 18, 2019) ("Plaintiffs have demonstrated that TTYs do not enable them to communicate effectively with persons outside of prison, much less provide them with telecommunications access equal to that provided to hearing prisoners, and that videophones are necessary for deaf inmates to have meaningful access to CDOC telephone services." (internal quotation and citation omitted)); *McBride v. Mich. Dep't of Corr.*, 294 F. Supp. 3d 695, 712–13 (E.D. Mich. 2018) ("Plaintiffs have shown that, *in reality*, TTYs do not enable them to communicate effectively with persons outside of prison, much less provide them with telecommunications access equal to that provided to hearing prisoners."). The evidence that TTYs are an inferior option and do not fully enable adequate communication is substantial. "[E]ach conversation over a TTY device takes significantly longer than signed or spoken conversations," and "[e]ffective communication over a TTY device requires proficiency in written English," which prisoners and/or the people with whom they wish to converse may not have. *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 207 (4th Cir. 2017). Stinnett and Collins have provided unrebutted evidence that they, in particular, struggle to communicate using a TTY, which is sufficient to raise the issue of reasonable accommodation.

With regard to that inquiry, TDOC's own actions confirm that providing at least *some* VP access is not an unreasonably difficult requirement. Indeed, by TDOC's own account, it is capable of providing VP access right now—and indeed does provide that access—without any significant

---

[7] One limited exception may be for the periods in which a prisoner was placed in medical quarantine. The record, which is chiefly focused on the issues related to providing VP access to prisoners in the general population, simply lacks sufficient evidence regarding the reasonableness or unreasonableness of providing VP access to prisoners during limited periods of quarantine. The court expresses no position on that specific issue.

21

overhaul of its facilities. There is no evidence in the record that TDOC's current actions were the result of some sudden leap forward in technology that occurred between the time that the plaintiffs filed their grievances and today. To the contrary, the evidence suggests that TDOC simply chose not to make VPs available to its Deaf prisoners until those prisoners and DRT advocated for a change, at which point it was relatively simple to provide at least limited access to the prisoners' preferred method of communication. The plaintiffs, therefore, are likely to succeed in establishing that denying the plaintiffs VP communications violated Title II.

The plaintiffs, however, do not merely challenge the total denial of VP access, but also the limitations that TDOC now places on that access, and the preliminary injunctive relief that they seek assumes that both policies—outright denial of VP access *and* providing VP access on more restrictive terms than voice telephone access—violated the ADA. The court, therefore, must consider whether the plaintiffs will succeed with regard to that latter aspect of their claims.

As a preliminary matter, TDOC argues that the plaintiffs cannot prevail on this component of their claims because, even though their access to telephone services is inferior to hearing inmates', their access is still "meaningful," and "meaningful access" is all that Title II requires. *See Alexander v. Choate*, 469 U.S. 287, 301 (1985). That argument, though, relies on an out-of-context reading of that particular phrase's use in the caselaw. What the ADA calls for is not meaningful access to some benefit, but "meaningful access *to the benefit that the grantee offers*." *Id.* at 301 (emphasis added). The question of what "benefit the grantee offers" looks at more than merely the broad category of service at issue, but what the government defendant actually provides. *See, e.g., Jones v. City of Monroe, MI*, 341 F.3d 474, 479 (6th Cir. 2003) (holding that, for ADA purposes, "[t]he benefit that [the city] is providing to all of its citizens . . . is free downtown parking at specific locations"). TDOC has chosen to offer its prisoners a program of telephone

22

access during all ordinary daytime hours, with no cap on the number of times per week it is used and no need to get an official's permission and assistance for each use. The plaintiffs seek meaningful access to *that* program, not meaningful access to some more restrictive telephone program for Deaf prisoners.

None of that means, of course, that Title II guarantees disabled prisoners fully equal access to every prison service. What it means, rather, is that the standard for determining the extent of access required is the familiar reasonable accommodation standard, not some abstract question of *de minimis* "meaningfulness." *See Tennessee v. Lane*, 541 U.S. 509, 531–32 (2004) ("Title II does not require States to employ any and all means to make . . . services accessible to persons with disabilities . . . . It requires only 'reasonable modifications' that would not fundamentally alter the nature of the service provided, and only when the individual seeking modification is otherwise eligible for the service.") (citation omitted). If all Title II required a government entity to provide was something meaningful—no matter how inferior—then the law would, in effect, be a license to openly discriminate against disabled individuals as long as the government tossed some non-negligible service their way. But Title II is not targeted at merely guaranteeing minimally adequate services to disabled people, but to remedying "unequal treatment of persons with disabilities by States and their political subdivisions"—that is to say, it addresses both "exclusion *and* discrimination." *Id.* at 526, 531 (emphasis added). All parties here agree that, absent additional accommodations, Stinnett and Collins will be receiving inferior access to telecommunications due to their disabilities. In other words, they lack meaningful access to the telephone program, as it exists for the general inmate population. The court, therefore, will proceed to the question of whether they are likely to succeed in establishing that their requested accommodations would be reasonable.

In this case, as in many disability discrimination cases, the issue of accommodation exists on a spectrum. On one far end of the spectrum is the refusal to offer any VP access at all, and the plaintiffs have shown that they are likely to establish that any such refusal was and would be unlawful. On the far other end of the spectrum, however, is what the plaintiffs ultimately want: for their access to VPs to be at least equivalent to the access that hearing prisoners have to voice telephones, in terms of ease and frequency of access, as well as any other relevant variables such as user cost and reliability, despite the fact that VPs represent a newer and more resource-intensive technology. In order to obtain injunctive relief requiring TDOC to extend its accommodations to that far end of its spectrum, the plaintiffs must show that they have a likelihood of success with regard to that more far-reaching aspect of their claims.

Further complicating matters is the fact that the question of what is "reasonable" in this area has always depended—and will continue to depend—on evolving facts regarding both what technology is available and what technology TDOC has already had installed. It is likely that there was a time, in the not-distant past, when a request for VP access would have been unreasonable, in light of the technological challenges involved. Indeed, the plaintiffs' own expert confirms that the rise of VP usage by Deaf individuals has been a product, not only of need, but of technological innovation. On the other hand, the evidence before the court suggests that a point may come, in the not-distant future, when access to video communication will be so widespread in TDOC facilities that allowing Deaf inmates to have relatively unfettered access to that technology might require little, if any, meaningful sacrifice for TDOC. The plaintiffs, however, happen to be incarcerated during this middle stage, in which the technology they seek is neither prohibitively rare nor conveniently ubiquitous. It is against that backdrop that they must demonstrate that their requested accommodations are reasonable.

The court concludes that the plaintiffs have demonstrated that they have some likelihood of success on the merits with regard to their claims based on the frequency and ease of their access to VPs, although that likelihood of success is less than their likelihood of success with regard to their claims based on the outright denial of VPs that they experienced earlier during their incarceration. Unlike, for example, the prisoner who unsuccessfully pursued a similar claim in *Spurlock v. Simmons*, 88 F. Supp. 2d 1189 (D. Kan. 2000), the plaintiffs have put considerable effort into exploring how TDOC could provide more equal access without prohibitive costs and have presented persuasive expert testimony about the costs. *See id*. at 1196 (noting that the prisoner has "fail[ed] to suggest any accommodation"); *see also Douglas v. Gusman*, 567 F. Supp. 2d 877, 890 (E.D. La. 2008) (rejecting similar claim from Deaf prisoner who "ha[d] not suggested any additional accommodation that would not place an undue burden on . . . officials"). As the plaintiffs clarified at the hearing, they are not asking for prison officials to be perpetually available at their beck and call to escort the prisoners to the current VP setups, nor are they asking TDOC to install expensive new fiber optic cable connections into new areas of the prison. According to Ray's testimony, which is not contradicted by any similarly qualified expert in disability accommodation, accommodations can likely be made relatively inexpensively just by extending existing data connections and placing a VP somewhere that does not require such a high level of staff involvement for a prisoner to access it.

Ray's expert opinion on the feasibility of accommodations, though persuasive, is unfortunately general in nature, based, for the most part, on his broad understanding of what has been done in prisons across the country, not on the particular circumstances at NECX. Nevertheless, when the court compares Ray's detailed recommendations based on his substantial professional expertise with the conclusory, significantly less detailed assertions made by Gentry

25

about the costs of an accommodation, the court concludes that there is a significant, though far from certain, likelihood that the plaintiffs will establish that they are entitled to a greater degree of access than they have been afforded so far.

## B. Irreparable Harm

The court has little doubt that, when an incarcerated person is prevented from effectively communicating with anyone in the outside world for an extended period of time, he likely suffers a significant, irreparable harm. *Cf. Hernandez v. Cty. of Monterey*, 110 F. Supp. 3d 929, 956 (N.D. Cal. 2015) (holding that prisoners "with disabilities continue to suffer irreparable harm through . . . lack of sign language interpreters"). Serving a period of incarceration can be difficult in even the best conditions; being incarcerated while also being cut off from one's family and friends, including one's own children, introduces an additional level of isolation and suffering that cannot simply be remedied at the end of litigation with a monetary award. The evidence before the court, moreover, shows that, while communication with the assistance of a TTY machine may be better than no communication at all, it is not sufficiently equivalent to communication in ASL to eliminate the risk of irreparable harm.

The irreparable injury inquiry is complicated, however, by the fact that it is exceedingly difficult to predict, based on the current record, how much VP access the plaintiffs would be likely to receive if the court denies an injunction. When the plaintiffs began this process, they had no access to VPs at all, and TDOC denied that access when they requested it through the grievance process. TDOC's position in front of this court, however, has been decidedly different, and there is evidence that TDOC has, at least to some degree, lived up to its revised stance. Stinnett and Collins are in a facility with VP access, and, while TDOC may not concede that it is legally *required* to offer VPs to its Deaf prisoners, the agency's counsel has repeatedly represented to the

court that it intends for VPs to remain available to Collins and Stinnett at NECX. Although TDOC pointedly does not go so far as to argue that its changes in behavior render the plaintiffs' claims moot, it does argue that they are evidence that an injunction is unnecessary.

Moreover, even the plaintiffs appear to accept that, because this problem will require a technological solution, improved access cannot be provided instantaneously. At the preliminary injunction hearing, counsel for the plaintiffs conceded that, even if they are granted injunctive relief, it may be necessary to allow a grace period of three to six months before improved capabilities might be expected to be in place. The court, therefore, cannot assume that TDOC's past difficulties with the NECX VPs prove that Stinnett and Collins will be denied effective VP access going forward. It may be that, even without an injunction, TDOC will work out the difficulties in the process with time.

Ultimately, though, the court concludes that the plaintiffs have shown a sufficient likelihood of irreparable harm for some preliminary injunctive relief to be granted. TDOC's efforts to provide functioning, accessible VPs have simply not been expeditious or effective enough to overcome the evidence of its past failures to accommodate, and, even if TDOC provides everything that it has promised, the defendants are still likely to suffer from their comparatively restricted communications options. Although it appears likely that Stinnett and Collins will have some opportunities for video communication even without an injunction, the available evidence suggests a significant likelihood that, absent some intervention, that access will not be frequent or effective enough to fully prevent irreparable harm.

## C. Equities/Public Interest

The third and fourth factors of the preliminary injunction analysis—harm to others and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S.

27

418, 435 (2009). In a reasonable accommodation case, moreover, many of the defendant's interests will already be accounted for in the court's analysis of the merits of the plaintiff's claims. If the costs of an accommodation are so great that the accommodation is unlikely to be found reasonable, then those same costs would also favor a finding that the public interest disfavors an injunction. By the same token, if the costs of the accommodation are minimal, then the harm to the public interest is also likely to be minimal. Unfortunately, what that overlap means in the context of this case is that the uncertainty that plagues the first two preliminary injunction factors is also an issue with regard to the latter two. The evidence supports a conclusion that TDOC has overestimated the cost—and, by extension, the harm to the public interest—of the requested accommodations, but it is less clear what precisely those costs are going to be.

Courts have recognized that there is a strong public interest in upholding the requirements of the ADA. *See Jones*, 341 F.3d at 490 (Cole, J., dissenting on other grounds); *Wilborn ex rel. Wilborn v. Martin*, 965 F. Supp. 2d 834, 848 (M.D. Tenn. 2013) (Haynes, C.J.). That public interest is particularly clear when it involves individuals, such as Stinnett and Collins, whose entire day-to-day lives are structured and controlled by the government and whose treatment reflects on the integrity of the justice system as a whole. There is no public interest in subjecting a Deaf criminal defendant to a period of incarceration that is harsher and more demanding than the sentence that would be served by a hearing criminal defendant who committed the same crime and received the same sentence. If Deaf inmates are subjected to levels of social and personal isolation that other prisoners are not, however, then that is precisely what is happening. Such a regime, if reasonably avoidable, is contrary to the public interest.

**D. Weighing of Factors**

The first two factors support the grant of a preliminary injunction in this case, but not overwhelmingly so. The plaintiffs' evidence, particularly Ray's expert report, suggests that the plaintiffs are likely to establish that TDOC can reasonably provide Stinnett and Collins with communication options that are at least closer to the options provided to hearing prisoners, in terms of ease and frequency of access, than TDOC has provided so far. That likelihood of success, however, is by no means a certainty, and the plaintiffs bear the burden of supporting the grant of an injunction. Similarly, the plaintiffs have demonstrated that they face a risk of irreparable harm, but the court does not know how extensive that harm ultimately will be.

On the other hand, there are legitimate public interest concerns weighing against the grant of an injunction, particularly one as categorical and unyielding as the plaintiffs have requested. Stinnett and Collins have asked the court to order TDOC to "ensure that . . . Stinnett and . . . Collins have access to the videophone on an equal basis with hearing inmates' access to telephones," whatever that requires. (Doc. No. 22-1 at 3.) The court, however, still has only a general sense of what complying with that edict would actually entail, other than that it would likely require less expenditure than TDOC claims. It would require a strong showing to support such a categorical, unyielding injunction.

The court concludes that the plaintiffs have carried their burden of establishing that preliminary relief is appropriate, but they have not carried the burden of establishing that they are entitled to the relief that they have requested. The court, instead, will order TDOC to work with Stinnett, Collins, and DRT to evaluate the logistical options at NECX and either propose a plan for greater access or provide the court with a significantly better-documented reason why such

29

access cannot be reasonably accomplished. The details will be set forth in the Order accompanying this Memorandum.

## IV. CONCLUSION

For the foregoing reasons, the plaintiffs' Motion for Preliminary Injunction (Doc. No. 22) will be granted, as modified by the court in the accompanying Order. TDOC will be ordered to work with the plaintiffs in an attempt to formulate an interim plan for improving their VP access until the telecommunications in TDOC facilities are overhauled, and if TDOC cannot agree to such a plan, it will be required to adequately document why such accommodations would not be reasonable.

An appropriate Order will enter.

ALETA A. TRAUGER
United States District Judge