UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| ERNEST KEVIN TRIVETTE et al. ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 3:20-cv-00276 |
| ) | Judge Aleta A. Trauger |
| TENNESSEE DEPARTMENT OF ) | |
| CORRECTION, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## MEMORANDUM

Disability Rights Tennessee ("DRT") and the individual plaintiffs have filed a Motion for Leave to File Their Fourth Amended and Supplemental Complaint (Doc. No. 120), to which the Tennessee Department of Correction ("TDOC") has filed a Response (Doc. No. 131), and the plaintiffs have filed a Reply (Doc. No. 135). For the reasons set out herein, the motion will be granted in part and denied in part.

## I. BACKGROUND

**A. The P&A System**

DRT is a Tennessee nonprofit corporation that advocates for individuals with disabilities. Although DRT is a private entity, it has been entrusted with certain public responsibilities as part of the federal Protection and Advocacy ('P&A') system, which relies on a state-by-state network of private agencies that receive public funds to help ensure that disabled individuals "participate in the design of and have access to needed community services, individualized supports, and other forms of assistance that promote self-determination, independence, productivity, and integration and inclusion in all facets of community life, through culturally competent programs " 42 U.S.C.

§ 15001(b). "[A] state cannot receive federal funds for" certain disability-related services "unless it has established a protection and advocacy system." *Prot. & Advoc. Sys., Inc. v. Freudenthal*, 412 F. Supp. 2d 1211, 1212 (D. Wyo. 2006) (citing *Ala. Disabilities Advoc. Program v. J.S. Tarwater Developmental Ctr.*, 97 F.3d 492, 495 (11th Cir. 1996)).

Although P&A agencies are nongovernmental, federal law grants them—or requires states to grant them—many powers that would typically be possessed by a regulator. For example, P&A agencies must have "authority to investigate incidents of abuse or neglect" and "must [be granted] broad and ready access to records and information to effectively pursue" such investigations. *Ga. Advoc. Off., Inc. v. Reese*, No. 1:15-CV-3372-AT, 2016 WL 8902366, at *3 (N.D. Ga. Aug. 30, 2016) (citing 42 U.S.C. § 15043 (a)(2)(B); *Miss. Prot. & Advoc. Sys., Inc. v. Cotten*, 929 F.2d 1054, 1059 (5th Cir. 1991); *Ala. Disabilities Advoc. Program v. J.S. Tarwater Developmental Ctr.*, 894 F. Supp. 424, 429 (M.D. Ala. 1995)) (emphasis omitted).

Whatever the merits of the P&A system's approach from a policy perspective, the privatization of enforcement poses some unique legal challenges, particularly with regard to bringing suit. In order for a state's P&A organization to qualify for federal dollars, it must have the power to "pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of [disabled] individuals within the State who are or who may be eligible for treatment, services, or habilitation." 42 U.S.C. § 15043(a)(2)(A)(i); *see also* 29 U.S.C. § 794e(f) (extending power-to-sue requirement to additional P&A duties); 42 U.S.C. § 300d-53(k) (same); 42 U.S.C. § 10805(a)(1)(B) (same). A general power to sue, however, does not necessarily mean that a claim brought by a P&A agency will actually be cognizable in federal court. Typically, the government "ha[s] standing to enforce its own law[s]." *Stauffer v. Brooks Bros., Inc.*, 619 F.3d 1321, 1325 (Fed. Cir. 2010). A P&A agency, however, is not the

2

government, nor is a claim filed by such an agency a claim on behalf of the government. Congress clearly intended P&A agencies to be able to bring enforcement actions, but, as the Supreme Court has unambiguously—and repeatedly—held, "Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Raines v. Byrd*, 521 U.S. 811, 820 n.3 (1997)). Accordingly, even if Congress adamantly and unambiguously intended for a P&A agency to be able to bring a certain type of claim, a federal court is still required to refuse to hear that claim unless the agency is able to satisfy the minimal constitutional requirements of standing for a private entity.

Of course, as anyone familiar with the federal courts is undoubtedly aware, private advocacy organizations are frequent litigants, a role that they are typically able to perform based on the assertion of "associational standing" derived from the organization's individual members. "An association has standing to bring suit on behalf of its members when [1] its members would otherwise have standing to sue in their own right, [2] the interests at stake are germane to the organization's purpose, and [3] neither the claim [brought] nor the relief requested requires the participation of individual members in the lawsuit." *Waskul v. Washtenaw Cty. Cmty. Mental Health*, 900 F.3d 250, 254–55 (6th Cir. 2018) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)). Applying those principles to DRT is somewhat challenging, though, because DRT, as a P&A agency, is charged with vindicating the rights of many individuals who are not "members" in any formal sense, but rather something more like constituents or beneficiaries.

That predicament is not necessarily fatal to DRT's power to sue on behalf of disabled Tennesseans in federal court, because the Supreme Court has recognized that associational

3

standing need not be confined to formal conceptions of "membership," as long as the "indicia of membership" are present. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977); *accord Ball by Burba v. Kasich*, 244 F. Supp. 3d 662, 682 (S.D. Ohio 2017). Nevertheless, the relatively unique position of P&A organizations places them between something of a rock and a hard place, from a standing perspective. A P&A agency enforces laws like a public agency, but it cannot fall back on the government's enforcement standing. It relies on doctrines typically applied to membership organizations, but the relevant individuals, frequently, are not members.

Faced with this situation, courts have nevertheless recognized that P&A agencies can, at least in some instances, sue to vindicate the rights of disabled people within the agency's territory, even in the absence of a formal membership nexus, based on the "indicia of membership" standard. *See, e.g., Doe v. Stincer*, 175 F.3d 879, 886 (11th Cir. 1999) (holding that P&A organization could assert associational standing on the same terms as membership-based organizations because its relationship with its constituents is "[m]uch like" the relationship of "members of a traditional association"). But the outer boundaries of that power—and what a P&A agency must show to exercise it—are not clearly set out in the caselaw, and courts have, at times, held that agencies have come up short. *See Tenn. Prot. & Advoc., Inc. v. Bd. of Educ. of Putnam Cnty., Tenn.*, 24 F. Supp. 2d 808, 818 (M.D. Tenn. 1998) (Wiseman, S.J.) (finding that P&A agency "failed to establish standing as required by Article III of the Constitution").

**B. This Case**

TDOC is an agency of the State of Tennessee that, among other things, operates prisons. *See* Tenn. Code Ann. §§ 4-3-601 to -612. On March 31, 2020, DRT and Ernest Kevin Trivette filed a Complaint pleading claims under Title II of the Americans with Disabilities Act ("ADA")

and Section 504 of the Rehabilitation Act related to several aspects of TDOC's treatment of deaf[1] and hearing-impaired prisoners within TDOC facilities, including the lack of access to videophones necessary to permit inmates to communicate with friends, family, or counsel in American Sign Language ("ASL") outside of in-person visitation. (Doc. No. 1 ¶¶ 145–67.) Shortly thereafter, TDOC filed a Motion to Dismiss for Lack of Jurisdiction, in which TDOC argued that DRT lacked standing to raise the stated claims. (Doc. No. 10.) While that motion was pending, the plaintiffs filed a Motion for Leave to File First Amended Complaint that would add three more deaf or hard of hearing prisoners, Alex Gordon Stinnett, and Jason Andrew Collins, as plaintiffs. (Doc. No. 18.)

On November 12, 2020, the court granted the plaintiffs leave to amend and denied the defendants' motion as to standing.[2] (Doc. No. 29.) Specifically, the court held that DRT's relationship with its beneficiaries, as pleaded, was sufficiently membership-like to support a facial assertion of associational standing. (Doc. No. 29 at 11.) The court acknowledged, however, that its holding was "arguably . . . at odds with an opinion by another judge of this court in a case involving the P&A system," although the two cases are distinguishable based on the fact that DRT has identified specific beneficiaries who suffered from the deprivations at issue in this lawsuit. (*Id.* at 11 n.5.)

On August 6, 2021, the plaintiffs filed an Unopposed Motion for Leave to File Second Amended and Supplemental Complaint. (Doc. No. 62.) The plaintiffs identified the purpose of the unopposed amendment/supplementation as "adding Thomas White as a plaintiff and setting out

---

[1] The court uses the lowercase "deaf" because this case involves the rights of individuals with hearing-related disabilities, regardless of whether any particular individual considers himself to be a member of the capital-d Deaf community.

[2] The court dismissed some plaintiff-specific requests for remedies that the plaintiffs had voluntarily abandoned.

factual events that occurred subsequent to the filing of the First Amended Complaint." (*Id.* at 2.) The court granted the motion. (Doc. No. 64.)

On March 31, 2022, the plaintiffs filed an Unopposed Motion for Leave to File Third Amended and Supplemental Complaint. (Doc. No. 86.) The plaintiffs sought to add three more individual plaintiffs— Lakeevious Owens, John Giles, and Pamela Bingham—and to set out "factual events that occurred subsequent to the filing of the Second Amended and Supplemental Complaint." (*Id.* at 2.) The court granted the motion. (Doc. No. 88.)

As 2022 progressed, the parties attempted to resolve the plaintiffs' claims through mediation, but they were ultimately unsuccessful. (Doc. No. 122.) On December 13, 2022, the plaintiffs filed a Motion for Leave to File Fourth Amended and Supplemental Complaint. (Doc. No. 120.) The plaintiffs identify four reasons why filing yet another operative complaint is, they argue, necessary in the interests of justice. First, the plaintiffs wish to "remove[] allegations asserting [direct, non-associational] standing [and separate damages] on behalf of DRT," while "add[ing] language supporting the remaining [associational] grounds for standing." (*Id.* at 1.) Second, the plaintiffs wish to "clarif[y] and explain[] the grounds for the individual Plaintiffs' damages claims in light of a recent change in the law." (*Id.* at 2.) Third, the plaintiffs wish, once again, to plead supplemental facts that occurred since the last complaint was filed. (*Id.*) Finally, the plaintiffs seek to add two new paragraphs for the following reason:

> [The proposed Fourth Amended and Supplemental Complaint] includes new paragraphs 98 and 99 in response to TDOC's assertions in [a December 12, 2022] telephone discovery conference, expressing a desire for a list of the claims at issue in this litigation. While Plaintiffs believe that the 3ASC and the discovery in this case have made such claims clear to TDOC, Paragraph 98 of the 4ASC provides such for easy reference.

(*Id.*) The court will refer to these requests as involving, respectively, the First Set of Proposed Changes through the Fourth Set of Proposed Changes.

6

Pretrial deadlines in this case have been extended by agreement of the parties on multiple occasions. The most recent extension affecting the deadline for amending pleadings was requested on January 27, 2022 (Doc. No. 77) and granted the following day (Doc. No. 78). That extension moved the deadline from February 1, 2022 to April 1, 2022. (*Id.*) The plaintiffs' motion for leave to amend was therefore untimely by about eight and one-half months. The plaintiffs concede that their request came after that deadline had passed, but they argue that they should still be permitted to amend their allegations, pursuant to the more demanding standard applicable to untimely amendments.

## II. LEGAL STANDARD

### A. Leave to Untimely Amend Complaint

"[W]hen a party seeks to amend its pleadings . . . after the expiration of scheduling order deadlines, it must show good cause under Rule 16(b)." *Garza v. Lansing Sch. Dist.*, 972 F.3d 853, 879 (6th Cir. 2020) (citing *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 625 (6th Cir. 2002); Fed. R. Civ. P. 16(b)(4)). "The primary measure of Rule 16's 'good cause' standard is the moving party's diligence in attempting to meet' the scheduling order's requirements, but courts also consider 'possible prejudice to the party opposing the modification.'" *Id.* (quoting *Inge*, 281 F.3d at 625). "While the absence of prejudice to a non-moving party may be relevant in determining whether leave to amend should be granted . . . , it does not fulfill the 'good cause' requirement of Rule 16(b)." *Woodcock v. Ky. Dep't of Corrs.*, No. 5:12-CV-00135-GNS-LKK, 2016 WL 3676768, at *1 (W.D. Ky. July 6, 2016) (citation omitted).

Assuming the movant clears the Rule 16 "good cause" hurdle, the court must then consider whether the proposed amendment is permissible under Rule 15. *Leary v. Daeschner*, 349 F.3d 888, 909 (6th Cir. 2003). Under Rule 15(a)(2), the court should "freely give leave [to amend] when

7

justice so requires." Fed. R. Civ. P. 15(a)(2). Rule 15(a)(2) "embodies a 'liberal amendment policy.'" *Brown v. Chapman*, 814 F.3d 436, 442 (6th Cir. 2016) (citation omitted). To determine whether to grant leave under this liberal policy, courts weigh several factors, including: "[u]ndue delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of amendment." *Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 458–59 (6th Cir. 2001) (citation omitted).

### B. Leave to Supplement Complaint

When a party wishes to plead facts about "any transaction, occurrence, or event that happened after the date of" the party's initial pleading, that party should rely on a supplemental pleading pursuant to Rule 15(d), not on an amended pleading pursuant to Rule 15(a). "Amended and supplemental pleadings differ in [that the] former relate to matters that occurred prior to the filing of the original pleading and entirely replace the earlier pleading," while "the latter deal with events subsequent to the pleading to be altered and represent additions to or continuations of the earlier pleadings." Wright & Miller, 6A Fed. Prac. & Proc. Civ. § 1504 (3d ed.). "The purpose of supplemental pleadings under Rule 15(d) is to allow a plaintiff to update his complaint to add allegations of later events relating to his original complaint." *Cage v. Harry*, No. 09–512, 2010 WL 1254562, at *1 (W.D. Mich. Mar. 26, 2010) (magistrate judge's order).

In addition to the different purposes served by amendment and supplementation, there is a key procedural difference: a supplemental complaint cannot be filed as a matter of course, regardless of its timing; "all supplemental pleadings require leave of court under Rule 15(d)." Wright & Miller, 6A Fed. Prac. & Proc. Civ. § 1504 (3d ed.). Although Rule 15(d) does not set out a specific standard governing requests, courts have generally assumed that, unless there is a

8

persuasive reason to the contrary, leave to supplement should be "freely given," just as leave is freely given to good-faith, timely amendments under Rule 15(a)(2). *Ne. Ohio Coal. for the Homeless v. Husted*, No. 2:06-CV-00896, 2015 WL 13034990, at *6 (S.D. Ohio Aug. 7, 2015).

## III. ANALYSIS

Before the court considers the specific requested amendments, it is worthwhile to consider what is—and is not—at stake. Rule 8 of the Federal Rules of Civil Procedure requires a complaint to contain three things: "(1) a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support; (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and (3) a demand for the relief sought, which may include relief in the alternative or different types of relief." Fed. R. Civ. P. 8(a). A complaint is not required to—and most of the time should not—cover every single fact or issue that might arise in a case. Rather, all the complaint must do is plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

There also is no requirement that a complaint be continually updated to reflect every development in the plaintiff's building of his case. The purpose of a complaint is to commence the lawsuit, Fed. R. Civ. P. 3, not to keep track of it. Although the complaint, by stating the claims asserted, defines the scope of litigation, there is no requirement that the complaint be updated to reflect the fine details of the case that the plaintiff actually builds and plans to take to trial. To the contrary, the Federal Rules envision that, once the trial is at hand, the parties and the court will work together to formulate and enter a pretrial order that will supersede the complaint and "control[] the course of the action." Fed. R. Civ. P. 16(d); *see also* Fed. R. Civ. P. 16(e); *Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1132 n.10 (10th Cir. 2003)). The circumstances in which

9

amendment is necessary are, therefore, limited. The court will consider the plaintiffs' requests with that in mind.

## A. First Set of Proposed Changes (Standing)

The plaintiffs state that they have two "primary motivation[s]" for seeking to file a new complaint. (Doc. No. 121 at 3.) One of those motivations involves the issue of available damages, which the court will discuss later in this opinion. The other "primary motivation," however, is somewhat more unusual: the plaintiffs' desire to "remove DRT's assertion of standing based on injury to the organization itself (as opposed to standing based on harm to its members and based on it[s] statutory authority [sic], which claims remain)."[3] (*Id.*) TDOC, however, has stated that it does not oppose the plaintiffs' decision to forsake reliance on DRT's direct, non-associational standing, and it does not appear to the court that a new operative complaint is actually necessary to give effect to the plaintiffs' concession. DRT could have—and now has—simply made that concession on the record. The court hereby recognizes and puts on the record DRT's waiver of reliance on any such theory of standing. This part of the plaintiffs' "primary motivation" is therefore easily accomplished without relying on an amendment.

The actual proposed amendments, however, go a great deal further than simply removing DRT's assertion of direct standing. Some of the requested amendments associated with this alleged purpose involve, instead, a recharacterization of the plaintiffs' substantive claims to focus less on the named individual plaintiffs and more on the general population of deaf and hard of hearing prisoners. For example, the following paragraph can be found in the currently operative Third Amended and Supplemental Complaint:

---

[3] As the court explained previously in this case (Doc. No. 29 at 10 (discussing *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016))) and has reiterated in this opinion, there is no such thing as "statutory authority" to bring suit in federal court in the absence of constitutional standing.

10

> 337. TDOC also refused to make reasonable accommodations and/or modifications to policies and procedures as requested by Mr. Trivette, for example, by alerting him to fire alarms when they sounded.

(Doc. No. 90 ¶ 337.) The plaintiffs, citing their position on standing, now seek to expand that assertion into the following two paragraphs:

> 340. TDOC also refused to make reasonable accommodations and/or modifications to policies and procedures as requested by deaf and hard of hearing prisoners and/or where obviously necessary to avoid disability discrimination.
>
> 341. For example, TDOC refused to make accommodations for Mr. Trivette by alerting him to fire alarms when they sounded.

(Doc. No. 120-1 ¶¶ 340–41.) Such a change would be wholly unnecessary to the limited purpose of relinquishing reliance on DRT's direct standing. Presumably, the reason for this edit is, instead, to shore up DRT's argument for associational standing, but the court has already rejected a motion to dismiss on that basis. While standing may still be contested and could come up again—in connection with a motion for summary judgment, for example—the question of whether associational standing was sufficiently *pleaded* has been resolved and remains the law of the case. There is no need to amend the complaint in order to plead it any better.

Insofar as these proposed revisions might nevertheless serve some purpose, there is no convincing reason to permit the plaintiffs to make such changes now. These amendments do not reflect new facts or changes to the law. They are, rather, changes in language and characterization—specifically, the framing of the underlying allegations as less tethered to individual plaintiffs—that could have been made at any time. It also is not clear to the court that such changes, if made, would have a meaningful substantive effect. Insofar as the changes *are* meaningful, however, they should have been made earlier, and there is no excuse for the delay. The interests of justice therefore weigh heavily against allowing the First Set of Proposed Changes.

## B. Second Set of Proposed Changes (Damages)

On April 28, 2022, the U.S. Supreme Court issued *Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562 (2022), in which it held that "emotional distress damages are not recoverable under" section 504 of the Rehabilitation Act. *Id.* at 1576. The Third Amended and Supplemental Complaint makes frequent reference to the "emotional and psychological distress" experienced by deaf and hard of hearing inmates, in an assertion of damages that are, the plaintiffs now concede, not recoverable in connection with their Rehabilitation Act claims. (*E.g.*, Doc. No. 90 ¶ 352.)

As the court noted in connection with the First Set of Proposed Changes, it is generally not necessary to amend a complaint simply to acknowledge that the plaintiff has abandoned a theory or assertion. The plaintiffs, however, do not simply seek to remove any requests for emotional distress damages in connection with the Rehabilitation Act. Rather, they seek to add a number of new assertions in support of possible recovery of other types of damages, particularly consequential economic damages.

TDOC responds by pointing out, accurately, that nothing about *Cummings* affected the availability of those other types of damages, which the plaintiffs could have requested from the start. The plaintiffs' delay, moreover, is exacerbated by the fact that the plaintiffs waited several months after the release of *Cummings* to make their request. The plaintiffs complain that the parties were focused on potential settlement during those months, but that is, at best, a partial excuse. The plaintiffs could have sought an agreed extension of amendment deadlines in order to facilitate a focus on settlement discussions, or they could have simply sought either an opposed extension or leave to amend while continuing to explore settlement. Of course, neither of those steps would have been necessary if the plaintiffs had simply pleaded these injuries to start with, which they

12

unambiguously could have. The court, therefore, will not grant the plaintiffs leave to file the Second Set of Proposed Changes as amendments to the Third Amended and Supplemental Complaint, on the ground that the amendment was not diligently pursued.

The court stresses, however, that the question of whether an amendment will be permitted is distinct from the question of what damages the plaintiffs can seek based on the complaint that is already pending. The Third Amended and Supplemental Complaint may focus, in its factual assertions, on emotional distress, but its prayer for relief includes no such limitation. To the contrary, the plaintiffs request "compensatory damages" as a general matter—with no qualification—as well as any "such additional or alternative relief as may be just, proper, and equitable." (Doc. No. 90 at 68–69.) Perhaps more importantly, Rule 54(c) of the Federal Rules of Civil Procedure expressly provides that, with the exception of judgments obtained through an opponent's default, "[e]very . . . final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." Fed. R. Civ. P. 54(c).

"This rule affords district courts flexibility in crafting relief so that a plaintiff may recover on a valid claim, regardless of counsel's pleading errors." *Yoder v. Univ. of Louisville*, 417 F. App'x 529, 530 (6th Cir. 2011) (citing *Colonial Refrigerated Transp., Inc. v. Worsham*, 705 F.2d 821, 825 (6th Cir. 1983)). "[T]he only caveat is that the opposing party must have had notice so as not to be prejudiced," *Versatile Helicopters, Inc. v. City of Columbus, Ohio*, 548 F. App'x 337, 343 (6th Cir. 2013) (citations omitted), and that notice has now been given, well before any judgment on the merits could plausibly be entered. The parties, therefore, should not mistake the court's Rule 16 analysis to be a ruling regarding what relief will ultimately be available if the plaintiffs prevail.

13

### C. Third Set of Proposed Changes (Supplemental Facts)

The Third Set of Proposed Changes, unlike the other proposed changes, involves supplemental allegations addressing events that could not have been included in the Third Amended and Supplemental Complaint, because the events had not happened yet. These new assertions, broadly speaking, involve two topics. First, the overwhelming majority of the new assertions involve the parole process for plaintiff White, who was released from prison in late November of 2022. The plaintiffs assert that White's "release was delayed due to TDOC's repeated failure to provide the auxiliary aids and services he needed to understand and participate in pre-parole, parole, and post-parole/preparation proceedings." (Doc. No. 120-2 ¶ 20; *see also id.* ¶¶ 22, 47, 66–67, 212–14, 321, 324, 358, 365, 373, 395, 405, 429.) Second, the plaintiffs wish to add a brief acknowledgment of TDOC's promulgation of an official "policy relating to deaf and hard of hearing incarcerated people," which the plaintiffs allege is inadequate. (*Id.* ¶ 243.)

TDOC states that it "does not object to [pleading] events that occurred after the filing of the prior complaint," meaning that this request—unlike the others—is unopposed. Moreover, even if this request were opposed, the court would be inclined to grant it, at least with regard to the allegations involving White's parole process, which are well within the realm of ordinary, permissible supplementation. The alleged failure of TDOC to provide White with adequate support in connection with his parole process is a continuation of the failures already raised by the Third Amended and Supplemental Complaint, and TDOC has not identified any reason not to permit the plaintiffs to fold those allegations into the case. There was, moreover, no meaningful delay for the purpose of pleading those facts; White was released from prison in November of 2022, and the plaintiffs filed the pending motion the next month. The necessity of the other proposed supplementation is less clear, but it is unopposed, and the TDOC's current policies are likely to

14

come up in this case, regardless of what the court does in this instance. The court will therefore permit the filing of a supplemental complaint based on the intervening facts that the plaintiffs have identified.

**D. Fourth Set of Proposed Changes (List of Claims)**

The Fourth Set of Proposed Changes consists of the following additions:

98. TDOC discriminates against deaf and hard of hearing people in its custody by, among other things:

   a. failing to have adequate policies, practices, and procedures in place to prevent disability discrimination;

   b. failing to provide sufficient training to prevent disability discrimination;

   c. failing to properly evaluate and screen for hearing disabilities;

   d. failing to track individuals with hearing disabilities;

   e. failing to provide effective communication;

   f. failing to provide sign language interpreters and/or relying on unqualified interpreters;

   g. failing to provide captioning services;

   h. denying access or providing unequal access to its programs and activities;

   i. denying access or providing unequal access to its telephone program including failure to provide or providing inadequate access to videophones and captioned telephones;

   j. failing to provide hearing aids and/or delaying repair or replacement of hearing aids;

   k. failing to provide visual and/or tactile systems to alert deaf and hard of hearing prisoners to audible announcements and alarms;

   l. failing to provide other reasonable modifications and/or accommodations necessary to avoid disability discrimination;

> m. restraining people who use their hands to communicate in ways that prevent or inhibit such communication.
>
> 99. The remaining paragraphs of this Fourth Amended and Supplemental Complaint provide examples of this discrimination.

(Doc. No. 120-1 ¶¶ 98–99.) Like the First Set of Proposed Changes, this addition represents a rhetorical reframing of the plaintiffs' allegations to be more general than they previously were, in a manner that could have been done at any time, including in the first complaint.

Again, there is an issue of superfluousness. The plaintiffs state that they "believe that the [Third Amended and Supplemental Complaint] and the discovery in this case have made [these] claims clear to TDOC," wholly aside from this proposed amendment. (Doc. No. 121 at 2.) The plaintiffs nevertheless offer the amendment, they explain, as (1) "easy reference" and (2) a response to comments by TDOC's counsel during a telephone conference. Neither of those rationales comes close to supplying grounds for amending a pleading more than eight months after the deadline for doing so, particularly given that the proposed language could have been included from the start of the case. The court accordingly will not grant leave to make such an amendment.

## IV. CONCLUSION

For the foregoing reasons, the plaintiffs' Motion for Leave to File Their Fourth Amended and Supplemental Complaint (Doc. No. 120) will be granted as to the filing of a supplemental complaint and will be otherwise denied.

An appropriate order will enter.

                                                                      _____
                                                                      ALETA A. TRAUGER
                                                                      United States District Judge