**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

ERNEST KEVIN TRIVETTE,
JASON ANDREW COLLINS,
ALEX GORDON STINNETT,
THOMAS WHITE,
LAKEEVIOUS OWENS,
JOHN GILES,
PAMELA BINGHAM,
and DISABILITY RIGHTS TENNESSEE,

               Plaintiffs,

v.

TENNESSEE DEPARTMENT OF
CORRECTION,
               Defendant.

Civil No. 3:20-cv-00276
**Judge Trauger**

---

## FOURTH SUPPLEMENTAL COMPLAINT

---

Plaintiffs Ernest Kevin Trivette, Alex Gordon Stinnett, Jason Andrew Collins, Thomas White, Lakeevious Owens, John Giles, Pamela Bingham, and Disability Rights Tennessee ("DRT"), on behalf of the individual Plaintiffs who are its Exemplar Constituents and all people who are deaf and hard of hearing and in the custody of the Tennessee Department of Corrections ("TDOC") who are also its constituents, by and through counsel, hereby file this Fourth Supplemental Complaint against the Tennessee Department of Corrections ("TDOC").

# INTRODUCTION

1.      Plaintiff Ernest Kevin Trivette was in the custody of TDOC from approximately June 2015 to April 2, 2019.[1] During that period, he was in multiple TDOC facilities. He is currently on parole.

2.      Mr. Trivette is Deaf.[2] His primary language is American Sign Language ("ASL") not spoken or written English.

3.      Throughout Mr. Trivette's time in TDOC custody, TDOC consistently failed to provide effective communication to him.

4.      Mr. Trivette regularly requested that TDOC provide qualified sign language interpreters to him when necessary to ensure effective communication. TDOC did so on only a handful of occasions. Instead of providing Mr. Trivette with qualified sign language interpreters, TDOC largely attempted to communicate with Mr. Trivette verbally, by written notes, and/or by relying on a hearing incarcerated person who has only a rudimentary knowledge of sign language and no formal training as an interpreter to "interpret" for him, including for multiple medical and psychiatric appointments. None of these methods resulted in effective communication for Mr. Trivette; they also compromised his privacy and safety.

---

[1] Plaintiff Trivette was previously in TDOC custody from approximately 1979 to 2002. While he experienced similar issues during this prior incarceration, this First Amended Complaint is limited to Mr. Trivette's claims against TDOC for discrimination against him while he was in TDOC custody from approximately 2015 to 2019.

[2] Uppercase Deaf typically refers to people like Mr. Trivette who share a language—American Sign Language (ASL)—and culture with other Deaf people. In contrast, lowercase deaf typically refers to people who do not hear but are not participants in Deaf culture. For additional information, see Community and Culture—Frequently Asked Questions, The National Association of the Deaf at https://www.nad.org/resources/american-sign-language/communityand-culture-frequently-asked-questions/ (last visited on March 30, 2020).

5.     Mr. Trivette also regularly requested access to appropriate telecommunication equipment necessary for him to communicate with his mother and friends. TDOC failed to provide such equipment until approximately the fall of 2018, a few months prior to Plaintiff Trivette's parole. Even after providing such equipment, TDOC failed to ensure that the equipment was in good working order. In addition, throughout Mr. Trivette's time in custody, TDOC placed more stringent rules on his use of telecommunication equipment than the rules for hearing incarcerated people to use phones. Thus, TDOC deprived Mr. Trivette of equal access to its phone program throughout his time in TDOC custody.

6.     TDOC's failure to provide Mr. Trivette with effective communication and equal access to TDOC's programs and services is part of a longstanding and ongoing pattern and practice of discrimination against deaf and hard of hearing incarcerated people.

7.     Plaintiff Alex Gordon Stinnett was in the custody of TDOC from approximately January 31, 2020 until approximately April 30, 2021. He was initially held at Bledsoe County Correctional Facility (BCCX) and was transferred to Northeast Correctional Complex (NECX) in June 2020.

8.     Mr. Stinnett is Deaf. His primary language is ASL, not spoken or written English.

9.     Throughout Mr. Stinnett's time in TDOC custody, TDOC consistently failed to provide effective communication to him.

10.    During his time in TDOC custody, Mr. Stinnett regularly requested that TDOC provide qualified sign language interpreters to him when necessary to ensure effective communication. However, TDOC failed to do so. Instead of providing Mr. Stinnett with qualified sign language interpreters, TDOC largely attempted to communicate with Mr. Stinnett

3

verbally and by written notes. None of these methods resulted in effective communication for Mr. Stinnett; they also compromised his privacy and safety.

11.    During his time in TDOC custody, Mr. Stinnett also regularly requested access to appropriate telecommunication equipment necessary for him to effectively communicate with his mother and other Deaf family members. Until approximately January 2021, TDOC denied him access to such equipment. After TDOC provided access to such equipment, there were ongoing equipment and/or service problems including connectivity problems. Upon information and belief, these connectivity problems often occurred during periods of high-volume phone usage by hearing incarcerated people such as evenings and weekends. In addition, TDOC placed more stringent rules on the telecommunication equipment for Deaf incarcerated people than the rules for hearing incarcerated people to use phones. Upon information and belief, from his entry into TDOC custody through his shortly anticipated release on parole, TDOC deprived Mr. Stinnett of equal access to its phone program.

12.    TDOC's failure to provide Mr. Stinnett with effective communication and equal access to TDOC's programs and services is part of a longstanding and ongoing pattern and practice of discrimination against deaf and hard of hearing incarcerated people.

13.    Upon information and belief, Plaintiff Jason Andrew Collins entered TDOC custody on February 19, 2020, was granted parole at his parole hearing on May 4, 2021, and currently resides in Jackson, Tennessee.

14.    Mr. Collins is Deaf. His primary language is ASL, not spoken or written English.

15.    Mr. Collins needs qualified sign language interpreters for complex and/or lengthy communications. His deafness and need for interpreters are obvious. Instead of providing Mr. Collins with qualified sign language interpreters, TDOC largely attempted to communicate with

4

Mr. Collins verbally, with gestures, by written notes, and through another incarcerated signer.[3] None of these methods have resulted in effective communication for Mr. Collins; they have also compromised his privacy and safety.

16.     Mr. Collins regularly requested access to appropriate telecommunication equipment necessary for him to effectively communicate with his Deaf children and other hearing family members. Until approximately December 7, 2020, TDOC denied him access to such equipment. After TDOC provided access to such equipment, there have been ongoing equipment and/or service problems including connectivity problems. These connectivity problems often occurred during periods of high-volume phone usage by hearing incarcerated people such as evenings and weekends. In addition, TDOC placed more stringent rules on telecommunication equipment for the Deaf than the rules for hearing incarcerated people to use phones. Upon information and belief, from his entry into TDOC custody through his shortly anticipated release on parole, TDOC deprived Mr. Collins of equal access to its phone program.

17.     TDOC refused to allow staff and other incarcerated people to have access to written materials in order to learn fingerspelling and basic signs for rudimentary communication with Mr. Collins. As a result, Mr. Collins was deprived of equal access to day-to-day interactions with TDOC staff and his peers.

18.     TDOC's failure to provide Mr. Collins with effective communication and equal access to TDOC's programs and services is part of a longstanding and ongoing pattern and practice of discrimination against deaf and hard of hearing incarcerated people.

---

[3] The term incarcerated signer refers to an incarcerated person that attempts to sign and does not mean or imply fluency in sign language.

19.     Plaintiff Thomas White is Deaf. His primary language is ASL, not spoken or written English.

20.     Upon information and belief, Mr. White was in the custody of TDOC from approximately 2017 to 2022. Mr. White was granted parole through a hearing held on August 4, 2022 and was released on or about November 21, 2022. His release was delayed due to TDOC's repeated failure to provide the auxiliary aids and services he needed to understand and participate in pre-parole, parole, and post-parole/preparation proceedings. He was housed at NECX prior to his release.

21.     Mr. White has complex communication needs and requires qualified sign language interpreters paired with Deaf interpreters for complex and/or lengthy communications. His deafness and need for interpreters are obvious. Instead of providing Mr. White with qualified sign language interpreters paired with Deaf interpreters, TDOC has largely attempted to communicate with Mr. White verbally, with gestures, by written notes, and through "incarcerated signers." None of these methods result in effective communication for Mr. White; they also compromise his privacy and safety.

22.     Mr. White requires appropriate telecommunication equipment necessary for him to effectively communicate with his Deaf and hearing family members. Until approximately January 2021, TDOC denied him access to such equipment. Since TDOC provided Mr. White with access to such equipment, there have been ongoing equipment and/or service problems including connectivity problems. Upon information and belief, these connectivity problems often occur during periods of high-volume phone usage by hearing incarcerated people such as evenings and weekends. In addition, TDOC placed more stringent rules on telecommunication

equipment for Deaf incarcerated people than the rules for hearing incarcerated people to use phones. TDOC deprived Mr. White of equal access to its phone program.

23.    As a Deaf person whose primary language is ASL, Mr. White has been hindered in his ability to pursue the ordinary grievance process at TDOC prisons.  The grievance form is in written English. TDOC has not provided Mr. White a qualified sign language interpreter so that he can access or understand the grievance form or process.

24.    TDOC's failure to provide Mr. White with effective communication and equal access to TDOC's programs and services is part of a longstanding and ongoing pattern and practice of discrimination against deaf and hard of hearing incarcerated people.

25.    Plaintiff Lakeevious Owens is currently in TDOC custody.

26.    Mr. Owens entered TDOC custody in 2017 and is incarcerated at Morgan County Correctional Complex (MCCX).

27.    Mr. Owens is Deaf. His primary language is ASL, not written or spoken English.

28.    Mr. Owens requires a qualified sign language interpreter for communications. TDOC has failed to provide Mr. Owens with a qualified sign language interpreter during classification, orientation, medical appointments, classes and disciplinary hearings that have been held since he entered TDOC custody.

29.    Mr. Owens requires appropriate telecommunication equipment necessary for him to effectively communicate on phone calls. Since the date of his incarceration, Mr. Owens has not had access to working telecommunication equipment necessary for him to effectively communicate on calls.

30.    Plaintiff Giles is currently in TDOC custody.

31.     Upon information and belief, Mr. Giles entered TDOC custody in approximately 2014 and is incarcerated at the Lois M. DeBerry Special Needs Facility ("DeBerry").

32.     Mr. Giles is hard of hearing.

33.     Mr. Giles requires a hearing aid for communications. Upon information and belief, TDOC has failed to provide Mr. Giles with a hearing aid.

34.     Mr. Giles requires appropriate telecommunication equipment necessary for him to effectively communicate on phone calls. Upon information and belief, since the date of his incarceration, TDOC has not provided Mr. Giles with such equipment necessary for him to effectively communicate on calls.

35.     Plaintiff Bingham is currently in TDOC custody.

36.     Upon information and belief, Ms. Bingham entered TDOC custody in approximately 2020 and is incarcerated at the West Tennessee State Penitentiary (WTSP).

37.     Ms. Bingham is hard of hearing.

38.     Because of her disability, Ms. Bingham requires reasonable modifications, such as an alert system, to notify her of prison instructions that she cannot hear. Upon information and belief, since the date of her incarceration, TDOC has not provided Ms. Bingham with any reasonable modifications to notify her of prison instructions.

39.     Instead, upon information and belief, TDOC has subjected Ms. Bingham to discipline due to her hearing loss, including placing her on "lockdowns" when she failed to follow instructions that she could not hear.

40.     Ms. Bingham requires appropriate telecommunication equipment necessary for her to effectively communicate on phone calls. Since the date of her incarceration, TDOC has

not provided Ms. Bingham with such equipment necessary for her to effectively communicate on calls.

41. In addition, for the past several years, DRT has repeatedly advocated for TDOC to provide effective communication to deaf and hard of hearing incarcerated people including each of the individual Plaintiffs who are DRT's Exemplar Constituents. DRT has engaged in this advocacy on behalf of both DRT's individual clients and systemically on behalf of all deaf and hard of hearing incarcerated people in TDOC custody who are all DRT constituents.

42. Despite DRT repeatedly informing TDOC about barriers to effective communication and the federal rights infringed upon thereby and advocating for TDOC to make changes to its actions, policies, and procedures, and to provide appropriate training to its personnel, TDOC continues to fail to provide effective communication to deaf and hard of hearing incarcerated people and continues to be in violation of federal laws.

43. Plaintiffs bring these claims under title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 et seq. ("ADA" or "Title II"), and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504"), to challenge TDOC's discrimination against and resulting injury to Mr. Trivette, Mr. Stinnett, Mr. Collins, Mr. Owens, Mr. Giles, and Ms. Bingham individually and as DRT's Exemplar Constituents, and all deaf and hard of hearing incarcerated people currently in TDOC custody who are all DRT's constituents.

44. TDOC discriminated against Mr. Trivette in violation of the ADA on the basis of his disability and in violation of Section 504 solely by reason of his disability.

45. TDOC discriminated against Mr. Stinnett in violation of the ADA on the basis of his disability and in violation of Section 504 solely by reason of his disability.

9

46. TDOC discriminated against Mr. Collins in violation of the ADA on the basis of his disability and in violation of Section 504 solely by reason of his disability.

47. TDOC discriminated against Mr. White in violation of the ADA on the basis of his disability and in violation of Section 504 solely by reason of his disability.

48. TDOC discriminated and continues to discriminate against Mr. Owens, Mr. Giles, Ms. Bingham, and other deaf and hard of hearing incarcerated people in TDOC custody in violation of the ADA on the basis of their disabilities and in violation of Section 504 solely by reason of their disabilities.

## JURISDICTION AND VENUE

49. This action arises under the laws of the United States. Jurisdiction is conferred upon this court pursuant to 28 U.S.C. §§ 1331 and 1343.

50. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because TDOC's central office is in the Middle District of Tennessee.

## PARTIES

51. Plaintiff Trivette is on parole from TDOC custody. He resides in Jackson, Tennessee.

52. Mr. Trivette is Deaf.

53. Mr. Trivette has an impairment that substantially limits major life activities that include but are not limited to hearing.

54. As such, he is a qualified individual with a disability as that term is used in the ADA and Section 504.

55. Mr. Trivette has been Deaf since early childhood, and ASL is his primary language.

56. Upon information and belief, Plaintiff Stinnett is on parole from TDOC custody. He resides in Knoxville, Tennessee.

57. Mr. Stinnett is Deaf.

58. Mr. Stinnett has an impairment that substantially limits major life activities that include but are not limited to hearing.

59. As such, Mr. Stinnett is a qualified individual with a disability as that term is used in the ADA and Section 504.

60. Mr. Stinnett has been Deaf since early childhood and ASL is his primary language.

61. Plaintiff Collins was granted parole at his parole hearing on May 4, 2021 and currently resides in Jackson, Tennessee.

62. Mr. Collins is Deaf.

63. Mr. Collins has an impairment that substantially limits major life activities that include but are not limited to hearing.

64. As such, Mr. Collins is a qualified individual with a disability as that term is used in the ADA and Section 504.

65. Mr. Collins has been Deaf since early childhood and ASL is his primary language.

66. Plaintiff White was released from TDOC custody on or about November 21, 2022.

67. Upon information and belief, Plaintiff White entered TDOC custody in approximately 2017, was initially housed at BCCX and was housed at NECX prior to his release.

68. Mr. White is Deaf.

69. Mr. White has an impairment that substantially limits major life activities that include but are not limited to hearing.

70. As such, Mr. White is a qualified individual with a disability as that term is used in the ADA and Section 504.

71. Mr. White has been Deaf since early childhood and ASL is his primary language.

72. Plaintiff Owens is currently in TDOC custody.

73. Mr. Owens entered TDOC custody in 2017 and is incarcerated at MCCX.

74. Mr. Owens is Deaf.

75. Mr. Owens has an impairment that substantially limits major life activities that include but are not limited to hearing.

76. As such, Mr. Owens is a qualified individual with a disability as that term is used in the ADA and Section 504.

77. Mr. Owens has been Deaf since early childhood and ASL is his primary language.

78. Plaintiff Giles is hard of hearing.

79. Mr. Giles has tinnitus.

80. Mr. Giles served in the U.S. Army where he began experiencing hearing loss.

81. Mr. Giles has an impairment that substantially limits major life activities that include but are not limited to hearing.

82. As such, Mr. Giles is a qualified individual with a disability as that term is used in the ADA and Section 504.

83. Mr. Giles is currently in TDOC custody.

84. Upon information and belief, Mr. Giles entered TDOC custody in approximately 2014. Mr. Giles is incarcerated at the Lois M. DeBerry Special Needs Facility ("DeBerry").

85.     Plaintiff Bingham is hard of hearing.

86.     Ms. Bingham has Ménière's disease, a condition that causes hearing loss, tinnitus, and vertigo. Ms. Bingham experiences all these symptoms.

87.     Ms. Bingham has an impairment that substantially limits major life activities that include but are not limited to hearing.

88.     As such, Ms. Bingham is a qualified individual with a disability as that term is used in the ADA and Section 504.

89.     Ms. Bingham is currently in TDOC custody.

90.     Upon information and belief, Ms. Bingham entered TDOC custody in approximately 2020. Ms. Bingham is incarcerated in the Women's Therapeutic Residential Center at WTSP.

91.     Plaintiff DRT is a Tennessee nonprofit corporation with its principal place of business in Nashville, Tennessee. DRT maintains regional offices in Nashville, Memphis, and Knoxville, Tennessee. It serves individuals with disabilities in all 95 counties in Tennessee.

92.     DRT is the federally mandated protection and advocacy system for the State of Tennessee. As such, DRT is authorized by multiple federal statutes to, among other things, pursue administrative, legal, and other remedies on behalf of people with disabilities, including but not limited to, people who are deaf and hard of hearing and are in the custody of TDOC, whose federally-protected rights are being violated.

93.     DRT also joins this lawsuit separately in its representative capacity in conjunction with Plaintiffs Trivette, Stinnett, Collins, White, Giles, and Bingham, and on behalf of and to vindicate the rights of deaf and hard of hearing incarcerated people in TDOC custody who are

being denied equal access to programs and services and effective communication in violation of the ADA and Section 504.

94.    Defendant TDOC is a department of the State of Tennessee.

95.    TDOC receives federal financial assistance as that term is used in 29 U.S.C. § 794.

96.    TDOC's central office is in Nashville, Tennessee.

## FACTS

**American Sign Language (ASL)**

97.    ASL is a visual language. It is a complete, complex language that employs signs made by moving the hands combined with facial expressions and postures of the body. For example, "English speakers ask a question by raising the pitch of their voice; ASL users ask a question by raising their eyebrows, widening their eyes, and tilting their bodies forward." American Sign Language, National Institute on Deafness and Other Communication Disorders (NIDCD) (May 8, 2019), https://www.nidcd.nih.gov/health/american-sign-language.

98.    ASL is not English in gestures. It has grammar and syntax that are completely different from English. When deaf people are raised using ASL as their first or primary language, written English is a foreign language, which is often acquired incompletely and imperfectly.

99.    Deaf people for whom ASL is their primary language almost always require the services of a qualified sign language interpreter for effective communication with people who speak English, especially when exchanging lengthy and complex information.

100.    Deaf people for whom ASL is their primary language almost always require the services of a qualified sign language interpreter for effective communication with people who

write notes to them in English and for effective communication about the content of English documents, especially when the note or document involves the exchange of lengthy and complex information.

101.    Becoming a qualified sign language interpreter takes many years of training and experience. Knowing some sign language is not sufficient to be a qualified sign language interpreter. Even being fluent in sign language is not sufficient to be a qualified sign language interpreter. Extensive formal training as an interpreter is needed to be a qualified sign language interpreter.

102.    According to the Registry of Interpreters for the Deaf ("RID"), "Interpreting is a complex process that requires a high degree of linguistic, cognitive and technical skills in both English and American Sign Language (ASL). . . . Interpreters must thoroughly understand the subject matter in which they work so that they are able to convert information from one language, known as the source language, into another, known as the target language." Professional Sign Language Interpreting Standard Practice Paper, Registry of Interpreters for the Deaf, Inc. (Updated 2007), https://rid.org/about-rid/about-interpreting/standard-practicepapers/.

103.    ADA regulations make clear a "[q]ualified interpreter means an interpreter who… is able to interpret effectively, accurately, and impartially, both receptively and expressively, using any necessary specialized vocabulary. Qualified interpreters include, for example, sign language interpreters…." 28 C.F.R. § 36.104.

104.    Incarcerated prisoners who are deaf or hard of hearing and communicate primarily in ASL as opposed to written English are hindered in their ability to pursue the ordinary grievance process, which is explained solely in verbal and/or written English and can be participated solely in written English.

105.    It is sometimes necessary to pair a hearing qualified sign language interpreter with a qualified Deaf interpreter to ensure effective communication for a Deaf person who has complex language needs. "A Deaf interpreter is a specialist who provides interpreting, translation, and transliteration services in American Sign Language and other visual and tactual communication forms used by individuals who are Deaf, hard-of-hearing, and Deaf-Blind. As a Deaf person, the Deaf Interpreter starts with a distinct set of formative linguistic, cultural, and life experiences that enables nuanced comprehension and interaction in a wide range of visual language and communication forms…." http://www.diinstitute.org/what-is-the-deaf-interpreter/ (last accessed on August 1, 2021).

**TDOC's Failure to Provide Qualified Sign Language Interpreters**

106.    ASL is Mr. Trivette's primary language.

107.    Mr. Trivette asked TDOC many times to provide a qualified sign language interpreter.

108.    TDOC did so on only a handful of occasions.

109.    The Parole Board required Mr. Trivette to complete a cognitive behavioral intervention program ("CBIP") prior to being released on parole.

110.    TDOC did not provide qualified interpreters for the CBIP program.

111.    No captioning was displayed for the videos shown during the CBIP program.

112.    As a result, Mr. Trivette sat through the CBIP program, which lasted approximately two months, without effective access to the information provided.

113.    During the CBIP program, TDOC staff regularly gave Mr. Trivette written tests.

114.    Mr. Trivette did not understand these tests. He was generally unable to even guess at the answers and often left the answers to many of the questions blank.

115.     TDOC offers Graduate Equivalency Degree (GED) classes and other classes to incarcerated people.

116.     Mr. Trivette requested that TDOC provide an interpreter for GED classes.

117.     TDOC refused to provide an interpreter for Mr. Trivette for GED classes.

118.     As a result, Mr. Trivette was not able to participate in TDOC's GED program or was not able to participate on an equal basis.

119.     As a result, Mr. Trivette was not able to obtain his GED.

120.     The lack of a GED left Mr. Trivette with fewer employment opportunities and lower anticipated future earnings when compared with those who have GEDs.

121.     TDOC provided certain information to Mr. Trivette only in written English.

122.     The information TDOC provided to Mr. Trivette only in written English included information relating to prison rules, the grievance process, and the Prison Rape Elimination Act (PREA).

123.     Mr. Trivette's understanding of this information was crucial to his health and safety while in TDOC custody.

124.     Mr. Trivette was unable to fully understand that information and thus was at risk for unwarranted discipline, inability to report infractions, and other violations of his rights.

125.     TDOC provided certain forms to Mr. Trivette only in written English.

126.     The forms TDOC provided to Mr. Trivette only in written English included forms regarding consent for medical treatment.

127.     Mr. Trivette was unable to fully understand any of those forms provided to him only in written English.

128.    Because he felt pressured by TDOC staff, Mr. Trivette often signed forms without understanding them.

129.    On multiple occasions, TDOC used one or more incarcerated people who allegedly knew some sign language ("incarcerated signers") to "interpret" for Mr. Trivette instead of providing a qualified sign language interpreter.

130.    TDOC used incarcerated signers for some of Mr. Trivette's medical appointments.

131.    TDOC's own records document the use of an incarcerated signer for multiple communications with Mr. Trivette instead of a qualified sign language interpreter.

132.    The following paragraphs provide a handful of examples of the many instances on which TDOC denied Mr. Trivette required effective communication.

a.    A March 16, 2016 entry in Mr. Trivette's medical records from TDOC states as follows: "Advised c/o u-11 of need for IM to accompany PT for purpose of sign language/communication officer states understanding and will send both for 1145 Appt today."

b.    A note from that March 16, 2016 visit with the Chronic Disease Clinic indicates, "Sign language utilized by cellmate for communication."

c.    A July 19, 2016 note from Rachael Whegber, PNPC it appears to read, in part, as follows: "Pt seen today, states he has not been seen by PT. The inmate is 'dumb' but with the help of his [illegible] cellmate he acknowledge [sic] that he did not know why he is here."

d.   A November 29, 2017 note regarding dental treatment for Mr. Trivette states, in part, "Do you have someone that signs for you?" In response, Mr. Trivette identified the person most frequently used by TDOC as an incarcerated signer for Mr. Trivette.

e.   A December 11, 2017 note regarding dental treatment states, "I will schedule you in approximately 1 molt month. It will be for wax bite. I will send [incarcerated signer] a slip again – we will need him for sure at next appt."

f.   On April 25, 2018, Mr. Trivette requested that TDOC provide a qualified sign language interpreter for religious services. The chaplain responded: "Asking some of our volunteers if they can help on this issue!" TDOC did not provide an interpreter to Mr. Trivette so he stopped attending religious services.

g.   Between February 12, 2019 and April 2, 2019, Northeast Correctional Complex ("NECX") Clinical Case Manager Kellie Shoun met with Mr. Trivette on approximately eleven occasions. These meetings were regarding case management services related to his upcoming parole. On February 12, 2019, Ms. Shoun noted, "Inmate is deaf and his interpreter was not available. CCM communicated with inmate via written communication. CCM will ensure inmate's interpreter is available for next appointment."

h.   Other than a few notes that make no reference at all to an interpreter, Ms. Shoun's notes for the remainder of the appointments repeatedly indicate that "inmate's interpreter" was present.

i.   All of Ms. Shoun's references to "inmate's interpreter" and "his interpreter" are references to an incarcerated signer who is not a qualified sign language interpreter.

j.   In a February 5, 2020 Memo addressed To Whom It May Concern, NECX's Clinical Case Manager Kellie Shoun documents that TDOC has used the same incarcerated signer

as a "sign language interpreter" for many years. She notes that this specific incarcerated signer has assisted her and many other staff members "in working with clients in need of an interpreter." While Ms. Shoun inaccurately states that the incarcerated signer is fluent in ASL, this memo documents that TDOC's reliance on unqualified incarcerated signers has occurred repeatedly and remains ongoing.

133.    Throughout his time in TDOC custody from approximately June 2015 - April 2, 2019, with the exception of a handful of occasions when it provided qualified sign language interpreters to him, TDOC failed to provide effective communication to Mr. Trivette for all complex and/or lengthy written and spoken English information, including that provided about grievance and PREA procedures and during orientation, medical appointments, dental appointments, case management, church services, the CBIP program, and the GED program.

134.    ASL is Mr. Stinnett's primary language

135.    TDOC is aware that Mr. Stinnett is Deaf.

136.    Mr. Stinnett's need for a qualified sign language interpreter for communications is obvious.

137.    Mr. Stinnett asked TDOC many times to provide a qualified sign language interpreter.

138.    TDOC only provided a qualified sign language interpreter to Mr. Stinnett a handful of times during his incarceration.

139.    TDOC did not provide an interpreter to Mr. Stinnett for orientation.

140.    TDOC did not provide an interpreter to Mr. Stinnett for classification.

141.    According to TDOC, the STRONG-R risk and needs assessment is used to identify "the most efficient case-plan, complete with appropriate programming, providing each

offender the opportunity to address the root of their criminal behavior."

https://www.facebook.com/TNDepartmentofCorrection/photos/a.150864261627612/1691994620

847894/?type=1&theater (last accessed on June 29, 2020).

142.    TDOC also notes, "The STRONG-R is the cornerstone of the Public Safety Act."

*Id.*

143.    TDOC did not provide an interpreter to Mr. Stinnett for the STRONG-R risks and

needs assessment.

144.    TDOC attempted to administer the STRONG-R risks and needs assessment to Mr.

Stinnett through written notes.

145.    TDOC's written notes did not result in effective communication with Mr. Stinnett

for the STRONG-R needs assessment.

146.    Mr. Stinnett did not fully understand the STRONG-R needs assessment.

147.    Mr. Stinnett spent significantly more time completing the STRONG-R needs

assessment than hearing incarcerated people.

148.    TDOC did not provide a qualified sign language interpreter to Mr. Stinnett for

his Tuberculosis (TB) skin test, results, or medication

149.    Mr. Stinnett did not understand the purpose or results of his TB skin test.

150.    TDOC gave Mr. Stinnett medication related to his TB skin test. Mr. Stinnett

does not know what that medication was.

151.    TDOC did not provide a sign language interpreter to Mr. Stinnett for

information about COVID-19.

152.    Mr. Stinnett did not fully understand the written information TDOC provided

about COVID-19

153. TDOC tested Mr. Stinnett for COVID-19 without explaining what the test was for.

154. TDOC did not provide a sign language interpreter to Mr. Stinnett for information about the Prison Rape Elimination Act (PREA).

155. Mr. Stinnett did not fully understand the written information TDOC provided about PREA.

156. Mr. Stinnett was scheduled for a parole hearing in April 2020, when he was incarcerated at BCCX.

157. Due to COVID-19, no incarcerated people at BCCX were allowed to attend parole hearings in person during the period Mr. Stinnett's hearing was scheduled to be held. Incarcerated people were instead given the option to continue their hearing to a later time or to waive their right to appear. However, TDOC did not provide a qualified sign language interpreter to explain this to Mr. Stinnett.

158. TDOC did not provide a qualified sign language interpreter to Mr. Stinnett regarding his options to continue the hearing or waive his appearance at the hearing.

159. TDOC did not provide a qualified sign language interpreter to Mr. Stinnett for review of the paperwork regarding his options for the April 2020 parole hearing.

160. Mr. Stinnett did not understand the paperwork regarding his options for the April 2020 parole hearing. As a result, he inadvertently waived his appearance at that hearing. So, a nonappearance hearing was held. He was not eligible for another parole hearing until April 2021.

161. TDOC did not provide Mr. Stinnett with an interpreter for information about the cognitive behavior intervention program (CBIP).

162.    Mr. Stinnett did not fully understand written information about the CBIP Program.

163.    Mr. Stinnett signed up for the CBIP program without understanding what that program is.

164.    During Mr. Stinnett's time at BCCX, he was penalized for attempting to communicate during head count. However, due to TDOC's failure to use a qualified sign language interpreter to review rules with him, Mr. Stinnett was unaware he was violating a rule. When he indicated he was unaware, TDOC staff told him he should look at the pictures in the handbook.

165.    Upon information and belief, TDOC did not provide an interpreter to Mr. Stinnett for development of his home plan prior to release on parole.

166.    ASL is Mr. Collins' primary language.

167.    TDOC is aware that Mr. Collins is Deaf.

168.    Mr. Collins was originally incarcerated at Bledsoe Correctional Complex (BCCX), before being transferred to NECX.

169.    Mr. Collins' need for a qualified sign language interpreter for communications is obvious.

170.    TDOC did not provide an interpreter to Mr. Collins for orientation.

171.    TDOC did not provide an interpreter to Mr. Collins for classification.

172.    TDOC did not provide an interpreter to Mr. Collins for the STRONG-R risk and needs assessment.

173.    TDOC attempted to administer the STRONG-R risks and needs assessment to Mr. Collins through written notes.

174.     TDOC's written notes did not result in effective communication with Mr. Collins for the STRONG-R needs assessment.

175.     Mr. Collins did not fully understand the STRONG-R needs assessment.

176.     TDOC did not provide a qualified sign language interpreter to Mr. Collins when reviewing his charges.

177.     Mr. Collins did not fully understand the information TDOC provided about his charges. This resulted in incorrect information remaining in his file.

178.     TDOC re-administered the STRONG-R needs assessment to Mr. Collins due to incorrect information about his charges.

179.     TDOC did not provide an interpreter to Mr. Collins when re-administering the STRONG-R needs assessment. They relied on written notes which did not result in effective communication. So, Mr. Collins still did not fully understand the STRONG-R needs assessment when it was re-administered to him.

180.     While TDOC did provide interpreters to Mr. Collins for participation in his CBIP class at NECX, it provided those interpreters only through VRI and there were significant connectivity problems. As a result, TDOC did not provide Mr. Collins with effective communication for his CBIP class.

181.     TDOC initially required Mr. Collins to complete homework assignments for his CBIP class on his own without an interpreter. Because those assignments were in written English and required written English responses, TDOC initially did not provide Mr. Collins with effective communication for his CBIP homework assignments.

182.     TDOC did not provide an interpreter to Mr. Collins for information about COVID-19.

183.	Mr. Collins did not fully understand the written information TDOC provided about COVID-19.

184.	TDOC did not provide an interpreter to Mr. Collins for development of his home plan prior to release on parole.

185.	Mr. Collins did not fully understand what TDOC required to be in the home plan in order to approve his release. As a result, TDOC rejected his initial home plan and required him to revise it.

186.	ASL is Mr. White's primary language.

187.	TDOC is aware that Mr. White is Deaf.

188.	Mr. White need for a qualified sign language interpreter for communications is obvious.

189.	TDOC has only provided a qualified sign language interpreter to Mr. White a handful of times during his incarceration.

190.	Due to Mr. White's complex communication needs, he requires both a qualified sign language interpreter and a Deaf interpreter working as a team to provide effective communication. Upon information and belief, TDOC has never provided a qualified sign language interpreter/Deaf interpreter team for communications with Mr. White.

191.	Upon information and belief, TDOC did not provide an interpreter to Mr. White for orientation.

192.	Upon information and belief, TDOC did not provide Mr. White a copy of the Tennessee Department of Correction handbook and his native language of ASL, nor was he provided access to it through a qualified sign language interpreter.

193.     Upon information and belief, TDOC did not provide an interpreter to Mr. White for classification.

194.     Upon information and belief, TDOC did not provide an interpreter to Mr. White for the STRONG-R risk and needs assessment.

195.     Upon information and belief, Mr. White did not fully understand the STRONG-R needs assessment.

196.     TDOC did not provide a qualified sign language interpreter to Mr. White when reviewing his charges.

197.     TDOC did not provide a qualified sign language interpreter to Mr. White for information about COVID-19.

198.     Mr. White did not fully understand the written information TDOC provided about COVID-19, including but not limited to, potential side effects so he was not able to effectively consent to treatment then or on other occasions.

199.     Upon information and belief, TDOC did not provide a sign language interpreter to Mr. White for information about the Prison Rape Elimination Act (PREA).

200.     Upon information and belief, Mr. White does not fully understand the written information TDOC provided about PREA.

201.     TDOC has provided a qualified sign language interpreter to Mr. White for his medical appointments only a handful of times and, instead, uses written notes or an untrained "incarcerated signer" to "interpret" for Mr. White during his medical appointments.  This does not provide Mr. White with effective communication about his health care.

202.     Mr. White does not understand why TDOC is repeatedly drawing blood from him. He does not want TDOC to draw his blood and TDOC has not obtained his informed

consent to do so. It is Mr. White's understanding that TDOC is requiring him to submit to repeated blood draws.

203.     TDOC correctional guards and staff communicate with Mr. White through written notes.  Written notes do not provide Mr. White with effective communication.

204.     On one occasion, a correctional guard at NECX took a phone call from one of Mr. White's relatives and then wrote down on a piece of paper that Mr. White's sister had died. Because he is Deaf, Mr. White was forced to receive this devastating information second hand and in a secondary language.

205.     As a prisoner with a hearing disability and whose primary language is ASL, Mr. White has been hindered in his ability to purse the ordinary grievance process at TDOC prisons. The grievance format is written English.  TDOC has not provided Mr. White a qualified sign language interpreter paired with a qualified Deaf interpreter so that he can access or understand the grievance process.

206.     In approximately July 2021, TDOC moved Mr. White from the Annex at NECX to the main compound. TDOC did not provide a qualified interpreter to explain this move to Mr. White. TDOC used an incarcerated signer to attempt to explain this move to Mr. White. This did not result in effective communication for Mr. White. As a result, Mr. White does not understand the reason for this move.

207.     In approximately July 2021, TDOC gave Mr. White a document about disciplinary charges. Because Mr. White's first language is ASL not spoken or written English, he does not understand this document.

208.     Prior to Mr. White's parole hearing on August 4, 2022, Plaintiff DRT requested that TDOC provide Mr. White with a qualified interpreter team, which would include a Deaf

interpreter, for the hearing. When TDOC did not commit to providing Mr. White with a Deaf interpreter, Plaintiff DRT offered to fund and virtually provide a Deaf interpreter for this critical hearing. Despite these attempts, TDOC still failed to allow the Deaf interpreter admittance to the hearing. Upon information and belief, TDOC provided Mr. White with a hearing interpreter through VRI at the hearing, which was not effective communication for Mr. White.

209. While Mr. White was granted parole at the August 4, 2022 hearing, he did not understand what occurred at the hearing or what the requirements are for his release, including whether he must complete a home plan or any classes. Mr. White faced barriers and delays to his release from incarceration due to TDOC's failure to provide him with a qualified interpreter team so that he can understand and complete the requirements for his release.

210. TDOC generally did not attempt to communicate with Mr. White even in an ineffective manner. He spent most of his time sitting in front of the TV. In TDOC custody, Mr. White felt lonely, depressed, and isolated.

211. ASL is Mr. Owens' primary language.

212. TDOC is aware that Mr. Owens is Deaf.

213. Mr. Owens' need for a qualified sign language interpreter for communications is obvious.

214. Mr. Owens entered TDOC custody on or about August 9, 2017.

215. Since that time, TDOC has only provided Mr. Owens a sign language interpreter one time for a parole hearing.

216. TDOC did not provide an interpreter to Mr. Owens for classification, which includes the SRONG-R risk and needs assessment and information on the Prison Rape Elimination Act (PREA), and, thus, he did not fully understand the information relayed to him.

217.    TDOC did not provide a qualified sign language interpreter to Mr. Owens for orientation, and thus, he did not fully understand the information relayed to him.

218.    TDOC did not provide Mr. Owens a copy of the Tennessee Department of Correction handbook and in his native language of ASL, nor was he provided access to it through a qualified sign language interpreter.

219.    TDOC has never provided Mr. Owens a sign language interpreter for a medical appointment or evaluation.  Therefore, Mr. Owens does not fully understand, nor can he participate, in his own health care.

220.    Mr. Owens wishes to complete his GED while in TDOC custody, but because TDOC does not provide sign language interpreters, he has been unable to attend classes and complete his GED.

221.    Mr. Owens has had approximately ten (10) disciplinary hearings since he has been in TDOC custody.  TDOC has not provided him a sign language interpreter for any of these hearings.

222.    During these hearings, Mr. Owens waived his right to due process without having this right explained in his primary language of ASL.

223.    At these hearings, TDOC also is required to give Mr. Owens a copy of the disciplinary report in question and advise him of his limited right to remain silent and be represented by an offender advisor.  TDOC has not provided Mr. Owens an interpreter to explain the report nor explain these rights.

224.    Mr. Owens pled guilty to all disciplinary charges that TDOC alleged and was placed in segregation as punishment on multiple occasions without the benefit of having any of

his rights explained in his primary language of ASL, nor having a sign language interpreter at the hearing.

225.    Mr. Owens did not fully understand, nor could he equally participate, in these disciplinary hearings due to TDOC's failure to provide him with a sign language interpreter.

226.    Mr. Owens is at great risk of harm from other incarcerated people and unable to participate equally in programming offered in the TDOC facility in which he resided. As a result of TDOC's failures, he is more isolated and at risk than other incarcerated people.

**TDOC's Failure to Provide Hearing Aids**

227.    TDOC is aware that Mr. Giles is hard of hearing.

228.    Before entering TDOC custody, Mr. Giles used a hearing aid for the hearing loss in his left ear.

229.    Since at least June 25, 2014, TDOC has been aware and on notice that Mr. Giles is hard of hearing.

230.    Mr. Giles has been incarcerated at DeBerry Special Needs Facility ("DeBerry') since approximately 2020.

231.    Since that time, upon information and belief, TDOC has not provided Mr. Giles with hearing aids.

232.    Upon information and belief, without hearing aids, Mr. Giles has difficulty hearing and cannot fully understand or equally participate and engage with either TDOC staff or other incarcerated people.

233.    Upon information and belief, Mr. Giles attends classes and religious services in custody. Upon information and belief, without hearing aids, Mr. Giles cannot fully understand or equally participate in these classes and services.

234.    Upon information and belief, Mr. Giles has made multiple requests to TDOC staff to receive hearing aids.

235.    Upon information and belief, TDOC has not provided Mr. Giles with any hearing aids since he has been incarcerated at DeBerry.

236.    Upon information and belief, throughout his time in TDOC custody, TDOC has not provided Mr. Giles with any alert system or assistive technology to notify him of TDOC prison staff instructions that he has difficulty hearing. As a result, Mr. Giles cannot equally participate and engage in TDOC's programs and services.

237.    As a result of TDOC's failure to provide him with hearing aids, an alert system, and other assistive technology to ensure effective communication, Mr. Giles is at greater risk of harm from other incarcerated people and unable to participate equally in programming offered in the TDOC facility in which he resides. As a result of TDOC's failures, he is more isolated than other incarcerated people.

**Lack of TDOC Policies for Effective Communication**

238.    When this litigation commenced, TDOC had no policy or procedure regarding provision of qualified sign language interpreters or ensuring effective communication with people who are deaf or hard of hearing. Two and a half years after the original Complaint was filed, calling out this shortcoming, TDOC promulgated a policy relating to deaf and hard of hearing incarcerated people.  That policy remains incomplete and ineffective in numerous ways.

239.     In contrast, TDOC has a detailed Limited English Proficiency (LEP) policy for providing communication to hearing individuals who use spoken languages other than English. See TDOC Policy 103.10.1. Although the LEP policy contains one reference to interpreters for

the "hearing impaired," it does not otherwise provide guidance about how or when to obtain or utilize the interpreters.

240. Upon information and belief, TDOC does not have a contract with any agencies which provide sign language interpreters.

241. TDOC continues to refuse and/or fail to provide qualified sign language interpreters to deaf and hard of incarcerated people currently in custody.

**Technology for Phone Access by Deaf and Hard of Hearing Incarcerated People**

242. Because deaf people cannot use a conventional telephone, technology has developed to permit them to communicate at a distance.

243. The earliest such technology, the teletypewriter or TTY, was invented in approximately 1964. It involved placing a standard telephone handset into an "acoustic coupler" connected to a teleprinter machine. Over time, the device evolved into a single piece of equipment that included a QWERTY keyboard and was connected to a phone jack.

244. A TTY requires that individuals at both ends of the communication have specific TTY equipment.

245. In a TTY communication, each participant types out in written English his or her side of the conversation, then waits while the other person types back.

246. As such, TTY communication is a more cumbersome form of communication than a telephone conversation between hearing people.

247. In addition, deaf people who do not communicate via written English, but primarily communicate via ASL, cannot communicate effectively using a TTY.

248.    For the same reason, TTY communication is a more cumbersome form of communication than a videophone conversation between deaf people or a deaf person and a hearing person who knows ASL.

249.    As technology has evolved, fewer and fewer deaf people own or use TTYs.

250.    It is more and more common for deaf people to use videophones rather than TTYs.

251.    As the name suggests, a videophone has a camera and a screen and transmits a video signal, permitting deaf people -- or a deaf person and a hearing person who signs -- to see each other and communicate directly with one another in ASL.

252.    A videophone also enables a deaf person to communicate with a hearing person who does not sign through a video relay service ("VRS"). A deaf person can use their videophone to connect with a VRS interpreter who then connects by phone to a hearing person. When the deaf person signs, the interpreter voices to the hearing person. When the hearing person speaks, the interpreter signs to the deaf person.

253.    Similarly, a conventional telephone is not accessible to many people who are hard of hearing.

254.    A captioned telephone ("CapTel") is a phone that allows a hard of hearing person to speak directly into the phone while a captioner listens and transcribes the other party's voiced words into captions for the hard of hearing person to read.

**TDOC's Failure to Provide Equal Access to its Phone Program**

255.    TDOC permits incarcerated people to make phone calls to individuals who are on their allowed telephone number list ("ATN list"). TDOC Administrative Policies and Procedures ("Policy") 503.08 ¶ VI(B)(2).

256. Telephones are readily accessible to hearing incarcerated people and may be used during days and times of day specified by the Warden of each facility. Policy 503.08 ¶¶ VI(A)(3), (D)(1)-(2).

257. Telephones are generally available at TDOC facilities from 6 a.m. to 10 p.m. local time. Policy 503.08 ¶ VI(A)(3).

258. Each telephone call is limited to no more than thirty minutes. Policy 503.08 ¶ VI(B)(6).

259. Hearing incarcerated people who wish to contact hearing family members or friends are permitted to walk up to the phones at any time they are available and place a call, provided they have paid for the time (or are calling collect) and are calling someone on their ATN list.

260. Policy 503.08 generally states, "Adaptations for the hearing impaired shall be provided." ¶V. This policy goes on to state, "A TTY system shall be made available at all TDOC and privately managed institutions as needed." ¶VI(D)(3).

261. TDOC does not make TTYs available to deaf and hard of hearing incarcerated people on the same basis that telephones are available to hearing incarcerated people.

262. Some TDOC prisons do not have a TTY on their premises.

263. Some TDOC prisons do not have a functioning TTY on their premises.

264. Instead, deaf and hard of hearing incarcerated people must submit a written request to their counselor or designated unit management team member to use the TTY.

265. The counselor/unit management team member then makes arrangements to "allow the inmate to place the TTY call using a staff telephone…." Policy 503.08 ¶VI(D)(3)(b).

266. This policy is unequal on its face to the policy governing use of the telephone.

34

267.    In addition, TDOC's policy for TTY usage often results in deaf and hard of hearing incarcerated people experiencing delays between submission of their call request and being allowed to make the call.

268.    Because his primary language is ASL, Mr. Trivette has difficulty communicating through a TTY. He requires access to a videophone for effective communication.

269.    Mr. Trivette's hearing mother and deaf friends do not have access to TTYs.

270.    Until TDOC installed a videophone in fall 2018 at Northeast Correctional Complex (NECX), only one of the many TDOC facilities, Mr. Trivette had no choice but to use a TTY to attempt to communicate with his mother and friends through a telecommunications relay service ("TTY Relay" or "TRS"). This did not result in effective communication.

271.    TRS permits a deaf person and a hearing person who does not sign to communicate. Using TRS, a deaf caller uses a TTY to call the hearing person's telephone number. The call is answered by a hearing communications assistant who then connects to the hearing person's phone. As the deaf person types in written English, the call assistant receives the text and then conveys that text verbally to the hearing recipient. As the hearing caller speaks, the call assistant uses a TTY to type the information in written English to the deaf recipient. TRS does not permit the caller or the recipient to communicate in ASL, only in written English. TRS does not permit the caller and recipient to communicate directly with each other, only through an intermediary call assistant. This is the method Mr. Trivette used to attempt to communicate with his mother by TTY.

272.    When Mr. Trivette communicated with deaf friends by TTY, the TRS involved an additional step. After a deaf caller types into the TTY, the communications assistant reads

35

the text to a hearing Video Relay Service ("VRS") interpreter who signs to the deaf individual receiving the call on their videophone. When the deaf called-party responds, they sign back to the VRS interpreter who speaks to the TTY operator who types the response back to the deaf caller. This process thus adds two intermediaries to a conversation between two people and can cause extreme delays, miscommunication, and confusion in their communication.

273. Even when they work properly, these double-relay processes initiated by TTY are far more cumbersome and time consuming than a phone call, a videophone ("VP") call, or even a VRS call.

274. On many occasions when Mr. Trivette attempted to use the TTY for communication, it did not work properly.

275. The TTY often skipped words or jumbled them, or sometimes both.

276. Mr. Trivette had no way to communicate with his mother in his primary language of ASL or to directly communicate with his deaf friends by phone until one TDOC facility installed a videophone in fall 2018.

277. Limiting Mr. Trivette to communicating through a TTY until fall 2018 essentially limited him to writing letters in rudimentary English -- some on paper, some on the TTY -- while hearing incarcerated people with hearing family and friends are permitted two different modes of communication: letters; and the more direct and intimate communication of a phone call. In addition, unlike for hearing incarcerated people, communicating in written English is extremely difficult for Mr. Trivette since ASL, not English, is his primary language. So, limiting Mr. Trivette to written communication is in some ways analogous to limiting a hearing person whose primary language is English to only writing letters in Spanish despite having only taken some Spanish during grade school.

278. Even after TDOC's installation of a VP at Northeast Correctional Complex ("NECX") in fall 2018, Mr. Trivette by and large still lacked equal access to TDOC's phone program due to problems with its specific VP equipment and/or VP connectivity.

279. The VP at NECX often froze, pixelated, or moved in slow motion, interfering with Mr. Trivette's ability to understand the signing of the individual on the end of the call and vice versa.

280. Sometimes the screen went black on one end, effectively preventing any communication attempts.

281. Mr. Trivette reported these VP problems to TDOC personnel.

282. However, TDOC failed to address them and again left him with no access to effective communication or with only an unequal lesser access to effective communication than was provided to other hearing incarcerated people

283. In addition, TDOC continued its failure to provide equal phone access to Mr. Trivette by placing more restrictions on Mr. Trivette's use of the VP than on use of telephones by hearing incarcerated people.

284. TDOC allowed Mr. Trivette to make only three (3) VP calls per week.

285. TDOC restricted Mr. Trivette's VP calls to Monday, Wednesday, and Friday.

286. TDOC restricted Mr. Trivette to making one VP call on each of those days and required the calls to be made between 8:30 a.m. and 10:00 a.m. or between 1:30 p.m. and 2:30 p.m.

287. In addition, each call was limited to 30 minutes in length.

288.     When Mr. Trivette asked why TDOC was placing these restrictions on his VP calls, TDOC staff indicated in writing on a post-it note, "the state is paying for the system to be here, so it can be limited."

289.     Because his primary language is ASL, Mr. Stinnett has difficulty communicating in written English through a TTY. He required access to a videophone for effective communication while incarcerated in a TDOC prison.

290.     Mr. Stinnett's family members (most of whom are also Deaf) do not have access to TTYs.

291.     Mr. Stinnett struggled to communicate with his Deaf mother through TTY Relay (TRS) while incarcerated at a TDOC prison.

292.     TRS is always a cumbersome process and even more so when both the caller and recipient are Deaf. After a deaf caller types into the TTY, the communications assistant reads the text to a hearing Video Relay Service ("VRS") interpreter who signs to the deaf individual receiving the call on their videophone. When the deaf called-party responds, they sign back to the VRS interpreter who speaks to the TTY operator who types the response back to the deaf caller. This process thus adds two intermediaries to a conversation between two people and can cause extreme delays, miscommunication, and confusion in their communication. This is the process Mr. Stinnett uses when using the TTY to call his Deaf mother.

293.     Mr. Stinnett was unable to communicate with his grandparents at all through TTY Relay. He was particularly distressed that he is unable to communicate with grandfather who has worsening dementia.

294.    Despite repeated requests, TDOC did not provide a videophone to Mr. Stinnett while he was housed at TDOC prisons until approximately January 2021.

295.    There are no videophones at BCCX.

296.    There is a videophone at NECX, but that videophone did not work properly the majority of the time Mr. Stinnett was incarcerated there.

297.    Because there was not a properly working videophone at NECX during his incarceration, Mr. Stinnett was unable to equally participate in TDOC's phone program.

298.    Because there was not a properly working videophone at NECX during his incarceration, Mr. Stinnett was unable to effectively communicate with his friends and family members.

299.    TDOC also placed restrictions on videophone calls that are not placed on the phone calls of hearing incarcerated people. So, Mr. Stinnett had unequal access to TDOC's phone program.

300.    While Mr. Collins was incarcerated at BCCX, he only had access to a TTY.

301.    Because his primary language is ASL, Mr. Collins had difficulty communicating in written English through a TTY. He requires access to a videophone for effective communication.

302.    Mr. Collins' hearing mother and three Deaf children do not have access to a TTY.

303.    ASL is the primary language of Mr. Collins' Deaf children.

304.    Even if they had access to a TTY, Mr. Collins' Deaf children would not be able to effectively communicate through it in written English.

305.     Mr. Collins struggled to communicate with his mother by TTY through TTY relay.

306.     Using TRS, a deaf caller uses a TTY to call the hearing person's telephone number. The call is answered by a hearing communications assistant who then connects to the hearing person's phone. As the deaf person types in written English, the call assistant receives the text and then conveys that text verbally to the hearing recipient. As the hearing caller speaks, the call assistant uses a TTY to type the information in written English to the deaf recipient. TRS does not permit the caller or the recipient to communicate in ASL, only in written English. TRS does not permit the caller and recipient to communicate directly with each other, only through an intermediary call assistant.

307.     Mr. Collins is unable to communicate with his three Deaf children, ranging in age from five to eleven years old, at all through TTY Relay. Mr. Collins was not able to communicate with his Deaf children for nearly a year during his incarceration.

308.     Mr. Collins' children do not understand why they could not communicate to their father during his time at BCCX. This caused them to be frustrated and act out.

309.     Instead of providing a videophone to Mr. Collins at BCCX, TDOC transferred him to NECX and indicated he would have immediate access to a VP at NECX. However, TDOC did not in fact provide Mr. Collins with access to a VP at NECX until several months after his arrival at NECX. In addition, TDOC's decision to move Mr. Collins from BCCX to NECX was over his objection and resulted in him being unable to complete the addiction program he was participating in at BCCX and which he wanted to continue.

310.     There is a videophone at NECX, but that videophone has not worked properly the majority of the time Mr. Collins has been incarcerated there. It has and continues to

experience connectivity and other technical issues despite feedback being provided by

Plaintiffs Expert Richard Ray on methods to address these problems.

311.    TDOC installed a VP in Mr. Collins's housing unit in approximately June of

2021.  However, the VP continues to experience connectivity and other technical issues.

312.    Because his primary language is ASL, Mr. White requires access to a

videophone for effective communication.

313.    When he first entered TDOC custody, Mr. White was housed at the system's

intake facility BCCX.

314.    BCCX only has a TTY and does not have a VP.

315.    Mr. White cannot use a TTY because he cannot type written English.  Therefore,

Mr. White had no access to telecommunications while housed at BCCX.

316.    There is a videophone at the NECX annex, but that videophone did not work

properly the majority of the time Mr. White was incarcerated there.  It has and continues to

experience connectivity and other technical issues.

317.    Upon information and belief, while Mr. White was housed in the NECX annex

there was no VP in Mr. White's housing unit, therefore, he did not have the same access to the

VP as hearing incarcerated people do to standard telephones.

318.    Upon information and belief, even when a VP was installed in the Annex it was

kept in a locked counselor's office and Deaf incarcerated people did not have access to the VP

equivalent to the access that hearing incarcerated people have to conventional telephones.

319.    Upon information and belief, from approximately July 2021 to his release in

November 2022, Mr. White was housed in the NECX main compound. There is a VP in the

housing unit in the main compound. However, that VP experiences connectivity and other

technical issues. Therefore, Mr. White did not have the same access to the VP as hearing incarcerated people do to standard telephones and/or Mr. White did not have access to a VP in fully working order.

320.    Because his primary language is ASL, Mr. Owens requires access to a VP for effective communication.

321.    Mr. Owens has not had access to a working VP since the date of his incarceration.  Mr. Owens also has not had access to a TTY since his incarceration. Therefore, Mr. Owens has not made a phone call in the four years since he has been incarcerated leaving him without any phone access to his family and friends.

322.    In order for Mr. Owens to have any phone communication with his family and friends, he must rely on a correctional officer and write notes back and forth with the officer who then speaks to the person on the phone.  This does not provide Mr. Owens equal access to TDOC's phone program and infringes on his privacy.

323.    Based on information and belief, a VP was installed in Mr. Owens' housing unit at MCCX in March of 2022, after attorneys from Disability Rights Tennessee advocated on behalf of Mr. Owens to install the VP. However, the VP is not working properly and has connectivity issues. Unlike hearing incarcerated people who wish to use the phone, Mr. Owens must request a remote from a guard to use the VP.  As a result of these issues, Mr. Owens still does not have equal access to TDOC's phone program on par with access of hearing incarcerated people to conventional telephones.

324.    TDOC has denied Mr. Owens any access its phone program during the entire time of his incarceration.

325.    Upon information and belief, the phones at DeBerry are in a congregate area that is often noisy.

326.    Upon information and belief, Mr. Giles uses the phone to call his children. Upon information and belief, Mr. Giles often cannot hear his family members when he calls them on the conventional phones at DeBerry.

327.    Upon information and belief, TDOC facilities, including DeBerry, do not have CapTel phones for people who are hard of hearing like Mr. Giles.

328.    Upon information and belief, because Mr. Giles is hard of hearing, he requires a CapTel phone to have equal access to TDOC's phone program.

329.    TDOC has denied Mr. Giles equal access to its phone program during his entire incarceration.

330.    Upon information and belief, the phones at the Women's Therapeutic Residential Center where Ms. Bingham is incarcerated are in a congregate area that is often noisy.

331.    Ms. Bingham often cannot hear when she attempts to use the conventional phones at the Women's Therapeutic Residential Center.

332.    TDOC facilities, including the Women's Therapeutic Residential Center, do not have CapTel phones for people who are hard of hearing like Ms. Bingham.

333.    Because Ms. Bingham is hard of hearing, she requires a CapTel phone to have equal access to TDOC's phone program.

334.    TDOC has denied Ms. Bingham equal access to its phone program during her entire incarceration.

**TDOC's Failure to Make Reasonable Accommodations/Modifications**

335.    TDOC also refused to make reasonable accommodations and/or modifications to policies and procedures as requested by Mr. Trivette by alerting him to fire alarms when they sounded.

336.    TDOC also refused to make reasonable modifications and/or modifications to policies and procedures as requested by Mr. Stinnett, for example, by alerting him to head counts in a manner other than shouting. In addition, despite Mr. Stinnett's experience with carpentry, TDOC refused to allow Mr. Stinnett to work with machinery or other equipment due to his deafness.

337.    TDOC also refused to allow hearing incarcerated people and staff to learn fingerspelling and basic signs in order to communicate with Mr. Collins in a rudimentary fashion. As a result, he feels extremely isolated.

338.    TDOC is aware that Ms. Bingham is hard of hearing.

339.    Upon information and belief, Ms. Bingham was diagnosed with Ménière's disease in 2019.

340.    Upon information and belief, medical professionals have informed Ms. Bingham that hearing aids would not be appropriate for her due to her Ménière's disease.

341.    Upon information and belief, TDOC has not provided Ms. Bingham with any alert system, assistive technology or other reasonable modifications to notify her of prison instructions that she cannot hear.

342.    Upon information and belief, Ms. Bingham regularly misses out on meals and call outs because she cannot hear the announcements.

343. On one occasion, upon information and belief, Ms. Bingham was unaware that there was a fire alarm sounding because she could not hear it. It was not until another incarcerated person notified her that she understood what was happening.

344. Upon information and belief, TDOC has subjected Ms. Bingham to discipline due to her hearing loss.

345. Upon information and belief, on three separate occasions, Ms. Bingham was placed on a 24-hour "lockdown" when she did not hear instructions to stand up for count.

346. Upon information and belief, Ms. Bingham has filed multiple grievances with TDOC for missing meals and call outs because she is hard of hearing.

347. Upon information and belief, Ms. Bingham filed these grievances in or about November of 2020 and September of 2021 respectively. TDOC has not provided any acknowledgement of receiving Ms. Bingham's grievances. Neither grievance has been addressed.

348. Ms. Bingham is at great risk of harm from other incarcerated people and unable to participate equally in programming offered in the TDOC facility in which she resides. As a result of TDOC's failures, she is more isolated and at risk than other incarcerated people.

**Impact of TDOC's Intentional Conduct**

349. Throughout his time in TDOC custody, TDOC failed to provide Mr. Trivette with effective communication he needed in order to access and equally participate in its programs and services. In addition, Mr. Trivette was unable to communicate effectively telephonically with friends and family. This discriminatory treatment and communication neglect caused him emotional and psychological distress, isolation, communication deprivation, inconvenience, frustration, depression, and heartache, as well as economic, incidental, and

consequential loss including but not limited to, physical injury, loss of opportunity and/or unequal opportunity to participate in programs, excessive confinement, loss of earning power based on lack of access or discriminatory access to educational and vocational programming, and other losses of the benefit of the bargain promised by TDOC in exchange for receipt of federal funds.

350.     Throughout his time in TDOC custody, TDOC repeatedly failed to provide Mr. Stinnett with effective communication he needed in order to access and equally participate in its programs and services. In addition, for the majority of the time that Mr. Stinnett was in TDOC custody he was unable to communicate effectively telephonically with friends and family. This discriminatory treatment and communication neglect caused him emotional and psychological distress, isolation, communication deprivation, inconvenience, frustration, depression, and heartache.

351.     Throughout his time in TDOC custody, TDOC repeatedly failed to provide Mr. Collins with effective communication he needed in order to access and equally participate in its programs and services. In addition, for the majority of his time in TDOC custody Mr. Stinnett was unable to communicate effectively telephonically with friends and family. This discriminatory treatment and communication neglect caused him emotional and psychological distress, isolation, communication deprivation, inconvenience, frustration, depression, and heartache.

352.     From his entry into TDOC custody, TDOC repeatedly and in many ways continuously failed to provide Mr. White with the effective communication he needs in order to access and equally participate in its programs and services. In addition, he was unable to communicate effectively telephonically with friends and family in a manner equal to that of the

access that hearing incarcerated people have to conventional phones. This discriminatory treatment and communication neglect caused him emotional and psychological distress, isolation, communication deprivation, inconvenience, frustration, depression, and heartache.

353.     TDOC's actions in refusing to provide effective communication, including qualified sign language interpreters and equal access to its phone program, to Mr. Trivette from 2015 through 2019 was intentional and/or constituted deliberate indifference to the strong likelihood that these policies and practices would likely result in a violation of Plaintiff Trivette's federally protected rights. Plaintiff and DRT repeatedly alerted TDOC to his need for qualified sign language interpreters, and other required aids, services, and accommodations, and that need is obvious. TDOC knowingly and intentionally refused to provide qualified sign language interpreters, and other required aids, services, and accommodations to Mr. Trivette.

354.     TDOC's actions in refusing to provide effective communication, including qualified sign language interpreters and equal access to its phone program, to Mr. Stinnett from 2020 through 2021 was intentional and/or constituted deliberate indifference to the strong likelihood that these policies and practices would likely result in a violation of Plaintiff Stinnett's federally protected rights. Plaintiff and DRT repeatedly alerted TDOC to his need for qualified sign language interpreters, and other required aids, services, and accommodations, and that need is obvious. TDOC knowingly and intentionally refused to provide qualified sign language interpreters, and other required aids, services, and accommodations to Mr. Stinnett.

355.     TDOC's actions in refusing to provide effective communication, including qualified sign language interpreters and equal access to its phone program, to Mr. Collins from 2020 through 2021 was intentional and/or constituted deliberate indifference to the strong likelihood that these policies and practices would likely result in a violation of Plaintiff Collins'

47

federally protected rights. Plaintiff and DRT repeatedly alerted TDOC to his need for qualified sign language interpreters, and other required aids, services, and accommodations, and that need is obvious. TDOC knowingly and intentionally refused to provide qualified sign language interpreters, and other required aids, services, and accommodations to Mr. Collins.

356.    TDOC's actions in refusing to provide effective communication, including qualified sign language interpreters and equal access to its phone program to Mr. White from his entry into custody were intentional and/or constituted deliberate indifference to the strong likelihood that these policies and practices would likely result in a violation of his federally protected rights. Plaintiffs have repeatedly alerted TDOC to his need for qualified sign language interpreters, and other required aids, services, and accommodations, and/or that need is obvious. TDOC knowingly and intentionally refused to provide qualified sign language interpreters and other required aids, services, and accommodations to Mr. White.

357.    TDOC's actions in refusing to provide effective communication, including qualified sign language interpreters and equal access to its phone program to Mr. Owens from his entry into custody and ongoing were and continue to be intentional and/or constituted and continue to constitute deliberate indifference to the strong likelihood that these policies and practices would and will likely result in a violation of his federally protected rights. Plaintiffs have repeatedly alerted TDOC to his need for qualified sign language interpreters, equal access to its phone program, and other required aids, services, and accommodations, and/or that need is obvious. TDOC knowingly and intentionally refused and continues to refuse to provide qualified sign language interpreters and other required aids, services, and accommodations to Mr. Owens.

358. TDOC's actions in refusing to provide effective communication, including hearing aids and equal access to its phone program to Mr. Giles from his entry into custody and ongoing were and continue to be intentional and/or constituted and continue to constitute deliberate indifference to the strong likelihood that these policies and practices would and will likely result in a violation of his federally protected rights. Mr. Giles has repeatedly alerted TDOC to his need for hearing aids, and other required aids, services, and accommodations, and/or that need is obvious. TDOC knowingly and intentionally refused and continue to refuse their duty to provide hearing aids and other required aids, services, and accommodations to Mr. Giles.

359. TDOC's actions in refusing to provide effective communication, including equal access to its phone program to Ms. Bingham from her entry into TDOC custody and ongoing were and continue to be intentional and/or constituted and continue to constitute deliberate indifference to the strong likelihood that these policies and practices would and will likely result in a violation of her federally protected rights. Ms. Bingham has repeatedly alerted TDOC to her need for required aids, services, and accommodations, and/or that need is obvious. TDOC knowingly and intentionally refused and continues to refuse to provide required aids, services, and accommodations to Ms. Bingham.

360. Despite requests from current deaf and hard of hearing incarcerated people and DRT and the obvious need, TDOC continues to routinely refuse to provide qualified sign language interpreters to deaf and hard of hearing incarcerated people for communications including orientation, classification, the STRONG-R, medical appointments, classes, and other programming and services. TDOC's refusal to provide qualified sign language interpreters to deaf and hard of hearing incarcerated people when needed for effective communication is

intentional and/or constitutes deliberate indifference to the strong likelihood that these policies and practices will likely result in a violation of these persons' federally protected rights. TDOC is knowingly and intentionally refusing to provide qualified sign language interpreters when needed for effective communication.

361. TDOC's actions in refusing to provide a videophone at all to Mr. Trivette until fall 2018 and then failing both to ensure that it was in good working order and to provide Mr. Trivette with access to the videophone on the same basis that hearing incarcerated people have access to telephones was intentional and/or constituted deliberate indifference to the strong likelihood that these policies and practices would likely result in a violation of Plaintiff Trivette's federally protected rights.

362. TDOC's actions in refusing to provide a videophone at all to Mr. Collins until December 2020 and then failing both to ensure that it was in good working order and to provide Mr. Collins with access to the videophone on the same basis that hearing incarcerated people have access to telephones was intentional and/or constituted deliberate indifference to the strong likelihood that these policies and practices would likely result in a violation of Plaintiff Collins' federally protected rights.

363. TDOC's actions in refusing to provide a videophone at all to Mr. Stinnett until January of 2021 and then failing both to ensure that it was in good working order and to provide Mr. Stinnett with access to the videophone on the same basis that hearing incarcerated people have access to telephones was intentional and/or constituted deliberate indifference to the strong likelihood that these policies and practices would likely result in a violation of Plaintiff Stinnett's federally protected rights.

364.    TDOC's actions in refusing to provide a videophone at all to Mr. White until January 2021 failure both to ensure that it is in good working order and to provide Mr. White with access to the videophone on the same basis that hearing incarcerated people have access to telephones was intentional and/or constituted deliberate indifference to the strong likelihood that these policies and practices would likely result in a violation of Plaintiff White's federally protected rights.

365.    TDOC's actions in failing to provide a working videophone at all to Mr. Owens until March 2022 and ongoing failure both to ensure that it is in good working order and to provide Mr. Owens with access to the videophone on the same basis that hearing incarcerated people have access to telephones was and remains intentional and/or constituted and continues to constitute deliberate indifference to the strong likelihood that these policies and practices would likely result in a violation of Plaintiff Owens' federally protected rights.

366.    TDOC's actions in failing to provide a CapTel phone to Mr. Giles and provide access to its phone program on the same basis that hearing incarcerated people have access to conventional telephones was and remains  intentional and/or constituted and continues to constitute deliberate indifference to the strong likelihood that these policies and practices would likely result in a violation of the federally protected rights of Plaintiff Giles and other similarly situated incarcerated people with disabilities who are constituents of Plaintiff DRT.

367.    TDOC's actions in failing to provide a CapTel phone to Ms. Bingham and provide access to its phone program on the same basis that hearing incarcerated people have access to conventional telephones was and remains intentional and/or constituted and continues to constitute a deliberate indifference to the strong likelihood that these policies and practices

would likely result in a violation of the federally protected rights of Plaintiff Bingham and other similarly situated incarcerated people with disabilities who are constituents of Plaintiff DRT.

368.    The Exemplar Plaintiffs and Plaintiff DRT repeatedly alerted Defendant to the need for a videophone in good working order and on the same terms and conditions as a telephone and that need is obvious. Defendant knowingly and intentionally initially refused to provide the requested videophones to Exemplar Plaintiffs at all and once TDOC did provide a videophone to Exemplar Plaintiffs, TDOC knowingly and intentionally failed to provide the videophone in good working order and on the same terms and conditions and equal access as hearing prisoners have to conventional telephones.

369.    Despite past and ongoing requests deaf and hard of hearing incarcerated people including Exemplar Plaintiffs and DRT, TDOC continues to refuse to provide a videophone to deaf and hard of hearing incarcerated people housed at any of the TDOC facilities besides NECX and MCCX. In addition, TDOC has not taken actions to ensure the videophones and/or service at NECX and MCCX are in good working condition. TDOC's refusal to provide a videophone at facilities besides NECX and MCCX and to correct the problems with the videophones at NECX and MCCX is intentional and/or constitutes deliberate indifference to the strong likelihood that this policy and practice has likely and/or will likely result in a violation of the federally protected rights of the Exemplar Plaintiffs and other deaf and hard of hearing incarcerated people.

**DRT's Advocacy for Deaf and Hard of Hearing Incarcerated People**

370.    DRT is part of the nationwide Protection and Advocacy ("P&A") system which is mandated by Congress to protect and advocate for the rights of people with disabilities in the United States. There is a P&A in all fifty states and in United States territories.

52

371. Disability Rights Tennessee is the P&A organization designated for the State of Tennessee.

372. Disability Rights Tennessee has a physical presence in each of Tennessee's three Grand Divisions, East, Middle, and West. DRT is headquartered in Nashville with regional offices in Memphis and Knoxville.

373. Congress has charged DRT with the statutory responsibility to represent and advocate for the rights of persons with disabilities, including deaf and hard of hearing individuals in state institutions, including state prisons, who have standing to sue on their own right.

374. DRT has statutory authority to pursue legal remedies on behalf of individuals with disabilities whose federal rights are being violated pursuant to 42 U.S.C.A. § 15043, 42 U.S.C. § 300d-53(k), 42 U.S.C. § 10805, and 29 U.S.C. § 794e(f).

375. DRT's mission is to ensure individuals with disabilities in Tennessee have freedom from harm, freedom to participate in the community, and freedom from discrimination.

376. DRT has a multiple member board of directors which includes people with disabilities.

377. DRT represents people with sensory disabilities, including those who are deaf and hard of hearing, and provides means by which they express their collective views and protect their collective interests.

378. People with disabilities who are served individually or whose communities are served provide input to DRT through DRT's PAIMI Advisory Council, stakeholder and constituent surveys, and grievance process.

379.     DRT does multiple types of surveys of DRT's constituents and advisory council members. These surveys include a stakeholder and constituent survey sent out every three years, and a satisfaction survey at the conclusion of each service request. This feedback from constituents and their families informs the financial and programmatic decisions regarding the delivery of services and the allocation of resources for future advocacy.

380.     In addition, DRT collaborates regularly with local and state disability organizations and taskforces that consist, in part, of people with disabilities.

381.     DRT also has a grievance procedure so that individuals with disabilities have full access to and input into DRT's services and areas of work.

382.     As a result of DRT's organizational structure, leadership, allocation of resources for future advocacy and outreach, connections with constituents in the disability community, and involvement in disability-rights advocacy, people with disabilities have a strong voice in and a direct influence on the work of DRT.

383.     Incarcerated people who are deaf and hard of hearing and are in TDOC custody are among the constituents who are served by, and who inform the work of, DRT. The interest of these constituents goes to the heart of DRT's mission to ensure that people with disabilities, including deaf and hard of hearing individuals, are free from harm and discrimination and have equal access to services and supports that they are entitled to under the ADA and Section 504.

384.     DRT has standing on behalf of all of its constituents and clients, including but not limited to the individually named Plaintiffs (exemplar constituents) and other deaf and hard of hearing incarcerated people of TDOC who have not been identified (constituents), who are substantially affected by Defendant's noncompliance with constitutional and statutory protections because such noncompliance falls within DRT's general scope of interest and

activity; the relief requested is appropriate for DRT to receive on behalf of its constituents; and though neither the claims asserted nor the relief requested require the participation of individual members or constituents in the lawsuit, DRT is joining in this lawsuit in conjunction with Plaintiffs Trivette, Stinnett, Collins, White, Owens, Giles, and Bingham.

385.    DRT's constituents, including but not limited to Mr. Trivette, Mr. Stinnett, Mr. Collins, Mr. White, Mr. Owens, Mr. Giles, and Ms. Bingham have suffered injury—and, in the case of Mr. White, Mr. Owens, Mr. Giles, and Ms. Bingham continue to suffer injury—that would allow them to have standing to sue in their own right. The interests that DRT seeks to protect are germane to DRT's purpose.

386.    DRT brings this suit on behalf of individuals currently in TDOC custody, including but not limited to Mr. Owens, Mr. Giles, and Ms. Bingham, who are deaf and hard of hearing and who are being denied effective communication and equal access to TDOC's programs and services in violation of the ADA and Section 504, and in conjunction with Plaintiffs Trivette, Stinnett, Collins, White, Owens, Giles, Bingham and other constituents.

387.    DRT has attempted to resolve the issue of TDOC denying deaf and hard of hearing incarcerated people in TDOC custody effective communication and equal access to goods and services for years prior to this lawsuit. Despite these efforts, DRT has been unable to achieve the reforms necessary to redress the ongoing lack of effective communication and unequal access to programs and services experienced by incarcerated people who are deaf and hard of hearing in TDOC custody.

## FIRST CLAIM FOR RELIEF: VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT 42 U.S.C. § 12131 et seq.

388.    Plaintiffs incorporate the allegations set forth in the remainder of Complaint as if fully set forth herein.

55

389.     Title II prohibits public entities such as Defendant TDOC from excluding individuals with disabilities from participation in or denying them the benefits of their services, programs or activities, or otherwise subjecting such individuals to discrimination. 42 U.S.C. § 12132.

390.     Because Plaintiff Trivette is Deaf and was incarcerated in the custody of the TDOC during all occurrences alleged herein, he is a qualified individual with a disability within the meaning of the Americans with Disabilities Act. 42 U.S.C. § 12102.

391.     Because Plaintiff Stinnett is Deaf and was incarcerated in the custody of TDOC during all occurrences alleged herein, he is a qualified individual with a disability within the meaning of the Americans with Disabilities Act. 42 U.S.C. § 12102.

392.     Because Plaintiff Collins is Deaf and was incarcerated in the custody of TDOC during all occurrences alleged herein, he is a qualified individual with a disability within the meaning of the Americans with Disabilities Act. 42 U.S.C. § 12102.

393.     Because Plaintiff White is Deaf, currently in the custody of TDOC, and has been incarcerated in the custody of the TDOC during all occurrences alleged herein, he is a qualified individual with a disability within the meaning of the Americans with Disabilities Act. 42 U.S.C. § 12102.

394.     Because Plaintiff Owens is Deaf, currently in the custody of TDOC, and has been an incarcerated in the custody of TDOC during all occurrences alleged herein, he is a qualified individual with a disability within the meaning of the Americans with Disabilities Act. 42 U.S.C. § 12102.

395.     Because Plaintiff Giles is hard of hearing, currently in custody of TDOC, and has been incarcerated in the custody of TDOC during all occurrences alleged herein, he is a

qualified individual with a disability within the meaning of the Americans with Disabilities Act. 42 U.S.C. § 12102.

396.     Because Plaintiff Bingham is hard of hearing, currently in custody of TDOC, and has been an incarcerated in the custody of TDOC during all occurrences alleged herein, she is a qualified individual with a disability within the meaning of the Americans with Disabilities Act. 42 U.S.C. § 12102.

397.     Defendant TDOC excluded Plaintiff Trivette from participation in and/or denied him the benefits of it services, programs, and/or activities and/or subjected him to discrimination on the basis of disability in violation of Title II and its implementing regulations as more fully described in this Complaint.

398.     Defendant TDOC excluded Plaintiff Stinnett from participation in and/or denied him the benefits of it services, programs, and/or activities and/or subjected him to discrimination on the basis of disability in violation of Title II and its implementing regulations as more fully described in this Complaint.

399.     Defendant TDOC excluded Plaintiff Collins from participation in and/or denied him the benefits of it services, programs, and/or activities and/or subjected him to discrimination on the basis of disability in violation of Title II and its implementing regulations as more fully described in this Complaint.

400.     Defendant TDOC has excluded and is continuing to exclude Plaintiff White from participation in and/or denied and is continuing to deny him the benefits of its services, programs, and activities and/or subjected and is continuing to subject him to discrimination on the basis of disability in violation of Title II and its implementing regulations as more fully described in this Complaint.

401. Defendant TDOC has excluded and is continuing to exclude Plaintiff Owens from participation in and/or denied and is continuing to deny him the benefits of its services, programs, and activities and/or subjected and is continuing to subject him to discrimination on the basis of disability in violation of Title II and its implementing regulations as more fully described in this Complaint.

402. Defendant TDOC has excluded and is continuing to exclude Plaintiff Giles from participation in and/or denied and is continuing to deny him the benefits of its services, programs, and activities and/or subjected and is continuing to subject him to discrimination on the basis of disability in violation of Title II and its implementing regulations as more fully described in this Complaint.

403. Defendant TDOC has excluded and is continuing to exclude Plaintiff Bingham from participation in and/or denied and is continuing to deny her the benefits of its services, programs, and activities and/or subjected and is continuing to subject her to discrimination on the basis of disability in violation of Title II and its implementing regulations as more fully described in this Complaint.

404. Such discrimination includes but is not limited to:

a. denying Plaintiffs Trivette, Stinnett, Collins, White, Owens, Giles, and Bingham the opportunity to participate in or benefit from an aid, benefit, or service, 28 C.F.R. § 35.130(b)(1)(i);

b. affording Plaintiffs Trivette, Stinnett, Collins, White, Owens, Giles, and Bingham the opportunity to participate in or benefit from an aid, benefit, or service that is not equal to that afforded others, *see id.* § 35.130(b)(1)(ii);

c.    providing Plaintiffs Trivette, Stinnett, Collins, White, Owens, Giles, and Bingham with aids, benefits, and services that are not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others, *see id.* § 35.130(b)(1)(iii);

d.    Using criteria and methods of administration that have the effect of subjecting Plaintiffs Trivette, Stinnett, Collins, White, Owens, Giles, and Bingham to discrimination on the basis of disability, *see id.* § 35.130(b)(3)(i);

e.    Using criteria and methods of administration that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of TDOC's program with respect to Plaintiffs Trivette, Stinnett, Collins, White, Owens, Giles, and Bingham, *see id.* § 35.130(b)(3)(ii);

f.    failing to make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination against Plaintiffs Trivette, Stinnett, Collins, White, Owens, Giles, and Bingham on the basis of disability, *see id.* § 35.130(b)(7);

g.    failing to ensure that communications with Plaintiffs Trivette, Stinnett, Collins, White, Owens, Giles, and Bingham were and are as effective as communications with others, *see id.* § 35.160(a)(1);

h.    failing to furnish appropriate auxiliary aids and services where necessary to afford Plaintiffs Trivette, Stinnett, Collins, White, Owens, Giles, and Bingham an equal opportunity to participate in, and enjoy the benefits of, TDOC's services, programs, or activities, *see id.* § 35.160(b)(1); and/or

i.  failing to give primary consideration to the requests of Plaintiffs Trivette, Stinnett, Collins, White, Owens, Giles, and Bingham concerning the types of auxiliary aids and services necessary, *see id.* § 35.160(b)(2).

405.  During the occurrences referenced herein, Plaintiffs Trivette, Stinnett, and Collins were qualified to participate in TDOC services, programs, and activities within the meaning of Title II.

406.  During the occurrences referenced herein which are ongoing, Plaintiffs White, Owens, Giles, and Bingham were and remain qualified to participate in TDOC services, programs, and activities within the meaning of Title II.

407.  Defendant TDOC's actions described in this Complaint were and remain intentional and/or were and continue to be taken with deliberate indifference to the strong likelihood that pursuit of its questioned policies would likely result in a violation of the Title II rights of Plaintiffs Trivette, Stinnett, Collins, White, Owens, Giles, and Bingham and the rights of other currently incarcerated people who are deaf and hard of hearing and in TDOC custody.

408.  As a direct and proximate result of Defendant TDOC's acts, omissions, and violations alleged above, Plaintiff Trivette has suffered damages as more fully described above.

409.  As a direct and proximate result of Defendant TDOC's acts, omissions, and violations alleged above, Plaintiff Stinnett has suffered damages as more fully described above.

410.  As a direct and proximate result of Defendant TDOC's acts, omissions, and violations alleged above, Plaintiff Collins has suffered damages as more fully described above.

411.  As a direct and proximate result of Defendant TDOC's acts, omissions, and violations alleged above and which are ongoing, Plaintiff White has suffered and continues to suffer damages as more fully described above.

412.    As a direct and proximate result of Defendant TDOC's acts, omissions, and violations alleged above, Plaintiff Owens has suffered damages as more fully described above.

413.    As a direct and proximate result of Defendant TDOC's acts, omissions, and violations alleged above and which are ongoing, Plaintiff Giles has suffered and continues to suffer damages as more fully described above.

414.    As a direct and proximate result of Defendant TDOC's acts, omissions, and violations alleged above and which are ongoing, Plaintiff Bingham has suffered and continues to suffer damages as more fully described above.

415.    Plaintiffs Trivette, Stinnett, Collins, White, Owens, Giles, and Bingham have been injured and aggrieved by and Plaintiffs Owens, Giles, and Bingham will continue to be injured and aggrieved by Defendant TDOC's discrimination against them.

416.    In addition to Plaintiffs Owens, Giles, and Bingham, other people who are deaf and hard of hearing and presently in TDOC custody who are constituents of Plaintiff Disability Rights Tennessee are being denied their federal rights to equal access to TDOC programs and services and effective communication and are being injured and aggrieved by Defendant TDOC's ongoing discrimination against them.

## SECOND CLAIM FOR RELIEF: VIOLATION OF SECTION 504 OF THE REHABILITATION ACT 29 U.S.C. § 794

417.    Plaintiffs incorporate the allegations set forth in all of the other paragraphs of this Complaint as if fully set forth herein.

418.    Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, prohibits discrimination on the basis of disability by recipients of federal financial assistance.

419.     Defendant TDOC receives federal financial assistance as that term is used in Section 504. 29 U.S.C. § 794.

420.     Because he is Deaf and was incarcerated in the custody of TDOC at all times relevant to his allegations in this Complaint, Plaintiff Trivette is a qualified individual with a disability within the meaning of Section 504. 29 U.S.C. § 705(9) (incorporating by reference 42 U.S.C. § 12102).

421.     Because he is Deaf and was incarcerated in the custody of TDOC at all times relevant to his allegations in this Complaint, Plaintiff Stinnett is a qualified individual with a disability within the meaning of Section 504. 29 U.S.C. § 705(9) (incorporating by reference 42 U.S.C. § 12102).

422.     Because he is Deaf and was incarcerated in the custody of TDOC at all times relevant to his allegations in this Complaint, Plaintiff Collins is a qualified individual with a disability within the meaning of Section 504. 29 U.S.C. § 705(9) (incorporating by reference 42 U.S.C. § 12102).

423.      Because he is Deaf and was incarcerated in the custody of TDOC at all times relevant to his allegations in this Complaint, Plaintiff White is a qualified individual with a disability within the meaning of Section 504. 29 U.S.C. § 705(9) (incorporating by reference 42 U.S.C. § 12102).

424.     Because he is Deaf, is currently incarcerated in the custody of TDOC, and was in the custody of TDOC at all times relevant to his allegations in this Complaint, Plaintiff Owens is a qualified individual with a disability within the meaning of Section 504. 29 U.S.C. § 705(9) (incorporating by reference 42 U.S.C. § 12102).

425.     Because he is hard of hearing, is currently incarcerated in the custody of TDOC, and was in the custody of TDOC at all times relevant to his allegations in this Complaint,

Plaintiff Giles is a qualified individual with a disability within the meaning of Section 504. 29 U.S.C. § 705(9) (incorporating by reference 42 U.S.C. § 12102).

426.    Because she is hard of hearing, is currently incarcerated in the custody of TDOC, and was in the custody of TDOC at all times relevant to his allegations in this Complaint, Plaintiff Bingham is a qualified individual with a disability within the meaning of Section 504. 29 U.S.C. § 705(9) (incorporating by reference 42 U.S.C. § 12102).

427.    Such discrimination includes but is not limited to:

a.    denying Plaintiffs Trivette, Stinnett, Collins, White, Owens, Giles, and Bingham the opportunity to participate in TDOC's programs and activities, *see* 28 C.F.R. § 42.503(b)(1)(i);

b.    denying Plaintiffs Trivette, Stinnett, Collins, White, Owens, Giles, and Bingham an equal opportunity to achieve the same benefits that others achieve in TDOC's programs and activities, *see id.* § 42.503(b)(1)(ii);

c.    denying Plaintiffs Trivette, Stinnett, Collins, White, Owens, Giles, and Bingham an equal opportunity to achieve the same benefit that others achieve in TDOC's programs and activities by providing them no effective communication in those programs, *see id.* § 42.503(b)(1)(vi);

d.    using criteria or methods of administration that either purposely or in effect discriminate on the basis of disability or defeat or substantially impair accomplishment of the objectives of TDOC's programs or activities with respect to Plaintiffs Trivette, Stinnett, Collins, White, Owens, Giles, and Bingham, *see id*. § 42.503(b)(3);

e.   failing to provide appropriate auxiliary aids to Plaintiffs Trivette, Stinnett, Collins, White, Owens, Giles, and Bingham including thereby discriminatorily impairing or excluding them from participation in TDOC's programs and activities, *see id.* § 42.503(f); and/or

f.   failing to provide reasonable accommodations to Plaintiffs Trivette, Stinnett, Collins, White, Owens, Giles, and Bingham as necessary to ensure that they have meaningful access to TDOC's programs, activities, or benefits, *see Alexander v. Choate*, 469 U.S. 287, 301 (1985).

428.   At all times relevant to his allegations in this Complaint, Plaintiff Trivette was qualified to participate in TDOC services, programs, and activities within the meaning of Section 504.

429.   At all times relevant to his allegations in this Complaint, Plaintiff Stinnett was qualified to participate in TDOC services, programs, and activities within the meaning of Section 504.

430.   At all times relevant to his allegations in this Complaint, Plaintiff Collins was qualified to participate in TDOC services, programs, and activities within the meaning of Section 504.

431.   At all times relevant to his allegations in this Complaint, Plaintiff White was qualified to participate in TDOC services, programs, and activities within the meaning of Section 504.

432.   At all times relevant to his allegations in this Complaint which are ongoing, Plaintiff Owens was and remains qualified to participate in TDOC services, programs, and activities within the meaning of Section 504.

433.    At all times relevant to his allegations in this Complaint which are ongoing, Plaintiff Giles was and remains qualified to participate in TDOC services, programs, and activities within the meaning of Section 504.

434.    At all times relevant to her allegations in this Complaint which are ongoing, Plaintiff Bingham was and remains qualified to participate in TDOC services, programs, and activities within the meaning of Section 504.

435.    Defendant TDOC's actions described in this Complaint were and remain intentional and/or were and remain taken with deliberate indifference to the strong likelihood that pursuit of its questioned policies and practices would likely result in a violation of the Section 504 rights of Plaintiffs Trivette, Stinnett, Collins, White, Owens, Giles, and Bingham and the rights of other current incarcerated people who are deaf and hard of hearing and in TDOC custody.

436.    As a direct and proximate result of Defendant TDOC's acts, omissions, and violations alleged above, Plaintiff Trivette has suffered damages, as more fully described above.

437.    As a direct and proximate result of Defendant TDOC's acts, omissions, and violations alleged above, Plaintiff Stinnett has suffered damages, as more fully described above.

438.    As a direct and proximate result of Defendant TDOC's acts, omissions, and violations alleged above, Plaintiff Collins has suffered damages, as more fully described above.

439.    As a direct and proximate result of Defendant TDOC's acts, omissions, and violations alleged above, Plaintiff White has suffered damages, as more fully described above.

440. As a direct and proximate result of Defendant TDOC's actions, omissions, and violations alleged above, Plaintiff Owens, Plaintiff Giles, and Plaintiff Bingham have suffered and continue to suffer damages, as more fully described above.

441. Plaintiff Trivette has been injured and aggrieved by Defendant TDOC's discrimination against him.

442. Plaintiff Stinnett has been injured and aggrieved by Defendant TDOC's discrimination against him.

443. Plaintiff Collins has been injured and aggrieved by Defendant TDOC's discrimination against him.

444. Plaintiff White has been injured and aggrieved by Defendant TDOC's ongoing discrimination against him.

445. Plaintiff Owens has been and continues to be injured and aggrieved by Defendant TDOC's ongoing discrimination against him.

446. Plaintiff Giles has been and continues to be injured and aggrieved by Defendant TDOC's ongoing discrimination against him.

447. Plaintiff Bingham has been and continues to be injured and aggrieved by Defendant TDOC's ongoing discrimination against her.

448. Other people who are deaf and hard of hearing and presently in TDOC custody have been and/or are being denied their federal rights to equal access to TDOC programs and services and effective communication and are being injured and aggrieved by Defendant TDOC's discrimination against them.

**WHEREFORE, Plaintiff respectfully requests:**

1.      That this Court assume jurisdiction;

2.      That this Court declare the actions of Defendant TDOC described in this Complaint to be in violation of Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act;

3.      That this Court enter an injunction ordering Defendant TDOC to cease violating the rights of deaf and hard of hearing incarcerated people under Title II and Section 504, and to cease discriminating against these incarcerated people on the basis of disability, and requiring Defendant TDOC to begin providing auxiliary aids and services and reasonable modifications, including but not limited to qualified sign language interpreters and videophones, to deaf and hard of hearing incarcerated people and to develop policies, procedures, and training to ensure non-discrimination against and equal access for these incarcerated people;

4.      That this Court award Plaintiffs compensatory damages pursuant to Title II and Section 504;

5.      That this Court award Plaintiffs and/or their attorneys their reasonable attorneys' fees and costs; and

6.      That this Court award such additional or alternative relief as may be just, proper, and equitable.

Respectfully submitted,

FOX AND ROBERTSON, PC

*/s/ Amy F. Robertson*
Amy F. Robertson*
1 Broadway, Suite B205
Denver, CO 80203
(303) 951-4164
arob@foxrob.com

DISABILITY RIGHTS TENNESSEE

Jack W. Derryberry, Jr. (TN Bar# 003870)
Stacie L. Price (TN Bar# 030625)
2 International Plaza, Suite 825
Nashville, TN 37217
(615) 298-1080
jackd@disabilityrightstn.org
staciep@disabilityrightstn.org

Daniel L. Ellis (TN Bar# 028130)
9050 Executive Park Drive, Suite B-101
Knoxville, TN 37923
(865) 670-2944
daniele@disabilityrightstn.org

DISABILITY RIGHTS ADVOCATES

Stuart John Seaborn*
2001 Center Street, 4th Floor
Berkeley, CA 94704
(510) 665-8644
sseaborn@dralegal.org

Torie Atkinson*
Madeleine J. Reichman*
655 Third Avenue, 14th Floor
New York, NY 10017
(212) 644-8644
tatkinson@dralegal.org
mreichman@dralegal.org

CIVIL RIGHTS EDUCATION AND
ENFORCEMENT CENTER

Albert Elia*
1245 E. Colfax Ave., Suite 400
Denver, CO 80218
(303) 757-7901
aelia@creeclaw.org

*Admitted Pro Hac Vice

Attorneys for Plaintiffs.

Dated: May 26, 2023

<u>**CERTIFICATE OF SERVICE**</u>

I certify that, on May 26, 2023, I served the foregoing document upon all parties herein by

e-filing with the CM/ECF system maintained by the court which will provide notice to the

following:

Dawn Jordon
Senior Deputy Attorney General
Office of Tennessee Attorney General
dawn.jordan@ag.tn.gov

Steven Hart
Special Counsel
Office of Tennessee Attorney General
steve.hart@ag.tn.gov

Jeffrey B. Cadle
Assistant Attorney General
Office of Tennessee Attorney General
jeffrey.cadle@ag.tn.gov

<u>/s/ Jordon Henderson</u>
Jordon Henderson
Paralegal
Fox & Robertson, PC