# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| ERNEST KEVIN TRIVETTE, *et al.*, | |
| Plaintiffs, | Case No. 3:20-cv-00276 |
| v. | Judge Trauger |
| TENNESSEE DEPARTMENT OF CORRECTION, | |
| Defendant. | |

## PLAINTIFFS' RULE 56.01(b) STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT

In accordance with Federal Rule of Civil Procedure 56 and Local Rule 56.01(b), Plaintiffs Disability Rights Tennessee ("DRT"), Ernest Kevin Trivette, Jason Andrew Collins, Alex Gordon Stinnett, Thomas White and Lakeevious Owens submit this statement of material facts to which there is no genuine dispute in support of their Motion for Partial Summary Judgment against Defendant Tennessee Department of Correction ("TDOC"). Unless otherwise noted, the documents and deposition excerpts cited below are attached to the Declaration of Jordon Henderson filed herewith.

The Appendix to this Statement contains an index to exhibits, a list identifying the individuals whose depositions and declarations are cited below, and a guide to common abbreviations.

## I.    Parties.

### A.  Plaintiff Disability Rights Tennessee

1.      Plaintiff DRT "is a nonprofit corporation that advocates on behalf of Tennesseans with disabilities as part of the federal government's Protection and Advocacy ('P&A') system." Mem. at 1, May 5, 2021, ECF No. 59 ("PI Mem.").

RESPONSE:


2.      In order for a state's P&A organization to qualify for federal funds, it must have certain powers, including the power to "pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of such individuals within the State who are or who may be eligible for treatment, services, or habilitation, or who are being considered for a change in living arrangements." 42 U.S.C. § 15043(a)(2)(A)(i); *see also* 29 U.S.C. § 794e(f)(3) (extending power-to-sue requirement to additional P&A duties); 42 U.S.C. § 300d-53(k) (same); 42 U.S.C. § 10805(a)(1)(B) (same). PI Mem. at 1-2.

RESPONSE:


3.      DRT has been advocating for effective communication for deaf and hard of hearing prisoners in Tennessee Department of Correction ("TDOC") custody for many years. For example, DRT has advocated for the installation of videophones and provision of sign language interpreters since at least 2017. Hancock Decl. ¶ 3, Dec. 2, 2020, ECF No. 35-3; Hancock Dep.[1]

---

[1] All deposition excerpts are attached to the Declaration of Jordon Henderson.

41:8-13; *see also generally* Craig Decl, Dec. 2, 2020, ECF No. 35-4; Mancino-Rosete Decl., Dec. 2, 2020, ECF No. 35-5; Price Decl. Exs. 2-4.[2]

RESPONSE:

4.     On March 4, 2020, DRT along with the Civil Rights Education and Enforcement Center wrote to TDOC calling its attention to its denial of effective communication for deaf and hard of hearing prisoners, including but not limited to sign language interpreters and videophones, and requesting TDOC provide these accommodations at all facilities. Price Decl. Ex. 1 at 1, 8.

RESPONSE:

**B.  The Individual Plaintiffs**

5.     Plaintiffs Jason Collins, Lakeevious Owens, Alex Stinnett, Kevin Trivette, and Thomas White (the "Individual Plaintiffs") are Deaf. Def's Answer to Fourth Suppl. Compl. ("4th Ans.") ¶¶ 2, 8, 14, 27, ECF No. 149[3]; Def's Resp. to Pl's Reqs. for Admis. to Def. Tennessee Dep't of Correction ("Resp. to RFA")[4] No. 159.

RESPONSE:

---

[2] Declarations not cited by ECF number are filed herewith and referred to by the last name of the declarant.

[3] Plaintiffs' Fourth Supplemental Complaint, to which this document responds, is found at ECF No. 148.

[4] Plaintiffs served three sets of requests for admission ("RFAs") on Defendant; Defendant's responses are all referred to herein as "Resp. to RFA." Plaintiffs' RFAs and Defendant's responses referenced in this Statement are all presented, pursuant to Federal Rule of Evidence 1006, in a spreadsheet attached as Exhibit 1 to the Declaration of Jordon Henderson.

6.      The Individual Plaintiffs all have physical impairments that substantially limit the major life activity of hearing and all are qualified individuals with disabilities under the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act. Resp. to RFA Nos. 74, 76, 105, 107, 128, 130, 160, 162, 184, 186.

RESPONSE:


7.      The Individual Plaintiffs all use American Sign Language ("ASL") as their primary and preferred language. Williams Decl. Ex. 1, Report of Roger C. Williams, LISW-CP/S, CT, NAD-V, QMHI-S ("Williams Rep.") at 16, 22, 26, 27, 31, 32.

RESPONSE:


8.      TDOC has known that the Individual Plaintiffs were deaf since they entered custody. Resp. to RFA Nos. 75, 106, 129, 185; 4th Ans. ¶ 187.

RESPONSE:


9.      Mr. Collins was incarcerated in TDOC custody from approximately February 19, 2020, until approximately August 11, 2021. Resp. to RFA No. 123.

RESPONSE:


10.     Mr. Owens has been incarcerated in TDOC custody since 2017. Resp. to RFA No. 182.

RESPONSE:

4

11.     Mr. Stinnett was incarcerated in TDOC custody from approximately January 30, 2020 to April 30, 2021. Resp. to RFA No. 102.

RESPONSE:


12.     Mr. Trivette entered TDOC custody in June 2015. Resp. to RFA No. 75. He was paroled in approximately April 2019. *See* Mem. of Law in Support of Mot. to Dismiss at 4, May 7, 2020, ECF No. 11.

RESPONSE:


13.     Mr. White was incarcerated in TDOC custody from at least July 2019 to November 2022. Resp. to RFA No. 158.

RESPONSE:


14.     Mr. Collins and Mr. Stinnett read English at approximately the fifth to sixth grade level. Williams Rep. at 22, 28.

RESPONSE:


15.     Mr. Owens and Mr. Trivette read English at approximately the third to fourth grade level. Williams Rep. at 26, 31.

RESPONSE:

16.     Mr. White is functionally illiterate in written English, with an English vocabulary at the third or fourth grade level. Williams Rep. at 33.

RESPONSE:


**C.  DRT Constituents Timothy Beck and Leonard Taylor**

17.     Timothy Beck entered TDOC custody in or about April 2023. Henderson Decl. Ex. 9.

RESPONSE:


18.     Mr. Beck is Deaf and his primary language is American Sign Language. Beck Dep. 6:17-18; 9:9-11; Williams Decl. Ex. 2, Supplemental Report of Roger C. Williams, LISW-CP/S, CT, NAD-V, QMHI-S ("Williams Supp. Rep.") at 4.

RESPONSE:


19.     Mr. Beck reads English at approximately the fifth to sixth grade level. Williams Supp. Rep. at 5.

RESPONSE:


20.     Leonard Taylor entered TDOC custody on January 30, 2023. Cobble Dep. 68:15-24.

RESPONSE:

21.     Mr. Taylor is Deaf and his primary language is American Sign Language. Taylor

Dep. 6:11-16, 12:22-23; Williams Rep. at 29-30.

RESPONSE:


22.     Mr. Taylor was first housed at Bledsoe County Correctional Complex ("BCCX"),

TDOC's intake facility, when he entered TDOC custody. Taylor Decl. ¶ 3, August 29, 2023,

ECF No. 159-3.

RESPONSE:


23.     Mr. Taylor reads English at approximately the fourth to sixth grade level.

Williams Rep. at 30.

RESPONSE:


**D.  Defendant Tennessee Department of Corrections**

24.     Defendant Tennessee Department of Correction is a department of the State of

Tennessee. 4th Ans. ¶ 94.

RESPONSE:


25.     TDOC receives federal financial assistance as that term is used in Section 504. 4th

Ans. ¶ 95.

RESPONSE:


7

26.     "TDOC is the agency of the State of Tennessee that operates prisons, *see* Tenn.

Code Ann. §§ 4-3-601 to -612, and is one of the entities whose actions are monitored by DRT."

PI Mem. at 2.

RESPONSE:


## II.     Background

27.     "ASL is a language with a structure and vocabulary distinct from American

English, through which individuals are able to convey information, feelings, and ideas through

hand gestures and facial expressions without the need of sound." PI Mem. at 2; *see also* Lafferty

Decl. Ex. 1, Expert Report of Richard Lorenzo Ray at 8, Oct. 14, 2020, ECF No. 23-3 ("Ray

2020 Rep.").[5]

RESPONSE:


28.     Title II of the ADA became effective as to the TDOC on January 26, 1992. Pub.

L. No. 101–336, § 205(a), 104 Stat. 327, 338 (1990); *see also* Atlas Dep. 77:20-22.

RESPONSE:

---

[5] Mr. Ray's 2020 Report was submitted in support of Plaintiffs' Motion for Preliminary Injunction. His curriculum vitae is attached to the declaration submitted with this Motion. Ray Decl. Ex. 2.

8

29.     TDOC's proffered expert Randall Atlas[6] is of the opinion that, as of August 31, 2023 – the date of his report – TDOC was not in full compliance with Title II of the ADA. Atlas Dep. 70:13-17.

RESPONSE:


30.     TDOC did not have a policy specifically addressing provision of auxiliary aids and services for deaf and hard of hearing prisoners until August 26, 2022. Trussell Dep. at 75:6-14; Lively Dep. at 153:21-24.

RESPONSE:


31.     On August 26, 2022, TDOC published a new policy entitled "Accommodations for Deaf and Hard of Hearing Inmates." Henderson Decl. Ex. 11 ("Policy 113.95").

RESPONSE:


32.     TDOC's proffered expert Randall Atlas is of the opinion that, as of August 31, 2023 – the date of his report and approximately a year after Policy 113.95 was published – no TDOC institution was yet fully in compliance with Policy 113.95. Atlas Dep. 65:10-66:1; *see also id.* 69:6-17.

RESPONSE:

---

[6] Simultaneous with this Motion Plaintiffs are filing a Motion to Preclude Defendants' Experts, including Dr. Atlas, pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Plaintiffs include several citations to Dr. Atlas's deposition to underscore that the facts in question are undisputed.

33.     Although Policy 113.95 states that "TDOC will monitor compliance with the Title II of the ADA through . . . the collection and review of data concerning compliance," *id.* ¶ VI.V.2, TDOC has produced no such data since the policy was published over a year ago, Robertson Decl. ¶ 3.

RESPONSE:


### III.    Failure to Assess or Investigate the Communications Abilities and Accommodation Needs[7] of Deaf and Hard of Hearing Prisoners.

34.     Communications assessments are necessary for TDOC to meaningfully determine the communication needs of deaf inmates in its custody and must be completed as soon as possible. Williams Rep. at 8-11.

RESPONSE:


35.     While TDOC screens incoming prisoners for their physical hearing ability, Trussell Dep. 51:14-52:20, 55:23-56:12, as described in the following paragraphs, it does not effectively assess their communications abilities or English literacy.

RESPONSE:


36.     Policy 113.95 does not address or require any sort of assessment or evaluation of the communications abilities of deaf or hard of hearing inmates. The only language in the Policy

---

[7] *See Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 268 (D.D.C. 2015) (identifying the obligations of correctional programs to assess and investigate communication abilities and accommodation needs of deaf and hard hearing prisoners to comply with the programs' effective communication obligations).

10

addressing identification of deaf or hard of hearing inmates provides that they must be offered a special ID card. *Id.* ¶ VI.C.

RESPONSE:

37.    TDOC identified Form CR-2178, "Health Questionnaire," as the means by which it assesses deaf inmates for communications abilities and English proficiency. Resp. to RFA Nos. 53, 54, 108, 163.[8] Christy Trussell, TDOC's 30(b)(6) designee as to (among other topics) screening, assessment, evaluation, and tracking of hearing related disabilities and the need for communications or other accommodations, *see* Trussell Dep. 22:8-23, did not explain how TDOC assessed prisoners' communications abilities beyond her references to Form CR-2178. *Id.* 52:23-54:23.

RESPONSE:

38.    Form CR-2178 is a two-page document that is provided to each incoming prisoner to fill out on their own on their first day in custody. Lively Dep. 118:9-19; 119:12-19; 131:21-132:1.

RESPONSE:

39.    Form CR-2178 asks prisoners to answer only two questions relevant to their communications abilities:

| 1. Do you have any barriers to learning? | ❏ Vision  ❏ Hearing   ❏ Reading   ❏ Writing   ❏ None |
|---|---|
| 2. Do you speak/read English? | Speak: ❏ Yes ❏ No          Read: ❏ Yes ❏ No |

---

[8] In Ms. Trussell's deposition and in TDOC's responses to requests for admission, this form is referred to as "CR-2176." That turned out to be an error and should read "CR-2178." Robertson Decl. Ex. 1, Email from Dawn Jordan to Amy Robertson (April 10, 2023).

11

Seaborn Decl. Ex. 1. Mr. Trivette's CR-2178, from August 2016, did not even contain these two basic questions. *Id.* at 001676.

RESPONSE:

40.     Nursing staff employed by Centurion, TDOC's contracted medical provider, distribute and review the Forms CR-2178. Cobble Dep. 47:3-49:2.

RESPONSE:

41.     Centurion staff do not test prisoners for proficiency in the English language, nor do they assess communications abilities beyond simply noting when a prisoner appears not to understand. Lively Dep. 122:17-19; 133:11-135:20.

RESPONSE:

42.     TDOC does not test inmates for English literacy, ask inmates whether they use sign language, or perform a communications assessment. Cobble Dep. 51:16-22; Trussell Dep. 75:19-23; Andrews Dep. 61:24-62:2; Kelley Dep. 42:11-21.

RESPONSE:

43.     The Associate Warden for Treatment ("AWT") of the Morgan County Correctional Complex ("MCCX") was not aware of any communications assessments at that facility. Oakes Dep. 127:3-128:4.

RESPONSE:

12

44.     There is no uniform set of questions asked at intake to determine prisoners'
communications needs and no defined process for developing a communications plan.
Henderson Decl. Ex. 5, Resp. to Pl. Ernest Kevin Trivette's First Set of Interrogs. and Reqs. for
Produc. of Documents to Def. Tennessee Department of Correction ("Resp. to Trivette
Interrogs."), Resp. to Interrog. Nos. 6, 8.

     RESPONSE:


45.     If an incoming prisoner cannot speak English, BCCX staff show the prisoner a
chart of different languages so "they can point to what . . . language they do speak." That chart
does not include ASL. Cobble Dep. 49:3-51:9. BCCX is the intake facility for all male prisoners.
*See infra* ¶ 173.

     RESPONSE:


46.     Outside of having access to Policy 113.95, TDOC does not inform inmates about
the process for requesting accommodations. Trussell Dep. 75:24-78:14.

     RESPONSE:


47.     TDOC's Form CR-1886 is its health classification summary, that is, the health
part of classifying an inmate. The second page of the form lists TDOC's standard
accommodations. Lively Dep. 109:12-116:6; *see also* Henderson Decl. Ex. 10, Policy 113.21
"Health Classification," ¶ VI(A)(2) ("[a]ccommodations must be documented on CR-1886").

     RESPONSE:

48.     Form CR-1886's list of standard accommodations does not include videophones or sign language interpreters as options. *See, e.g.*, Seaborn Decl. Ex. 2 (gathering Forms CR-1886 for the Individual Plaintiffs, Mr. Taylor, and Mr. Beck).

RESPONSE:


49.     The Individual Plaintiffs and several other Deaf prisoners of which Plaintiffs are aware were not provided sign language interpreters during the intake process. *See infra* ¶¶ 68, 73, 74.

RESPONSE:


50.     Plaintiffs' expert Roger Williams opined "[b]ased on my review of the form and reviewing the testimony of Dr. Tersa Lively concerning how the form is filled out, the form CR-2178, as used at TDOC facilities, does not do an adequate job of either assessing or documenting communication needs. The revised form (dated 01-20) asks if the individual has 'barriers' to learning, including hearing, reading, and writing. Most of the time, but not always, individuals who were deaf were identified as having a hearing loss. However, none of them indicated that reading and writing were a barrier, despite the challenges" identified by Mr. Williams in professional communications assessments and described in his report. Williams Rep. at 12-13.

RESPONSE:

51.     Mr. Williams also opined that it is essential that all staff be provided with information about working with deaf prisoners and about the specific communications requirements of each individual deaf prisoner. *Id*. at 11-12.

RESPONSE:


52.     In TDOC's system, "an inmate's central records do not readily identify an inmate as Deaf or hearing impaired." Resp. to Trivette Interrogs., Resp. to Interrog. No. 1. In response to Mr. Trivette's interrogatory requesting TDOC to identify all deaf or hard of hearing inmates in its custody, TDOC explained that "[t]he average annual population of TDOC is more than 20,000, and each facility keeps paper records of its inmates at that facility, which means that an individual seeking the requested information would be required to visit each facility and physically open and review each of the 20,000+ files in order to determine which of the current inmates met the criteria of this Interrogatory." *Id*.

RESPONSE:


53.     No diagnostic codes are recorded in the Tennessee Offender Management System with respect to hearing loss as a health condition, and no recording is made in that system to indicate hearing loss as a disability. *Id*.

RESPONSE:


54.     Rather than systematically identify and track deaf and hard of hearing inmates, TDOC has responded to ad hoc requests for that information by sending out surveys to each institution asking them to report back on the number of such inmates. *Id.*

RESPONSE:

55. TDOC's proffered expert Randall Atlas stated that there were four deaf inmates in TDOC custody but his source for that number was counsel for TDOC. He did not independently verify the accuracy of that number, nor did he have any documents stating how TDOC arrived at that number. Atlas Dep. 114:21-117:5.

RESPONSE:

56. When Dr. Atlas asked counsel for TDOC to provide the number of hard of hearing inmates in TDOC custody, counsel told him that "the department was unable to give him a clear answer." *Id*. at 117:6-18.

RESPONSE:

57. There is no defined process for notifying facility staff that a prisoner is deaf or hard of hearing. Resp. to Trivette Interrogs., Resp. to Interrog. No. 10.

RESPONSE:

58. Neither of TDOC's proffered experts rebutted the opinions of Roger Williams, Plaintiffs' expert as to deaf language and literacy. Atlas Dep. 46:18-47:2.

RESPONSE:

IV. **Failure to Provide Interpreters**

    A. **General Information Relating to Interpreters**

59.    In response to Plaintiffs' requests for admission to TDOC, TDOC admitted that it had failed to provide an interpreter to the Individual Plaintiffs on 269 occasions between 2015 and 2023. Resp. to RFA Nos. 80, 97, 101, 111, 114, 134, 136, 150, 153, 166, 192, 196, 200, 202, 204, 206, 208, 210, 212, 214, 216, 218, 220, 222, 224, 226, 228, 229, 230, 263, 264, 265, 266, 267, 268, 269, 270, 271, 273, 274, 276, 277, 280, 281, 282, 283, 284, 285, 286, 289, 290, 291, 292, 296, 297, 298, 299, 300, 301, 302, 303, 304, 305, 306, 307, 308, 309, 310, 311, 312, 313, 314, 315, 316, 317, 318, 320, 321, 322, 323, 324, 325, 326, 327, 328, 329, 330, 331, 332, 334, 336, 337, 338, 339, 340, 341, 342, 345, 346, 347, 349, 350, 352, 353, 354, 356, 358, 359, 360, 361, 362, 363, 364, 365, 366, 367, 368, 369, 370, 371, 372, 373, 374, 375, 376, 377, 379, 380, 381, 382, 383, 384, 385, 386, 387, 388, 392, 393, 394, 395, 396, 397, 398, 399, 400, 401, 402, 403, 404, 405, 406, 409, 410, 411, 412, 413, 414, 415, 416, 417, 418, 419, 420, 422, 423, 424, 425, 427, 429, 431, 432, 433, 434, 435, 437, 438, 439, 440, 442, 443, 444, 445, 446, 447, 448, 449, 450, 451, 452, 453, 454, 455, 456, 457, 458, 460, 461, 462, 464, 465, 466, 467, 468, 469, 470, 471, 472, 474, 475, 476, 479, 480, 485, 486, 487, 488, 489, 490, 491, 492, 493, 494, 495, 496, 497, 498, 499, 500, 501, 502, 503, 504, 505, 506, 507, 508, 509, 510, 512, 513, 514, 515, 516, 517, 601, 603, 605, 606, 607, 609, 614, 616, 617, 618, 620, 621, 622, 624, 626, 628, 629, 633, 634, 635, 636, 637, 638, 639, 640. Plaintiffs summarize those admissions below; the text of the cited requests and responses are set forth in the table attached as Exhibit 1 to the Henderson Declaration.

    RESPONSE:

60.     Of the occasions listed above on which TDOC admitted it failed to provide sign language interpreters, 124 occurred after March 31, 2020, the date on which the original Complaint in this matter was filed. Resp. to RFA Nos. 153, 196, 200, 202, 204, 206, 208, 271, 274, 276, 277, 280, 281, 282, 283, 284, 285, 286, 289, 290, 291, 292, 296, 297, 298, 299, 300, 358, 359, 361, 362, 363, 364, 365, 366, 367, 368, 369, 370, 371, 372, 373, 374, 375, 376, 377, 379, 380, 381, 382, 383, 384, 385, 386, 387, 388, 399, 400, 401, 402, 403, 404, 405, 406, 409, 410, 411, 412, 413, 414, 415, 416, 417, 418, 419, 420, 422, 423, 424, 425, 502, 503, 504, 505, 506, 507, 508, 509, 510, 512, 513, 514, 515, 516, 517, 601, 603, 605, 606, 607, 609, 614, 616, 617, 620, 621, 622, 624, 626, 628, 629, 633, 634, 635, 636, 637, 638, 639, 640.

RESPONSE:


61.     Policy 113.95 requires auxiliary aids and services for a list of specific interactions – including intake, orientation, classification, medical care, educational programming, and "[c]ritical communications which involve complex information . . .," *id.* ¶ VI.D.1.

RESPONSE:


62.     Of the occasions listed above on which TDOC admitted it failed to provide sign language interpreters, 13 – involving Plaintiffs White and Owens – occurred after August 26, 2022, the date on which Policy 113.95 was published. Resp. to RFA Nos. 605, 606, 607, 609, 614, 616, 617, 635, 636, 637, 638, 639, 640.

RESPONSE:

63. It is the unrebutted opinion of Plaintiffs' expert Roger Williams that TDOC needs to provide qualified sign language interpreters for inmates whose primary language is ASL for any communications above a very simple, basic level, including GED, vocational training, and medical encounters. Williams Rep. at 35.

RESPONSE:


64. TDOC's proffered expert Randall Atlas agrees that the ADA requires TDOC to provide a sign language interpreter during intake and during medical appointments for a deaf prisoner whose primary language is ASL. Atlas Dep. 99:8-101:16. When asked about adult education, he stated that it was not within his area of expertise. *Id*. at 98:6-13.

RESPONSE:


**B.  Failure to Provide Interpreters for Intake, Classification, and Orientation**

65. TDOC's intake process happens when prisoners first arrive, usually from county jail. Cobble Dep. 41:9-12.

RESPONSE:


66. During the intake process, newly arriving prisoners are "strip searched, drug screened. Their facial hair is shaved off. They're…measured for clothing and issued clothing…bedding and towels and wash cloths. They meet with a counselor to get demographic information. Have a [Prison Rape Elimination Act or] PREA screening…Medical meets with them just quickly, just to basically get an initial assessment…[a] majority of it is self-reported by the inmate…[including any] diagnosis they have…[M]ental health meets with them, too, just to kind of get a quick idea of what is going on. Then they go to orientation where they're…shown

19

the PREA video, shown what to expect during the diagnostic process, given their rules and regulations, given a copy of the inmate handbook. They're issued toilet paper, laundry bags, told about the library schedule, how to get haircuts, how to make a phone call…Then they're sent to see medical to get lab work, vitals, to get a health assessment. They're evaluated by mental health staff and are given a level of care…[T]hey're given an education test…[called] the TABE[9] test to see where they are on their education level. They're seen by dental. They're seen by the chaplain. They're seen by the security threat group, which is [TDOC's] gang department, to take pictures of any tattoos and interview them if they're involved in any kind of gang activity." Cobble Dep. 41:9-43:14; *see also* Tennessee Department of Correction, *Experiencing Prison Intake*, YouTube (Aug. 16, 2018), https://www.youtube.com/watch?v=zLq0MQcyQz4 (last visited Nov. 13, 2023) (authenticated by Brett Cobble, Cobble Dep. 45:6-24).

RESPONSE:


67.    On the fourteenth day of the intake process, prisoners are classified to determine their custody level. Cobble Dep. 43:16-17.

RESPONSE:


68.    TDOC failed to provide an interpreter during intake for any of the Individual Plaintiffs on dates ranging from June 2015 to January 2020. Resp. to RFA Nos. 80, 111, 134, 166, 192.

RESPONSE:

---

[9] Likely a reference to the Test of Basic Adult Education.

69. TDOC failed to provide an interpreter for Mr. Collins, Mr. Stinnett, and Mr. White for orientation and classification. 4th Ans. ¶¶ 139, 140, 170, 171, 191, 193.

RESPONSE:

70. TDOC failed to provide an interpreter for Mr. Owens for orientation when he first got to the Northeast Correctional Complex ("NECX") in early December 2022. Owens Dep. 21:8-13; *see also* Seaborn Decl. Ex. 1 at D-008028 (intake health questionnaire dated December 9, 2022).

RESPONSE:

71. TDOC failed to provide an interpreter for Mr. White or Mr. Collins for the STRONG-R risk and needs assessment. 4th Ans. ¶ 194; Resp. to RFA No. 136.

RESPONSE:

72. Policy 113.95 – published on August 26, 2022 – requires TDOC to provide and document the provision of interpreters for intake and classification and prohibits reliance on staff members to interpret unless qualified and "hired specifically to serve as interpreters" or in cases of emergency. *Id.* ¶ IV.G., H., P.

RESPONSE:

73. TDOC failed to provide an interpreter for Leonard Taylor for intake at BCCX in early 2023. Taylor Dep. 32:16-33:4; *see also* Seaborn Decl. Ex. 1 at D-008834 (initial intake

21

interview completed using writing). (He had an interpreter for classification and STRONG-R. *Id.* at 27:25-28:7.)

RESPONSE:


74.     TDOC failed to provide an interpreter for Timothy Beck for intake at BCCX in April 2023. Beck Dep. 26:5-18.

RESPONSE:


75.     TDOC provided an unqualified staff member to attempt to interpret for Mr. Beck during classification. *See infra* ¶¶ 144, 149.

RESPONSE:


### C.  Failure to Provide Interpreters for Medical, Dental, and Mental Health Interactions

76.     On at least 16 occasions in 2020 and 2021, TDOC failed to provide an interpreter for Mr. Collins for medical appointments, including two dental appointments, two mental health appointments, and two physical examinations. Resp. to RFA Nos. 153, 264, 265, 267, 268, 270, 273, 274, 276, 277, 280, 283, 291, 292, 297, 298.

RESPONSE:


77.     On at least 49 occasions between 2017 and 2023, TDOC failed to provide an interpreter for Mr. Owens for medical appointments, including eleven appointments involving medical education or counseling and eight mental health appointments and/or screenings. Resp. to RFA Nos. 226, 302, 304, 305, 307, 308, 310, 311, 314, 315, 316, 318, 320, 323, 324, 326,

331, 336, 338, 340, 342, 347, 350, 353, 354, 361, 363, 364, 365, 366, 367, 368, 370, 371, 373, 374, 376, 380, 381, 382, 385, 386, 387, 601, 605, 609, 614, 616, 617.

RESPONSE:


78.     On at least 17 occasions in 2020 and 2021, TDOC failed to provide an interpreter for Mr. Stinnett for medical appointments, including three appointments relating to treatment for Hepatitis C and two vaccinations. Resp. to RFA Nos. 393, 394, 395, 397, 398, 402, 403, 405, 406, 409, 411, 412, 413, 414, 415, 419, 424.

RESPONSE:


79.     On at least 18 occasions between 2015 and 2018, TDOC failed to provide an interpreter for Mr. Trivette for medical appointments, including two appointments involving medical education or counseling and two physical examinations. Resp. to RFA Nos. 427, 429, 431, 433, 449, 451, 452, 454, 455, 458, 460, 461, 462, 464, 465, 467, 468, 469.

RESPONSE:


80.     On at least 30 occasions between 2019 and 2022, TDOC failed to provide an interpreter for Mr. White for medical appointments, including two dental appointments and three vaccinations. Resp. to RFA Nos. 489, 491, 492, 497, 500, 501, 502, 504, 505, 506, 507, 508, 509, 510, 513, 514, 515, 516, 517, 620, 621, 622, 624, 626, 629, 633, 635, 636, 637, 639.

RESPONSE:

81.     TDOC failed to provide interpreters for Mr. White and Mr. Stinnett for information about COVID-19 and about the Prison Rape Elimination Act. 4th Ans. ¶¶ 151, 154. 197, 199.

RESPONSE:


82.     TDOC failed to provide interpreters for Mr. Taylor for a dentist appointment at DeBerry Special Needs Facility ("DeBerry") in the first half of 2023. Taylor Dep. 19:9-17.

RESPONSE:


83.     The Individual Plaintiffs also did not have interpreters when they signed documents relating to medical care. *See infra* ¶¶ 113, 114, 116.

RESPONSE:


**D.  Failure to Provide Interpreters for Discipline and Segregation**

84.     Lakeevious Owens was disciplined on approximately 14 occasions between 2018 and 2022. He was not provided an interpreter for any of these occasions when he was told about his rights. Resp. to RFA No. 196.

RESPONSE:

85.     On each occasion, he signed a "Disciplinary Report Hearing Summary" waiving his rights to 24-hour notice, to have the reporting official present, and to call witness(es) on his behalf; TDOC did not provide him an interpreter while signing these documents waiving his rights. Resp. to RFA Nos. 200, 202, 204, 206, 208, 210, 212, 214, 216, 218, 220, 222, 224; *see also* Henderson Decl. Ex. 7 (Disciplinary Report Hearing Summaries).

RESPONSE:


86.     Based on TDOC's failure to provide Mr. Owens with an interpreter for these disciplinary proceedings, he didn't understand why he was in trouble. He was written up many times, but TDOC did not explain why. Owens Dep. 30:10-20.

RESPONSE:


87.     TDOC failed to provide an interpreter for Mr. Owens relating to his placement in restrictive housing on at least seven occasions. Resp. to RFA Nos. 337, 341, 349, 360, 372, 603, 607.

RESPONSE:


88.     TDOC failed to provide an interpreter for Mr. White for the segregation check on or about September 28, 2019. Resp. to RFA No. 493.

RESPONSE:

89.     Mr. Collins did not have an interpreter when he was placed into and taken out of protective custody. Collins Dep. 109:23-110:1.

RESPONSE:


E.  **Failure to Provide Interpreters for Classes, Programming, and Other Interactions.**

90.     TDOC did not provide interpreters for Mr. Trivette, Mr. Collins, Mr. Owens, or Mr. White to attend church services. Trivette Dep. 50:11-25; Collins Dep. 36:25-37:10; Second White Dep. at 55:16-56:1; Owens Dep. 29:13-25; 55:2-12.

RESPONSE:


91.     "TCOM" is the Therapeutic Community, a drug and alcohol class. Cobble Dep. 26:3-11.

RESPONSE:


92.     The AWT at BCCX stated that TDOC could not provide an interpreter for Mr. Collins for each TCOM class. Instead, TDOC relied on another inmate to interpret TCOM classes and homework and other daily communication requirements. Resp. to RFA Nos. 150, 151.

RESPONSE:


93.     Mr. Owens was 17 years old when he entered TDOC custody in 2017. Seaborn Decl. Ex. 1 at D-002948.

RESPONSE:

26

94.    TDOC has not provided a qualified sign language to Lakeevious Owens for any educational program during his incarceration. Resp. to RFA No. 228.

RESPONSE:


95.    Specifically, TDOC failed to provide an interpreter for Mr. Owens for Adult Basic Education ("ABE") classes in 2017, 2018, and 2019, ultimately resulting in Correctional Teacher Lou Ann Roberts recommending that he be dismissed from the course. Resp. to RFA Nos. 229-231.

RESPONSE:


96.    The notes in Mr. Owens's file state that "he has not made significant progress" in two years and that "he is also deaf and that is an additional barrier to his academic progress." Henderson Decl. Ex. 6 at D-003119.

RESPONSE:


97.    Other records concerning Mr. Owens's ABE classes include:

a.    April 19, 2018: "He is hearing and speech impaired which makes teaching him a challenge. However the largest hurdle is him not putting for any effort in class." *Id*. at D-003095.

b.    May 21, 2018: "Over the last seven months he has shown no academic progress. He is hearing and speech impaired which is a challenge. However his biggest problem is he has no interest in being in ABE." *Id*. at D-003098.

27

c. March 14, 2019: "Student Owens was out of his seat on several occasions and not attempting his assignments. I communicated with him to sit down and try to finish his work." *Id.* at D-3107.

d. April 1, 2019: "Student Owens had his head down on his desk and he was told sleeping in class was against school rules." *Id.* at D-003110.

e. July 29, 2019: "I/M Owens had to be called down several times today for his loud behavior which was distracting other students from their work. He also lacked a whole math assignment." *Id.* at D-003113.

f. August 1, 2019: "I/M Owens was called down for aggravating class tutor on several occasions. I told him that he would suffer consequences if he continued in this behavior." *Id.* at D-003116.

RESPONSE:

98. TDOC did not provide interpreters for Mr. Trivette's Career Management for Success Program. Trivette Dep. at 21:5-8.

RESPONSE:

99. TDOC did not provide interpreters for Mr. Trivette's GED program and as a result he did not make progress in it. Trivette Dep. at 25:12-16; 26:2-12; *see also* Resp. to RFA No. 101.

RESPONSE:

28

100.    The Parole Board required Mr. Trivette to complete a Cognitive Behavioral Intervention Program prior to being released on parole. Resp. to RFA No. 94.

RESPONSE:


101.    TDOC did not provide Mr. Trivette with a qualified sign language interpreter for the Cognitive Behavioral Intervention Program. Resp. to RFA No. 97; 4th Ans. ¶ 110.

RESPONSE:


102.    TDOC did not provide a qualified sign language interpreter to Mr. Stinnett regarding his options to continue his April 2020 parole hearing or waive his appearance at the hearing, to review paperwork regarding his options for the hearing, or for the development of his home plan prior to his release on parole. 4th Ans. ¶¶ 158, 159, 165.

RESPONSE:


103.    TDOC did not provide interpreters for Mr. White for his home plan parole process, and Mr. White had to wait an additional four to six weeks to be paroled as a result. Second White Dep. 25:3-16.

RESPONSE:


104.    Without interpreters, Mr. White was left to rely on a hearing friend who knew some sign language to fill out forms for him and sign for him. Second White Dep. 30:12-19.

RESPONSE:

105.    TDOC failed to provide an interpreter for Mr. Trivette for at least four case manager meetings in February through April of 2019. Resp. to RFA Nos. 475, 476, 479, 480.

RESPONSE:


106.    TDOC failed to provide an interpreter for Mr. Stinnett for his case manager meeting on April 16, 2021. Resp. to RFA No. 420.

RESPONSE:


**F.  Failure to Provide Interpreters for Reading and Signing Documents**

107.    Many deaf people who grow up with native competency in ASL are not fluent in written or spoken English. These language challenges are even more prevalent in the incarcerated population. Williams Rep. at 5-6.

RESPONSE:


108.    The average deaf high school graduate reads English below a 6th grade level and the median reading level for a deaf adult is at or below 4th grade. Williams Rep. at 6.

RESPONSE:


109.    Individual Plaintiffs, Mr. Beck and Mr. Taylor all read English at varying levels between third and sixth grade. *See supra* ¶¶ 14-16.

RESPONSE:


110.    Relying on written notes as a method of communication for anything beyond basic interactions is not likely to be effective for approximately half the population of deaf

30

adults, and what little research is out there indicates that notes would be ineffective for a much larger percentage of the incarcerated population. Williams Rep. at 6-7.

RESPONSE:


111.    TDOC's proffered expert Randall Atlas agrees that "many people whose primary language is ASL who may have grown up using ASL are not very literate in written English." Atlas Dep. 25:13-24.

RESPONSE:


112.    Dr. Atlas further agrees that when prisoners are signing medical forms an interpreter would be necessary. Atlas Dep. 100:18-101:4.

RESPONSE:


113.    On at least 124 occasions between 2015 and 2022, TDOC failed to provide an interpreter to the Individual Plaintiffs when reading and signing documents, including documents relating to medical screening, consent, and treatment; advance care plans (including circumstances under which the individual would not want to be resuscitated); discipline; classification; and orientation. Resp. to RFA Nos. 196, 200, 202, 204, 206, 208, 210, 212, 214, 216, 218, 220, 222, 224, 263, 266, 269, 271, 281, 282, 284, 286, 289, 290, 296, 299, 300, 301, 303, 306, 309, 312, 313, 317, 321, 322, 325, 327, 328, 329, 330, 332, 334, 339, 345, 346, 352, 356, 358, 359, 362, 369, 375, 377, 379, 383, 384, 388, 392, 396, 399, 400, 401, 404, 410, 416, 417, 418, 422, 423, 425, 432, 434, 435, 437, 438, 439, 440, 442, 443, 444, 445, 446, 447, 448,

31

450, 453, 456, 457, 466, 470, 471, 472, 474, 485, 487, 488, 490, 494, 495, 496, 498, 499, 503, 512, 606, 618, 628, 634, 638, 640.

RESPONSE:


114.    Specifically, TDOC failed to provide Mr. Owens with an interpreter when reading and signing documents on at least 32 occasions, including health questionnaires, consents for treatment, an advance care plan, and five classification summaries. Resp. to RFA Nos. 301, 303, 306, 309, 312, 313, 317, 321, 322, 325, 327, 328, 329, 330, 332, 334, 339, 345, 346, 352, 356, 358, 359, 362, 369, 375, 377, 379, 383, 384, 388, 606.

RESPONSE:


115.    When Mr. Williams, Plaintiffs' expert, presented Mr. Collins with documents that he had signed while in TDOC custody, he was unable to explain what the forms meant, stating he signed them because he was expected to do so. In particular, he was unaware of what the advance directive form meant and stated if he had understood it, he would have selected his mother as his representative. Williams Rep. at 22.

RESPONSE:


116.    Mr. White was not provided an interpreter for a religious request form he was given. He had to rely on a fellow incarcerated person, Kendrick Banks, to fill it out for him. Second White Dep. 10:23-11:13, 15:11-21.

RESPONSE:

117.    Mr. White reported to Mr. Williams that many of the documents he had filled out during his incarceration had been written by other incarcerated people on his behalf since he could not understand the forms. He had received a form from the parole review board that he did not understand. Williams Rep. at 33.

RESPONSE:


118.    Mr. Taylor testified that at intake, "there was no interpreter. … I just signed the papers without the interpreter." When asked whether he was able to understand the documents, he stated, "No. Of course not. No. But the officer showed me where to sign my name. So he gave me the paper and the pen and I was very frustrated because I didn't know what it meant. No one told me what it meant. I had to go ahead and sign without understanding. No one told me." Taylor Dep. 32:19-33:4.

RESPONSE:


**G.  TDOC's Use of Written Notes to Communicate With Deaf Prisoners**

119.    TDOC attempted to communicate with Plaintiffs Trivette, Stinnett, Collins, and White using written notes for medical appointments on more than one occasion during their incarceration. Resp. to RFA Nos. 82, 113, 154, 168. TDOC also used written notes to communicate with Mr. White concerning pre-parole matters. Resp. to RFA No. 179.

RESPONSE:


120.    The AWT of MCCX, where Mr. Owens was housed from 2017 to December 2022, believes that Mr. Owens is fluent in written English and that his preferred method of communication is by writing on Post-It Notes. Oakes Dep. 38:12-39:21, 66:9-11, 120:5-14. (In

33

fact, pursuant to a professional communications assessment, Mr. Owens reads English at the third to fourth grade level. *See supra* ¶ 15.)

RESPONSE:


121.    Although Mr. Oakes claims that Mr. Owens expressed this preference in writing, TDOC has no written record of this and Mr. Oakes did not retain any of the Post-It Notes he used to communicate with Mr. Owens. Resp. to RFA No. 225; Oakes Dep. 120:21-121:9.

RESPONSE:


122.    During the initial conversation in which Mr. Oakes claims Mr. Owens expressed a preference for writing, he did not offer Mr. Owens an interpreter. Oakes Dep. 126:7-19.

RESPONSE:


123.    Mr. Owens testified that staff at MCCX "wouldn't listen to me when I asked for an interpreter. They would just write things down . . . [b]ut they didn't provide me an interpreter." Owens Dep. 28:6-29:6; *see also id.* 31:17-33:5. Warden Oakes "would come and write notes, and I would say I needed an interpreter." *Id*. at 31:2-16.

RESPONSE:


**H.  Use of Other Inmates and a Staff Member to Interpret**

124.    Claude Kenny and Kendrick Banks are individuals incarcerated in TDOC custody. Resp. to RFA No. 15; Henderson Decl. Ex. 3, Second Kenny Decl. ¶ 2.

RESPONSE:

34

125.    Neither Mr. Kenny nor Mr. Banks is certified by the Registry of Interpreters for the Deaf, and TDOC did not provide either of them with training in sign language interpreting. Resp. to RFA Nos. 6, 7, 18, 19.

RESPONSE:


126.    The Registry of Interpreters for the Deaf is "the national certifying body of sign language interpreters and is a professional organization that fosters the growth of the profession and the professional growth of interpreting." *About Us*, Registry of Interpreters for the Deaf, Inc., https://rid.org/about/ (last visited Nov. 14, 2023).

RESPONSE:


127.    TDOC has never evaluated Mr. Kenny's nor Mr. Banks's ability to interpret ASL. Second Kenny Decl. ¶ 12; Resp. to RFA No. 20.

RESPONSE:


128.    When tested by Plaintiffs' expert Roger Williams, Mr. Kenny "had multiple challenges when using ASL. Most notably, he had a limited vocabulary and did not understand that ASL uses different signs for different meanings of a word." Williams Rep. at 25.

RESPONSE:

129.     When tested by Mr. Williams, Mr. Banks "had multiple challenges when using ASL. Most notably, he had a limited vocabulary and did not know basic signs like 'smaller', 'they' or 'looks.'" Williams Rep. at 19.

RESPONSE:


130.     It is Mr. Williams's unrebutted opinion that neither Mr. Kenny nor Mr. Banks is "qualified to interpret and relying on [them] to interpret for Deaf inmates would be inappropriate." Williams Rep. at 19, 25.

RESPONSE:


131.     Using other prisoners to interpret is also inappropriate because, among other reasons, in the correctional setting, the ethical issues with using a fellow prisoner to interpret are problematic. Mr. Williams opined, "[f]rom my experience in inpatient systems, and from interviews with multiple deaf inmates at multiple facilities, another inmate has considerable incentive to use the information gained from interpreting for personal gain and there is no guarantee that they are impartial, with multiple reasons for them to withhold information which might reflect negatively on their own behavior, or which might be used to solicit favors or desirable items." Williams Rep. at 17.

RESPONSE:


132.     TDOC designated Claude Kenny to assist in communicating with other inmates in sign language. Resp. to RFA No. 3.

RESPONSE:

133.     TDOC used Mr. Kenny to interpret for Mr. Trivette during medical appointments on eleven occasions between 2015 and 2018. Resp. to RFA Nos. 86, 463; Henderson Decl. Ex. 4, Def's Resp. to Pl. Disability Rights Tennessee's Second Set of Interrog. ("Resp. to DRT Interrog.") Nos. 5-13; *see also* Resp. to RFA No. 89 ("TDOC used an inmate to interpret for Kevin Trivette at the medical appointment on or about March 16, 2016. TRIVETTE-000360").

RESPONSE:


134.     TDOC used Mr. Kenny to interpret for Mr. Trivette for six case management meetings related to parole planning in 2019. Resp. to DRT Interrog. Nos. 14-19.

RESPONSE:


135.     TDOC used Mr. Kenny to interpret for Mr. Trivette during a Career Management for Success program, a program designed to prepare inmates for reentry. Resp. to RFA Nos. 92, 93.

RESPONSE:


136.     TDOC used Mr. Kenny to interpret for Jason Collins on more than one occasion during Jason Collins's incarceration. Resp. to RFA No. 155.

RESPONSE:

37

137.     TDOC used an inmate signer to interpret for Mr. White during his medical appointments on at least one occasion. Resp. to RFA No. 169.

RESPONSE:


138.     TDOC used Mr. Kenny to interpret for Mr. Stinnett during three medical appointments in 2020. Resp. to DRT Interrog. Nos. 20-22.

RESPONSE:


139.     TDOC's Policy 113.95, published on August 26, 2022, prohibits the use of both staff members and other prisoners to interpret for Deaf prisoners except under limited circumstances. *Id.* ¶ VI.O., P.

RESPONSE:


140.     The Policy prohibits using other prisoners except (1) when the Deaf person specifically requests it, the other prisoner agrees, and such use of inmate interpreters is appropriate under the circumstances; or (2) in an emergency involving imminent threat to safety or welfare. *Id.* ¶ VI.O.

RESPONSE:


141.     On or about September 12, 2023, staff at NECX asked Mr. Kenny to interpreter for Mr. Owens at a disciplinary hearing. Second Kenny Decl. ¶ 7.

RESPONSE:


38

142.     Mr. Kenny explained that he was not a professional interpreter and urged staff to provide Mr. Owens with a professional interpreter. They did not do so. *Id.* ¶ 8.

RESPONSE:


143.     During the disciplinary hearing, Mr. Owens signed a document that was not interpreted to him. *Id.* ¶ 10.

RESPONSE:


144.     When Mr. Beck went through the classification process at BCCX, TDOC used one of its staff members, Matthew Foster, to interpret. Foster Dep. 48:25-49:11; *see also* Email from Amber Gooding to Brett Cobble, April 27, 2023, Henderson Decl. Ex. 8.

RESPONSE:


145.     Mr. Foster also attempted to interpret for Mr. Taylor in a conversation with the unit manager about his request for a job. Foster Dep. 68:3-25.

RESPONSE:


146.     TDOC's proffered expert, Randall Atlas, is of the opinion that it would violate this provision for TDOC to rely on another prisoner to interpret for a Deaf prisoner for medical appointments and disciplinary proceedings, or substantive case manager meetings. Atlas Dep. 110:18-112:6.

RESPONSE:


39

147.    With the exception of individuals hired specifically to serve as qualified sign language interpreters or in cases of emergency, TDOC Policy 113.95 also prohibits the use of TDOC employees to interpret. *Id.* ¶ VI.P.

RESPONSE:


148.    Mr. Foster's ASL and interpreting ability was not discussed during the TDOC hiring process. Foster Dep. 72:18-20.

RESPONSE:


149.    Mr. Foster is not qualified to be a sign language interpreter. Williams Supp. Rep. at 3-4. He has never received any training as an interpreter and neither his ASL ability nor his ability to interpret between ASL and English has ever been evaluated or tested. Foster Dep. 39:14-40:1. He had difficulty interpreting for Mr. Beck's medical appointment, and had to ask the nurse to use smaller words so he could sign them. *Id.* at 65:9-13.

RESPONSE:


150.    Mr. Foster had not seen Policy 113.95 nor received any training on it. *Id.* at 74:15-76:3.

RESPONSE:


## V.    Failure to Provide Videophones

### A.  General Information Relating to Videophones

151.    This Court provided a detailed description of the history and technology behind videophones in its May 5, 2021, PI Memorandum, relying heavily on the expertise and opinions

40

of Plaintiffs' expert Richard Lorenzo Ray. *Id.* at 10-13, ECF No. 59. Plaintiffs incorporate that portion of the Memorandum by reference herein.

RESPONSE:


152.    Videophones are telephones with a high-definition video display, capable of simultaneous two-way interactive video and audio for communication between people in real-time. Ray 2020 Rep. at 14, ECF No. 23-3. Videophones are widely used by deaf people, as they permit them to communicate in sign language, which has its own structure, syntax, and grammar, as well as body language and facial expressions to indicate the intensity of emotion. *Id.* at 14-15. Videophones allow point-to-point calls between deaf people using ASL as well as "video relay service" ("VRS") calls between a deaf person and a hearing person. *Id.* at 15. With VRS, the deaf caller signs to an intermediary sign language interpreter via video monitor. The interpreter, in turn, relays the deaf person's message to the hearing person in spoken English; when the hearing person speaks his response, the interpreter translates back into ASL for the deaf person. *Id.*

RESPONSE:


153.    It is Mr. Ray's unrebutted opinion that "there is no significant technological barrier preventing or that would have prevented TDOC's implementation of" videophones and VRS. "Moreover, any security concerns with these services are easily addressed." Ray 2020 Rep. at 16-17; *see also id.* 19-20 (describing methods for addressing security concerns).

RESPONSE:


41

154. Videophones have been widely available to the deaf populations since at least the mid-2000s. Ray 2020 Rep. at 14; *McBride v. Michigan Dep't of Corr.*, 294 F. Supp. 3d 695, 707 (E.D. Mich. 2018) (quoting Mr. Ray).

RESPONSE:


155. Pursuant to settlements with private parties and the U.S. Department of Justice, state prison systems and local jails have been providing videophone access to deaf prisoners since at least 2010. *See* Ray 2020 Rep. at 22-24 and sources cited therein.

RESPONSE:


156. On May 5, 2021, this Court granted Plaintiff Disability Rights Tennessee's Motion for Preliminary Injunction, ECF No. 22 ("First PI Motion"), ordering that TDOC provide access to videophones for then-inmates Jason Collins and Alex Stinnett. *See generally* PI Mem.; Order, May 5, 2021, ECF No. 60 ("PI Order").

RESPONSE:


157. Specifically, this Court ordered TDOC "to work diligently with DRT, Stinnett, and Collins to evaluate potential temporary options for permitting Stinnett and Collins to have videophone access at Northeast Correctional Complex ('NECX') or any other facility to which either man is transferred, without the need for assistance, accompaniment, or special supervision by NECX officials for each use, until such time as TDOC installs its anticipated new telecommunications systems." PI Order.

RESPONSE:

42

158.     TDOC's August 26, 2022 Policy 113.95 does not require that videophones be provided to deaf prisoners. It defines videophones and VRS, notes that interpreters may be provided for intake via videophone, and requires that the privacy afforded users of videophones, TTYs, and phones with volume control must be equal to the privacy afforded other prisoners' telephone calls. Policy 113.95, ¶¶ IV.K., L.; VI.G., S. But there is no language addressing the circumstances under which deaf prisoners are to be provided access to a videophone. *See generally id.*

RESPONSE:


159.     TDOC relied heavily, in opposing Plaintiffs' First PI Motion, on its then-pending request for proposals ("RFP") and the promise of a new telecommunications system that the resulting contract would yield. For example, in a January 27, 2021 Notice of Filing, TDOC stated that it had issued an RFP "to contract to provide videophones in each TDOC prison, with the videophones as available to Deaf and hearing-impaired inmates as telephones are available to hearing inmates." Def's Notice of Filing Decls. in Rebuttal to Pls' Filings at 2, ECF No. 54; *see also* Def.'s Resp. in Opp'n. to Mot. for Prelim. Inj. at 4, Nov. 25, 2020, ECF No. 32 ("TDOC is presently pursuing a contract to install videophones in the TDOC prisons and hopes to have them installed in the Spring of 2021.").

RESPONSE:

43

160.     The RFP in question was issued on July 31, 2020. Def's Notice of Filing Additional Decls. Regarding Pls' Mot. for Prelim. Inj. and attachments thereto, Jan. 14, 2021, ECF Nos. 51, 51-3.

RESPONSE:


161.     TDOC ultimately issued an intent to award the contract to ViaPath (f/k/a Global Tel*Link) on February 3, 2022. Gulden Dep. 98:1-7.

RESPONSE:


162.     A week later, a losing bidder filed a protest, which was subsequently appealed to the circuit court on November 23, 2022. *Id*. at 98:1-21.

RESPONSE:


163.     The case remains pending before the Davidson County Chancery Court. Resp. in Opp'n to Pl. DRT's Second Mot. for Prelim. Inj. at 2, Sept. 12, 2023, ECF No. 160.

RESPONSE:


164.     While TDOC's proffered expert Randall Atlas appears to excuse TDOC's failure to install videophones based on delays in the bid process, Atlas Dep. 70:12-71:8, 72:3-17, he concedes that if TDOC had issued the RFP and started the contracting process for videophones in 2010, we would be seeing those devices in facilities "now and probably a couple of years ago." *Id*. at 158:4-16.

RESPONSE:

165.    Any hearing inmate can contact the number used to anonymously report sexual abuse and/or harassment, often referred to as the PREA hotline or tip line, by dialing a four- or five-character number from any conventional telephone for inmate use. Resp. to RFA No. 596.

RESPONSE:


166.    Neither videophones nor TTYs in TDOC facilities can be used to contact the number used to anonymously report sexual abuse and/or harassment, often referred to as the PREA hotline or tip line. Resp. to RFA Nos. 597-598.

RESPONSE:


167.    The TTY is a 60-year-old technology in which users type back and forth while their conversations are transmitted over the standard telephone network. Ray 2020 Rep. at 10.

RESPONSE:


168.    TDOC's proffered expert Randall Atlas is of the opinion that using a TTY is not equally effective as telephones are for inmates who are hearing. Atlas Dep. 86:20-87:5.

RESPONSE:


### B.  Facilities With and Without Videophones

169.    Despite its professed commitment to install videophones in each facility, *see supra* ¶¶ 159-60, as of late August 2023, the only videophones in TDOC facilities were one at MCCX and two at NECX. TDOC had installed a videophone at DeBerry, but it was not

operational. RFA No. 529; Henderson Decl. Ex. 2, Agreed Protocol for Plaintiffs' Rule 34 Visits ("Protocol") ¶ 4.a.i. and Ex. 1; Taylor Decl. ¶ 10, August 29, 2023, ECF No. 159-3.

RESPONSE:


170.    The videophones at MCCX and NECX did not work when tested by Plaintiffs' expert Richard Ray during site visits on June 1 and 2, 2023. Ray Decl. Ex. 1, Expert Report of Richard Lorenzo Ray, June 30, 2023 ("Ray 2023 Rep.") at 9, 19.

RESPONSE:


171.    Prior to the site visits, TDOC stipulated in an agreed Protocol that "the areas and equipment Plaintiffs elect to inspect are representative of all such areas in all TDOC facilities." Protocol ¶ 5.

RESPONSE:


172.    TDOC's proffered expert Randall Atlas did not test the videophones at MCCX or NECX. Atlas Dep. 133:5-7,134:14-16.

RESPONSE:


173.    All male prisoners coming from county jails to TDOC must go through BCCX for intake. Cobble Dep: 44:2-5.

RESPONSE:

174.    No videophone has been available at BCCX at any time material to this litigation. Resp. to RFA No. 35, 38, 144, 526, 527; Cobble Dep. 46:13-20; Price Decl. Ex. 4, Email from Priscilla Wainwright to Bryce Coatney (May 31, 2019) at DRT-000051 (as of May 31, 2019, NECX was the only facility with a videophone).

RESPONSE:


175.    TDOC's proffered expert Randall Atlas offered the opinion that it is a violation of the ADA for TDOC to fail to provide a videophone at BCCX. Atlas Dep. 122:12-24.

RESPONSE:


176.    All female prisoners coming from county jails to TDOC must go through the Debra K. Johnson Resource Center ("DJRC") for intake. Cobble Dep 44:6-9.

RESPONSE:


177.    There is no videophone at DJRC. Resp. to RFA No. 529; Protocol ¶ 4.a.i. & Ex. 1 at 17.

RESPONSE:


178.    There was no videophone at NECX from at least June 2015 to June 2018. Resp. to RFA No. 25.

RESPONSE:

179.    When a videophone was first installed at NECX, it had connectivity issues.

Andrews Dep. 95:8-11.

RESPONSE:


180.    There was no videophone at MCCX until March 2022. Resp. to RFA No. 42.

RESPONSE:


181.    TDOC installed a videophone at DeBerry in late August 2023. Although it was

initially not operational, DRT constituent Leonard Taylor is now able to use it. Taylor Decl.,

¶ 10, ECF No. 159-3; *see also* Pl. DRT's Reply in Support of Second Mot. for Prelim. Inj. at 1,

ECF No. 161.

RESPONSE:


182.    It required repeated requests, reminders, and the threat and ultimate filing of

Plaintiffs' Second Motion for Preliminary Injunction before TDOC finally installed and made

operational a videophone at DeBerry. *See* Mem. in Supp. of Pls.' Second Mot. for Prelim. Inj. at

5-8 and sources cited therein, Aug. 29, 2023, ECF No. 159.

RESPONSE:


### C.    Kevin Trivette

183.    Mr. Trivette entered TDOC custody in June 2015 at BCCX; he did not have

access to a videophone there. Resp. to RFA No. 70; *supra* ¶ 174 (no videophone at BCCX).

RESPONSE:

184.     Mr. Trivette was housed at NECX from July 2015 to April 2019 (with the exception of short stays at MCCX in July 2015 and DeBerry in July 2016). He did not have access to a videophone at NECX until June 2018 at the earliest. Resp. to RFA Nos. 25, 71, 72, 73.

RESPONSE:


185.     TDOC's policy at NECX was to limit deaf prisoners' access to the videophone to three times a week for 30 minutes at a time. Gentry Decl. ¶ 6, Nov. 25, 2020, ECF No. 32-1. While Mr. Trivette was at NECX, TDOC limited his videophone access to 30 minutes each on Monday, Wednesday, and Friday, while hearing inmates could use the phone for approximately five or six hours a day without limits. Trivette Dep. 35:18-36:7, 38:10-12, 39:2-11.

RESPONSE:


186.     The videophone at NECX was kept in a locked office and not in Mr. Trivette's housing unit. When a deaf prisoner wanted to use the videophone, an officer would have to escort him to that office. Gentry Decl. ¶ 4, ECF No. 32-1; Resp. to RFA No. 26, 29.

RESPONSE:


187.     During at least the period between 2018 and the present, conventional telephones were available for use by inmates in their housing units at NECX, and not kept in staff offices. Resp. to RFA Nos. 27-28.

RESPONSE:

**D. Jason Collins**

188.     Mr. Collins was housed at BCCX from approximately February to November 2020. Resp. to RFA No. 124.

RESPONSE:


189.     Mr. Collins did not have access to a videophone the entire time he was housed at BCCX. Resp. to RFA No. 38.

RESPONSE:


190.     During the time Mr. Collins was housed at BCCX, hearing inmates in that facility had access to telephones. Collins Dep. 133:16-20.

RESPONSE:


191.     Mr. Collins was housed at NECX from approximately November 2020 to August 2021, with a two-day stay at DeBerry in April 2021. Resp. to RFA Nos. 125-127.

RESPONSE:


192.     Mr. Collins did not want to transfer to NECX in November 2020 as he was involved in a drug rehabilitation program at BCCX that he wanted to complete. However, BCCX did not have a videophone, so he was essentially forced to choose between the program he needed for rehabilitation and the videophone he needed to communicate with his children. Collins Dep. 28:15-29:13.

RESPONSE:

50

193.    For the first several weeks after his transfer to NECX, Mr. Collins was quarantined and did not have access to a videophone. Supp. Collins Decl. ¶ 2-3, Dec. 21, 2020, ECF No. 43. Hearing inmates in quarantine at that facility at that time had access to conventional telephones during the time they are out of their cells. *Id.* ¶ 4.

RESPONSE:


194.    After his transfer to NECX in December 2020, Mr. Collins was able to place several videophone calls, but the quality was so bad that he was not able to follow the conversation. Third Supp. Collins Decl. ¶ 2, Feb. 16, 2021, ECF No. 57-2.

RESPONSE:


195.    On or about January 6, 2021, the videophone he was using at NECX stopped working. Fourth Supp. Collins Decl. ¶ 5, Feb. 16, 2021, ECF No. 57-4.

RESPONSE:


196.    During Mr. Collins's incarceration at BCCX, visitation with family was suspended due to the COVID-19 pandemic. Resp. to RFA No. 145.

RESPONSE:


197.    Mr. Collins has three children, who are also Deaf. Because of TDOC's failure to provide reliable access to videophone service, he was unable to communicate with them for over a year. Collins Decl. ¶¶ 10-11, Oct. 14, 2020, ECF No. 23-1; Collins Dep. 88:11-17.

RESPONSE:

### E. Alex Stinnett

198.    Mr. Stinnett was housed at BCCX from January to June 2020, during which time he had no access to a videophone. Resp. to RFA No. 103; Stinnett Decl. ¶ 8, Oct. 23, 2020, ECF No. 28.

RESPONSE:


199.    Mr. Stinnett was housed at NECX from June 2020 until his release in April 2021. Resp. to RFA No. 104.

RESPONSE:


200.    The videophone in the Annex at NECX was installed on or about December 20, 2020. Resp. to RFA No. 532.

RESPONSE:


201.    Even after the videophone was installed at NECX, it did not work and had constant connectivity issues. Stinnett Dep. 29:18-30:2.

RESPONSE:


202.    Mr. Stinnett was limited to three videophone calls a week while the other inmates could use conventional phones 20-40 times a week. Stinnett Dep. 31:2-8; Stinnett Fourth Supp. Decl. ¶¶ 4-8, Feb. 16, 2021, ECF No. 57-3. As of January 19, 2021, Mr. Stinnett had not had access to a videophone since entering TDOC custody. *Id*.

RESPONSE:

203.     While Mr. Stinnett was incarcerated at the Annex at NECX, the videophone was kept in a locked office. When Mr. Stinnett was later moved to NECX's Compound, the videophone was locked in an office. Videophone phone usage was limited to three times a week. Stinnett Dep. 60:3-15.

RESPONSE:


### F.  Thomas White

204.     Thomas White was housed at BCCX from approximately July 2019 to October 2019, and then at NECX from approximately October 2019 until his release from custody in November 2022. Resp. to RFA No. 158. He was housed at DeBerry for a short time in 2021 or 2022. Second White Dep. 24:3-17.

RESPONSE:


205.     Mr. White did not have access to a videophone at BCCX or DeBerry. *Supra* ¶ 174 (no videophone at BCCX); Second White Dep. 24:3-17 (DeBerry).

RESPONSE:


206.     For part of the time Mr. White was housed in NECX, the videophone he was provided was locked in an office and inaccessible to him. Second White Dep. 19:3-13, 19:19-20:6.

RESPONSE:

207.    The videophone Mr. White was provided was freezing and breaking, and it took a long time to fix it. Second White Dep. 12:21-13:1, 13:6-18.

RESPONSE:


208.    The delays on repairing the videophone were so significant that Mr. White gave up on using the videophone. *Id*. at 21:25-22:17.

RESPONSE:


209.    When the videophone did work, Mr. White called his sister Patrice every day. *Id*. at 46:14-16.

RESPONSE:


**G.  Lakeevious Owens**

210.    Mr. Owens was housed at BCCX when he first entered TDOC custody in August 2017. Resp. to RFA No. 183. He had no access to a videophone. *Supra* ¶ 174 (no videophone at BCCX).

RESPONSE:


211.    Mr. Owens was housed in MCCX from approximately August 2017 to December 2022 and at NECX since December 2022. Resp. to RFA No. 183 (housed at MCCX starting in August 2017); Seaborn Decl. Ex. 1 at D-008028-29 (Health Questionnaire dated December 9, 2022 showing "receiving institution" as NECX).

RESPONSE:


54

212.    The videophone in MCCX was installed on or about March 8, 2022, thus TDOC did not provide Lakeevious Owens with a videophone in his housing unit/cell block until March of 2022. Resp. to RFA Nos. 41, 42, 44.

RESPONSE:


213.    NECX has two videophones, one in Unit 14 and one in the Annex. Protocol ¶ 4.a.i. and Ex. 1 at 12.

RESPONSE:


214.    At the time he was deposed on February 10, 2023, Mr. Owens was living in Unit 11 at NECX. That unit did not have a videophone. In order to use the videophone in Unit 14, he had to get permission and ask a guard to walk him to that unit. Owens Dep. 53:8-54:2.

RESPONSE:


215.    In addition, the videophone in Unit 14 at NECX was "broken" and had had problems since he arrived at the facility in December 2022. *Id*. at 18:14-19:15, 53:15-20.

RESPONSE:


216.    Mr. Owens "want[ed] to call [his] family" and it has been "very hard on [him] not to be able to communicate with them." *Id*. at 52:18-24.

RESPONSE:

55

### H. DRT Constituents Leonard Taylor and Timothy Beck

217.    Mr. Taylor was housed at BCCX from approximately January to March 2023 and

has been housed at DeBerry since that time. Taylor Decl. ¶¶ 2-3, Aug. 29, 2023, ECF No. 159-3;

Seaborn Decl. Ex. 1 at D-008823-24 (Health Questionnaire dated March 22, 2023 showing

receiving institution as DeBerry); Taylor Dep. 13:13-15.

RESPONSE:


218.    Mr. Taylor did not have access to a videophone when he was housed at BCCX.

Taylor Dep. 38:18-22.

RESPONSE:


219.    Between March and August 2023, TDOC did not provide videophone access to

Mr. Taylor at DeBerry; he was thus unable to communicate with his girlfriend or family. *Id*. at

37:20-38:3; Taylor Decl. ¶¶ 7-10, 14, ECF No. 159-3.

RESPONSE:


220.    Mr. Beck was housed at BCCX when he initially entered TDOC custody in early

2023. He did not have access to a videophone while at BCCX. Beck Dep. 26:23-25.

RESPONSE:


221.    Mr. Beck is currently housed at MCCX. Beck Dep. 9:23-25.

RESPONSE:

222. Both Mr. Beck and Mr. Taylor spent their initial months in TDOC custody without access to a videophone during a period almost two years after this Court's May 5, 2021 Memorandum and Order.

RESPONSE:

Respectfully submitted,                                    DATE: November 15, 2023

FOX AND ROBERTSON, PC                    DISABILITY RIGHTS ADVOCATES

/s/ Amy F. Robertson                                   Stuart John Seaborn*
Amy F. Robertson*                                        2001 Center Street, 4th Floor
1 Broadway, Suite B205                                Berkeley, CA 94704
Denver, CO 80203                                          (510) 665-8644
(303) 951-4164                                               sseaborn@dralegal.org
arob@foxrob.com

                                                                   Torie Atkinson*
DISABILITY RIGHTS TENNESSEE        Madeleine J. Reichman*
                                                                   655 Third Avenue, 14th Floor
Jack W. Derryberry, Jr. (TN Bar# 003870)   New York, NY 10017
Stacie L. Price (TN Bar# 030625)               (212) 644-8644
2 International Plaza, Suite 825                    tatkinson@dralegal.org
Nashville, TN 37217                                    mreichman@dralegal.org
(615) 298-1080
jackd@disabilityrightstn.org
staciep@disabilityrightstn.org

CIVIL RIGHTS EDUCATION AND
ENFORCEMENT CENTER

Albert Elia*
1245 E. Colfax Ave., Suite 400
Denver, CO 80218
(303) 757-7901
aelia@creeclaw.org

Counsel for Plaintiffs
*Admitted *pro hac vice*

57

## CERTIFICATE OF SERVICE

I certify that on November 15, 2023, I served the foregoing document upon all parties herein by e-filing with the CM/ECF system maintained by the court which will provide notice to the following:

Steve Hart steve.hart@ag.tn.gov
Jeffrey Cadle jeffrey.cadle@ag.tn.gov
Tennessee Attorney General's Office
P.O. Box 20207
Nashville, Tennessee 37202
(615) 741-6440

*s/ Jordon Henderson*
Jordon Henderson
Paralegal
Fox & Robertson, PC

# APPENDIX

## Exhibit Index

**Declaration of Stacie Price**:

1. Letter from Stacie Price (DRT) and Martha Lafferty (CREEC) to TDOC Commissioner Tony Parker dated March 5, 2020.

2. Letter from Kelsey Craig (DRT) to Warden Grady Perry dated Sept. 5, 2018.

3. Email from Daniel Ellis (DRT) to Bryce Coatney (TDOC) providing resources for sign language interpreters dated Aug. 15, 2019.

4. Emails among April Mancino-Rosete (DRT), Bryce Coatney (TDOC), and Priscilla Wainwright.

**Declaration of Jordon Henderson**:

1. Chart of Plaintiffs' Requests for Admission and Defendant's Reponses Relied on in Plaintiffs' Statement of Undisputed Facts.

2. Agreed Protocol for Plaintiffs' Rule 34 Site Visits dated May 15, 2023.

3. Second Declaration of Claude Kenny dated September 28, 2023.

4. Defendant's Responses to Plaintiff Disability Rights Tennessee's Second Set of Interrogatories dated May 15, 2023.

5. Excerpts from Defendant's Responses to Plaintiff Ernest Kevin Trivette's First Set of Interrogatories and Requests for Production of Documents to Defendant Tennessee Department of Correction dated March 21, 2022.

6. Contact notes relating to Lakeevious Owens's education.

7. Disciplinary Report Hearing Summaries for Lakeevious Owens.

8. Email from Amber Gooding (TDOC) to Brett Cobble (TDOC) concerning use of Matthew Foster to interpret for Timothy Beck.

9. Classification Summary of Timothy Beck

10. TDOC Policy 113.21, "Health Classification."

11. TDOC Policy 113.95, "Accommodations for Deaf and Hard of Hearing Inmates."

12. Excerpts from the Deposition of Steven Andrews.

13. Excerpts from the Deposition of Randall Atlas.

14. Excerpts from the Deposition of Timothy Beck.

15. Excerpts from the Deposition of Brett Cobble.

16. Excerpts from the Deposition of Jason Collins.

17. Excerpts from the Deposition of Matthew Foster.

18. Excerpts from the Deposition of Kimberly Gulden.

19. Excerpts from the Deposition of Hunter Hancock.

20. Excerpts from the Deposition of Shakera Kelley.

21. Excerpts from the Deposition of Tersa Lively.

22. Excerpts from the Deposition of Stacy Oakes.

23. Excerpts from the Deposition of Lakeevious Owens.

24. Excerpts from the Deposition of Alex Stinnett.

25. Excerpts from the Deposition of Leonard Taylor.

26. Excerpts from the Deposition of Ernest Kevin Trivette.

27. Excerpts from the Deposition of Christy Trussell.

28. Excerpts from the Second Deposition of Thomas White.

**Confidential Declaration of Stuart Seaborn:**

1. TDOC Forms CR-2178, "Health Questionnaire" for each Individual Plaintiff and Leonard Taylor [including D008028 and D-002948, both of which are for Owens but we need them both for different cites; also D-008823-24 for Taylor]

2. TDOC Forms CR-1886, "Health Classification Summary" for each Individual Plaintiff, Leonard Taylor, and Timothy Beck.

**Declaration of Amy F. Robertson**:

1. Email from Dawn Jordan to Amy Robertson April 10, 2023.

**Declaration of Roger C. Williams**:

1. Report of Roger C. Williams, LISW-CP/S, CT, NAD-V, QMHI-S.

2. Supplemental Report of Roger C. Williams, LISW-CP/S, CT, NAD-V, QMHI-S.

3. Curriculum Vitae of Roger C. Williams.

**Declaration of Richard Lorenzo Ray:**

1. Expert Report of Richard Lorenzo Ray, June 30, 2023.

2. Curriculum Vitae of Richard Lorenzo Ray.

## Identity and Affiliation of Individuals Cited in Plaintiffs' Undisputed Facts

**Plaintiffs**:

- Jason Collins

- Lakeevious Owens

- Alex Stinnett

- Kevin Trivette

- Thomas White

## Disability Rights Tennessee's Deaf Incarcerated Constituents

- Timothy Beck

- Leonard Taylor

## Disability Rights Tennessee's Present and Former Staff Members

- Anna Bass, Deputy Executive Director

- Kelsey Craig, Director of State Contracts and Resource & Referral

- Hunter Hancock, former Investigator/Advocate

- April Mancino-Rosete, Children & Youth and Adult Program Director

- Stacie Price, DRT Staff Attorney and counsel for Plaintiffs

## Plaintiffs' Experts

- Richard Ray, Plaintiffs' expert on technology, telecommunications, and other accommodations for deaf and hard of hearing people.

- Roger Williams, Plaintiffs' expert on Deaf language and literacy.

## Tennessee Department of Correction's Staff and Rule 30(b)(6) Designees

- Steven Andrews, Associate Warden for Treatment, Northeast Correctional Complex.

- Brett Cobble, Associate Warden for Treatment, Bledsoe County Correctional Complex.

- Jerry Gentry, Compliance Manager, Northeast Correctional Complex.

- Kimberly Gulden, Deputy Inspector General, TDOC's Rule 30(b)(6) designee on TDOC's inmate telephone program including policies, procedures, contracts, monitoring, recording, charges, and reasonable modifications relating to such program.

- Shakera Kelley, Associate Warden for Treatment, Women's Therapeutic Residential Center.

- Stacey Oakes, Associate Warden for Treatment, Morgan County Correctional Complex.

- Christy Trussell, Director of Clinical Compliance and ADA Compliance; TDOC's Rule 30(b)(6) designee on: standards, factors, and processes for granting or denying auxiliary aids, services and accommodations and participants in any such determination; and policies, practices, and procedures relating to screening, assessment, evaluation, record keeping, and tracking of hearing-related and other disabilities, the need for communications or other accommodations, and physical and mental health, whether during intake and orientation or during incarceration.

**Others**
- Dr. Tersa Lively was the Rule 30(b)(6) designee deponent for Centurion, TDOC's contract medical provider. Lively Dep. 15:1-8.

- Randall Atlas, designated as an expert witness by TDOC

## Guide to Common Abbreviations

4th Ans.: Defendant's Answer to Fourth Supplemental Complaint, ECF No. 149.

ABE: Adult Basic Education

ASL: American Sign Language

AWT: Associate Warden for Treatment

BCCX or Bledsoe: Bledsoe County Correctional Complex

DeBerry: Lois M. DeBerry Special Needs Facility

DRT: Disability Rights Tennessee

MCCX or Morgan County: Morgan County Correctional Complex

NECX or Northeast: Northeast Correctional Complex

Resp. to RFA No.: Response to Request for Admission Number

TDOC: Tennessee Department of Correction

VRS: Video Relay Service