# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **ERNEST KEVIN TRIVETTE et al.** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:20-cv-00276** |
| | ) | **Judge Aleta A. Trauger** |
| **TENNESSEE DEPARTMENT OF** | ) | |
| **CORRECTION,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM

Plaintiffs Disability Rights Tennessee ("DRT"), Ernest Trivette, Jason Collins, Alex Stinnett, Thomas White, Lakeevious Owens, John Giles, and Pamela Bingham have filed a Partial Motion for Summary Judgment (Doc. No. 162), to which the Tennessee Department of Correction ("TDOC") has filed a Response (Doc. No. 181), and the plaintiffs have filed a Reply (Doc. No. 186). The plaintiffs have also filed a Motion to Exclude Defendant's Experts (Doc No. 167), to which TDOC has filed a Response (Doc. No. 175), and the plaintiffs have filed a Reply (Doc. No. 178). Finally, TDOC has filed a Motion for Summary Judgment (Doc. No. 170), to which the plaintiffs have filed a Response (Doc. No. 179), and TDOC has filed a Reply (Doc. No. 184). For the reasons set out herein, each motion will be granted in part and denied in part.

# I. BACKGROUND

## A. Deaf and Hard-of-Hearing Individuals in the Prison Setting

Individuals with hearing-related disabilities can be found in all parts of society, including prisons. Deaf[1] and hard-of-hearing inmates, however, have some needs that other prisoners do not. Some of those needs involve aspects of prison life that require prisoners to hear and respond to rudimentary auditory signals. For example, deaf and hard-of-hearing individuals may need vibrating alarm clocks, instead of ones that rely on sound. Deaf and hard-of-hearing inmates may also be unable to hear alarms, a situation that requires the installation of appropriately placed strobe lights. (Doc. No. 185 ¶¶ 12-13.) There are also aspects of managing a hearing-related disability that an individual might be able to handle on his or her own outside of the prison setting, but which the prison must facilitate while the prisoner is incarcerated—such obtaining hearing aids. (*Id.* ¶ 17.)

The most serious challenges related to being a deaf or hard-of-hearing prisoner, however, tend to involve verbal communication. Prison life—like life outside of prison—is filled with circumstances requiring effective, one-on-one communication of the type typically accomplished, by hearing individuals, through audible speech. Many deaf individuals, however, are incapable of communicating effectively in that manner, and many of those individuals rely, instead, on sign language—typically, American Sign Language, or "ASL." The parties agree that ASL is not simply a transcription of English into gestures, but rather "a language with a structure and vocabulary distinct from American English, through which individuals are able to convey

---

[1] During this litigation, the word "deaf" has sometimes been capitalized and sometimes not. A person is lowercase-d "deaf" if he has a hearing-related disability that meets the relevant definition of deafness. A deaf person is capital-D "Deaf" if he both is deaf and identifies with the Deaf community as part of his cultural identity. The court will generally use the term "deaf," because the relevant legal protections arise out of the relevant individuals' disabilities and would be available to any deaf individual, regardless of his or her particular attitude regarding his or her cultural identity.

information, feelings, and ideas through hand gestures and facial expressions without the need of sound." (Doc. No. 183 ¶ 27.) When an ASL speaker needs to communicate with a non-ASL speaker, the exchange can be facilitated in the same manner that communication between individuals who speak different languages is often facilitated—through a qualified interpreter. (*See, e.g.*, *id.* ¶ 3.)

Deaf and hard-of-hearing inmates are also likely to need certain accommodations or supports in order to communicate effectively with their friends, family, and other contacts outside of prison. Many prisoners rely on telephone access to maintain their connections to the outside world, but a conventional voice telephone cannot transmit ASL. There are other technological solutions that can better serve the needs of deaf and hard-of-hearing individuals, and, in order to explain the options available, the plaintiffs have introduced an Expert Report by Richard Lorenzo Ray, who was the ADA Technology Access Coordinator for the City of Los Angeles until his recent retirement. (Doc. No. 164-5.)

Until fairly recent advances in technology, the best available option to deaf individuals who wished to use the telephone without relying on a translator was the teletypewriter, or "TTY." (*Id.* at 16) TTY is "a 60-year-old technology in which users type back and forth while their conversations are transmitted over the standard telephone network ." (Doc. No. 183 ¶ 167.) TTY technology, however, presents a number of limitations. For one thing, TTY communication is only as effective as the participants' skills with written language. Even individuals proficient in written English, however, lose many expressive options when forced to speak through written text, which has significantly more limited options for expressing tone, emphasis, or affect.

In more recent years, as data connections have permitted real-time transmission of relatively high-resolution video images, videophones—which, by their very nature, permit

3

communication through ASL—have arisen as a preferred alternative for many individuals. The parties agree that videophones have been available to deaf individuals since "at least the mid-2000s" and that such systems have been installed in some state prison systems and local jails since 2010, at the latest. (*Id.* ¶¶ 154–55.)

Individual-to-individual communication in ASL, however, only works if both parties are ASL-proficient. If an individual wishes to use ASL to speak telephonically to someone who does not use ASL, he or she may do so through a telecommunications relay service ("TRS")—that is, "a telephone service that allows persons with hearing or speech disabilities to place and receive telephone calls with hearing people via a third-party 'relay operator' who facilities communication between the parties in real time." (Doc. No. 164-5 at 22.) According to Ray, "TRS providers—generally telephone companies—are compensated for the costs of providing TRS from either a state or a federal fund," and there is "no per-minute cost to the TRS user or facilities providing TRS devices." (*Id.* at 22–23.). Another option—particularly for hard-of-hearing individuals who can speak orally and do not use ASL—is to rely on a captioned telephone, "a special telephone that has a built-in screen to display as text (captions) everything the other person on the call says." (*Id.* at 18.) However, the viability of a captioned telephone, TTY, or any other accommodation that uses written English is dependent on whether the parties involved have sufficient written language skills, which many people—including some deaf ASL users—do not.

Finally, for a prison to meet the needs of its inmates with hearing-related disabilities, it must first know what they are. The parties agree, for the purposes of summary judgment, that doing so requires the performance of a "communication assessment." (Doc. No. 183 ¶ 34.) Another of the plaintiffs' experts, consultant and social worker Roger C. Williams, explains that

a communication assessment looks beyond simply an individual's hearing loss, in and of itself, in order to determine how the individual is able to communicate effectively. For example, a communication assessment will take into account the individual's reading proficiency and fluency in ASL, in order to determine how information can best be conveyed to that individual. (*See* Doc. No. 164-4 at 11–17.)

## B. TDOC and its Grievance System

### 1. TDOC's Policies Regarding Deaf and Hard-of-Hearing Inmates

TDOC is an agency of the State of Tennessee that, among other things, operates prisons. *See* Tenn. Code Ann. §§ 4-3-601 to -612. As part of this litigation, the plaintiffs requested that TDOC identify all deaf and hard-of-hearing inmates in TDOC custody. TDOC was ultimately able to identify four deaf inmates who were still in TDOC custody as of the relevant date, but it was unable to provide a number for its hard-of-hearing population. TDOC explained that reaching such a number would be difficult, because "[t]he average annual population of TDOC is more than 20,000, and each facility keeps paper records of its inmates at that facility, which means that an individual seeking the requested information would be required to visit each facility and physically open and review each of the 20,000+ files in order to determine which of the current inmates met the criteria of this Interrogatory." (*Id.* ¶¶ 52–55) Whatever their number, the deaf and hard-of-hearing individuals in TDOC's custody face potential challenges in connection with a number of aspects of prison life.

#### a. Intake

TDOC screens incoming prisoners for physical hearing ability and has new prisoners fill out a two-page health questionnaire that includes questions regarding whether the inmate has a hearing-related disability and whether the prisoner can "speak/read English." (Doc. No. 183 ¶¶

5

365–39.) TDOC also performs an assessment known as the "TABE" test, which measures academic skills including reading and language. (*Id.* ¶ 66.)

However, TDOC concedes that "[t]here is no uniform set of questions asked at intake to determine prisoners' communications needs and no defined process for developing a communications plan." (*Id.* ¶ 44.) TDOC maintains that it now "offers a qualified sign language interpreter during intake when necessary," but it concedes that no interpreter was provided to the plaintiffs in this case. (*Id.* ¶¶ 42, 49.) TDOC also concedes that "an inmate's central records do not readily identify an inmate as Deaf or hearing impaired." (*Id.* ¶ 52.)

### b. Situations Requiring Translation Services

The plaintiffs have identified 269 occasions, between 2015 and 2023, on which, in their view, a translator should have been provided to a named plaintiff but was not. Although TDOC does not concede that the failure to provide translators was unlawful, it concedes that none were provided in the identified situations. (*Id.* ¶ 59.) Many of the identified instances involved medical care. For example, the plaintiffs have identified 49 medical appointments for which Owens was not provided an interpreter; 30 such appointments for White; 18 for Trivette; 17 for Stinnett; and 16 for Collins. (*Id.* ¶¶ 76–80.) Another 124 of the identified instances involved situations in which a plaintiff was required to read and sign documents, including documents bearing directly on their legal rights, about which a hearing prisoner would be able to receive oral explanation if he did not understand the written materials. (*Id.* ¶ 113.)

On August 22, 2022—that is, about two and one-half years after the commencement of this litigation—TDOC adopted a policy regarding deaf and hard-of-hearing inmates, Policy 113.95. (*Id.* ¶ 31; *see* Doc. No. 182-1 at 5–12.) Policy 113.95 states that "[a]ll institutions will provide appropriate auxiliary aids and services for deaf and hard of hearing inmates to ensure

effective communication and the equal opportunity to participate in and benefit from TDOC's services, programs, and activities." (Doc. No. 182-1 at 7.) The policy defines "effective communication" as follows:

> Communication with individuals who are deaf or hard of hearing that is as effective as communication with others. Effective communication is achieved by furnishing appropriate auxiliary aids and services where necessary to afford inmates with disabilities an equal opportunity to participate in or benefit from the services, programs, or activities of TDOC, unless to do so would result in a fundamental alteration in the nature of the service, program, or activity or would cause an undue financial and administrative burden.

(*Id.* at 6.) The policy includes a list of 14 situations in which "appropriate auxiliary aids and services" must be provided, including educational programming, medical encounters, and religious services. (*Id.* at 8.) The policy does not permit TDOC to rely on other prisoners as translators unless either the prisoner needing the interpretation requested it or there is an emergency. (*Id.* at 10–11.)

<u>c. Outside Communications</u>

The parties agree that, as of late August 2023, TDOC had functioning videophones in two of its facilities: the Morgan County Correctional Complex ("MCCX") and the Northeast Correctional Complex ("NECX"). (Doc. No. 183 ¶ 169.) The plaintiffs concede that, as of that date, a videophone had been installed at another TDOC institution, the DeBerry Special Needs Facility ("DeBerry"), and, although the parties disagree regarding when that system became functional, the plaintiffs concede that at least one DRT constituent was, as of the time of the relevant briefing, able to use the DeBerry videophone. (*Id.* ¶ 181.)

TDOC also identifies evidence suggesting that it has now installed a videophone system in a fourth facility, the Bledsoe County Correctional Complex ("BCCX"). (*Id.* ¶ 169.) All male prisoners coming from county jails pass first through BCCX for a period of time for intake,

meaning that a videophone at BCCX is necessary in order to provide continuous access to prisoners, even if other facilities could provide access for most of the prisoners' time in custody. (*Id.* ¶¶ 173–74.) All female prisoners coming from county jails pass through the Debra K. Johnson Rehabilitation Center ("DJRC"), which does not have videophone capability. (*Id.* ¶¶ 176–77.)

TDOC acknowledges that its addition of its current videophones is a relatively recent development. NECX lacked a videophone "from at least June 2015 to June 2018," and MCCX had no videophone until March 2022. (*Id.* ¶¶ 178, 180.) In early June 2023, the plaintiffs sent Ray to test the videophones in MCCX and NECX, and he was not able to successfully complete a call at either facility. TDOC, however, asserts that the systems were fully operational on those dates, and they have produced records purporting to show the systems having been used for inmate calls in the surrounding time period. (*Id.* ¶ 170.) TDOC concedes that none of its facilities offer captioned telephones, but TDOC asserts that no prisoner has properly exhausted administrative procedures in connection with these issues. (Doc. No. 185 ¶¶ 15.)

### d. Alarm Clocks/Announcements/Alerts

TDOC concedes that it has not provided vibrating alarm clocks or watches to its prisoners. However, it states that no prisoner has properly exhausted administrative remedies in connection with that issue. (*Id.* ¶ 12.) TDOC also concedes that, although it uses strobe alarms, it has not placed the strobes in any individual cell. TDOC disputes, however, that the lights that are installed outside of the cells are not visible within cells. TDOC also states no prisoner has properly exhausted administrative remedies in connection with that issue. (*Id.* ¶ 13.)

## 2. TDOC's Grievance System

### a. Basic Structure

As the court has already noted, TDOC generally expects prisoners who are unhappy with their circumstances at TDOC facilities to follow certain administrative procedures. TDOC has a general prisoner grievance system, which is governed by TDOC Policy 501.01. (Doc. No. 185 ¶ 21.) Policy 501.01 provides for three levels of review, with Level I referring to the lowest level and Level III referring to the highest. (Doc. No. 180 ¶¶ 32–33.) A prisoner can initiate the grievance process by filling out a form that he or she must obtain from a facility staff member. (Doc. No. 185 ¶¶ 22–23.) The form, which is only available in English, must be completed in writing. (*Id.* ¶¶ 24–25.) TDOC concedes, for the purposes of summary judgment, that "[t]he grievance process assumes the person can read and write English in order to submit a grievance." (*Id.* ¶ 27.) TDOC's Rule 30(b)(6) witness, Benjamin Bean, testified that, to his knowledge, the form has not been translated into ASL, and no ASL instructions for filling out the form have ever been provided. (*Id.* ¶¶ 28–31.)

TDOC imposes a time limit on itself to respond to grievances and appeals, and, if it does not address the grievance or appeal within that period, the prisoner can proceed to the next level of review. (Doc. No. 180 ¶¶ 33–35.) For example, a prisoner's initial grievance is to receive a written Level I response within seven days. (Doc. No. 172-1 at 4–5.)

If the prisoner appeals an adverse Level I determination, Level II of the grievance process calls for a hearing. (Doc. No. 185 ¶ 34.) Bean testified that he was unaware of any instance in which an ASL interpreter was offered to a grievant in connection with a Level II hearing. (*Id.* ¶ 35.) Level III of the process, like Level I, is performed in writing. Bean testified that he was not

aware of any instance in which an ASL interpreter was provided to assist with a prisoner's understanding of a Level III response. (*Id.* ¶ 37.)

b. Non-Grievable Matters

Not every prisoner complaint can be raised through the general grievance system. Policy 501.01 lists a number of "Matters Inappropriate to the Grievance Procedure" and permits the Grievance Chairperson to reject a grievance on that ground. (Doc. No. 172-1 at 6.) Among those categories is an exception for grievances related to "[d]iagnoses by medical professionals, medical co-payments where Policy #113.15 has been adhered to, and requirements of substance use therapeutic programs." (*Id.* at 7.)

On its face, that exception appears relatively narrow, but Bean's Rule 30(b)(6) testimony—though sometimes confusing—suggested that TDOC read the exception significantly more broadly. Bean initially testified that *all* requests for communications aids would be exempted from the grievance policy because they were "under medical," although it appears, in context, that Bean may have misunderstood the question:

> Q. . . . So I -- you mentioned the medical grievances. I'm looking for that here. It looks like it's number 8, Diagnoses by medical professionals and copayments.
>
> A. Yes, ma'am.
>
> Q. Okay. Would a grievance about disability-related effective communication request, say, for a sign language interpreter, is that considered something appropriate for the grievance procedure or would it fall under one of these categories?
>
> A. It would fall under medical.
>
> Q. Okay.
>
> A. For deaf, it would fall upon the medical, yes, ma'am.

10

(Doc. No. 180-1 at 91.) Shortly thereafter, Bean seemingly confirmed that position, stating that counsel's statement that "requests for sign language interpretation . . . wouldn't really be appropriate for the grievance process" was "[c]orrect." (*Id.* at 92.)

Other responses by Bean during this portion of his questioning, however, suggested that Bean's interpretation of the medical exemption would only apply "if it's [a] deaf [person] dealing with a medical issue." (*Id.* at 91.) Later in his deposition, he revisited the issue and explained that he was only discussing requests for an interpreter "if they requested something for their medical—medical treatment." (*Id.* at 98.) Accordingly, while Bean's testimony on behalf of TDOC was not always clear, it appears that he testified multiple times that the medical exemption from the grievance structure would at least apply to requests for services, including translation services, in connection with medical treatment.

<u>c. Explanation of Process to Prisoners</u>

A prisoner's ability to take advantage of the grievance process depends, by necessity, on either his knowledge of the process or the availability of the necessary information, if he wishes to find it. There are three primary ways through which TDOC communicates information regarding the grievance process to inmates. First, new prisoners go through an intake and orientation process, during which the grievance procedures are communicated to them orally. (Doc. No. 185 ¶ 49.) Bean, however, testified that he was not aware of TDOC's ever having provided captioning or ASL interpretation as part of its intake and orientation process. (Doc. No. 180-1 at 95.)

Second, TDOC gives new prisoners a copy of its Inmate Grievance Handbook, which outlines the grievance process. That Handbook states that "[a]ppropriate provisions shall be made to communicate these procedures to non-English speaking, handicapped, or impaired

11

inmates by staff members. The staff person in charge of orientation shall ensure that this is accomplished and documented." (Doc. No. 180-1 at 46.) Bean testified, on behalf of TDOC, that he was not aware of an ASL interpreter or captioning ever having been provided in connection with the Handbook. (Doc. No. 185 ¶ 50.)

Third, Policy 501.01 is available in prison libraries. (Doc. No. 180-1 at 95.) The record does not reflect that Policy 501.01 is available in any form other than written English.

The plaintiffs have performed analyses of the Flesch-Kincaid reading level of the Handbook and Policy 501.01 using Microsoft Word. TDOC disputes the admissibility of those analyses, but it concedes that, insofar as they are admissible, the plaintiffs have accurately represented the results. According to that analysis, the Inmate Grievance Handbook and Policy 501.01 are written at grade level 13.9. (Doc. No. 185 ¶¶ 51–52.)

## C. DRT and the Protection and Advocacy System

DRT is a Tennessee nonprofit corporation that advocates for individuals with disabilities. Although DRT is a private entity, it has been entrusted with certain public responsibilities as part of the federal Protection and Advocacy ('P&A') system, which relies on a state-by-state network of private agencies that receive public funds to help ensure that disabled individuals "participate in the design of and have access to needed community services, individualized supports, and other forms of assistance that promote self-determination, independence, productivity, and integration and inclusion in all facets of community life, through culturally competent programs." 42 U.S.C. § 15001(b). "[A] state cannot receive federal funds for" certain disability-related services "unless it has established a protection and advocacy system." *Prot. & Advoc. Sys., Inc. v. Freudenthal*, 412 F. Supp. 2d 1211, 1212 (D. Wyo. 2006) (citing *Ala. Disabilities Advoc. Program v. J.S. Tarwater Developmental Ctr.*, 97 F.3d 492, 495 (11th Cir. 1996)). As a

12

P&A agency, DRT receives a substantial portion of its funding from the federal government. (Doc. No. 185 ¶ 4.)

Although P&A agencies are nongovernmental, federal law grants them—or requires states to grant them—many powers that would typically be possessed by a regulator. For example, P&A agencies must have "authority to investigate incidents of abuse or neglect" and "must [be granted] broad and ready access to records and information to effectively pursue" such investigations. *Ga. Advoc. Off., Inc. v. Reese*, No. 1:15-CV-3372-AT, 2016 WL 8902366, at *3 (N.D. Ga. Aug. 30, 2016) (citing 42 U.S.C. § 15043 (a)(2)(B); *Miss. Prot. & Advoc. Sys., Inc. v. Cotten*, 929 F.2d 1054, 1059 (5th Cir. 1991); *Ala. Disabilities Advoc. Program v. J.S. Tarwater Developmental Ctr.*, 894 F. Supp. 424, 429 (M.D. Ala. 1995)) (emphasis omitted). A P&A agency must have the power to "pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of such individuals within the State who are or who may be eligible for treatment, services, or habilitation, or who are being considered for a change in living arrangements, with particular attention to members of ethnic and racial minority groups." 42 U.S.C. § 15043(a)(2)(A)(i).

DRT's activities are overseen by a Board of Directors. The organization's bylaws require at least 30% of Directors to be either individuals with disabilities or family members of individuals with disabilities. (Doc. No. 185 ¶ 1.) The disabled Tennesseans whom DRT seeks to protect are not "members" in any formal sense, but rather constituents, and it is undisputed, for the purposes of summary judgment, that DRT receives input from those constituents in its performance of its duties. (*Id.* ¶ 2.) It is also undisputed, for the purposes of summary judgment, that "DRT does not force anyone to accept its services." (*Id.* ¶ 3.)

13

**D. The Experiences of the Individual Plaintiffs/DRT Constituents**

**1. The Individual Plaintiffs**

a. Ernest Kevin Trivette

Ernest Kevin Trivette is a deaf man who was in TDOC custody from approximately June 2015 to April 2, 2019. (Doc. No. 180 ¶ 1.) When Trivette first entered TDOC custody, he was housed at BCCX for intake, where, TDOC concedes, he did not have videophone access. (Doc. No. 183 ¶ 183.) The next month, in July 2015, he was then moved to NECX, where he lacked videophone access until June 2018 at the earliest.[2] (Id. ¶ 184.) When the videophone system was installed, his access to it was not comparable to hearing inmates' access to telephones, because the videophone was housed in a secure area that Trivette could not access without help from facility personnel, whereas conventional telephones were housed in inmates' own housing units and could be easily accessed without assistance. Trivette has characterized this setup as resulting in a policy of providing him access to a videophone three times a week for 30 minutes at a time. TDOC denies that there was a formal policy limiting Trivette's access to a set number of times per week, but it does not dispute that the location of the videophone system required Trivette to rely on assistance from facility personnel, resulting in a practical limitation on his access that hearing prisoners did not experience. (Id. ¶¶ 185–87.)

Trivette concedes, for the purposes of summary judgment, that he was provided an ASL interpreter in some situations, such as for his parole hearings and his evaluation with the STRONG-R tool used by TDOC for risk assessment. (Doc. No. 180 ¶ 2.) Trivette, however, has identified other instances in which a translator was not provided, such as when he signed his parole certificate on April 3, 2019, as well as a series of four case manager meetings around that time. (Doc. No. 183 ¶ 105.) TDOC also relied on an inmate, rather than a professional

---

[2] During this period, Trivette also had brief stays at MCCX and DeBerry. (Doc. No. 183 ¶ 183.)

14

interpreter, to assist with Trivette's April 2, 2019 meeting with his case manager. (Doc. No. 185 ¶ 10.) TDOC did not provide interpreters for his participation in TDOC's GED program or Career Management for Success Program. (Doc. No. 183 ¶¶ 98–99.) Trivette states that his lack of an interpreter for the GED program resulted in his failing to make progress in the program, and, while TDOC says that it does not concede that fact, it has cited no evidence in support of that position. (*Id.* ¶ 99.) TDOC also provided no qualified interpreter for Trivette's participation in a cognitive behavioral intervention program ("CBIP") that was required before he could be released on parole. (*Id.* ¶ 101.)

Trivette also complains of his inability to hear announcements and alarms, and he has identified at least one instance, during his most recent time in TDOC custody,[3] in which he was affected by that inability: a 2018 incident in which he was left alone in his cell during a fire drill. (Doc. No. 185 ¶ 90.)

Trivette filed grievances with TDOC on the following dates: August 26, 2015; June 7, 2016, December 28, 2016; January 4, 2018; December 18, 2018; December 19, 2018; and February 13, 2019. (Doc. No. 180 ¶ 4.) TDOC contends that Trivette failed to exhaust his avenues for appeal with regard to most of those grievances. TDOC, however, concedes that Trivette exhausted the last of those grievances, Grievance No. 29090-19, which reached its final disposition on March 11, 2019. (Doc. No. 172-3 at 78; Doc. No. 180 ¶¶ 5–6.) The subject of that grievance was TDOC's denial of Trivette's access to the available telephone technology—at the time, TTY—on weekends or after 3 p.m. (Doc. No. 173-3 at 81.)

Williams performed a communications assessment of Trivette and concluded that Trivette "demonstrated limited literacy in written English, displaying reading and writing skills at the 3rd to 4th grade level." (Doc. No. 164-4 at 34.) Trivette, however, has testified that he can

---

[3] Trivette identifies another incident that apparently took place in 1995. (Doc. No. 185 ¶ 89.)

read and write English to some extent and was assisted by another prisoner, with whom he communicated through ASL, in the grievance process. (Doc. No. 185 ¶ 58.)

### b. Jason Andrew Collins

Jason Andrew Collins is a deaf man who was in TDOC custody from February 2020 until August 11, 2022 (Doc. No. 180 ¶ 8.) He spent his first several months at BCCX, where he had no videophone access, despite the fact that hearing inmates had ready access to conventional telephones. (Doc. No. 183 ¶¶ 188–90.) He was housed at NECX from approximately November 2020 to August 2021, with the exception of one short stay at DeBerry. (*Id.* ¶ 191.) When Collins first arrived at NECX, he was quarantined for several weeks, during which time he had no videophone access. (*Id.* ¶ 193.) After his quarantine ended, he had some videophone access, and he concedes that he was able to make some videophone calls in December 2020. However, he complains regarding the quality of those calls. (*Id.* ¶ 194.) The videophone system went down for a significant period of time in January 2021, but it was eventually restored. (*Id.* ¶ 195.)

Collins alleges that he was denied the opportunity to participate in his own dental care, and was eventually denied care altogether in the form of missed tooth extractions, because, insofar as TDOC provided an interpreter at all for his appointments, it did so with a remote interpreter who was rendered useless when Collins was leaning back and looking upwards, as dental appointments often require. (Doc. No. 180 ¶ 9; Doc. No. 185 ¶¶ 18, 97.) TDOC also concedes that it did not provide Collins with an interpreter for an electrical class, although TDOC states that Collins failed to exhaust his administrative remedies in connection with that issue. (Doc. No. 185 ¶ 99.)

Collins also complains that he was not provided a professional interpreter for his participation in "TCOM," a therapeutic program related to drug and alcohol use. Rather, TDOC

relied on another inmate to interpret TCOM classes and homework and other daily communication requirements. (Doc. No. 183 ¶ 92.)

Collins concedes, for the purposes of summary judgment, that he received an ASL interpreter in connection with his parole hearing. (Doc. No. 180 ¶¶ 12–13.) However, he says that his pre-parole home plan was delayed by the fact that TDOC did not provide him with an interpreter to explain the rules and process to him, particularly with regard to firearm-related restrictions, causing him to need to revise the original plan. TDOC acknowledges that Collins had to revise his home plan but points out that Collins received written instructions regarding the process and was able to make the necessary revisions in a few days. TDOC also asserts that Collins failed to exhaust administrative remedies related to the home plan. (Doc. No. 185 ¶ 100.)

While incarcerated, Collins filed "a number of" grievances regarding his lack of access, or limited access, to videophone and TTY technology. TDOC has not identified any evidence, for the purposes of summary judgment, suggesting that those particular grievances were not exhausted through the administrative appeal process. (Doc. No. 180 ¶ 11.) He also filed an October 21, 2020 grievance because he did not receive an interpreter in connection with an item of TDOC programming, and the exhaustion of that grievance appears to be contested. (*Id.* ¶ 12) Williams performed a communications assessment of Collins and concluded that Collins "demonstrated basic literacy in written English," but the tool that Williams used did not permit him to know whether, and to what extent, Collins exceeded reading at the fifth/sixth grade level. (Doc. No. 164-4 at 25.)

### c. Alex Gordon Stinnett

Alex Gordon Stinnett is a deaf man who was in TDOC custody from approximately January 31, 2020 until approximately April 30, 2021. (Doc. No. 180 ¶ 13.) As is common, he

was at BCCX for the first few months of his time in custody, where he, at the time, had no videophone access. (Doc. No. 183 ¶ 198.) He was then moved to NECX, where he was housed until his release. (*Id.* ¶ 199.) At NECX, Stinnett faced largely the same issues with the videophone that Trivette did; although he had some access to the system, that access was significantly curtailed compared to hearing prisoners' access to conventional telephones, and he complains regarding the videophone system's reliability. (*Id.* ¶¶ 201–02.) Stinnett also complains that he was denied access to religious programs, because TDOC did not provide an interpreter, and was denied access to a videophone for at least part of his time in custody. (Doc. No. 185 ¶¶ 95–96.)

TDOC has conceded that Stinnett was not granted an interpreter for his participation in three educational/training programs, including a GED program, but TDOC contends that Stinnett did not properly exhaust his administrative remedies in connection with that issue. (*Id.* ¶¶ 91–92.) Stinnett was not provided an ASL interpreter in connection with an April 2020 parole hearing. (Doc. No. 180 ¶ K.) He also was not provided an interpreter for an April 16, 2021 case manager meeting. (Doc. No. 183 ¶ 106.) He concedes, however, that he was provided an ASL interpreter for later parole hearings in 2021. (Doc. No. 180 ¶ 14.)

Stinnett was not provided an interpreter during orientation or intake, and he says that he did not understand the TDOC policies explained as part of that process. (Doc. No. 185 ¶ 94.) Stinnett filed two grievances relating to videophone access, but he never filed a grievance complaining that he was denied an interpreter. (Doc. No. 180 ¶ 16–17.) Williams performed a communications assessment of Stinnett and concluded that Stinnett "demonstrated limited literacy in written English, showing a competence at approximately the 5th to 6th grade level." (Doc. No. 164-4 at 31.)

<u>d. Thomas White</u>

Thomas White is a deaf man who was in TDOC custody from approximately 2017 until November 21, 2022. (Doc. No. 180 ¶ 18.) White was housed at BCCX from approximately July 2019 to October 2019, and then at NECX from approximately October 2019 until his release, with a brief stint at DeBerry in 2021 or 2022. (Doc. No. 183 ¶ 204.) He had no videophone access at BCCX or DeBerry, and his access at NECX was subject to largely the same challenges that affected the other prisoners. (*Id.* ¶¶ 204–07.)

White states that he is unable to comprehend or participate in conversations without an interpreter and that his lack of one in TDOC custody caused him to fear for his safety, due to his inability to either communicate on his own behalf or to comprehend the situations into which he was placed. (Doc. No. 185 ¶¶ 101–02.) He complains, in particular, about the lack of an interpreter in connection with medical or dental care, which TDOC concedes that it did not provide. TDOC states, however, that he was able to participate through written notes and failed to exhaust administrative remedies in connection with that issue. (*Id.* ¶ 103.)

Similarly, White complains that he was not provided an interpreter for educational classes or religious services, or in connection with legal or disciplinary processes. (*Id.* ¶¶ 104–06.) White has identified at least 30 instances, since August 9, 2020, in which he was not provided an interpreter in connection with events and encounters for which, he asserts, he needed one. Those incidents largely consist of medical encounters and instances in which White was required to sign a document. (Doc. No 185 ¶ 8.) White also maintains that TDOC did not provide an interpreter in connection with White's pre-parole home plan process, resulting in a delay of several weeks before his parole, although TDOC objects that that contention is unsupported by evidence. (Doc. No. 183 ¶ 103.)

19

White filed a grievance regarding videophone access in 2021, but he concedes that he did not appeal the disposition of that grievance. (Doc. No. 180 ¶ 19.) He filed another grievance—this time, related to his parole plan—on November 7, 2022. He concedes that he completed a "Level II" appeal, but not a "Level III" appeal in connection with that grievance. (*Id.* ¶ 20.) White has testified that he did not and does not understand the appeals process for grievances. (Doc. No. 172-6 at 15.) Williams performed a communications assessment on White and concluded that White is "functionally illiterate in written English." (Doc. No. 164-4 at 36.)

<u>e. Lakeevious Owens</u>

Lakeevious Owens is a currently incarcerated deaf man who has been in TDOC custody since 2017. (Doc. No. 180 ¶ 21.) Like the other male prisoners, Owens began his time in TDOC custody at BCCX, where he had no videophone access. (Doc. No. 183 ¶ 210.) He was held at MCCX from approximately August 2017 to December 2022, since which time he has been at NECX. (*Id.* ¶ 211.) He expresses complaints regarding the inadequacy of NECX's videophone setup similar to those made by the other plaintiffs. (*Id.* ¶¶ 213–16.)

Owens has identified at least 28 instances, since April 4, 2021, in which he was not provided an interpreter in connection with events and encounters for which, he asserts, he needed one. Most of those instances involve medical encounters, teaching/counseling, or the signing of documents. (Doc. No 185 ¶ 9.) For example, Owens complains that he was not provided with an interpreter in connection with an Adult Basic Education course and that, as a result, he was unable to understand what either the instructor or his classmates was saying. (*Id.* ¶ 107.) Owens testified that he has missed announcements due to his deafness. (*Id.* ¶ 111.)

Owens was disciplined approximately 14 times between 2018 and 2022. In each instance, he, without an interpreter, signed a "Disciplinary Report Hearing Summary" waiving his rights

20

to 24-hour notice, to have the reporting official present, and to call witness(es) on his behalf." (Doc. No. 183 ¶ 85.) Owens testified, with the aid of an interpreter, that he often did not "understand why [he] was in trouble." (Doc. No. 180-1 at 178.) On at least seven occasions, proceedings in which Owens did not have an interpreter resulted in his placement in restrictive housing. (Doc. No. 183 ¶ 87.)

TDOC takes the position that Owens has never filed a grievance, but it concedes, for the purposes of summary judgment, that Owens' counsel submitted a TDOC grievance form on Owens' behalf on July 28, 2022—a few months after Owens joined this case. (Doc. No. 185 ¶ 73.) Owens has filed a Declaration stating that he does not read English well, that no ASL interpreter was provided during his inmate orientation, and that no one has ever explained the TDOC grievance process to him in ASL. He states that he does not understand the grievance forms, the Handbook, or Policy 501.01. (Doc. No. 180-6 ¶¶ 3–9.) Williams performed a communications assessment on Owens, concluding that Owens "demonstrated limited literacy in written English, showing reading and writing skills at approximately the 3rd or 4th grade level." (Doc. No. 164-4 at 29.)

### f. John Giles

John Giles is a currently incarcerated hard-of-hearing, but not deaf, man who has been in TDOC custody since 2014. (Doc. No. 180 ¶ 24.) Giles states that he requested a hearing aid when he first arrived in TDOC custody and reiterated that request repeatedly, but that none was provided. TDOC concedes that Giles made such requests but disputes that he was never given a hearing aid, pointing to paperwork suggesting that one was provided in 2019. (Doc. No. 185 ¶¶ 17, 86–87.) Giles also complains that no alert systems or assistive devices have been installed to notify him of prison announcements. (*Id.* ¶ 114.)

Between 2016 and 2021, he filed five grievances, but he concedes, for the purposes of summary judgment, that none of those grievances involved hearing-related matters and that none was appealed. (Doc. No. 180 ¶¶ 26–27.) Giles is currently housed at TDOC's DeBerry Special Needs Facility. (Doc. No. 185 ¶ 6.)

### g. Pamela Bingham

Pamela Bingham is a currently incarcerated hard-of-hearing, but not deaf, woman who has been in TDOC custody since 2020. (Doc. No. 180 ¶ 29.) Bingham states that she needs a telephone with caption capabilities in order to be able to communicate effectively through calls, but that none has ever been provided. (Doc. No. 185 ¶ 14.) Bingham also complains that she was not provided captioning in connection with a CBIP class that she took in prison. (*Id.* ¶ 115.) Bingham says that her disability has caused her to miss "callouts"—that is, announcements that, for example, it was time for a meal or for the distribution of medications. (*Id.* ¶ 117.) She also says that she has missed two fire alarms, including one involving a ventilation system fire that caused her to suffer smoke inhalation. (*Id.* ¶ 119.)

Bingham states that she filed grievances in November 2020, September 2021, and March 2022. The first two of those grievances involved her missing callouts and the last one involved her access to a phone with captioning capabilities. (Doc. No. 180 ¶ 29.) Bingham has not been able to produce copies of those grievances, and she concedes, for the purposes of summary judgment, that she did not appeal them. (*Id.* ¶ 31.) However, TDOC concedes that Bingham fully appealed two grievances that were filed after she filed her claims: a September 28, 2022 grievance, involving missed callouts and the lack of a signaling device in her cell, and a January 17. 2023 grievance, requesting captioning during the CBIP program and a captioned telephone.

22

(Doc. No. 185 ¶¶ 77, 84–85.) Bingham is currently housed at TDOC's West Tennessee State Penitentiary. (Doc. No. 185 ¶ 7.)

### 2. Other Named DRT Constituents

#### a. Timothy Beck

Timothy Beck is a currently incarcerated deaf man who entered TDOC custody around April 2023. (Doc. No. 183 ¶¶ 17–18.) Beck was originally housed at BCCX, where he lacked videophone access, but was later moved to MCCX. (*Id.* ¶¶ 220–21.)

#### b. Leonard Taylor

Leonard Taylor is a currently incarcerated deaf man who entered TDOC custody on January 30, 2023. (*Id.* ¶ 20.) Taylor was held at BCCX from approximately January to March 2023 and has been housed at DeBerry since that time. (*Id.* ¶ 217.) He had no videophone access at BCCX and lacked videophone access at DeBerry until August 2023. (*Id.* ¶¶ 218–19.)

### E. This Litigation

On March 31, 2020, DRT and Ernest Kevin Trivette filed a Complaint pleading claims under Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act related to several aspects of TDOC's treatment of deaf and hearing-impaired prisoners within TDOC facilities (Doc. No. 1 ¶¶ 145–67.) The other individual plaintiffs have joined the case through amendments. (*See* Doc. No. 148.)

On October 14, 2020, DRT, Collins, and Stinnett filed a Motion for Preliminary Injunction. (Doc. No. 22.) They asked the court to order that TDOC "shall provide videophone service to Gordon Stinnett and Jason Andrew Collins and shall ensure that Mr. Stinnett and Mr. Collins have access to the videophone on an equal basis with hearing inmates' access to telephones." (Doc. No. 22-1 at 3.) The parties agreed that there would not be a need for live

23

evidence in connection with that motion, and, after the submission of written evidence, the court granted the request in a substantially modified form. (Doc. No. 60 at 1.)

In support of that ruling, the court found, first, that the plaintiffs were likely to establish that, to the extent Stinnett, Collins, or a similarly situated deaf inmate was denied access to videophone technology, that prisoner was "receiving inferior access to telecommunications due to [his or her] disabilities" and therefore would be entitled to a reasonable accommodation, if one was possible. (Doc. No. 59 at 23.) The court noted, however, that the feasibility of providing videophone access over the short term was contested, resulting in a "significant, though far from certain, likelihood that the plaintiffs will establish that they are entitled to a greater degree of access than they have been afforded so far." (*Id.* at 26.) The court also held that the isolation and personal suffering associated with being cut off from outside contacts posed a risk of irreparable harm, supporting injunctive relief. (*Id.* at 26–27.)

In fashioning that relief, the court noted the logistical challenges associated with installing new communication technologies and, accordingly, ordered only that TDOC file "either (1) a Notice of a plan to provide [videophone] access [to Stinnett and Collins] within six months of the entry of this Order or (2) a detailed explanation for why such an accommodation would be unreasonable, including specific cost determinations related to any proposals suggested by the plaintiffs." (Doc. No. 60 at 1.)

At the time when the court granted the preliminary injunction, it appeared that there was a significant chance that the relief required would only need to be temporary, because TDOC was beginning a process of modernizing its communication technologies in a way that would make access to video communication significantly more commonplace. TDOC had issued a request for proposals ("RFP") for the project, and it announced its intent to award the contract to

24

a particular vendor, ViaPath, on February 3, 2022. (Doc. No. 138 ¶ 161.) Another bidder, however, challenged that decision in court, and litigation over the contract brought matters to a halt. (*Id.* ¶¶ 161–63.) TDOC now informs the court that it cancelled the original bid altogether, "in order to find quicker and better ways of providing these services." (Doc. No. 181 at 10 n.2.)

The parties have now completed discovery. The plaintiffs filed a Motion for Partial Summary Judgment, asking the court to grant them summary judgment, as to liability, with regard to three issues: (1) "failing to adequately assess deaf prisoners for communications abilities and accommodation needs"; (2) "failing to provide deaf prisoners sufficient and reliable access to sign language interpreters for substantive communications"; and (3) "failing to provide deaf prisoners sufficient and reliable access to videophones." (Doc. No. 162 at 1.) TDOC filed a Motion for Summary Judgment, in which it argues that (1) many of the plaintiffs' claims are time-barred, (2) most of the plaintiffs' claims are barred for a lack of administrative exhaustion, and (3) most of the plaintiffs' claims for monetary damages are barred by sovereign immunity. (Doc. No. 170 at 1.)

## II. LEGAL STANDARD

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To win summary judgment as to the claim of an adverse party, a moving defendant must show that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim. Once the moving defendant makes its initial showing, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23

(1986). Conversely, to win summary judgment as to its own claims, a moving plaintiff must demonstrate that no genuine issue of material fact exists as to all essential elements of her claims. "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. 242, at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## III. ANALYSIS

### A. Standing and Scope of Claims

Article III of the Constitution gives the federal courts jurisdiction only over "cases and controversies," of which the component of standing is an "essential and unchanging part." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To establish standing under the Constitution, a plaintiff must show that: (1) it has suffered an "injury in fact" that is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by the relief requested. *Gaylor v. Hamilton Crossing CMBS*, 582 F. App'x 576, 579–80 (6th Cir. 2014) (citing *Lujan*, 504 U.S. at 560–61); *see also Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).

26

These mandatory minimum constitutional requirements—commonly known as (1) injury-in-fact, (2) causation, and (3) redressability—apply in every case.

The issue of standing has come up a number of times in this litigation, because, among other things, the unique structure of the P&A system creates something of a challenge for traditional standing principles. Typically, the government "ha[s] standing to enforce its own law[s]." *Stauffer v. Brooks Bros., Inc.*, 619 F.3d 1321, 1325 (Fed. Cir. 2010). A P&A agency is entrusted with the rough equivalent of enforcement power by the federal and state governments, but it is still a private party. Although Congress clearly intended P&A agencies to be able to bring enforcement actions, the Supreme Court has unambiguously—and repeatedly—held that "Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Raines v. Byrd*, 521 U.S. 811, 820 n.3 (1997)). Some statutes permit private parties to sue in the name of the government, giving that private litigant the benefit of the government's standing as a "the assignee of [the government's] claim." *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 773, (2000). The ADA however, is not such a statute, meaning that a P&A agency must sue as itself.

Typically, when an advocacy organization finds itself in such a position, it relies on the principle that "[a]n association has standing to bring suit on behalf of its members when [1] its members would otherwise have standing to sue in their own right, [2] the interests at stake are germane to the organization's purpose, and [3] neither the claim [brought] nor the relief requested requires the participation of individual members in the lawsuit." *Waskul v. Washtenaw Cty. Cmty. Mental Health*, 900 F.3d 250, 254–55 (6th Cir. 2018) (quoting *Friends of the Earth*, 528 U.S. at 181). That standard, however, implicates another idiosyncrasy of the P&A system.

27

The individuals whom a P&A agency is called on to protect are not members of the organization but, as the court put it earlier in this case, "something more like constituents or beneficiaries." (Doc. No. 146 at 3.) That fact does not necessarily deprive a P&A agency of associational standing, because an organization without a formal membership roster can still rely on associational standing, if it establishes the "indicia of membership" in connection with relevant individuals. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977); *accord Ball by Burba v. Kasich*, 244 F. Supp. 3d 662, 682 (S.D. Ohio 2017). Nevertheless, a P&A agency is, as the court explained, "between something of a rock and a hard place," unable to rely on the enforcement standing that a government could assert but not ideally suited to caselaw that primarily deals with membership-based organizations. (Doc. No. 146 at 4.)

Another judge of this court held, in *Tennessee Protection & Advocacy, Inc. v. Board of Education of Putnam County*, 24 F. Supp. 2d 808 (M.D. Tenn. 1998), that a P&A agency lacks standing to challenge a policy, where it is not seeking to do so on behalf of any specific, named individual. *Id.* at 816. DRT, however, has identified a number of specific individuals who have been subjected to alleged violations of their rights by TDOC. This court has held, in connection with a Rule 12(b)(1) motion, that sufficient indicia of membership are present with regard to those specific, named individuals who have directly participated in DRT's litigation efforts in this case. (*See* Doc. No. 29 at 11.) The court has little difficulty reaching the same conclusion in the summary judgment context. It may well be that, if DRT sought to assert standing based on nothing but its statutory responsibility to unwitting, unnamed constituents, it could not do so. That issue, however, is not presented here, because DRT has not only identified specific individuals on whose injuries its standing is premised, but it has included those individuals in its effort to address the situation. DRT's demonstrated relationship with the specifically identified

28

prisoners who have participated in this litigation is significantly closer than many relationships that meet the formal definition of "membership."

TDOC protests that such a showing is insufficient, because DRT's constituents, unlike conventional "members," "have no choice and cannot opt out of being a constituent." (Doc. No. 171 at 14.) However, the prisoners who have joined this case as plaintiffs, or who have assisted DRT, have all done so voluntarily, and TDOC has not identified any evidence that they object to such a role.[4] DRT, moreover, has confirmed that it permits individuals to rebuff its offers of help. The court, accordingly, finds that DRT has established sufficient indicia of membership with regard to the named plaintiffs and the two identified constituents who have not formally joined this case. The court's analysis of the remaining elements of associational standing remains similarly unchanged.

The court's conclusion, however, does not close the door on the role of standing in this case, because the fact that the plaintiffs have standing to raise some issues does not necessarily mean that they have standing to raise every issue they wish to raise. While it "generally suffices for an association to demonstrate 'at least one of [its] members'"—or member-equivalents— "'would have standing to sue on his own,'" the Sixth Circuit has stated that that principle is qualified by the ordinary rule that "'standing is not dispensed in gross.'" *Waskul*, 900 F.3d at 255. TDOC argues that the plaintiffs' sometimes broadly-framed claims should, therefore, be limited to the specific TDOC policies or actions that the plaintiffs have sufficiently linked to an actual or imminent injury of a specific named constituent, and the plaintiffs have identified no legal basis for disregarding that relatively modest limitation.

---

[4] TDOC also objects that DRT's constituents do not "fund" or "direct the activities of" DRT. (Doc. No. 171 at 14.) TDOC, however, identifies no caselaw suggesting that associational standing is only available in connection with the injuries of individuals with enough resources to pay membership dues or that any particular right to direct policy is required for "membership" to exist.

The plaintiffs point out that DRT likely has other constituents with hearing-related disabilities that might face or have faced additional issues. Even if that is true, however, the issue here is not what standing DRT might be able to establish, but what standing it has actually demonstrated in court. The standing that it has demonstrated in court is limited to the policies alleged to have injured its identified constituents—that is, the plaintiffs and the two additional individuals identified.

This case, accordingly, is not an open-ended inquiry into every aspect of how deaf and hard-of-hearing inmates are treated in TDOC custody. Rather, it is a case about specific alleged deficiencies that are alleged to have resulted in injuries to identified DRT constituents. TDOC has raised issues related to timeliness, exhaustion, and remedies with regard to many of the underlying claims, and the court will address those arguments in the coming sections. Setting those issues aside, however, the issues properly raised in this case, and for which the plaintiffs have demonstrated standing, are as follows: (1) lack of equal and effective access to telephone communication; (2) lack of interpreters in connection with (a) programming, (b) medical encounters, (c) religious services, (d) filling out formal paperwork, and (e) formal processes involving parole, discipline, or grievances; (3) insufficient mechanisms for communicating alarms and announcements; and (4) access to hearing aids.[5]

---

[5] Although the issue of remedies is not yet before the court, the court notes that this holding bears on the extent of any potential permanent injunction, as well. The injunctive relief requested in the Fourth Supplemental Complaint includes requests for specific relief related to, for example, videophones and translators, but it also includes a strikingly broad request for an injunction requiring TDOC to "cease violating the rights of deaf and hard of hearing incarcerated people under Title II and Section 504," to "cease discriminating against these incarcerated people on the basis of disability," and to "develop policies, procedures, and training to ensure non-discrimination against and equal access for these incarcerated people." (Doc. No. 148 at 67.) Such strikingly vague relief, if granted, would effectively turn every decision made at a TDOC facility regarding a deaf or hard-of-hearing inmate into a matter for potential immediate judicial oversight, under threat of a contempt holding. This court's power, however, is to address discrete injuries, not to take over whole areas of policy. While the relief granted for discrete injuries in this case may involve a permanent injunction protecting current and reasonably foreseeable

30

**B. Sovereign Immunity/Extent of Money Damages Available**

**1. Damages under the ADA**

TDOC argues, next, that, even if the individual plaintiffs have suffered injuries sufficient to confer standing, they cannot seek money damages for those injuries, because TDOC is protected from a money judgment by sovereign immunity. The State of Tennessee, like every other U.S. state, possesses certain immunities from suit that "flow[] from the nature of sovereignty itself as well as the Tenth and Eleventh Amendments." *Ernst v. Rising*, 427 F.3d 351, 358 (6th Cir. 2005) (en banc). Consequently, a state may not be sued for money damages in federal court by a private party, subject to a few exceptions. *Id.* at 358–59; *see also Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54 (1996) ("For over a century we have reaffirmed that federal jurisdiction over suits against unconsenting States 'was not contemplated by the Constitution when establishing the judicial power of the United States.'" (quoting *Hans v. Louisiana*, 134 U.S. 1, 15 (1890)); *Edelman v. Jordan*, 415 U.S. 651, 662–63 (1974). Sovereign immunity extends not only to a state itself but to "arms of the state," such as certain state agencies. *Ernst*, 427 F.3d at 358 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977)). Unlike the state itself, arms of the state, like TDOC, may still be sued for injunctive relief through the well-established *Ex parte Young* framework of seeking such relief against official officers, but no such option is available with regard to money damages. *See Stanley v. W. Michigan Univ.*, No. 23-1808, 2024 WL 3100987, at *3 (6th Cir. June 24, 2024).

Sovereign immunity can be abrogated, either by a state itself or, in some situations, by Congress. Congress unambiguously sought to do so in connection with Title II of the ADA, which provides:

---

future DRT constituents from specific, foreseeable future deprivations, the court has no power to award relief of the scope requested.

> A state shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter. In any action against a State for a violation of the requirements of this chapter, remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in an action against any public or private entity other than a State.

42 U.S.C. § 12202. As TDOC points out, however, the Supreme Cour held in *United States v. Georgia*, 546 U.S. 151 (2006), that, while this provision demonstrates Congress's *intent* to abrogate states' Eleventh Amendment immunity from Title II claims, that fact does not necessarily mean that such abrogation was actually accomplished, because Congress's power to abrogate sovereign immunity depends on the source of its legislative authority for the particular enactment at issue. *See Stanley*, 2024 WL 3100987, at *4. When Congress enacted the ADA, it expressly relied on the full "sweep" of its legislative power, including both its power to regulate interstate commerce and its power to enforce the Fourteenth Amendment, 42 U.S.C. § 12101(b)(4). Only the latter of those sources of Congressional authority—Congress's 14th Amendment enforcement power—would support an abrogation of sovereign immunity. Accordingly, Congress's power to create causes of action under the ADA was broader than its authority to abrogate sovereign immunity, and a claim may fall within the substance of the ADA, but outside the scope of its valid waiver of sovereign immunity. *Georgia*, 546 U.S. at 157.

The Supreme Court has held that lower courts must decide on a case-by-case basis to what extent abrogation is constitutional in a Title II case. *Id.* at 154. Any alleged misconduct that violates both Title II and a plaintiff's constitutional rights under the Fourteenth Amendment can proceed under Congressional abrogation of immunity, but, "insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment," the court must consider "whether Congress' purported abrogation of sovereign immunity as to that class of conduct is nevertheless

valid" for some other reason, *id.* at 159, including Congress's power to enact "appropriate legislation" that implements and safeguards the protections of the Fourteenth Amendment in ways that go beyond mere "legislative repetition of this Court's constitutional jurisprudence." *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 365 (2001)

As TDOC points out, while the Equal Protection Clause of the 14th Amendment does provide disabled individuals with some protection in connection with their disabilities, the Supreme Court has held that that protection is very limited when what is at issue is not differential treatment, in and of itself, but a request for accommodations. "States are not required by the Fourteenth Amendment to make special accommodations for the disabled, so long as their actions toward such individuals are rational." *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 367 (2001). "Rational," moreover, is being used, in this instance, in the same manner as it is used in connection with so-called rational basis review, which affords the government considerable discretion. *Id.* Under that standard, TDOC's refusal to provide better telecommunications systems, translation services, and alarm/announcement systems is generally permissible as a cost control measure. The plaintiffs, moreover, have not identified any caselaw suggesting that a guarantee of those measures generally would be a permissible use of Congress' preventive or implementation-focused power under the Fourteenth Amendment. TDOC is, therefore, entitled to summary judgment with regard to money damages under Title II for most of the plaintiffs' accommodation-based claims.

However, as even TDOC admits, some of the translation and videophone-related claims implicate constitutional issues that require more than rational basis review. Translators, for example, were frequently not provided in connection with formal proceedings implicating due process, and TDOC "concedes that if any of Plaintiffs' claims would violate the Due Process

Clause of the Fourteenth Amendment if proven, those claims would be a permissible abrogation of TDOC's [sovereign] immunity." (Doc. No. 171 at 11.) Any claims for money damages involving disciplinary, pre-release, or parole proceedings may, therefore, proceed. (*See id.* at 12.)

### 2. Section 504

As the plaintiffs note, the court's award of summary judgment regarding some ADA damages claims may ultimately be academic in many instances, because money damages are potentially available, regardless of the scope of the ADA waiver, pursuant to Tennessee's own waiver of sovereign immunity for the purposes of Section 504 of the Rehabilitation Act. In contrast with the general prohibitions of the ADA, the protections of Section 504 were not imposed on Tennessee by Congress, but voluntarily accepted by the State of Tennessee in return for federal funds. In making that voluntary decision, Tennessee chose to subject itself to liability for whatever damages Section 504 clearly provides, which include at least some money damages. *See Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 219 (2022).

TDOC does not dispute that a prisoner may, in theory, seek damages in connection with Section 504, despite the fact that sovereign immunity would prevent such damages under the ADA. TDOC argues, however, that none of the damages that the plaintiffs seek is of the type permitted by Section 504, because the Supreme Court has held that Section 504 does not permit damages for emotional distress. *Cummings*, 596 U.S. at 230. The plaintiffs have not identified any basis for disregarding that holding, and TDOC is correct that some of the injuries that the plaintiffs have identified would give rise primarily, if not exclusively, to emotional distress damages. TDOC is, therefore, entitled to summary judgment as to those potential damages.

TDOC's contention that those barred emotional distress damages are the only potential money damages at issue in this case, however, lacks merit. Although courts have not been

34

unanimous regarding the types of damages available under Section 504, "[s]everal district courts have allowed claims for expectation damages to proceed." *Luke v. Lee Cnty.*, No. 1:20-CV-388-RP, 2023 WL 6141594, at *1 (W.D. Tex. Sept. 20, 2023) (collecting cases, including cases to the contrary). There is, moreover, no basis for disregarding a plaintiff's right to the ordinary consequential damages typically associated with a breach of contract. *See Cummings*, 596 U.S. at 230 (holding that conventional remedies for breach of contract are generally available under the Act). Among the injuries alleged in this case are missed medical care, missed GED classes, and missed cognitive behavioral therapy. Such events are of the type likely to create real, foreseeable economic losses—some of which a court might find cognizable even without calling them "expectation damages." Moreover, as the plaintiffs have pointed out, some of their injuries may be appropriate for nominal damages. *See Uzuegbunam v. Preczewski*, 592 U.S. 279, 141 S. Ct. 792, 798 (2021). The court, accordingly, cannot grant TDOC's request for summary judgment with regard to all possible monetary damages.

## C. Timeliness

TDOC argues, next, that most of the plaintiffs' claims are untimely. "The ADA has no statute of limitations" in its text. *Williams v. Trevecca Nazarene Coll.*, 162 F.3d 1162 (Table), 1998 WL 553029, at *1 n.2 (6th Cir. Aug. 17, 1998). The Supreme Court has "generally concluded that," when a federal statute has no express statute of limitations, "Congress intended that the courts apply the most closely analogous statute of limitations under state law." *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 158 (1983). The Sixth Circuit, applying that rule, has held that ADA claims in Tennessee are governed by the state's one-year statute of limitations for personal injury actions. *Straser v. City of Athens, Tenn.*, 951 F.3d 424, 427 (6th Cir. 2020) (citing Tenn. Code Ann. § 28-3-104(a)(1)(B); *Hughes v. Vanderbilt Univ.*, 215 F.3d

35

543, 547 (6th Cir. 2000)). The same is true for Section 504 claims. *I.L. ex rel. Taylor v. Knox Cty. Bd. of Educ.*, 257 F. Supp. 3d 946, 964 (E.D. Tenn. 2017) (citing *Williams*, 1998 WL 553029, at *1 n.2).

The particular timing of that one-year statute of limitations depends, in this instance, on which plaintiff is at issue. Generally speaking, an amendment that "adds a new party creates a new cause of action and there is no relation back to the original filing for purposes of limitations." *In re Kent Holland Die Casting & Plating*, 928 F.2d 1448, 1449 (6th Cir. 1991). Accordingly, a newly added plaintiff typically cannot rely on relation back to the original complaint.

At the same time, however, a party that has taken the appropriate steps to seek leave to be added as a plaintiff will not lose his or her cause of action simply because the court allowed the statute of limitations to lapse before granting leave. "Federal courts have uniformly held that a claim set forth in an amended pleading is timely under the applicable statute of limitations, if the motion for leave to amend was filed before the statute of limitations had run." *United States v. Katz*, 494 F. Supp. 2d 641, 644 (S.D. Ohio 2006) (collecting cases).

The timing of amendments in this case means that there are four sets of plaintiffs for timeliness purposes. DRT and Trivette asserted their claims at the commencement of litigation, on March 31, 2020. (Doc. No. 1.) Collins and Stinnett, in turn, sought leave to assert their claims on July 13, 2020. (Doc. No. 18) White sought leave to assert his claims on August 6, 2021, and, finally, Owens, Giles, and Bingham sought leave to assert their claims on March 31, 2022. (Doc. No. 62; Doc. No. 86.)

The plaintiffs argue that each plaintiff alleges to have been discriminatorily harmed at least once during the relevant limitations period, and this appears to be correct. (*See* Doc. No.

36

179 at 16 (chart).) Nevertheless, many of the acts discussed in the plaintiffs' complaints, including the currently operative Fourth Supplemental Complaint, occurred more than a year before each respective plaintiff's assertion of his or her claims. Accordingly, limiting the plaintiffs' claims to those based on specific acts that occurred within a year of filing would trim the plaintiffs' claims considerably. The plaintiffs argue, however, that such a step is not called for, because the allegedly unlawful acts that occurred more than a year before filing reflected ongoing unlawful policies and practices that persisted into the limitations period, implicating the "continuing violation" doctrine.

"[T]he continuing violation doctrine does not allow recovery for discrete acts of discrimination outside the filing period." *Mayers v. Campbell*, 87 F. App'x 467, 470 (6th Cir. 2003) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)). Rather, it allows a plaintiff to recover for cumulative acts of discrimination—some of which occurred within the filing period and some of which did not—in two discrete situations: first, where the plaintiff seeks to recover for a "series of discriminatory actions" that, taken together, constitute the actionable discrimination; and, second, where he seeks to recover for an "ongoing discriminatory policy or environment" that "results in an allegedly discriminatory act within the limitations period." *Straser*, 951 F.3d at 427 (citing *Dixon v. Anderson*, 928 F.2d 212, 216–18 (6th Cir. 1991)).

The first three types of general violation that the plaintiffs have established standing to pursue—failure to provide videophone access, failure to provide interpreters in particular situations, and inadequate alarm/announcement systems—fall into the latter of those two categories. Indeed, one need only consult the plaintiffs' voluminous spreadsheet of incidents in which a translator was not provided to confirm that what is at issue in this case, at least as far as

37

interpreters are concerned, is not isolated incidents, but a pervasive and continuing approach to when ASL-reliant deaf inmates will or will not be granted access to interpreters. TDOC argues that those alleged violations do not represent a continuous policy, because the evidence shows that individual plaintiffs were, in fact, provided with qualified interpreters occasionally. TDOC identifies no caselaw, however, suggesting that occasional compliance necessarily interrupts a continuing violation, particularly with regard to a policy that—like TDOC's policy of generally not providing qualified, effective translators in connection with signing documents or receiving medical care—has resulted in dozens, or even hundreds, of violations over time.

Similarly, while there may have been some issues related to telephone systems that reflected isolated incidents—for example, brief outages or technical difficulties—the primary substance of the plaintiffs' videophone-related allegations involve two continuing policies: (1) the placement of deaf inmates in facilities with no videophone access, particularly BCCX and DKJRC; and (2) the provision of videophone access on terms inferior to those associated with conventional telephones. TDOC's physical system for announcements and alarms is similarly a continuing issue of policy. The court, therefore, has no basis for treating claims based on those policies as untimely

The plaintiffs assert that Giles' hearing aid-related claims, as well as DRT's hearing aid-related claims based on Giles' standing, similarly assert an ongoing violation, because Giles' lack of a hearing aid continued into the relevant one-year limitations period. The Sixth Circuit, however, has made a point of distinguishing between continuing violations and continuing injuries, with only the former allowing a party to overcome a statute of limitations. *See Doe v. Haslam*, No. 3:16-CV-02862, 2017 WL 5187117, at *12 (M.D. Tenn. Nov. 9, 2017) (Crenshaw, J.) (collecting cases). By the plaintiffs' own account, Giles requested—and was denied—a

38

hearing aid early during his time in TDOC custody, well outside the statute of limitations. While it is disputed whether TDOC ever rectified that error, Giles and DRT have identified no ongoing policy or practice that is actually denying him a hearing aid on an ongoing basis; they merely assert that he has not been given one and has continuously complained informally about that fact. Without more, DRT and Giles have failed to assert a continuing violation based on his denial of a hearing aid in this case.[6] TDOC is, therefore, entitled to summary judgment with regard to the plaintiffs' hearing aid-related claims.

### D. Administrative Exhaustion

#### 1. General Principles of Exhaustion under the Prison Litigation Reform Act

TDOC argues, next, that most of the plaintiffs' claims are barred by the Prison Litigation Reform Act ("PLRA"). "The PLRA provides that '[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner . . . until such administrative remedies as are available are exhausted.'" *Lee v. Willey*, 789 F.3d 673, 677 (6th Cir. 2015) (quoting 42 U.S.C. § 1997e(a)). "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007). The Sixth Circuit has interpreted the PLRA to impose a "precondition to filing an action in federal court," meaning that a prisoner "may not exhaust administrative remedies during the pendency of the federal suit," *Freeman v. Francis*, 196 F.3d 641, 645 (6th Cir. 1999), as some plaintiffs appear to have done here. Moreover, "[t]he PLRA has been interpreted to require 'proper exhaustion,' meaning that a prisoner must 'complete the administrative review process in accordance with the applicable procedural rules,' as defined not

---

[6] The court stresses that this fact does not leave Giles without recourse. If he affirmatively and formally sought a hearing aid again and was denied, that fresh denial, if unlawful, would constitute a new alleged violation that could be challenged in court.

39

by the PLRA, but by the prison grievance process itself." *Lee*, 789 F.3d at 677 (quoting *Jones*, 549 U.S. at 218).

There is no futility exception to the exhaustion requirement under the PLRA, meaning that a prisoner must exhaust the administrative process, even if he knows that doing so would be futile. *Booth v. Churner*, 532 U.S. 731, 741 & n.6 (2001) The fact that the PLRA seems virtually ironclad on its face, however, has not prevented difficult questions from arising regarding its scope or application. Because Congress declined to impose a universal grievance procedure for the purposes of federal litigation—and instead chose to leave that discretion to each jurisdiction's lawmakers and prison officials—the actual, effective requirements of the PLRA are only as clear as the prison grievance procedures at issue in any given instance. The PLRA only requires a prisoner to "us[e] all steps that the [corrections] agency holds out," *Woodford v. Ngo*, 548 U.S. 81, 90 (2006) (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)), not every step that the agency meant to hold out or claims, after the fact, to have held out. As one would expect, some prison grievance systems are better run and more clearly delineated than others, and, while the PLRA does expect scrupulous compliance with procedures that are genuinely available, it does not penalize a prisoner for his or her supposed failure to navigate "an administrative scheme" that was "so opaque that it [was], practically speaking, incapable of use." *Ross v. Blake*, 578 U.S. 632, 643 (2016).

Accordingly, the Sixth Circuit has held that "[a] prisoner's lack of compliance may be excused if the administrative remedies" that might address his grievance "are not available," despite the prisoner's "'affirmative efforts to comply.'" *Lee*, 789 F.3d at 677 (quoting *Napier v. Laurel Cnty.*, 636 F.3d 218, 223 (6th Cir. 2011); citing *Brock v. Kenton Cty.*, 93 F. App'x 793, 798 (6th Cir. 2004)).

40

The plaintiffs argue that their claims are not barred by administrative exhaustion for three reasons. First, they argue that DRT, which is not a prisoner, is not subject to any administrative exhaustion requirement. Second, the plaintiffs argue that some of them did exhaust their grievances, at least with regard to some violations. Finally, the plaintiffs argue that the grievance process was unavailable to them for various reasons, including TDOC's consistent failure to explain the grievance process to them in ASL. "[B]ecause an inmate's failure to exhaust his administrative remedies is an affirmative defense . . . that the defendants have the burden to plead and prove by a preponderance of the evidence, '[a] district court should grant summary judgment only if a defendant establishes that there is no genuine dispute of material fact that the plaintiff failed to exhaust.'" *Lamb v. Kendrick*, 52 F.4th 286, 292 (6th Cir. 2022) (quoting *Does 8-10 v. Snyder*, 945 F.3d 951, 961 (6th Cir. 2019)).

### 2. Administrative Exhaustion and DRT

Because the administrative exhaustion requirement of the PLRA is statutorily created, the bar that it erects extends no farther than the terms set by the statute itself. By its own terms, the PLRA's administrative exhaustion requirement applies only to a federal "action . . . with respect to prison conditions . . . [brought] by a prisoner confined in any jail, prison, or other correctional facility." 42 U.S.C. § 1997e(a). DRT relies on the injuries of its prisoner constituents for standing purposes, but the claims it actually asserts are formally its own—as confirmed by, among other things, the fact that most of the relevant constituents have filed their own distinct claims as part of this same lawsuit. By the plain language of the PLRA, then, no exhaustion requirement applies to DRT's claims. Other courts have held the same with regard to other P&A organizations. *See, e.g.*, *Dunn v. Dunn*, 219 F. Supp. 3d 1163, 1176 (M.D. Ala. 2016); *Trueblood*

*v. Washington State Dep't of Soc. & Health Servs.*, No. C14-1178 MJP, 2015 WL 12030114, at
*1 (W.D. Wash. June 22, 2015). Such a conclusion flows from the plain language of the PLRA.

TDOC has identified no meaningful basis for disregarding that plain language. Instead, it simply argues, without supportive authority, that, because DRT is relying on the standing of its constituents in order to assert its own associational standing, then any PLRA bar that would apply to those individual plaintiffs' claims must, therefore, apply to DRT. The PLRA administrative exhaustion requirement, however, is a non-jurisdictional, statutorily created affirmative defense that has nothing to do with constitutional standing. *See Woodford*, 548 U.S. at 101. As with any federal statute, the PLRA's boundaries are those set by Congress, and Congress chose to enact a specific limitation on litigation *by* prisoners, not litigation *about* prisoners by organizations that count prisoners among their members or constituents. DRT's claims, therefore, can proceed regardless of any lack of administrative exhaustion by individual prisoners.

### 3. Claims for which Administrative Avenues Were Arguably Exhausted

#### a. Stinnett and Collins

TDOC has set forth its exhaustion-related arguments on a plaintiff-by-plaintiff basis, and, in so doing, it wholly omitted two plaintiffs: Stinnett and Collins. (Doc. No. 171 at 6–9.) It appears, from the briefing, that TDOC does ultimately intend to dispute whether those two plaintiffs' claims were adequately exhausted, and has merely elected not to raise any argument that it can establish their failure to exhaust based on the undisputed evidence. (*See* Doc. No. 185 ¶¶ 91–92, 100.) The claims of those two plaintiffs, accordingly, can proceed.

42

## b. Trivette's Fully Appealed Grievance

TDOC concedes that Trivette exhausted one grievance, Grievance No. 2909029, which involved evening access to TTY technology. (Doc. No. 171 at 7.) TDOC argues, however, that that exhaustion has no bearing on this case, because "Trivette has not raised any such claim"—meaning, apparently, a claim seeking better access to TTY technology—"in this lawsuit." (Doc. No. 171 at 7.) The plaintiffs, however, have produced evidence establishing that TTY technology and videophone technology are simply different technological solutions to the same problem: the need to communicate telephonically despite one's inability to hear. Indeed, TDOC's own contemporaneous response to Grievance No. 2909029 recognizes that what was at issue was nothing specific to TTY machines, but rather Trivette's desire to "use the hearing [impaired] phone in the evening." (Doc. No. 172-3 at 79.) It is true that Trivette has not specifically sought access to TTY technology as a remedy, but that is because TTY technology is not his best option. That does not change the fact that Trivette has consistently and repeatedly claimed that he was granted inferior access to a telephone system that accommodated his disability. Trivette, accordingly, has exhausted his administrative options with regard to that issue.

## c. Upheld Grievances

The plaintiffs identify a few grievances that, they say, were not appealed because they were formally granted: (1) Trivette's June 2018 grievance seeking an interpreter for religious services; (2) Trivette's December 2018 grievance involving unequal treatment generally; (3) Bingham's request for a captioned telephone; (4) Collins' October 2020 grievance seeking an interpreter for the T-COM program; and (5) Collins' April 2020 grievance seeking TTY access. TDOC has not sought summary judgment based on the PLRA with regard to Collins, but,

43

because the plaintiffs have sought summary judgment on the merits, the court will consider the extent of his exhaustion alongside Trivette's and Bingham's.

Multiple federal courts have held that, when a prisoner receives a favorable response to his or her grievance, but officials ultimately fail to provide the promised relief, the plaintiff is not required to start the process anew to prove exhaustion. *See Harvey v. Jordan*, 605 F.3d 681, 685 (9th Cir. 2010); *Abney v. McGinnis*, 380 F.3d 663, 669 (2d Cir. 2004); *Malone v. Franklin*, 113 F. App'x 364, 366 (10th Cir. 2004); *Rogers v. Colorado Dep't of Corr.*, No. 16-CV-02733-STV, 2019 WL 4464036, at *13 (D. Colo. Sept. 18, 2019). Without such a rule, officials could simply trap a prisoner in a "never-ending cycle of exhaustion" by promising him or her relief whenever requested but never providing it. *Abney*, 380 F.3d at 669. Although the plaintiffs have not identified any case from the Sixth Circuit affirmatively adopting such an approach, TDOC has not identified any basis for holding otherwise, and it is difficult for the court to see how the PLRA could function any other way.

If a state's prison grievance system provides for a formal mechanism that permits a prisoner to challenge the implementation of a favorable determination without filing a new grievance, then exhaustion may require a plaintiff to use that mechanism. *See id.* If, however, a plaintiff prevailed on his initial grievance, only to discover, when it was too late to do anything about it, that his promised relief was not forthcoming, then that prisoner has exhausted the remedies available to him with regard to the underlying grievance. A review of Policy 501.01 confirms that it offers no mechanism, other than filing a fresh grievance, for complaining about the implementation of the relief in connection with a prior successful grievance. Accordingly, insofar as the plaintiffs are correct that the cited grievances were successful, then they exhausted those grievances for the purposes of the PLRA.

In Trivette's June 25, 2018 grievance, he wrote, "Why don't I get an interpreter for religious service? I am Baptist. Can you do something to get an interpreter for service? Let me know. OK thanks." (Doc. No. 172-3 at 32.) He received a same day response, apparently signed by a prison chaplain, that reads, "Asking some of our volunteers if they can help us on this issue!" (*Id.*) A reasonable prisoner in Trivette's position could have construed that response as an acknowledgment of his request and an assurance that remedial steps were being pursued. The court, accordingly, finds that Trivette exhausted his available grievances in connection with the denial of a translator in connection with religious services. Because the grievance and response were plainly limited to religious services, however, the court does not find that that exhaustion encompasses Trivette's complaints regarding the lack of a translator in any other setting.

In Trivette's December 2018 grievance, he "aske[ed] for equal access to services, education and communication as the other inmates that can hear are afforded." (Doc. No. 172-3 at 92.) Prison officials wrote a multi-paragraph response that mostly characterized the services that Trivette has already received as adequate. The response provided with regard to educational/training programming, however, was arguably more ambiguous. Officials wrote, "You completed career management for success on 11-20-2017. I understand [that inmate] Claude Kenny assisted you with interpretation. If you are recommended to take another program, we will consider what will need be done to assist you." (*Id.* at 93.) Trivette asks the court to construe that response as having upheld his grievance with regard to educational programming. The court, however, cannot agree that a reasonable prisoner would read it that way. The response did not acknowledge that TDOC's prior approach had been in error, and, if anything, characterized that approach as a success. Unlike with regard to the grievance involving religious services, moreover, the response did not commit to any particular remedial steps—merely stated

that the issue would be considered again next time it came up. The court, accordingly, holds that this response did not excuse Trivette from further exhausting the grievance process with regard to educational or training programming.

With regard to Bingham, TDOC does not dispute, for the purposes of summary judgment, that Bingham has testified that TDOC promised to provide her a captioned telephone in response to one of her grievances on that issue. (Doc. No. 185 ¶ 82.) It is, therefore, effectively undisputed that that grievance was successful. TDOC argues, however, that that fact is immaterial, because the relevant grievance was filed after Bingham joined this lawsuit, and, while Bingham's testimony is somewhat confusing on the issue, it appears that the grievance to which she was referring was, in fact, that late-filed one. Bingham's exhaustion of that grievance, accordingly, cannot support the continuation of that claim in this litigation. *See Freeman*, 196 F.3d at 645.

The two relevant grievances by Collins were filed on April 1, 2020 and October 21, 2020 and involved, respectively, TTY access and the provision of an interpreter for programming. (Doc. No. 185 ¶¶ 67, 69.) TDOC's response to the April 1, 2020 grievance states that it was "[r]esolved prior to processing," and Collins testified that he did not appeal that grievance because "they said that they were going to continue to work on it." (Doc. No. 172-4 at 59; Doc. No. 180-1 at 151.) The documentation surrounding the October 21, 2020 grievance similarly confirms that it was treated as resolved because Collins was led to believe that an interpreter would be provided, potentially in connection with a transfer to another facility. (Doc. No. 180-1 at 57–61.) Collins, accordingly, has established exhaustion with regard to telephone access and interpreters in connection with TDOC programming.

46

**4. Availability**

The foregoing analysis leaves the following sets of claims as potentially subject to the PLRA's bar based on a prisoner's failure to administratively exhaust the grievance process: all claims by White; all claims by Owens; all claims by Giles; all claims by Bingham; and all claims by Trivette other than those involving the adequacy of telephone access or translation of religious services. With regard to those claims, the plaintiffs raise three arguments. First, they argue, with regard to White, Owens, and Trivette, that TDOC's grievance procedure was not "available" to them, as inmates whose primary language was ASL. Second, they argue that some of the matters at issue are exempt from TDOC's grievance process, meaning that the plaintiffs did, in fact exhaust all avenues, if any, available to them. Finally, the plaintiffs argue that the grievance process was not available to Bingham, because TDOC repeatedly failed to respond to her grievances.

a. Availability of Grievance Procedure to White, Owens, and Trivette

A prisoner cannot exhaust an administrative process that he has no way of knowing about or understanding. TDOC's policies generally acknowledge this fact and incorporate affirmative steps to inform inmates of the grievance process, both in writing and orally as part of intake. TDOC, however, concedes that the individual named plaintiffs, as well as several other deaf prisoners, were not provided sign language interpreters during the intake process. (Doc. No. 183 ¶ 49.) That failure did not necessarily render the process unavailable to every deaf inmate, because many deaf people are capable readers. The plaintiffs argue, however, that the process was not available to White, Owens, or Trivette, in light of the combination of their deafness and their insufficient literacy to decode the relevant written materials.

The plaintiffs have presented evidence suggesting that White is functionally illiterate, while Owens and Trivette read at the level of a 3rd or 4th grader. Literacy challenges are likely common in prisons, and there is no basis for concluding that limited reading skills, in isolation, automatically excuse a prisoner from administrative exhaustion. These prisoners, however, were not simply dealing with limitations related to their literacy, but also the fact that TDOC simply chose not to translate its oral explanation of the grievance process—which it provides to every other prisoner—into ASL. TDOC argues that this fact is immaterial, because the availability of a grievance procedure under the PLRA must be evaluated based on the availability of the process to an "ordinary prisoner." *Ross v. Blake*, 578 U.S. 632, 644 (2016). Nothing in the caselaw, however, suggests that the Supreme Court intended the "ordinary prisoner" standard to require courts to ignore individuals prisoners' genuine disabilities or language differences. The relevant "ordinary prisoner," in this instance, is an ordinary prisoner who can neither read nor hear. TDOC's grievance process was, in fact, plausibly unavailable to such a prisoner.

The evidence before the court is more than sufficient for a reasonable finder of fact to conclude that the full grievance process was not, in fact, available to White or Owens, who, unlike Trivette, were never able to appeal even a single of their many complaints to fruition. That unavailability is not, in and of itself, sufficient to permit their claims to proceed, because, even where the grievance process is unavailable, a prisoner still must make reasonable "affirmative efforts" to access that process. *Lamb*, 52 F.4th at 296. The plaintiffs, however, have identified facts sufficient to permit a finder of fact to conclude that White and Owens did, in fact, make such efforts. It appears that Owens complained about his predicament to TDOC personnel repeatedly, but simply was unaware of the actually appropriate mechanism for raising those complaints formally. White filed and even appealed grievances, but he has presented evidence

48

sufficient to permit a finder of fact to conclude that he did not appeal to Level III because an explanation of the process was never made available to him in a form that he could understand. The court, therefore, finds that disputed issues of fact preclude awarding TDOC summary judgment as to the claims of White or Owens based on the PLRA.

Trivette presents a somewhat closer question, because, although the evidence suggests that he had limited reading skills, he did fully appeal one grievance, suggesting that he might, in fact, have understood the procedures and simply failed to use them in every instance except one. Trivette, however, has testified that he relied on another prisoner in the grievance process, and the fact that that *ad hoc* approach resulted in one exhausted appeal does not establish that the appeals process was actually available to Trivette in a broader sense. There is, moreover, little doubt that Trivette took affirmative steps to try to avail himself of the grievance process, given that he filed numerous grievances and only failed to navigate the process correctly after that initial step. TDOC, therefore, is not entitled to summary judgment with regard to Trivette on the basis of failure to exhaust.

### b. Exempted Complaints

The plaintiffs argue that many of their complaints were exempted from TDOC's general grievance process because they fall into one of two categories: (1) grievances related to medical care or (2) grievances related to discipline. Policy 501.01's list of "Matters Inappropriate to the Grievance Procedure" references both types of issues, but its treatment of them is somewhat ambiguous. The policy itself describes the exemption related to medical issues as limited to "[d]iagnoses of medical professionals," disputes regarding copays, and "requirements of substance use therapeutic programs." (Doc. No. 172-1 at 7.) Diagnosis is, of course, only one part of medical care, and it is unclear, from the policy's text alone, whether Policy 501.01

49

intends to exempt grievances *of* diagnoses or grievances *related to* diagnoses. The text of the policy seems to suggest that only the former, significantly narrower type of grievance is exempt. However, Bean, as TDOC's Rule 30(b)(6) witness, clearly did not consider the exemption to be that narrow, apparently viewing it, instead, as a much broader exemption of grievances related to medical diagnosis and treatment. It appears, from the briefing, that TDOC may be unhappy with this aspect of its Rule 30(b)(6) witness's testimony, but Bean said what he said, and he was certainly on notice that this would be an issue covered in his deposition. TDOC has, therefore, failed to carry its burden of establishing that the plaintiffs failed to exhaust all available administrative options with regard to grievances related to medical care.

Some of Bean's testimony, taken in isolation, would seem to support the possibility that the medical exemption was even broader—potentially even broad enough to cover any grievance related to deafness, given that deafness is a medical diagnosis. (*See* Doc. No. 180-1 at 91.) Based on the court's review of the testimony, however, the court finds that any reasonable finder of fact would conclude that Bean's testimony that all requests for interpreters would "fall under medical" was a result of misunderstanding the question asked, not an actual statement of TDOC policy. Bean made that statement only after having been informed that the exemption being discussed was the medical exemption. It appears, then, that Bean mistakenly believed either that he was being asked about the availability of the grievance process in connection with interpreters *in the medical setting* or whether a prisoner could file a grievance based on the denial of an ASL interpreter based on the conclusion that he *was not deaf*. No other interpretation of his testimony makes sense in light of the policy at issue, and none of the other evidence regarding the grievance process reflects the extraordinarily broad exemption that one might infer from the

relevant portion of Bean's testimony in isolation. The court, therefore, will limit its holding to grievances involving actual medical encounters.

Policy 501.01 does not say that disciplinary matters are exempt from grievance. Rather, it says that "[a]ppealing or seeking review of procedures or punishment imposed under established disciplinary procedures of the TDOC" must be "appealed pursuant to Policy #502.01." (Doc. No. 172-1 at 6.) It is, therefore, possible that a plaintiff might fail to exhaust administrative appeals in connection with, for example, the denial of a translator in connection with a disciplinary hearing. TDOC, however, has the burden of establishing any such affirmative defense, and it has failed to do so. The court, accordingly, cannot award it summary judgment on that basis.

### c. Bingham's Allegedly Ignored Grievances

Bingham asserts that, in addition to her late-filed grievance, she submitted grievances regarding verbal announcements twice, as well as a later grievance regarding her lack of access to a captioned telephone. She says that she never received any response to those grievances and, therefore, should be excused from being required to have pursued them further. Under Policy 501.01, TDOC must respond to a new grievance within seven days, and, "[i]f a time limit expires at any stage of the process without the required response, the grievant may move the grievance to the next stage of the process, unless the inmate agrees in writing to a fixed extension of the time limit for response." (Doc. No. 172-1 at 4–5.) Under the terms of the policy, then, Bigham could have appealed her grievances regardless of the lack of any response. However, the plaintiffs urge the court to adopt the reasoning of the District Court for the Western District of Tennessee in *Parks v. Cochran*, No. 2:16-CV-2862-STA-EGB, 2018 WL 6186807 (W.D. Tenn. Nov. 27, 2018), in which the court held, based on the plain language of Tennessee's grievance policies, that such a step was not required:

[The defendant] argues in his summary judgment brief that an inmate cannot simply abandon a grievance but must proceed to the next step of the grievance process when a jail or prison official fails to respond to a grievance. It is true that "proper exhaustion" requires a prisoner to "tak[e] advantage of each step the prison holds out for resolving the claim internally and by following the critical procedural rules of the prison's grievance procedure to permit prison officials to review and, if necessary, correct the grievance on the merits." *Reed–Bey v. Pramstaller*, 603 F.3d 322, 324 (6th Cir. 2010) (quoting [*Woodford*, 548 U.S. at 95]). [The defendant's] arguments to the contrary notwithstanding, TDOC policy did not require [the plaintiff] to move his grievance to the next step of the process. The language of the policy is permissive ("the grievant may move the grievance to the next stage of the process . . . "), not mandatory. Submitting the grievance was all TDOC policy "specifically required" *Parks to do. Risher v. Lappin*, 639 F.3d 236, 240–41 (6th Cir. 2011) ("declin[ing] to impose requirements on [an inmate] for exhaustion purposes that go beyond what was specifically required by the [jail]'s grievance procedure").

*Id.* at *6.

In TDOC's reply, it does not address *Parks*, and its only specific treatment of exhaustion with regard to Bingham consists of stating, incorrectly, that "[a]ll of the cases cited by Plaintiffs are distinguishable because the grievance procedures in those cases were different than TDOC's procedures." (Doc. No. 184 at 5.) The grievance procedures at issue in *Parks*, however, *were* TDOC's procedures, and the permissive language that the court construed was the same language that Bingham has cited in this case.

That said, the fact that TDOC's argument in its Reply was lacking does not mean that the plaintiffs' position is the correct one. The Sixth Circuit has clearly held that an inmate's failure to file an appeal, after his grievance was met with silence, can, under at least some procedures, amount to a failure to exhaust under the PLRA. *See Lamb*, 52 F.4th at 294; *Cross v. Horton*, 80 F. App'x 430, 432 (6th Cir. 2003). The procedures at issue in those cases, moreover, also included some permissive language—unsurprisingly, given that appealing an adverse determination is almost always permissive, rather than mandatory. *See* Ohio Admin. Code 5120-9-31(J)(2) ("If the inmate is dissatisfied with the informal complaint response, or the informal

52

complaint process has been waived, the inmate may file a notification of grievance with the inspector of institutional services."); *Cross*, 80 F. App'x at 431 ("[T]he procedure states that absent an extension, expiration of response time limits entitles the inmate to move on to the next step in the review process."). It is difficult, therefore, to see how TDOC's policies could call for a different result.

The PLRA requires a prisoner to exhaust all "administrative remedies as are available." 42 U.S.C.A. § 1997e(a). Bingham unambiguously failed to do so, because additional levels of appeal were "available," by any reasonable interpretation of that word. TDOC's policy of allowing a prisoner to appeal the denial of a grievance that was never actually denied can reasonably be characterized as a trap for the unwary, but the Sixth Circuit has been clear that such an approach is nevertheless permissible, if it is validly incorporated into the relevant state policies. While TDOC's policy may differ from Ohio's or Kentucky's in some ways,[7] those differences are not ones that would render a Level II or III appeal any less "available." The only grievances that Bingham properly exhausted were, therefore, those she filed after she joined this case, and TDOC is entitled to summary judgment with regard to Bingham's claims.

## E. The Plaintiffs' Request for Summary Judgment on the Merits

The defendants' motion for summary judgment largely bypasses the substantive questions of whether any of the underlying policies violated the ADA or Section 504. The plaintiffs, however, have requested partial summary judgment "on the grounds that [TDOC] violates Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act

---

[7] For example, Ohio's policy requires a plaintiff to file his or her appeal within a certain period of time after either an actual denial or a non-response. *See* Ohio Admin. Code 5120-9-31(J)(1), (2). The time limit for filing a Level II appeal under Policy 501.01, in contrast, runs from the time that the prisoner is "notified of the Level I response." Similarly, the time limit for filing a Level III appeal runs from the inmate's "receipt of" the Level II response. Accordingly, while the issue is not before the court, it appears that, by the plain language of the policy, Bingham—if she did, in fact, file grievances that were ignored—could still exhaust her grievances and file a new case once exhaustion is complete, if she so chooses.

by: [1] failing to adequately assess deaf prisoners for communications abilities and accommodation needs; [2] failing to provide deaf prisoners sufficient and reliable access to sign language interpreters for substantive communications; and [3] failing to provide deaf prisoners sufficient and reliable access to videophones." (Doc. No. 163 at 1.) They ask the court to "reserve[e] for later proceedings issues relating to remedies." (*Id.*)

### 1. Claims at Issue

Before the court considers the plaintiffs' request, it is worth summarizing what remains at issue. The court has already held that the TDOC is entitled to summary judgment with regard to a number, though not all, of the plaintiffs' claims. Specifically, the court has held that the PLRA bars the claims of plaintiffs Giles and Bingham, who are not deaf and have not raised any allegations regarding issues that are exempt from the grievance process. The court has also held that any claims related to hearing aids were untimely, that money damages are unavailable with regard to most of the ADA claims, and that emotional distress damages are unavailable with regard to the Section 504 claims. Finally, the court has held that there are issues of contested fact related to exhaustion that would preclude a grant of summary judgment to individual plaintiffs with regard to issues other than those for which actual exhaustion occurred or which involved medical issues that TDOC's Rule 30(b)(6) witness repeatedly characterized as exempt from the grievance process.

Although those rulings trim the case down somewhat, they do not inherently prevent the court from considering whether any of the three grounds for liability that DRT has identified supports an award under either relevant statute. Specifically, the court can still consider all of the claims that DRT has standing to raise, other than the hearing aid-related claims, all of the

remaining plaintiffs' claims related to medical care, and Trivette's and Collins' actually exhausted claims.

### 2. Principles of Law

Although, as the court has discussed, the remedies available under the ADA and Section 504 differ in this case, the parties appear to agree that, for the purposes of liability, "requirements of both statutes are precisely the same." *S.S. v. E. Kentucky Univ.*, 532 F.3d 445, 453 (6th Cir. 2008) (quoting *Weixel v. Bd. of Educ. of N.Y.*, 287 F.3d 138, 146 n. 6 (2d Cir. 2002)). The court, accordingly, will focus on the ADA, which has a more robust caselaw.

To state a claim under Title II of the ADA, the plaintiff must allege that (1) he has a disability; (2) he is otherwise qualified for the benefit or services at issue; and (3) he was excluded from participation in, denied the benefits of, or was subjected to discrimination under the program because of his disability. *Anderson v. City of Blue Ash*, 798 F.3d 338, 357 (6th Cir. 2015). It is well-settled that a plaintiff can satisfy the third element of a Title II claim by establishing that the defendant failed to provide a reasonable accommodation necessary to permit him to participate equally in the relevant program or service, in light of his disability. *See Jones v. City of Detroit, Mich.*, 20 F.4th 1117, 1119 (6th Cir. 2021) (citing *Roell v. Hamilton Cnty.*, 870 F.3d 471, 488 (6th Cir. 2017)). Accordingly, "prison officials have a general duty to provide reasonable accommodations to their disabled inmates." *Cox v. Corr. Med. Servs., Inc.*, No. 06-10350, 2006 WL 3147733, at *3 (E.D. Mich. Oct. 25, 2006).

Title II, like other antidiscrimination laws, provides a general mandate and framework, without expressly resolving how the law will apply in the full range of situations in which its requirements could arguably arise. The Sixth Circuit has recognized that, to that end, the federal government may issue regulations that "effectuate[] a mandate of Title II and [are] therefore

55

enforceable through the private cause of action available under the statute." *Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 907 (6th Cir. 2004). As relevant to this case, the Department of Justice ("DOJ") has promulgated regulations setting forth the duties of government agencies subject to Title II with regard to individuals with communication-related disabilities. *See* 28 C.F.R. §§ 35.101, -.160–64. Pursuant to those regulations, the agency must "furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities, including applicants, participants, companions, and members of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." 28 C.F.R. § 35.160(b)(1).

The regulations recognize that, in many situations, the agency may face a choice between various alternative auxiliary aids and services with different capabilities, and the DOJ prescribes the following principles for selecting among those alternatives:

> The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place. In determining what types of auxiliary aids and services are necessary, a public entity *shall give primary consideration to the requests of individuals with disabilities*. In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability.

28 C.F.R. § 35.160(b)(2) (emphasis added).

A disabled participant in a government program, however, does not have an unqualified right to dictate how the agency will accommodate his needs. There are two overarching limitations to an individual's rights under Title II that safeguard a government's resources and objectives from accommodation requests that would be too expensive or disruptive to grant: first, "[t]he requirements of Title II are 'subject to the bounds of reasonableness,'" meaning that,

56

among other things, there is no duty to provide an accommodation that would result in "undue financial and administrative burdens"; and, second, "the ADA 'does not require a public entity to take any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity . . . .'" *Tucker v. Tennessee*, 539 F.3d 526, 532 (6th Cir. 2008) (quoting *Johnson v. City of Saline*, 151 F.3d 564, 571 (6th Cir. 1998) (emphasis omitted); *see also* 28 C.F.R. § 35.164 (codifying limitations in context of communications-related accommodations).

### 3. Assessment

The first two elements of an ADA claim are for the most part undisputed here. The evidence shows that the plaintiffs are disabled and that they are qualified to receive the prison services at issue. The determinative question, then, is whether they were excluded from participation in, denied the benefits of, or otherwise subjected to discrimination in connection with those programs. That issue, however, presents something of a conceptual challenge when it comes to the plaintiffs' first request for summary judgment, regarding TDOC's assessments of incoming inmates. The plaintiffs' claims based on videophone/TTY access and interpreters fit a familiar, straightforward pattern in disability-related cases: the plaintiffs claim to have required certain accommodations in order to avail themselves of certain services available to similarly situated non-disabled individuals, and they are suing based on that denial. Their claims involving assessment, however, are qualitatively different, because they do not involve a particular program or service from which the plaintiffs were excluded, but, rather, TDOC's failure to take an administrative step intended to avoid later deprivations. The issue, with regard to this theory of liability, is not actually that the plaintiffs were excluded from any program, but that TDOC's

process of assessing new disabled inmates effectively guaranteed that such exclusions would eventually occur.

The plaintiffs argue that insufficient assessment can, in and of itself, form the basis for liability, a theory that they base, in significant part, on the analysis of the district court for the District of Columbia in *Pierce v. D.C.*, 128 F. Supp. 3d 250 (D.D.C. 2015). In *Pierce*, then-Judge (and now-Justice) Jackson held that "prison officials have an affirmative duty to assess the potential accommodation needs of inmates with known disabilities who are taken into custody and to provide the accommodations that are necessary for those inmates to access the prison's programs and services, without regard to whether or not the disabled individual has made a specific request for accommodation and without relying solely on the assumptions of prison officials regarding that individual's needs." *Id.* at 272.

The court's analysis in *Pierce* is thorough, and this court similarly concludes that it would be unlikely, if not impossible, for a prison operator to comply with the ADA without evaluating the needs of incoming prisoners who appear to be disabled or who are likely so. Indeed, it is difficult to see how the law could be otherwise. Many prisoners have extensive, obvious disabilities—including, in many instances, cognitive disabilities that would make it impracticable to put the onus on the prisoner to seek an assessment. Incarceration, moreover, encompasses every moment of a prisoner's day and virtually every aspect of his physical life, making the need for some accommodation incredibly likely, at least with regard to some disabilities. It is consistent with the text and purposes of the ADA to hold that, where a prison is on notice of a prisoner's disability, it can be held liable for deprivations that arose from its failure to assess that prisoner's needs.

The key phrase in that sentence, however, is "deprivations that arose from." The plaintiffs would have this court go a step farther than simply holding that improper assessments can lead to actionable violations and, instead, impose potential liability based on the improper assessments themselves. The court, however, cannot square such a holding with the ordinary elements of ADA liability. The ADA is an antidiscrimination statute, and it is the discrimination—not the prologue to the discrimination—that is actionable. DOJ regulations recognize this fact, imposing no particular mandatory assessment or screening structure for communication needs and, instead, only requiring a public entity to "take appropriate steps to ensure that communications with applicants, participants, members of the public, and companions with disabilities are as effective as communications with others" and avoid "criteria or methods of administration" with the "purpose or effect" of discriminating on the basis of disability. 28 C.F.R. § 35.160(a)(1), (b)(7). The agency's duty is to avoid the eventual deprivation—not to conform to any particular set of procedures.

It is, moreover, not clear to the court that a cause of action based solely on a failure to assess a plaintiff's needs—without any resultant injury—would even be constitutionally viable. The Supreme Court has, particularly in recent years, been highly skeptical of congressional efforts to create causes of action out of bare procedural injuries. *See, e.g.*, *Spokeo*, 578 U.S. at 337. If a prison fails to assess a prisoner's needs and, as a result, denies that prisoner equal participation in, for example, prison programming, then that resultant injury would be a clearly constitutionally cognizable one. However, if a prison fails to assess a prisoner's needs, but nothing whatsoever comes from that failure, then the plaintiff has suffered only a purely theoretical injury of the type that the Supreme Court would be unlikely to recognize as sufficient

59

to support a federal cause of action. The court, accordingly, will not grant the plaintiffs summary judgment with regard to any standalone "assessment" claim.

This holding does bring the court somewhat into conflict with *Pierce*, but only minimally so. While some of the language in *Pierce* does suggest that a bare failure to assess could be actionable, the actual cause of action at issue was not such a claim, but rather involved the combination of the failure to assess *and* the resultant deprivations:

> The District's prison staff was indisputably aware that Pierce was deaf; however, during the entire 51–day period in which Pierce was held in custody, no staff person ever assessed Pierce's need for accommodation or otherwise undertook to determine the type of assistance that he would need to communicate effectively with others during his incarceration. Instead, according to Pierce, the District's employees and contractors merely assumed that lip-reading and exchanging written notes would suffice, and they largely ignored his repeated requests for an interpreter to assist him in interacting with other people. As a result, Pierce asserts that he was forced to serve his prison time in abject isolation, generally unaware of what was going on around him and unable to communicate effectively with prison officials, prison doctors, his counselor, his teacher, or his fellow inmates.

*Pierce*, 128 F. Supp. 3d at 253–54. To the extent that *Pierce*'s holding can be interpreted as granting relief based on a purely procedural injury, moreover, *Pierce* preceded the Supreme Court's *Spokeo* opinion and the ensuing caselaw cracking down on claims based solely on procedural injuries. Insofar as *Pierce* can be read as permitting such claims, the court cannot join it in such a holding.

That does not mean, however, that TDOC's allegedly inadequate assessments are irrelevant to this case. Those inadequate assessments are certainly relevant to claims based on resultant instances of discrimination, including those involving translators and videophones. Indeed, it appears likely that those alleged violations may well have been a direct result of TDOC's failure to ascertain the actual needs of its disabled prisoners. The issue of assessments may, moreover, be highly relevant to the issue of injunctive relief, because, as the court

convincingly explained in *Pierce*, it is difficult to provide reasonable accommodations without knowing what a prisoner needs in the first place. It would, therefore, make sense for injunctive relief to require such assessments. On the narrow question of whether the court can grant the plaintiffs summary judgment based solely on inadequate assessments, however, the court cannot rule for the plaintiffs.

### 4. Translators

The unrefuted evidence shows that (1) five of the named plaintiffs, as well as two additional DRT constituents, require ASL in order to engage in ordinary person-to-person communication, (2) translators are an effective mechanism for addressing the need for ASL communication, and (3) translators were not provided to those prisoners in hundreds of situations in which they plausibly would have been helpful, particularly those involving programming, medical encounters, religious services, filling out formal paperwork, and formal prison processes, such as those involving parole and disciplinary proceedings. The court is unable to grant summary judgment to those individual plaintiffs on most of the underlying claims because there are contested factual issues related to administrative exhaustion. Administrative exhaustion does not, however, bar: DRT's claims, which are not subject to the exhaustion requirement; claims related to medical care that TDOC's Rule 30(b)(6) witness conceded are not subject to administrative exhaustion; Trivette's claims based on the denial of an interpreter in connection with religious services, which he exhausted by filing a grievance that resulted in a promise of relief that was not ultimately provided; or Collins' claims regarding translators for programming, which were exhausted for similar reasons. Accordingly, while not all of the ADA and Section 504 claims involving the denial of translators are before the court, the court is in the position to resolve the basic question that the plaintiffs have presented: whether they are entitled to

61

summary judgment on the question of whether the denial of translators in connection with the cited instances was actionable.

The court has little difficulty concluding that the provision of translation services is, in fact, sometimes required by the ADA. That does not mean that translators must be provided 24/7, and the plaintiffs have not argued that it does. Rather, the plaintiffs suggest that this court can follow the lead of the U.S. District Court for the Eastern District of Michigan and award summary judgment regarding the denial of interpreters in certain "high stakes" settings, such as medical care. *See McBride v. Michigan Dep't of Corr.*, 294 F. Supp. 3d 695, 716 (E.D. Mich. 2018). The undisputed evidence shows that, at least generally speaking, some form of accommodation is necessary in order to appropriately render medical care to deaf individuals and that such accommodations were frequently not provided by TDOC. The same is true with regard to formal matters such as disciplinary proceedings, parole proceedings, and grievance hearings. Indeed, TDOC's own policies now "require the provision of appropriate auxiliary aids and services" for several such high-stakes activities, including those categories of event. (Doc. No. 182-1 at 8.) TDOC's new Policy No. 113.95 similarly requires supportive aids and services for religious services, "[e]ducational and vocational programming," and "anything involving legal due process," and TDOC has identified no basis for disputing that such support is required by the ADA. (*Id.*)

Rather, TDOC argues that summary judgment would be inappropriate because it did not "fail[] to provide sign language interpreters when it was necessary for effective communication." (Doc. No. 181 at 6.) In support of that position, it makes two related arguments. First, it points out that it did provide translators in a handful of instances that may have been the only instances in which translators were actually necessary. Second, TDOC argues that the incidents in which

62

translators were not provided may, on further inspection, turn out to have proceeded without problems, showing that translators had not been needed in those instances after all.

Neither argument is persuasive. The plaintiffs have identified hundreds of high-stakes interactions in which interpreters were not provided, many of which involved situations—such as receiving medical care—in which effective communication is an inherently vital component. It is beyond implausible to suggest that, for some unexplained, conjectural reason, none of those instances required an interpreter, while the few instances in which an interpreter *was* provided did call for one. Moreover, even if one were to accept TDOC's implausible premise that all of the cited encounters proceeded without a problem, despite the lack of an interpreter, that would, at most, be relevant to damages, not the question of whether TDOC violated its obligations. As the Eastern District of Michigan has explained, the duty to provide an interpreter or the equivalent in connection with an encounter that appears to require one "arises before, and in connection with," the encounter. *McBride*, 294 F. Supp. 3d at 714. A public entity's duty to provide reasonable accommodations is not merely imposed retroactively after something goes wrong.

TDOC is correct that the extent of aids and services necessary in any situation is highly fact-dependent, such that "the effectiveness of auxiliary aids and/or services" is typically "a question of fact precluding summary judgment." *Chisolm v. McManimon*, 275 F.3d 315, 327 (3d Cir. 2001). The plaintiffs, however, are only seeking a summary judgment of basic liability, and most of the situations at issue involved either no meaningful aids at all or mechanisms, such as written notes, that were plainly insufficient. Moreover, because the plaintiffs are not seeking summary judgment as to the appropriate remedy, it is not necessary for the court to conclude that interpreters would have been the only viable option for all of the identified situations and

63

encounters. It suffices that providing an interpreter would have been one way to avoid a violation, and neither it—nor any adequate alternative mechanism—was actually pursued in most of the relevant instances.

TDOC argues next that it should not be held liable for the lack of interpreters in the medical setting, because it relied on a contractor to provide medical services and cannot be vicariously liable for the contractor's failure to provide interpreters. (*See* Doc. No. 181-12 at 7–8.) TDOC, however, has provided only limited information regarding the division of responsibilities between TDOC and its medical contractor, Centurion, and there is no evidence that prisoners who saw Centurion medical providers were not still under the physical custody and control of TDOC. Moreover, TDOC's own policies now recognize TDOC's responsibility to ensure that such translators are provided. Whether or not Centurion might have violated the ADA in its own right is not before the court. TDOC, however, has not produced sufficient evidence to defeat summary judgment based on its own obligation not to discriminate on the basis of disability "directly or through contractual, licensing, or other arrangements." 28 C.F.R. § 35.130(b)(1).

While there may be room for disputing whether certain specific listed encounters fall within the scope of TDOC's violations, there is no longer any basis for disputing that such violations generally existed and were manifestations of a continuous, ongoing policy or practice. The court, accordingly, will grant summary judgment: to DRT as to liability with regard to the denial of interpreters or otherwise sufficient services in connection with prison programming, medical encounters, religious services, and formal processes involving parole, discipline, or grievances; to Trivette with regard to the denial of interpreters or otherwise sufficient services in connection with religious services; and to Collins with regard to TDOC programming.

TDOC argues that, even if the court grants summary judgment with regard to those issues, it should not grant summary judgment with regard to the denial of interpreters in connection with filling out prison paperwork, because the necessity of interpreters for that purpose remains in dispute. On this point, TDOC is correct. Although the plaintiffs have provided some evidence of literacy issues with regard to some of the plaintiffs, the extent to which those plaintiffs' reading limitations actually rendered any particular piece of paperwork beyond their comprehension is still an open question. If, in fact, any plaintiff or DRT constituent was sufficiently capable of reading written English so as to have no need for ASL clarification regarding the underlying materials, the lack of an interpreter likely would not have resulted in a deprivation of the plaintiff's rights. The court, accordingly, will not grant summary judgment with regard to that aspect of the plaintiffs' claims.

### 5. Videophones/TTY

Much of the past discussion of videophones in this case involved their expense and the challenges of providing them, in light of the high-quality data connections necessary. In response to the plaintiffs' Motion for Summary Judgment, however, TDOC raises no argument that providing access to videophones would involve unreasonable expense. Rather, TDOC simply touts the fact that it has, in its view, resolved its past issues and that it now "provides sufficient and reliable access to videophones." (Doc. No. 181 at 10.)

That current compliance, however, is, at most, relevant to remedies, not the plaintiffs' entitlement to summary judgment. On the issue of liability for past violations, this court, consistently with its preliminary injunction opinion, holds that the ADA generally requires videophone access that is available, to the extent reasonably possible, on the same terms as hearing prisoners' access to conventional telephones. *See Rogers v. Colo. Dep't of Corr.*, No. 16-

CV-02733-STV, 2019 WL 4464036, at *16 (D. Colo. Sept. 18, 2019; *McBride*, 294 F. Supp. 3d at 712–13 (E.D. Mich. 2018). The unrefuted evidence shows that TDOC violated that requirement repeatedly, both by failing to provide videophones altogether and by providing them on inferior terms The court, accordingly, will grant DRT, Trivette, and Collins summary judgment as to this aspect of their claims.

## F. Plaintiffs' Evidentiary Motion

The only pending motion remaining to resolve is plaintiffs' Motion to Exclude, which addresses whether TDOC can rely on two proffered experts, Randall Atlas and Kevin Myers, in an attempt to defeat liability. The plaintiffs ask the court to exclude the testimony of Atlas and Myers pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). TDOC suggests that it is unnecessary to address this issue now, because it did not rely on those experts in connection with its Motion for Summary Judgment. The matter, however, is fully briefed and needs to be decided before trial in any case, so the court will address it.

### 1. *Daubert* Standard

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. It provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

66

As "gatekeepers," the district courts are charged with "discretion in determining whether . . . a proposed expert's testimony is admissible." *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 429 (6th Cir. 2007).

The exercise of this discretion requires consideration of three factors: "First, the witness must be qualified by 'knowledge, skill, experience, training, or education.' Second, the testimony must be relevant, meaning that it 'will assist the trier of fact to understand the evidence or to determine a fact in issue.' Third, the testimony must be reliable." *In re Scrap Metal Antitrust Litigation*, 527 F.3d 517, 528–29 (6th Cir. 2008) (quoting Fed. R. Evid. 702). The Sixth Circuit has repeatedly recognized that "rejection of expert testimony is the exception, rather than the rule." *U.S. ex rel. Tenn. Valley Auth. v. 1.72 Acres of Land in Tenn.*, 821 F.3d 742, 749 (6th Cir. 2016) (quoting *In re Scrap Metal*, 527 F.3d at 530). Accordingly, "Rule 702 should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact." *Id.* (quoting *Morales v. Am. Honda Motor Co., Inc.*, 151 F.3d 500, 516 (6th Cir. 1998). The inquiry is "a flexible one"; "[t]he focus must be solely on principles and methodology, not on the conclusions they generate." *Daubert*, 509 U.S. at 594–95.

The Sixth Circuit has identified some "[r]ed flags that caution against certifying an expert," including "reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity." *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012) (citing *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 177 (6th Cir. 2009)). Where the "factual basis, data, principles, methods, or their application are called sufficiently into question, the trial judge must determine whether the [challenged expert] testimony has a 'reliable basis in the knowledge and experience of [the relevant] discipline.'"

*Kumho Tire*, 526 U.S. at 149 (quoting *Daubert*, 509 U.S. at 592). Generally, "a trial judge . . . ha[s] considerable leeway in deciding whether particular expert testimony is reliable." *Id*. at 152.

### 2. Randall Atlas

Atlas is an architect and the President of Atlas Safety & Security Design Inc. (Doc. No. 169-1 at 28.) Atlas says that he is "qualified as an expert in accessibility and the ADA, especially on Title II Program and Services Accessibility." (Id. at 2.) "Accessibility" is a broad topic, but the court's review of Atlas's education and experience confirms that he is, as a general matter, qualified to testify as an expert regarding accessibility as it relates to building design, particularly with regard to prisons. Atlas has, among other things, "served as a technical assistance consultant with the National Institute of Corrections, and conducted approximately 20 assessments for them since 1983" and taught on the topic of "Architecture, Criminal Justice and Urban Planning" at Florida Atlantic University. (*See id.* at 2, 29.)

As the plaintiffs point out, however, little, if any, of Atlas's work has been specifically addressed to the issue of effective communication for people who are deaf or hard of hearing. During Atlas's deposition, he was asked if any of the cases he had worked on in the past had involved that issue, and he responded as follows:

> No, ma'am, not specifically. I would say 95 percent of it was dealing with mobility impairments and physical accessibility to programs, services, and activities, you know. But within that you have a visitation room. So I had to make sure that the intercom worked so people could hear each other if they were hearing [disabled], and likewise I would ask the questions well, where is your TDD or TTY—you understand what I'm trying to say—TYYs, yes, text display devices. Yeah. Where were they; were they working; was there power for it. So I was looking at it from like a thousand foot perspective, not like a ten-foot perspective like were there interpreters or what kind of machines they were using, things of that nature, or were they giving the inmates hearing aids. I mean, that was not the focus of my work and these facilities and these lawsuits.

(Doc. No. 169-3 at 12.) He is not proficient in ASL and has very limited experience communicating with deaf individuals. (*Id.* at 16.)

The plaintiffs complain that the opinions in Atlas' report go well beyond his expertise, and the court agrees. For example, Atlas opines that TDOC "has made significant progress in the last several years to provide an effective, dependable, consistent, accessible, affordable, two-way communication system between deaf and hearing-impaired inmates and correctional staff, and consistent access to a VRS (video relay services) and VRI (video remote interpreting) services or live qualified interpreters." (Doc. No. 169-1 at 26.) Nothing about Atlas's identified experience, however, suggests that he is qualified to testify as an expert on the topic of whether any particular communication option is "effective" for individuals with hearing-related disabilities. Indeed, as the plaintiffs point out, Atlas's deposition testimony showed him to have been ignorant of many basic details involved with assistive technologies and accommodations for deaf and hard-of-hearing individuals—unsurprisingly, given that he has essentially no meaningful experience with the issue aside from this case. (*See* Doc. No. 168 at 3–4.)

Because Atlas cannot testify regarding the effectiveness of any accommodation, he cannot testify on any question that would hinge, in any part, on that issue, such as whether TDOC's efforts have been reasonable. For example, Atlas states, "Based upon my experience, it is my opinion that when the TDOC Policy for Accommodations for Deaf and Hard of Hearing Inmates, TDOC Policy 113.95 dated August 26, 2022, is fully implemented, TDOC facilities will be in compliance with the ADA as much as reasonably possible." (*Id.*) That statement arguably rests on legal conclusions that would be inappropriate for an expert or lay witness to address. *See Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310, 322 (6th Cir. 2014). Even aside from that problem, however, the fact that Atlas is not qualified to offer opinions regarding the adequacy of

specific communication-related accommodations leaves him incapable of judging ultimate ADA compliance.

There are aspects of Atlas's expertise that touch on issues that have arisen in this case. In particular, the fashioning of potential injunctive relief may touch on issues related to the bid process associated with prison renovations and improvements, as has been the case with the preliminary injunction. Atlas might have been an appropriate expert on those topics. The brief discussion of those matters in Atlas's Report, however, is so general and ungrounded in any kind of situation-specific analysis that it offers no probative value. Atlas says little more than that changing prisons is a slow process and that TDOC has made some efforts to comply with its own recently adopted policies. He also details several site visits he performed that showed both some progress and some continuing problems, such as missing call buttons or inoperable systems. There is, however, no need for an expert to testify to those basic facts. TDOC, therefore, has not identified any probative, appropriately supported expert testimony within Atlas's area of qualification, and the court will exclude Atlas's testimony.

### 3. Kevin Myers

Myers is a former warden, treatment officer, and facility administrator with several decades of experience in the corrections field, including having worked for TDOC from 2016 until May 2023. (*See* Doc. No. 169-2 at 16.) He is now the sole proprietor of 4Square Corrections, LLC, which provides various services, including expert consultation, related to correctional facilities. (*Id.* at 1–2.) TDOC retained Myers "as an expert consultant to review alleged violations of the Americans with Disabilities Act (ADA) regarding Deaf and the hard of hearing inmates." (Doc. No. 169-2.) His Report lists nine numbered opinions, some of which involve issues of prison operations that are within his field of expertise. For example, as Opinion

No. 9, Myers states, "based on [his] experiences in the Tennessee Department of Correction[,] that a time period of three- and one-half months from parole hearing to release"—as plaintiff White experienced—"is not unusual." (*Id.* at 12.) Other of his opinions bear more directly on the issue of accommodations, but do so by situating potential accommodations in the context of prison operations more generally. For example, while Opinion No. 8 does include a conclusion that "external stimuli for announcements, notifications and/or emergency alerts are unnecessary," Myers does not base that opinion on any kind of analysis of the particular needs of deaf or hard-of-hearing individuals. Rather, he bases it on his experience of how information is typically relayed to and among prisoners. (*Id.* at 11.) Opinion No. 3 through Opinion No. 6 involve the security and implementation challenges associated with using electronic devices in the prison setting, a topic that does not require any particular expertise regarding deaf or hard-of-hearing individuals. (*Id.* at 8–11.)

Some of Myers' other opinions, however, suffer from the same defects that the court identified with regard to Atlas. For example, in Opinion No. 1, Myers, like Atlas, states that certain steps would bring TDOC into compliance with the ADA, but, as with Atlas, it is simply not possible for a person to offer that opinion without actual expertise in the needs of individuals with the relevant disabilities. In Opinion No. 7, Myers opines regarding the degree of accommodation needed for effective medical care, a topic well outside his expertise.

Myers' opinion testimony, accordingly, will be allowed, but restricted. Myers may testify regarding prison operations, including issues of prison operations associated with implementing announcement, alarm, and/or communications technologies. However, Myers will not be permitted to offer any opinion regarding the actual sufficiency of any specific accommodation or whether any particular policy would bring TDOC into compliance with the ADA.

71

## IV. CONCLUSION

For the foregoing reasons, the plaintiffs' Partial Motion for Summary Judgment (Doc. No. 162), the plaintiffs' Motion to Exclude Defendant's Experts (Doc No. 167), and TDOC's Motion for Summary Judgment (Doc. No. 170) will each be granted in part and denied in part.

An appropriate Order will enter.

ALETA A. TRAUGER
United States District Judge

72