# Exhibit A

# SETTLEMENT AGREEMENT AND RELEASE

This SETTLEMENT AGREEMENT AND RELEASE ("Settlement Agreement" or "Agreement") sets forth the terms of the settlement by and between Alex Gordon Stinnett, Thomas White, Lakeevious Owens, (collectively the "Individual Plaintiffs"), and Disability Rights Tennessee ("DRT") with respect to its Deaf constituents in the custody of the Tennessee Department of Correction (the Individual Plaintiffs and DRT collectively the "Plaintiffs"), on the one hand, and Defendant Tennessee Department of Correction ("TDOC"), on the other, concerning the claims of the Plaintiffs for declaratory and injunctive relief, damages, and attorneys' fees.

## INTRODUCTION

WHEREAS, Plaintiffs filed a civil lawsuit entitled *Trivette v. Tennessee Department of Correction*, United States District Court for the Middle District of Tennessee, Civil Action No. 3:20-cv-00276 (the "Action"), alleging that the Tennessee Department of Correction failed to abide by Title II of the Americans with Disabilities Act (42 U.S.C. § 12131), and Section 504 of the Rehabilitation Act (29 U.S.C. § 794) with respect to the accommodations it provides to Deaf and hard of hearing inmates (the "Allegations");

WHEREAS, Plaintiffs and TDOC, without conceding any infirmity in their claims or defenses, have engaged in settlement negotiations to resolve the claims raised in this Action and recognize that it is in their mutual best interest to fully resolve and finally settle any and all past, existing, and/or potential declaratory, injunctive, equitable and damages claims between Plaintiffs and TDOC relating to the Allegations;

WHEREAS, TDOC is entering into this Settlement Agreement for the purpose of settlement, and nothing contained herein may be taken as or construed to be an admission or concession of any violation of law or regulation, or of any other matter of fact or law, or of any liability or wrongdoing (including Allegations of the Complaint, all of which TDOC expressly denies);

WHEREAS, TDOC does not admit to any violation of law and does not admit to any wrongdoing that was or could have been alleged by Plaintiffs, and no part of this Settlement Agreement, including its statements and commitments, shall constitute evidence of any liability, fault, or wrongdoing by TDOC;

WHEREAS, it is the intent of the parties that this Settlement Agreement shall not create a private cause of action or confer any right to any third party for violation of any federal or state constitution or statute;

NOW, THEREFORE, IN CONSIDERATION OF THE MUTUAL TERMS, COVENANTS, CONDITIONS AND RELEASES OF THIS SETTLEMENT AGREEMENT, IT IS HEREBY AGREED by and between the parties, as follows:

1. **DEFINITIONS.**

As used in this Agreement, the following terms have the following meanings:

    a. "ASL" means American Sign Language.

    b. "Auxiliary Aids and Services" means those aids and services used to communicate with people who are Deaf, including but not limited to qualified sign language interpreters on-site or through video remote interpreting (VRI) services; note takers; computer-aided real-time transcription services (CART); written materials;

exchange of written notes; closed caption decoders; open and closed captioning, including real-time captioning; text and video-based telecommunications products and systems, including text telephones (TTY) and videophones, or equally effective telecommunications devices; videotext displays; accessible electronic and information technology; or other effective methods of making aurally delivered information available to individuals who are deaf.

c.  "Captioning" means the process of converting and providing the audio content of a television program, webcast or livestream, film, video, DVD, live event or broadcast, or other production into text that is displayed on a screen.

d.  A person is "Deaf" when they are a person determined to have a hearing disability pursuant to TDOC Policy 113.95 (IV)(E), and have severe-profound hearing loss, or who self-identify as Deaf.

e.  "Disability" means a physical or mental impairment that substantially limits one or more major life activities of an individual or a record of such an impairment. Individuals have "hearing disabilities" if they have a physical impairment that substantially limits their hearing, without regard to mitigating measures such as hearing aids or cochlear implants.

f.  "DRT" means Disability Rights Tennessee or any successor Protection and Advocacy System in the State of Tennessee.

g.  "Effective Date" means the date that all signatures are obtained on the agreement and "Final Approval" as defined in this Agreement has been obtained.

h. "Inmate" means someone who is in the custody of TDOC at a TDOC facility or at a facility that is contracted by TDOC.

i. "Inmate-run Programs," for purposes of this Agreement means Alcoholics Anonymous ("AA"), Narcotics Anonymous ("NA"), "Al-Anon," or any other program designated a 12-step or addiction recovery program, and religious programs, that are approved by TDOC

j. "Program" means any service, program, activity, or function conducted by a TDOC Facility or its staff, directly or by other entities through contractual, licensing, or other arrangements, including but not limited to volunteer-provided programming.

k. "Qualified Interpreter" means a sign language interpreter who, by video remote interpreting (VRI) service or an on-site appearance, is able to interpret effectively, accurately, and impartially, both receptively (i.e., understanding what the participants to the interaction are saying) and expressively (i.e., conveying the message from the communicating participant to the receiving participant in the interaction) using any necessary specialized vocabulary (medical, legal, etc.), given the deaf individual's language, skills, and education. Qualified interpreters include, but are not limited to, for example, sign language interpreters, oral transliterators, and cued-language transliterators. *See* 28 C.F.R. § 35.104. *See* TDOC Policy 113.95 (IV)(H).

l. "Reasonable Accommodations" means changes to TDOC policies, practices, or procedures that are necessary to avoid discrimination on the basis of deafness and

to ensure equal access to TDOC's services, programs, and activities, which do not constitute a fundamental alteration in the nature of a service, program, or activity or an undue financial or administrative burden pursuant to 28 CFR § 35.164.

m. "Staff" means any person performing duties for TDOC, including as an employee, contractor, or volunteer, and carrying out TDOC Programs.

n. "TDOC" means Tennessee Department of Correction, an agency of the State of Tennessee and, as used herein, includes all TDOC Facilities, their staff, and vendors of professional services, private prison operation services, and inmate communications services.

o. "TDOC Facility" means any correctional facility which is, now or within the duration of this Settlement Agreement, owned and operated by the State of Tennessee under the management of TDOC or any correctional facility operated by CoreCivic of Tennessee LLC or another private third-party contractor which houses persons committed to the custody of TDOC.

p. "TDOC Policy 113.95" means the version of the policy that is attached hereto as Exhibit A.

q. "VRI" means video remote interpretation. As used in this Settlement Agreement, it is understood to mean the provision of sign language interpretation by remote video connection on demand, without the need for an advance request.

2. **POLICIES**

a. TDOC shall apply its currently applicable TDOC Policy 113.95, which is attached as Exhibit A hereto, in conjunction with the terms of this Settlement Agreement.

TDOC shall be responsible for training its staff, correctional health care providers who are employed with TDOC, and TDOC-contracted health care service vendors on the terms of its Policy 113.95, and the terms of this Settlement Agreement. Neither Policy 113.95 nor this Agreement is a substitute for individualized assessment, and each case is evaluated on an independent basis.

b. TDOC shall, in accordance with TDOC Policy 113.95 (II) and 28 C.F.R. §§ 35.160 – 35.164, provide appropriate auxiliary aids and services and reasonable accommodations to ensure that Deaf inmates have an equal opportunity to participate in or benefit from the services, programs, or activities of TDOC, including Inmate-run Programs, and shall ensure that communications with Deaf inmates are as effective as communications with others.

c. TDOC shall not punish or penalize a Deaf inmate for a hearing disability or its expression. For example, TDOC shall not discipline any Deaf inmate who uses sign language to communicate, or any person who communicates with such an inmate, for communicating with sign language, including the expressive physical movement that is part of sign language. TDOC shall not discipline or punish any inmate who teaches sign language to another inmate or learns sign language from another inmate. TDOC shall not discipline any Deaf inmate for failing to obey an order that the inmate could not hear or understand or for failing to comply with any rule that was not effectively communicated to the inmate.

d. Nothing in this agreement prevents TDOC from disciplining inmates for forming a conspiracy to commit a crime or violating TDOC rules and regulations.

**3.   AUDIOLOGICAL SCREENING AND REFERRAL FOR AUDIOLOGICAL EXAM.**

TDOC agrees to screen all inmates in its custody for hearing loss and need for audiological examination in accordance with the following terms to the extent that it conforms to the Tennessee state standard of care.

   a.   All inmates over the age of sixty-five (65) in TDOC's custody shall be screened for referral to a licensed audiologist at least every three (3) years.

   b.   All inmates in TDOC's custody with a co-occurring disability, or a history of hearing loss risk factors as a result of a previous screening, shall be screened for referral to a licensed audiologist at least every two (2) years.

   c.   All inmates in TDOC's custody may request screening for referral to a licensed audiologist at any time, regardless of their last screening date; such referral will be subject to the discretion of TDOC but will not be unreasonably denied.

   d.   When TDOC screens inmates in its custody for referral to a licensed audiologist, it shall utilize a test that meets the community standard.

   e.   When the result of the screening procedure specified in subparagraph (d) indicates referral to a licensed audiologist, TDOC shall submit a request to a licensed audiologist for examination of the screened inmate within five (5) business days of such screening.

   f.   When an inmate in TDOC's custody is examined by an audiologist pursuant to paragraph 3(e), TDOC will ask the licensed audiologist to determine whether the inmate has a hearing disability.

4.    **REASONABLE ACCOMMODATIONS AND AUXILIARY AIDS AND SERVICES.**

TDOC agrees to evaluate Deaf inmates in its custody for reasonable accommodations and auxiliary aids and services in accordance with the following terms.

a.   When a Deaf inmate has an obvious hearing disability or is determined to have a hearing disability, TDOC will conduct an individualized accommodation needs assessment to determine the reasonable accommodations and/or auxiliary aids and services reasonably necessary to ensure effective communication and access to services for that inmate. All TDOC staff responsible for conducting such assessments will receive training in how to conduct the assessment. Each assessment shall be reviewed by TDOC's ADA Compliance Director to ensure that each Deaf inmate is receiving necessary auxiliary aids and services and accommodations.

b.   TDOC will approve and provide the auxiliary aids and services recommended in the assessment in accordance with its duties and obligations under 28 CFR §§ 35.160 - 35.164.

c.   When new accommodations are approved, after TDOC effectively communicates those new approved accommodations to the Deaf inmate, TDOC shall provide the inmate for whom those accommodations were approved with a printed document or ID card pursuant to TDOC Policy 113.95 VI(C), listing the inmate's approved accommodations, and that inmate shall be permitted to carry the printed document on their person. The inmate has the right to refuse the special ID card and the printed document listing the inmate's preferred auxiliary aids.

d.  For Deaf inmates, it is a rebuttable presumption that the following accommodations and auxiliary aids do not require a fundamental alteration in the nature of a service, program, or activity or an undue financial or administrative burden pursuant to 28 CFR § 35.164. Other accommodations and auxiliary aids and services necessary to afford Deaf inmates an opportunity to participate in or benefit from the services, programs, or activities of TDOC are to be determined on a case-by-case basis.

    i.  Interpreters provided according to paragraph 5 below;

    ii.  Pursuant to TDOC Policy 113.95 (VI)(Q), a visual or other notification system so that inmates who have a hearing disability will not miss public address announcements, alarms, or other auditory information, including times for meals, recreation, education, work assignments, and other events;

    iii.  Videophones;

    iv.  If requested by a Deaf inmate, assistance by an inmate helper (subject to approval of TDOC); and/or

    v.  Written communications.

e.  Once an accommodation or auxiliary aid or service is approved, that status will not change as a result of a Deaf inmate's transfer to another housing assignment at the same or lower custody level. A Deaf inmate's approved accommodations or auxiliary aids or services will not be revoked except pursuant to a subsequent assessment, provided that TDOC may temporarily revoke such accommodations or auxiliary aids or services pending an assessment if they pose a threat to safety

or security and the reasons for that temporary revocation are documented in writing and retained by TDOC. Nothing in this Settlement Agreement prevents TDOC from re-assessing the need or appropriateness of a previously approved accommodation or auxiliary aid for an inmate or for a particular occasion. Approved accommodations shall continue to be provided pending any reassessment.

f.   Nothing in this Settlement Agreement precludes a Deaf inmate from requesting a specific accommodation pursuant to TDOC's accommodation request process, or precludes TDOC from showing that a specific accommodation request constitutes a fundamental alteration in the nature of a service, program, or activity or an undue financial or administrative burden pursuant to 28 CFR § 35.164.

g.   TDOC will provide any training required for an inmate with a hearing disability to use any auxiliary aids and services or accommodations approved pursuant to this Paragraph.

5.   **INTERPRETER SERVICES.**

a.   TDOC agrees to take reasonable steps provide qualified interpreters to Deaf inmates as appropriate based on the inmate's primary language and any assessment made pursuant to paragraph 3(a) of this Settlement Agreement when Deaf inmates are determined to need such services for any of the activities, services, and programs listed in paragraph VI(D)(1) of Policy 113.95.

b.   When TDOC has two (2) or more business days of advance notice that interpreter services are required for any activity listed in TDOC Policy 113.95 (VI)(D)(1),

TDOC will make reasonable attempts to provide an on-site qualified interpreter for that activity, and document those attempts in writing, except when an on-site qualified interpreter would materially interfere with security or infection control measures. In such cases or when an on-site qualified interpreter is not available TDOC shall provide VRI in lieu of on-site interpretation on a screen of sufficient size to ensure that the qualified interpreter is intelligible.

c.   When TDOC has less than two (2) business days of advance notice that interpreter services are required for any activity, it may provide a qualified interpreter through VRI for that activity.

d.   TDOC will abide by TDOC Policy 113.95, paragraph VI(D) for purposes of evaluating requests for interpreters for any other type of interaction, including but not limited to routine meetings related to residential programming, grievance preparation, library services, and interpretation of written materials. TDOC will evaluate such request on a person-by-person and/or case-by-case basis, and approve them when the inmate demonstrates that the accommodation is necessary for them to access the full benefits of TDOC's services and programs. Where a needs assessment as provided in paragraph 3(a) has indicated that a specific type of accommodation is necessary, in a specific context to access the full benefits of TDOC's services and programs, the Deaf inmate will be entitled to this accommodation in this context going forward, and will not have to reestablish the necessity for each future request. The Deaf inmate may be required to provide notice to TDOC of the necessity for the accommodation in a new context. TDOC will ensure that the requesting process is accessible to the Deaf inmate.

6. **COMMUNICATIONS TECHNOLOGY:**

   a. TDOC shall provide VRI at all facilities where a Deaf inmate is housed.

   b. All VRI services provided by TDOC shall meet the standards set forth at 28 C.F.R. § 35.160(d).

   c. TDOC shall furnish sufficient equipment such that the technologies identified in paragraph 6(a) are readily accessible during the interactions listed in Policy 113.95, paragraph VI(D)(1) as well as other unscheduled interactions between staff and Deaf inmates.

   d. TDOC shall ensure that staff shall receive training on how and when to utilize the communications technologies discussed in paragraph 6(a).

   e. TDOC shall provide closed captioning of all TDOC-generated video content relating to intake or orientation as well as all TDOC-generated video content (including but not limited to educational videos) presented at TDOC facilities where a Deaf inmate is housed and at the intake facilities at the Bledsoe County Correctional Complex (BCCX) and the Debra K. Johnson Rehabilitation Center (DJRC). TDOC shall ensure that any video content presented by an outside party has captioning.

   f. TDOC will abide by TDOC Policy 113.95 (VI)(Q) and paragraph 5(d), above, with regard to notifications of auditory announcements.

7. **TELECOMMUNICATIONS**

   a. TDOC shall provide:

i. In facilities where one or more Deaf inmates are housed, and at any intake facility or area including BCCX and DJRC, at least one videophone in each location where Deaf inmates are housed and where conventional telephones are located or (in the case of high security units, including segregation units) with the same access as conventional telephones.

b. Videophones shall be available on terms equal to conventional telephones including but not limited to:

i. Deaf inmates will be able to use videophones during the same hours that hearing inmates at the same custody level may use conventional phones;

ii. TDOC shall not curtail access to videophones except when access to conventional phones is curtailed for hearing inmates, or in direct response to a security risk that would also limit access to conventional phones;

iii. Deaf inmates shall not be required to take additional steps to use a videophone beyond those required of other inmates to use the conventional telephone; TDOC will make reasonable efforts to protect the privacy of videophone calls, including but not limited to making reasonable efforts to limit the visibility of the videophone screen while in use, provided that nothing in this Agreement will prohibit TDOC from monitoring videophone calls to the same extent it monitors conventional phone calls;

iv. Where inmate telephone calls are time-limited, TDOC will provide Deaf inmates who use videophones a minimum of two (2) times the amount of

time afforded similarly situated inmates to make calls on a conventional telephone;

     v.    TDOC shall ensure that all functions for which hearing inmates use the telephone system are available using telecommunications technology that is accessible to Deaf inmates;

    vi.    Videophone calls will be monitored and recorded on the same terms as TDOC monitors and records calls on conventional phones;

    vii.    TDOC shall not impose a charge or surcharge on inmates for using a videophone beyond amounts charged hearing inmates for using conventional telephones, including additional amounts based on the length of the calls; and

    viii.    Should any future technology such as, but not limited to, tablets expand the availability of phone service to hearing inmates, such technology will be deployed and used consistent with this Settlement Agreement.

8.     **MAINTENANCE OF EQUIPMENT AND TECHNOLOGY**

    a.    TDOC shall make reasonable efforts to maintain in working condition at all times all equipment and technology required by this Settlement Agreement and/or provided to Deaf inmates pursuant to an accommodation request.

    b.    TDOC shall make reasonable efforts to ensure its telecommunications vendor maintains sufficient speed, bandwidth, and quality to support videophone calls and other connectivity required by this Settlement Agreement and/or provided to Deaf

inmates pursuant to an accommodation request, and TDOC shall make reasonable efforts to maintain its internet connection to ensure the same for VRI.

c. TDOC shall attempt to resolve complaints about any malfunctioning equipment or connectivity within a reasonable time of receiving that complaint. In case of a malfunctioning videophone or VRI connection, TDOC shall notify the provider and request that repair be completed no later than two (2) business days after receiving the complaint.

d. If required equipment cannot be repaired to full working condition within two (2) business days, TDOC shall take reasonable steps to provide temporary alternative means of communication by Zoom with VRI interpreters available if needed during hours and on terms equivalent to conventional telephones until repairs can be accomplished.

9. **CLEAR FACE MASKS.**

Whenever protective masks are worn by TDOC staff who regularly interact with one or more Deaf inmates, including but not limited to staff assigned to a unit housing a Deaf inmate, such staff shall use clear face masks during communications with Deaf inmates.

10. **USE OF RESTRAINTS :**

TDOC will abide by TDOC Policy 113.95 (VI)(R).

11. **POLICIES AND TRAINING.**

a. If TDOC believes it is necessary to substantially alter or amend any of the policies controlled by this Settlement Agreement, including but not limited to Policy 113.95, in a manner that is inconsistent with terms of this Agreement, it shall meet

and confer with DRT before making any such changes. If following such conferral, the Parties cannot reach agreement on the proposed amendment(s), either Party may invoke the dispute resolution process set forth in paragraphs 14 and 15, below. Notwithstanding such conferral, the terms of this Settlement Agreement shall continue to bind the Parties unless and until the Settlement Agreement is amended in writing and signed by the Parties or modified by judicial resolution.

12. **INFORMATIONAL MATERIALS FOR DEAF INDIVIDUALS.**

An informational document for Deaf individuals, drafted by the Parties, is attached to this document as Exhibit B. TDOC shall make an accessible ASL version of Exhibit B available at no charge:

    a. to all known Deaf inmates within forty-five (45) days of the Effective Date of this Agreement;

    b. by posting in all living units, libraries, infirmaries, and intake areas;

    c. to all Deaf inmates in its custody upon request; and

    d. to all Deaf inmates in its custody during the intake process.

13. **IMPLEMENTATION PARTNERSHIP:**

    a. Within thirty (30) days of the effective date of this Agreement, TDOC will provide Plaintiffs with copies of all relevant training and any other implementation materials, if any, so that Plaintiffs can review and provide commentary. Any comments will be provided within thirty (30) days of receipt.

b. The parties will create a working group in order to discuss implementation of the agreement and share information. TDOC will designate its ADA Compliance Director and at least one representative from each TDOC facility that has a Deaf inmate to participate in the working group; DRT will designate at least two individuals to participate in the working group. Representatives of TDOC and DRT shall meet quarterly until the end of the term of this Agreement to discuss the implementation of this Agreement and the needs of Deaf inmates. The goal of this working group is to share information and develop relationships between the parties so as to efficiently address any issues that arise during the term of this Agreement.

c. At least one week prior to the quarterly working group meetings, TDOC will provide DRT with the following information:

- The names of TDOC and CoreCivic prisons that currently house deaf inmates.

- The names of the Deaf inmates at each facility.

- Any ADA grievances filed by Deaf inmates at each facility.

- The names of the TDOC and CoreCivic facilities that have videophones.

d. TDOC agrees to comply with DRT's P&A access authority pursuant to 42 U.S.C. § 794e(f)(2) (Protection and Advocacy of Individual Rights Act or "PAIR") and 29 U.S.C. § 3004(a)(2) (Assistive Technology for Individuals with Disabilities Act or "PAAT"), where such access does not interfere with the security or

operations of TDOC institutions or the safety of TDOC staff. In addition, TDOC

will take reasonable steps to ensure DRT has the same access to CoreCivic

facilities as it does to TDOC-run facilities.

14. **INFORMAL DISPUTE RESOLUTION:**

   a. Anytime during the term of this Settlement Agreement, if either party believes that a dispute exists relating to the performance or interpretation of this Settlement Agreement, it shall notify the other party in writing that it is invoking this dispute resolution process. Its notice shall describe the dispute in sufficient detail to enable the other party to conduct a meaningful investigation of the alleged dispute. Electronic notification by email is considered written notice.

   b. The other party shall respond in writing to such notice within thirty (30) days of receipt of the notice.

   c. Counsel for the Parties shall meet and confer regarding the dispute by telephone, video conference, or in person within ten (10) days of the transmittal of the response described in paragraph 14(b) to attempt to resolve the issue informally.

   d. If the Parties are unable to resolve the dispute through the informal process described in this paragraph 14, then either party may submit the dispute for judicial resolution in accordance with the terms of paragraph 15.

15. **JUDICIAL DISPUTE RESOLUTION:**

   a. If after completing the informal dispute resolution process in paragraph 14 of this Settlement Agreement, either party believes that the other party remains in breach

of the terms of this Settlement Agreement, that party may submit the dispute for resolution by the Court.

b. In resolving the dispute, the Court will apply Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

c. The Parties agree that the United States District Court for the Middle District of Tennessee shall retain continuing jurisdiction over any attempt to enforce this Settlement Agreement by either of the Parties.

d. Any party may move the United States District Court to enforce the Settlement Agreement, subject to the terms of paragraphs 14-15 of this Settlement Agreement.

e. Fees incurred for judicial dispute resolution shall be available pursuant to the standards in 42 U.S.C. § 12205 and the cases interpreting that provision including the fee-shifting standards in *Christiansburg Garment Co. v. Equal Employment Opportunity Commission*, 434 U.S. 412, 422 (1978). Costs incurred in judicial dispute resolution shall be awarded pursuant to Fed. R. Civ. P. 54(d)(1).

16. **FINAL APPROVAL:**

This Settlement Agreement shall be subject to the Final Approval of the appropriate state officials, pursuant to Tenn. Code Ann. § 20-13-103. Without the approval of the appropriate state officials, this Settlement Agreement shall be null and void and of no force and effect.

## 17.  DISMISSAL

The parties understand and agree that upon the Effective Date of this Settlement

Agreement this case will be administratively closed, however the Court will maintain

jurisdiction to reopen this civil action throughout the duration of the Settlement Agreement

to enforce the provisions of the Settlement Agreement and that the Plaintiffs' Counsel may

seek to reopen the case to enforce the Settlement Agreement, pursuant to paragraph 15,

*supra*. The parties also agree that, upon termination of the Settlement Agreement, they will

sign and submit a joint stipulation of dismissal with prejudice pursuant to Fed. R. Civ. P.

41(a), thereby ending the Court's jurisdiction over this case.

## 18.  TERM

The term of this Settlement Agreement shall be two (2) years from the date of the Effective

Date of this Agreement, provided that the dispute resolution mechanism in paragraphs 14

and 15 remain in force through the resolution of any disputes pending at the end of the

term.

## 19.  NOTICE TO PARTIES:

All notices required or permitted hereunder shall be in writing and shall be served on the

Parties at the email addresses set forth below. Either party may modify its notice recipients

by notifying the other party in writing and such modification does not require an

amendment to the Agreement.

| | |
|---|---|
| To Defendants | Jeffrey Cadle<br>jeffrey.cadle@ag.tn.gov |
| To Plaintiffs | Stacie Price<br>staciep@disabilityrightstn.org |
| | Shawna Parks<br>sparks@dralegal.og |

Amy Robertson
arob@foxrob.com

Albert Elia
aelia@creeclaw.org

**20.    NO ADMISSION OF LIABILITY:**

Neither this Settlement Agreement nor anything in this Settlement Agreement shall be deemed an admission or concession of liability or evidence respecting any liability on the part of TDOC or an admission that any of Plaintiffs' claims lack merit. Neither this Settlement Agreement nor any policies or procedures referenced herein shall define any state or federal constitutional rights.

**21.    DAMAGES**

TDOC will pay the following amounts to the following individuals:

Alex Gordon Stinnett, ███; Thomas White, ███; Lakeevious Owens, ███.

**22.    ATTORNEYS' FEES AND COSTS**

TDOC will pay Plaintiffs' Counsel a reasonable amount of attorneys' fees and costs in the amount of three million two hundred and fifty thousand dollars ($3,250,000) to be made out to Disability Rights Tennessee. DRT will distribute amounts to co-counsel as agreed upon by Plaintiffs' counsel in this matter.

DRT shall provide a Form W-9 to counsel for TDOC.

**23.    RELEASE**

a.  In consideration of the terms and conditions called for herein, the parties agree that this Agreement represents a full and fair resolution of the claims for declaratory and injunctive relief and related attorneys' fees on behalf of the Individual Plaintiffs and on behalf of DRT with respect to its Deaf constituents in

TDOC custody, as alleged in the Fourth Amended Complaint, Docket No. 148 in this Action. Plaintiffs release and completely and forever discharge TDOC, its agents, attorneys, servants, representatives, and employees, past and present, and their past, present, and future agents, attorneys, servants, representatives, and employees, of and from the claims for declaratory or injunctive relief and related attorneys' fees on behalf of the individual Plaintiffs and DRT with respect to its Deaf constituents within the custody of TDOC presented in the Fourth Amended Complaint, Docket No. 148, which have accrued as of the Effective Date or which accrue during the duration of this Settlement Agreement, and which relate to the subject matter of this Action.

b. In further consideration of the monetary payments called for herein, the parties agree that this Agreement represents a full and fair resolution of the claims for damages and related attorneys' fees alleged in the Fourth Amended Complaint, Docket No. 148 in this Action, on behalf of Alex Gordon Stinnett, Thomas White, Lakeevious Owens. Plaintiffs Alex Gordon Stinnett, Thomas White, Lakeevious Owens release and completely and forever discharge TDOC, its agents, attorneys, servants, representatives, and employees, past and present, and their past, present, and future agents, attorneys, servants, representatives, and employees, of and from the claims for damages presented in the Fourth Amended Complaint through the Effective Date of this Agreement.

## 24. <u>INTEGRATION CLAUSE</u>

The terms of this Settlement Agreement and its exhibits as written are the entire agreement and there are no other terms relied upon by the parties, verbal or otherwise.

**25.** <u>**COUNTERPARTS**</u>

This Settlement Agreement may be signed in multiple counterparts by fax or email and interchangeably executed. Such execution shall be valid and binding upon the parties and all counterparts when so executed and shall together be deemed one final original instrument. The parties may rely on fax or email copies or use electronically signed copies as if they were originals and such copies shall be equally admissible in evidence.

**26.** <u>**HEADINGS**</u>

The headings used throughout this Settlement Agreement are for convenience only and shall not be deemed to modify the meaning of any provisions of this Settlement Agreement.

**27.** <u>**WRITTEN MODIFICATION**</u>

As permitted by law, this Settlement Agreement may be modified only by a written instrument signed by all parties, with the exception of the notice recipients pursuant to Paragraph 19.

**28.** <u>**SEVERABILITY**</u>

If, for any reason, any provision of this Settlement Agreement is determined to be invalid or unenforceable, the remaining provisions of this Settlement Agreement shall be construed, performed, or enforced as if the invalidated or unenforceable provision had not been included in the text of the Agreement.

**29.** <u>**GOVERNING LAWS**</u>

This Settlement Agreement shall be governed by the laws of the State of Tennessee, except as provided in paragraph 15.

**30. <u>BINDING EFFECT</u>**

Except as provided elsewhere herein, this Settlement Agreement is binding upon the parties, and TDOC will ensure TDOC's respective agents, officers, directors, employees, and successors-in-interest regarding this action are aware of the requirements set by the Settlement Agreement and their responsibility to comply with those requirements as described in the Agreement

**31. <u>ADVICE OF COUNSEL</u>**

The parties acknowledge that each has carefully read the entire Settlement Agreement, has been given the opportunity to consult with and be advised by their attorney, and knows and understands the contents of this Settlement Agreement.

**32. <u>AMBIGUITIES</u>**

This Settlement Agreement has been reviewed by the parties and their respective attorneys, and the parties have had a full opportunity to negotiate the contents of this Settlement Agreement. The parties waive any common law or statutory rule of construction that ambiguities should be construed against the drafter(s) of this Settlement Agreement and agree that the language in all parts of this Settlement Agreement shall be in all cases construed as a whole, according to its fair and reasonable meaning.

**33. <u>JURISDICTION: DISPUTE RESOLUTION</u>**

The parties hereby consent to personal jurisdiction and venue in the United States District Court for the Middle District of Tennessee to resolve any dispute relating to the terms of the Settlement Agreement or the obligations of the parties under this Settlement Agreement. The Court shall be the sole forum for the enforcement of this Settlement

Agreement. Nothing in this paragraph shall limit the Parties' rights to challenge or appeal any finding or any order entered by the Court.

For Plaintiffs:

X _____    Dated: 1/6/2025
Alex Gordon Stinnett

X _____    Dated: 1/6/2025
Thomas White

_____    Dated: 1-6-25
Lakeevious Owens


_____    Dated: _____
Lisa Primm, Executive Director, Disability Rights Tennessee


For Defendant:

_____    Dated: 1-6-2025
Frank Strada, Commissioner, Tennessee Department of Correction


Approved as to Form:

Counsel for Plaintiffs:

_____    Dated: 1-6-25
Stacie Price, Disability Rights Tennessee


_____    Dated: _____
Albert Elia, Disability Law United


_____    Dated: _____
Shawna L. Parks, Disability Rights Advocates

Agreement. Nothing in this paragraph shall limit the Parties' rights to challenge or appeal any finding or any order entered by the Court.

For Plaintiffs:

_____     Dated: _____
Alex Gordon Stinnett

_____     Dated: _____
Thomas White

_____     Dated: _____
Lakeevious Owens

_____     Dated: Jan 06, 2025
Lisa Primm, Executive Director, Disability Rights Tennessee

For Defendant:

_____     Dated: _____
Frank Strada, Commissioner, Tennessee Department of Correction

Approved as to Form:

Counsel for Plaintiffs:

_____     Dated: _____
Stacie Price, Disability Rights Tennessee

_Albert Elia_                        Dated: Jan 06, 2025
Albert Elia, Disability Law United

_____     Dated: Jan 06, 2025
Shawna L. Parks, Disability Rights Advocates

Page 25 of 26

_____                      Dated: _1/6/25_
Amy Robertson, Fox & Robertson

Counsel for Defendant:

_____                      Dated: _1/6/25_
Jeffrey B. Cadle, Assistant Attorney General



ADMINISTRATIVE POLICIES
AND PROCEDURES
State of Tennessee
Department of Correction

Effective Date: August 26, 2022

Distribution: A

Supersedes: N/A

Approved by:

Subject: ACCOMMODATIONS FOR DEAF AND HARD OF HEARING INMATES

I. AUTHORITY: Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131-12134, TCA § 24-1-211 and 28 C.F.R. Part 35.

II. PURPOSE: To establish guidelines in accordance with Title II Americans with Disabilities Act (ADA) by taking reasonable steps to provide appropriate auxiliary aids and services to ensure effective communication where necessary to afford inmates with hearing disabilities an equal opportunity to participate in or benefit from the services, programs, and activities of TDOC.

III. APPLICATION: To all Tennessee Department of Correction (TDOC) employees and inmates under TDOC custody, including privately managed institutions, employees of Tennessee Rehabilitative Initiative in Correction (TRICOR), and all providers and recipients of departmental services including contract service providers.

IV. DEFINITIONS:

A. ADA Compliance Director: The TDOC central office employee designated to coordinate all of the TDOC's statewide efforts to comply with and carry out its responsibilities under Title II of the ADA. The TDOC employee who has the responsibility and authority to ensure that TDOC institutions are readily accessible to and usable by inmates with disabilities, provide inmates with disabilities equal opportunity to participate in and benefit from TDOCs services, programs and activities, including the provision of appropriate auxiliary aids and services to ensure effective communication, and ensure that inmate requests for accommodations, complaints, and grievances are addressed and resolved as set forth in this Policy.

B. American with Disabilities Act (ADA): The ADA is a federal civil rights law that prohibits discrimination against individuals with disabilities in all areas of public life, including jobs, schools, transportation, and all public and private places that are open to the general public. Title II of the ADA prohibits discrimination on the basis of disability in the services, programs, or activities of a public entity, like TDOC. It further provides that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity. The purpose of the law is to make sure that people with disabilities have the same rights and opportunities as everyone else.

C. American Sign Language (ASL): A complete, natural language that has the same linguistic properties as spoken languages, with grammar that differs from English. ASL is expressed by movements of the hands and face. It is the primary language of many North Americans who are deaf and hard of hearing and is used by many hearing people as well.

D. Auxiliary Aids and Services: Includes qualified sign language interpreters on-site or through video remote interpreting (VRI) services; note takers; computer-aided real-time transcription services (CART); written materials; exchange of written notes; telephone handset amplifiers;

**EXHIBIT A**

assistive listening devices; assistive listening systems; telephones compatible with hearing aids; closed caption decoders; open and closed captioning, including real-time captioning; voice, text, and video-based telecommunications products and systems, including text telephones (TTY), videophones, and captioned telephones, or equally effective telecommunications devices; videotext displays; accessible electronic and information technology; or other effective methods of making aurally delivered information available to individuals who are deaf, hard of hearing, or who have a speech disability.

E.  Disability: A physical or mental impairment that substantially limits one or more major life activities of an individual or a record of such an impairment. Individuals have "hearing disabilities" if they have a physical impairment that substantially limits their hearing, without regard to mitigating measures such as hearing aids or cochlear implants.

F.  Effective Communication: Communication with individuals who are deaf or hard of hearing that is as effective as communication with others. Effective communication is achieved by furnishing appropriate auxiliary aids and services where necessary to afford inmates with disabilities an equal opportunity to participate in or benefit from the services, programs, or activities of TDOC, unless to do so would result in a fundamental alteration in the nature of the service, program, or activity or would cause an undue financial and administrative burden.

G.  Institutional ADA Coordinator: The Associate Warden of Treatment (AWT)/Deputy Superintendent at TDOC institutions and the Assistant Warden of Treatment at privately managed facilities.

H.  Qualified Interpreter: A sign language interpreter who, via a video remote interpreting (VRI) service or an on-site appearance, is able to interpret effectively, accurately, and impartially, both receptively (i.e., understanding what the person with the disability is saying) and expressively (i.e., having the skill needed to convey information back to that person) using any necessary specialized vocabulary, given the deaf or hard of hearing individual's language, skills, and education. Qualified interpreters include, for example, sign language interpreters, oral transliterators, and cued-language transliterators.

I.  Text Telephone/Teletype Terminal/Teletypewriter (TTY): A device that allows individuals with hearing disabilities to use a telephone to type and send text messages.

J.  Telecommunications Relay Service (TRS): An operator service that allows individuals with hearing disabilities to place call to standard telephone users via keyboard or assistive device.

K.  Videophone: A telephone with a camera and screen for visual, real-time communication.

L.  Video Relay Service (VRS): A telephone service for individuals who are deaf and use American Sign Language and have videophones, smart phones, or computers with video communication capabilities. VRS uses interpreters connected to callers by video hook-up and provides services that are functionally equivalent to those provided to users who are hearing. For outgoing calls, the inmate contacts the VRS interpreter, who places the call and serves as an intermediary between the inmate and a person using a standard voice telephone; the interpreter tells the telephone user what the inmate is signing and signs to the inmate what the telephone user is saying.

M.  Video Remote Interpreting (VRI): An interpreting service that uses video conference technology over dedicated lines or wireless technology offering high-speed, wide-bandwidth video connection that delivers high-quality video images.

V. POLICY: The TDOC will not discriminate against or exclude inmates with disabilities from participating in or deny them the benefits of the TDOC's programs, services, or activities, including, but not limited to, telephones, housing, education, vocation, recreation, and religious services programs and activities.

VI. PROCEDURES:

A. All institutions will provide appropriate auxiliary aids and services for deaf and hard of hearing inmates to ensure effective communication and the equal opportunity to participate in and benefit from TDOC's services, programs, and activities.

B. Institutional ADA Coordinator: The AWT/Deputy Superintendent (DS) at each TDOC institution is the designated ADA Coordinator for their institution. Each AWT/DS is responsible for coordinating requests for reasonable modifications and auxiliary aids and services for inmates with disabilities. Additionally, as Institutional ADA Coordinators the AWTs/DSs are responsible for the following:

1. Maintaining records of inmate requests for auxiliary aids and services, as well as the auxiliary aids and services provided with or without a specific inmate request.

2. Act affirmatively and take appropriate steps to assess the potential needs of an inmate with a known disability, regardless of whether or not the inmate has made a specific request for an accommodation.

3. Conduct individualized reviews regarding the type of action that is required to accommodate inmates with hearing disabilities and conduct ongoing reviews to ensure that an inmate's disability related needs are being met.

4. Investigate any inmate ADA grievance or complaint, that is communicated to the TDOC.

5. Maintain records of inmate ADA complaints and their resolution.

6. Ensure that other departments within TDOC are notified of the inmate's hearing disability and need for auxiliary aids and services.

7. Coordinate with and provide pertinent and/or requested information to the ADA Compliance Director to ensure the institution is in compliance with Title II of the ADA.

C. Identification of Deaf or Hard of Hearing Inmates: During the intake process, inmates with hearing disabilities must be offered a special ID card which provides notice of the disability and the inmates' preferred auxiliary aids and services to all employees having contact with the inmate. The names of those inmates requiring auxiliary aids and services will be documented and reported to the Institutional ADA Coordinator immediately. Inmates may refuse to accept a special ID card. If an inmate does not want this special ID card, the refusal must be documented in writing and signed by the inmate. The waiver of the special ID card does not waive the inmate's right and/or access to eligible services. This special ID card will not be treated as confidential medical information.

D. Provision of Auxiliary Aids and Services: All institutions must provide appropriate auxiliary aids and services, including qualified interpreters, to inmates who have a hearing disability when such aids and services are necessary to ensure effective communication. Determination of appropriate auxiliary aids and services, as well as the timing and manner in which provided,

Case 3:20-cv-00276 Document 278-1 Filed 03/04/25 Page 31 of 39 PageID #: 5248

depends on the nature, length, complexity, and context of the communication and the inmate's normal method of communication. Primary consideration is to be given to the expressed choice of the inmate with a disability and the institution must honor the choice of the inmate unless it can demonstrate that another effective means of communication exists.

1.  The activities, services, and programs which require the provision of appropriate auxiliary aids and services, include, but are not limited to, the following:

    a.  Intake, including transfers between institutions.

    b.  Orientation.

    c.  Classification.

    d.  Critical communications which involve complex information, lengthy exchanges, or anything involving legal due process.

    e.  Medical care, health programs and services, including, but not limited to, physicals, medical screenings, and treatments, dental, visual, and/or mental health examinations or treatment, and drug and alcohol recovery services.

    f.  Counseling or psychological services.

    g.  Educational and vocational programming, including any programming required for parole or early-release.

    h.  Due process hearings, including, but not limited to, disciplinary hearings and hearings in which the inmate is a witness.

    i.  Classification review interviews.

    j.  Grievance interviews and processes.

    k.  Religious services.

    l.  Non-criminal investigations conducted by the institution or OIC.

    m.  Pre-release instructions.

    n.  All communications regarding PREA.

E.  Qualified Interpreters for TDOC Programs, Services and Activities:

    1.  When a sign language interpreter is required to ensure effective communication with an inmate, the interpreter provided must be qualified, as defined above in Section IV.(H.) of this Policy.

    2.  On-site sign language interpreter services are required when VRI is not available or the use of VRI is not feasible or does not result in effective communication, such as where

the inmate is unable to clearly see the video monitor (for example, due to vision difficulties or because the video monitor is out of the inmate's sightline), where the signal is interrupted causing unnatural pauses in communication, or where the image is grainy or otherwise unclear.

F.  **Procedure for Requesting and Documenting Qualified Interpreter:**

The Institutional ADA Coordinator at each institution must contact the Director of Contract Administration at Central Office to request interpreter services. Requests must be made at least 48 hours in advance and the following information must be provided:

a.  Inmate First/Last Name

b.  TOMIS ID of the inmate

c.  Purpose of the appointment

d.  Date and Time of the appointment

e.  Length of time expected for interpreter services. Interpreter services are scheduled for a maximum two-hour time period. If the requested interpreter services are expected to exceed two-hours, more than one interpreter will be scheduled.

f.  Location, including the street address.

1.  A qualified interpreter must be requested and provided at the earliest reasonable time. The activity, service, or program may be delayed until the interpreter is made available, or the inmate may elect to delay his or her participation in the activity, service, or program until the interpreter is available, except in situations or circumstances involving an emergency.

2.  Until a qualified interpreter is present, the institution must use the most effective, readily available means of communicating with the inmate. The institution must inform the inmate of the current status of efforts being taken to secure a qualified interpreter and provide supplemental updates to the inmate as necessary until an interpreter is secured. Notification efforts to secure a qualified interpreter does not lessen the institution's obligation to provide qualified interpreters in a timely manner.

G.  **Institutional Intake:** A qualified interpreter or other auxiliary aids and services must be provided for deaf and hard of hearing inmates to understand and complete the intake process. If, prior to intake, the institution is not aware that an inmate will require an interpreter or other auxiliary aid to ensure effective communication, the nursing supervisor must immediately notify the Institutional ADA Coordinator or designee when a deaf or hard of hearing inmate is received for intake. If a qualified interpreter is needed to effectively communicate with the inmate, the Institutional ADA Coordinator or designee must immediately request a qualified interpreter, either in person in accordance with Section VI(F) of this Policy, or by videophone or VRI.

H.  **Orientation/Classification Assignment and Hearing:** Inmates must be provided with information relative to Title II of the ADA during their orientation. Information will also be

included in the inmate and visitor handbooks. Notices regarding Title II requirements and complaint procedures will be posted in the inmate living areas and in visitation areas. The Institutional ADA Coordinator will conduct a structural interview with the inmate explaining classification procedures through a qualified interpreter, if necessary, to achieve effective communication, and provide an explanation of the sentence structure. The Institutional ADA Coordinator will conduct all classification hearings through a qualified interpreter, if necessary, to achieve effective communication, and provide the inmate with an explanation of the results of the hearing and the recommendations made during the hearing. A written report thoroughly documenting these communications must be placed in the inmates' institutional file and must include the name of the interpreter used. If an interpreter was not used the written report must contain an explanation for why no interpreter was used.

I.    Medical/Mental Health Staff:  If a qualified interpreter is needed to effectively communicate with an inmate for a medical appointment, the Institutional ADA Coordinator must request a qualified interpreter when notified that a medical appointment has been scheduled. No inmate shall ever be used to interpret for another inmate in matters dealing with inmate health care. The Institutional ADA Coordinator must place a written report in the inmates' medical file documenting all communications relating to inmate healthcare and must include name of the qualified interpreter used.

J.    Disciplinary Procedures:  If a qualified interpreter is needed to effectively communicate with an inmate, the Institutional ADA Coordinator must request a qualified interpreter to discuss his/her case prior to the hearing and throughout the hearing process up to and including appeals. Inmates shall never be used as interpreters at disciplinary hearings. The name of the qualified interpreter must be documented in the disciplinary report.

K.    Grievance Procedures:  If a qualified interpreter is needed to effectively communicate with an inmate, the Institutional ADA Coordinator must request a qualified interpreter to assist in the submission of grievances or in order to discuss his/her case prior to the hearing and throughout the hearing process up to and including appeals. The name of the qualified interpreter must be documented on Inmate Grievance, CR-1394 (See Policy #501.01). The Institutional ADA Coordinator must investigate the complaint according to the procedures outlined in TDOC Policy #501.01 and provide written notice to the inmate of the disposition of the complaint.

L.    Grievance Procedures for ADA Complaints:  Any inmate alleging discrimination based on disability covered by Title II of the ADA may file a complaint with the TDOC in accordance with Policy #501.01.

M.    Parole Hearings:  The Institutional ADA Coordinator will notify the Institutional Probation/Parole Specialist (IPPS) when an inmate with a hearing disability is scheduled to meet the parole board. The Institutional ADA Coordinator will ensure that a qualified interpreter is requested and provided for the parole hearing.

N.    Housing Assignments:  Unit management staff shall monitor the housing assignments of all inmates with a hearing disability and ensure that the appropriate auxiliary aids and services are provided.

O.    Use of Other Inmates to Facilitate Communication:  Institutions cannot require an individual with a hearing disability to bring another inmate to interpret for him or her. Institutions will not use another inmate to interpret unless:

    1.    The individual with the hearing disability specifically requests such assistance from another inmate, the inmate agrees, and reliance on that inmate is appropriate under the circumstances; or

    2.    In an emergency involving an imminent threat to the safety or welfare of an individual or the public where there is no interpreter available.

P.    Use of TDOC Employees to Facilitate Communication:    Except for individuals hired specifically to serve as qualified sign language interpreters, the TDOC will not use any of its officers or employees to serve as sign language interpreters unless there is an emergency involving an imminent threat to the safety or welfare of an individual or the public where there is no interpreter available.

Q.    Medical Devices: TDOC will provide deaf and/or hard of hearing inmates with an effective visual or other notification system so that inmates who have a hearing disability do not miss announcements, alarms, or other auditory information, including times for meals, recreation, education, work assignments, and other events. Any personal devices, including but not limited to, hearing aids, cochlear processor batteries or a watch for alerts, must be deemed medically necessary and approved in the same manner as durable medical equipment pursuant to TDOC Policy 113.08.

R.    Handcuffing: In circumstances that reasonably require an inmate to be able to communicate, an inmate who has a hearing disability must be cuffed or restrained in a manner that allows for effective communication (i.e., cuffing inmates in the front so they can sign or have one hand free to write) unless legitimate safety concerns dictate otherwise. All incidences which involve non-routine handcuffing of deaf and hard of hearing inmates must be documented in the incident report. If an inmate who is deaf or hard of hearing is cuffed or restrained in a manner that does not allow for effective communication, then a written explanation of the legitimate safety concerns must be documented in an incident report.

S.    Privacy: Telephone calls involving hearing disabled inmates' use of a videophone, TTY, or a telephone with volume control must be equal to the privacy afforded to other inmates' telephone calls.

T.    Television Programming: Inmates who have a hearing disability must have equal access to captioned television programming as other inmates in the same classification level have to television programming.

U.    Training: All TDOC employees who have contact with inmates must complete training as to effective communication with inmates who have a hearing disability. All new TDOC employees who will have contact with inmates will receive this training as part of their Correctional Officer Basic Training. Current employees must receive this training during their annual in-service. Additionally, sub-recipients must provide ADA training to their staff. This training may be administered by the use of lesson plans and/or outlines. Training will be reviewed and approved by TDOC annually.

V.    The TDOC will monitor compliance with the Title II of the ADA through the following:

    1.    The annual inspection process.

    2.    The collection and review of data concerning compliance.

      W.     Notice of available auxiliary aids and services for inmates with a hearing disability must be clearly posted at the main entrance to the institution, intake, visitation galleries, the inmate library and inmate housing units.

VII.   APPLICABLE FORMS: CR-1394 (Rev. 3-00).

VIII.  ACA STANDARDS: 5-ACI-2F-03, 5-ACI-3D-04, and 5-ACI-5E-2.

IX.   EXPIRATION DATE: August 26, 2025



# TENNESSEE DEPARTMENT OF CORRECTION
## INMATE GRIEVANCE

_____     _____     _____
NAME                              NUMBER                 INSTITUTION & UNIT

DESCRIPTION OF PROBLEM: _____

_____

_____

REQUESTED SOLUTION: _____

_____

_____

_____

_____                    _____
Signature of Grievant                             Date

_____

*TO BE COMPLETED BY GRIEVANCE CLERK*

_____     _____     _____
Grievance Number                 Date Received           Signature Of Grievance Clerk

INMATE GRIEVANCE COMMITTEE'S RESPONSE DUE DATE: _____

AUTHORIZED EXTENSION: _____     _____
                              New Due Date                  Signature of Grievant

_____

**INMATE GRIEVANCE RESPONSE**

Summary of Supervisor's Response/Evidence: _____

_____

_____

Chairperson's Response and Reason(s): _____

_____

_____

DATE: _____     CHAIRPERSON: _____

Do you wish to appeal this response?        _____ YES        _____ NO

If yes:   Sign, date, and return to chairman for processing within five (5) days of receipt of first-level response.

_____     _____     _____
GRIEVANT                          DATE                   WITNESS

Distribution Upon Final Resolution:
    White - Inmate Grievant    Canary – Warden    Pink – Grievance Committee    Goldenrod – Commissioner (if applicable)

CR-1394 (Rev. 3-00)                        Page 1 of 2                          RDA 2244



**TENNESSEE DEPARTMENT OF CORRECTION**

**INMATE GRIEVANCE**     **(continuation sheet)**

DESCRIPTION OF PROBLEM: _____

Distribution Upon Final Resolution:

   White - Inmate Grievant    Canary – Warden    Pink – Grievance Committee    Goldenrod – Commissioner (if applicable)

CR-1394 (Rev. 3-00)                Page 2 of 2               RDA 2244

# DEAF? Accommodations & resources are available for you.

| | |
|---|---|
| **INTERPRETERS**  | You can request a sign language interpreter at any time for any of the following:<br>    ○ When you first get to prison (intake, orientation, classification)<br>    ○ Long communications<br>    ○ Medical, dental, vision, and mental health care<br>    ○ Drug and alcohol recovery services<br>    ○ School and job programming<br>    ○ Discipline and due process hearings<br>    ○ Grievance interviews and processes<br>    ○ Religious Services<br>    ○ Communications regarding PREA<br>    ○ Parole hearings<br>    ○ Pre-release instructions<br><br>TDOC will attempt to provide an in-person interpreter when you ask for one at least two business days before you need one. With less than two business days' notice, or when an in-person interpreter is not available, TDOC may provide a remote interpreter (interpreter on screen). You can also request an interpreter for other things. TDOC will review your request.<br><br>You may request an interpreter in another sign language such as Black American Sign Language or Mexican Sign Language. |
| **VIDEOPHONES** | TDOC will provide deaf prisoners with access to videophones in the same manner that hearing inmates have access to the conventional telephones. |
| **NOTIFICATION OF ANNOUNCEMENTS AND ALARMS** | TDOC will provide a way for deaf prisoners to be notified when prison staff make verbal announcements. That way, deaf prisoners will not miss announcements, alarms, or other information, including times for meals, recreation, education, work assignments, and other events. |
| **RESTRAINTS** | TDOC will cuff or restrain Deaf inmates in a manner that allows for effective communication unless legitimate safety concerns dictate otherwise. |
| **HEARING EXAMS** | You can ask TDOC to have a hearing exam any time during your sentence.<br><br>If you are over the age of 65, you will be screened every three years.<br><br>If you have a history of risk for hearing loss, you will be screened every two years. |
| **CLEAR FACE MASKS** | TDOC staff will use clear face masks when communicating with deaf prisoners. |
| **OTHER** | You may request other things that you need. This is called requesting an accommodation. If TDOC denies an accommodation, they must tell you why.<br><br>When you transfer to another facility, you get to keep the same accommodations unless they are a security risk. |

# EXHIBIT B